UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

BENJAMIN WEY and
SEREF DOĞAN ERBEK,

Defendants.

Crim. Action No.: 15-CR-00611 (AJN)

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT BENJAMIN WEY'S MOTION TO SUPPRESS,
TO DISMISS THE INDICTMENT, AND FOR OTHER RELIEF**

**HAYNES AND BOONE, LLP**
**30 Rockefeller Plaza**
**New York, New York 10012**
**(212) 659-7300**
*Attorneys for Defendant Benjamin Wey*

15742826_10

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 6

    1.    Background ................................................................................................ 6

        A.    Mr. Wey's Personal, Educational and Professional Background ................. 6

        B.    Formation of the NYGG Brand .................................................... 7

        C.    The Rise of the Chinese Economy and NYGG's Business ........................... 8

        D.    SmartHeat, Inc., Deer Consumer Products, Inc., and CleanTech Innovations, Inc. ...................................................................................... 9

        E.    The Investigation Begins, and the Search of the NYGG Office ................. 10

    2.    The Investigation ......................................................................................... 10

        A.    The Application and Supporting Affidavit to Search The NYGG Office .... 10

            (1)    Probable Cause ........................................................................ 10

            (2)    Specifying documents to be seized .................................................. 17

        B.    The Warrant to Search The NYGG Office .................................................. 20

        C.    The Execution of the Search of the NYGG Office ..................................... 21

        D.    The Apartment Search Warrant and Supporting Affidavit ........................... 21

        E.    The Execution of the Search of the Apartment ........................................... 23

        F.    After The Searches ..................................................................................... 24

    3.    The Indictment and Surrounding Publicity .............................................. 25

ARGUMENT ...................................................................................................................... 27

I.    THE SEARCH WARRANTS ARE OVERLY BROAD AND UNREASONABLE "GENERAL WARRANTS" ................................................................................... 27

    A.    Fourth Amendment Requirements ............................................................... 28

    B.    The Warrants Fail to Describe with Particularity the Items To Be Seized .............. 30

  C. The Lists of Items To Be Seized Are Overbroad and Lack Probable Cause ........... 35

II. NO PROBABLE CAUSE EXISTED TO SUPPORT THE WARRANTS, BECAUSE THE SUPPORTING AFFIDAVIT WAS MATERIALLY MISLEADING ..................... 37

  A. NASDAQ Was Not Defrauded Regarding Issuers' Listing Qualifications ............. 39

  B. Agent Komar's Claims of Market Manipulation Are Misleading .......................... 43

   (1) Deer and SmartHeat's Stock Price Rise is Not "Unexplained" .................. 43

   (2) Agent Komar's Selective and Misleading Assertions of Manipulation ....... 46

  C. No Currency Transaction Reporting Requirements Were Evaded .......................... 48

  D. Other Portions of Agent Komar's Affidavit Fail to Establish Probable Cause to Search. ....................................................................................................................... 49

  E. At the Very Least, The Court Should Hold a Hearing Pursuant to *Franks v. Delaware* ................................................................................................................... 51

III. THE GOVERNMENT'S FOUR-YEAR RETENTION OF NEARLY EVERY FILE SEIZED CONSTITUTES AN UNREASONABLE SEARCH AND SEIZURE IN VIOLATION OF MR. WEY'S FOURTH AMENDMENT RIGHTS .............................. 53

IV. THE GOVERNMENT SHOULD BE COMPELLED TO DISCLOSE ITS TAINT PROCESS, AND SHOULD BE PROHIBITED FROM REVIEWING PRIVILEGED OR POTENTIALLY PRIVILEGED DOCUMENTS ............................................................... 59

V. THE CHARGES SHOULD BE DISMISSED ................................................... 63

  A. Counts One, Two, Three, Four, Seven, and Eight are Duplicitous ......................... 64

  B. Counts Two Through Six Must be Dismissed ........................................................ 67

   (1) Count Two Fails to Allege any Deceptive Act ........................................... 68

   (2) Count Three Fails to State an Offense ......................................................... 70

   (3) Count Four Should Be Dismissed For Failure to Allege Wire Fraud .......... 73

   (4) Counts Five and Six Should Be Dismissed Because the Indictment Fails to Allege Willfulness ................................................................................ 73

  C. Counts One, Seven and Eight Also Fail .................................................................. 76

  D. The Government's Prejudicial Pre-Indictment Delay Requires Dismissal of the Indictment. ............................................................................................................... 79

VI.   MR. WEY SHOULD BE PERMITTED TO TAKE A PRE-TRIAL DEPOSITION OF
      CO-DEFENDANT SEREF DOĞAN ERBEK PURSUANT TO RULE 15.......................82

      A.   Mr. Erbek Will Offer Material, Non-Cumulative Exculpatory Testimony
           Unattainable From Any Other Source........................................................................84

      B.   Mr. Erbek Is Unavailable to Testify in the United States........................................87

      C.   Mr. Erbek's Testimony Is Necessary to Prevent a Failure of Justice.......................87

VII.  THE INDICTMENT SHOULD BE STRIPPED OF ALL REFERENCES TO MR.
      WEY'S "A/K/AS"...........................................................................................................88

CONCLUSION...........................................................................................................................91

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Gant,*
    556 U.S. 332 (2009)..................................................................................................28

*Bryan v. United States,*
    524 U.S. 184 (1998)..................................................................................................74

*Calderon v. City of New York,*
    14-Civ-1082, 2015 WL 5802483 (S.D.N.Y. Oct. 5, 2015)....................................43

*Cheek v. United States,*
    498 U.S. 192 (1991)..................................................................................................76

*Chemical Bank v. Arthur Andersen & Co.,*
    726 F.2d 930 (2d Cir. 1984).....................................................................................69

*Coolidge v. New Hampshire,*
    403 U.S. 443 (1971)..................................................................................................28

*Doane v. United States,*
    08-CR-0017, 2009 WL 1619642 (S.D.N.Y. June 5, 2009) ....................................54

*Doggett v. United States,*
    505 U.S. 647 (1992)..................................................................................................81

*Franks v. Delaware,*
    438 U.S. 154 (1978)................................................................................38, 43, 52

*Groh v. Ramirez,*
    540 U.S. 551 (2004)..................................................................................................32

*Herring v. United States,*
    555 U.S. 135 (2009)..................................................................................................29

*Klitzman v. Krut,*
    744 F.2d 955 (3d Cir. 1984).....................................................................................37

*Kyloo v. United States,*
    533 U.S. 27 (2001)....................................................................................................54

*Maryland v. Garrison,*
    480 U.S. 79 (1987)....................................................................................................28

*Russell v. United States*,
    369 U.S. 749 (1962)...................................................................................68

*Schurman v. Leonardo*,
    768 F. Supp. 993 (S.D.N.Y. 1991)........................................................80

*In re Search Warrant for Law Offices Executed on March 19, 1992*,
    153 F.R.D. 55 (S.D.N.Y. 1994) ..............................................................62

*SEC v. China Energy Savings Technology*,
    No. 06 Cv. 6402 (E.D.N.Y.) ....................................................................41

*State v. Lenarz*,
    22 A.3d 536 (Conn. 2011) .......................................................................61

*United States v. Polizzi*,
    06-CR-22, 257 F.R.D. 33 (E.D.N.Y. 2009) ...........................................64

*United Mun. Distributors Group v. F.E.R.C.*,
    732 F.2d 202 (D.C. Cir. 1984)................................................................41

*United States v. Abdellatif*,
    758 F. Supp. 2d (E.D.N.Y. 2010) ...........................................................54

*United States v. Alfonso*,
    143 F.3d 772 (2d Cir. 1998)...................................................................68

*United States v. Allen*,
    09-CR-329, 2014 WL 1745933 (W.D.N.Y. Apr. 30, 2014)...................89

*United States v. Barnes*,
    13-CR-387, 2013 U.S. Dist. LEXIS 189631 (S.D.N.Y. Oct. 21, 2013) ..........................28, 29

*United States v. Berlin*,
    472 F.2d 1002 (2d Cir.1973)...................................................................68

*United States v. Bershchansky*,
    788 F.3d 102 (2d Cir. 2015)....................................................................29

*United States v. Bin Laden*,
    No. 98 CR. 1023, 2000 U.S. Dist. LEXIS 18957 (S.D.N.Y. 2000)........29

*United States v. Buck*,
    813 F.2d 588 (2d Cir. 1987)..............................................................28, 31

*United States v. Burke*,
    718 F. Supp. 1130 (S.D.N.Y. 1989)........................................................37

*United States v. Calandra*,
  414 U.S. 338 (1974)......................................................................................29

*United States v. Chacko*,
  169 F.3d 140 (2d Cir. 1999)...........................................................................64

*United States v. Cioffi*,
  668 F. Supp. 2d 385 (E.D.N.Y. 2009) ...............................................29, 34, 54

*United States v. Clark*,
  541 F.2d 1016 (4th Cir. 1976) .......................................................................89

*United States v. Cohen*,
  260 F.3d 68 (2d Cir. 2001)..............................................................................83

*United States v. Comprehensive Drug Testing, Inc.*,
  621 F.3d 1162 (9th Cir. 2010) ................................................................ *passim*

*United States v. Coplan*,
  703 F.3d 46 (2d Cir. 2012)........................................................................77, 78

*United States v. Costin*,
  5-CR-38, 2006 WL 2522377 (D. Conn. July 31, 2006) ................................34

*United States v. D'Alessio*,
  822 F. Supp. 1134 (D.N.J. 1993) ...................................................................78

*United States v. D'Amato*,
  39 F.3d 1249 (2d Cir. 1994)............................................................................71

*United States v. Davis*,
  94-CR-381, 1995 WL 608464 (E.D. La. Oct. 13, 1995) ...............................90

*United States v. Debbi*,
  02-CR-808, 2003 WL 1922928 (S.D.N.Y. Mar. 31, 2003) ...........................57

*United States v. Debbi*,
  244 F. Supp. 2d 235 (S.D.N.Y. 2003)........................................................55, 57

*United States v. Dinero Express, Inc.*,
  99-CR-975, 2000 WL 254012, (S.D.N.Y. Jan. 6, 2010) ...............................35

*United States v. Dixon*,
  536 F.2d 1388 (2d Cir. 1976)..........................................................................75

*United States v. Eisenminger*,
  16 F.2d 816 (D. Del. 1926).............................................................................78

*United States v. Elsbery*,
    602 F.2d 1054 (2d Cir. 1979)..............................................................................81

*United States v. Finn*,
    919 F. Supp. 1305 (D. Minn. 1995)............................................................... 78-79

*United States v. Finnerty*,
    533 F.3d 143 (2d Cir. 2008)......................................................................69, 70

*United States v. Galpin*,
    720 F.3d 436 (2d Cir. 2013)................................................................... *passim*

*United States v. Ganias* (*Ganias I*),
    755 F.3d 125 (2d Cir. 2014) *rehearing en banc*,
    12-240 (2d Cir. May 27, 2016) .............................................................. *passim*

*United States v. Ganias* (*Ganias II*),
    12-240 (2d Cir. May 27, 2016) .............................................................. *passim*

*United States v. Garcia-Zambrano*,
    06-CR-00172, 2007 WL 108396 (D. Colo. Jan. 10, 2007)....................................52

*United States v. Geibel*,
    369 F.3d 682 (2d Cir.2004)......................................................................77

*United States v. George*,
    386 F.3d 383 (2d Cir. 2004)......................................................................75

*United States v. George*,
    975 F.2d 72 (2d Cir. 1992).............................................................30, 31, 37

*United States v. Goyal*,
    629 F.3d 912 (9th Cir. 2010) ...............................................................75, 76

*United States v. Grant*,
    14-CR-391, 2015 WL 321586 (N.D. Tex. Jan. 26, 2015) .....................................90

*United States v. Gross*,
    165 F. Supp. 2d 372 (E.D.N.Y. 2001) .............................................80, 81, 82

*United States v. Grossman*,
    03-CR-1156, 2005 WL 486735 (S.D.N.Y. Mar. 2, 2005) .....................................84

*United States v. Hernandez*,
    09-CR-625, 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010) .........................29, 34, 35, 36

*United States v. Hoo*,
    825 F.2d 667 (2d Cir. 1987).......................................................................82

*United States v. Jackson*,
   488 F. Supp. 2d 866 (D. Neb. 2007)....................................................................80, 82, 83

*United States v. Johnpoll*,
   739 F.2d 702 (2d Cir. 1984)................................................................................83, 87

*United States v. Johns*,
   851 F.2d 1131 (9th Cir. 1988) ....................................................................................52

*United States v. Josephberg*,
   562 F.3d 478 (2d Cir. 2009).........................................................................................76

*United States v. Kapelioujnyj*,
   547 F.3d 149 (2d Cir. 2008)..................................................................................77, 78

*United States v. Kaplan*,
   02-CR-883, 2003 U.S. Dist. LEXIS 21825 (S.D.N.Y. Dec. 8, 2003) ....................62

*United States v. Kassir*,
   04-CR-356, 2009 WL 995139 (S.D.N.Y. Apr. 9, 2009).........................................91

*United States v. Kearney*,
   451 F. Supp. 33 (S.D.N.Y. 1978)..............................................................................66

*United States v. Labate*,
   100-CR-632, 2001 WL 533714 (S.D.N.Y. May 18, 2001) ......................................67

*United States v. Landham*,
   251 F.3d 1072 (6th Cir. 2001) ...................................................................................73

*United States v. Leary*,
   846 F.2d 592 (10th Cir.1988) ....................................................................................32

*United States v. Leon*,
   468 U.S. 897 (1984)......................................................................................37, 48, 56

*United States v. Levy*,
   577 F.2d 200 (3d Cir. 1978)........................................................................................61

*United States v. Lovasco*,
   431 U.S. 783 (1977)..............................................................................................80, 81, 82

*United States v. Malachowski*,
   604 F. Supp. 2d 512 (N.D.N.Y. 2009) ......................................................................89

*United States v. Males*,
   459 F.3d 154 (2d Cir. 2006).......................................................................................70

*United States v. Mandell*,
  752 F.3d 544 (2d Cir. 2014).................................................................38

*United States v. Marion*,
  404 U.S. 307 (1971)..................................................................79, 80

*United States v. Mattice*,
  186 F.3d 219 (2d Cir. 1999)...............................................................75

*United States v. McKeeve*,
  131 F.3d 1 (1st Cir. 1997)..................................................................88

*United States v. McMurtrey*,
  704 F.3d 502 (7th Cir. 2013) ............................................................52

*United States v. Metter*,
  860 F. Supp. 2d 205 (E.D.N.Y. 2012) ...............................54, 55, 57, 58

*United States v. Montour*,
  944 F.2d 1019 (2d Cir.1991).............................................................77

*United States v. Moon*,
  93 F.R.D. 558 (S.D.N.Y. 1982) .........................................................87

*United States v. Morrison*,
  518 F. Supp. 917 (S.D.N.Y. 1981)......................................................81

*United States v. Mostafa*,
  14 F. Supp. 3d 515, 522 (S.D.N.Y. 2014)............................................87

*United States v. Mulder*,
  273 F.3d 91 (2d Cir. 2001)................................................................89

*United States v. Mulheren*,
  938 F.2d 364 (2d Cir. 1991)..............................................................72

*United States v. Novak*,
  443 F.3d 150 (2d Cir. 2006)..............................................................71

*United States v. Pham*,
  12-CR-423, 2015 WL 7871348 (S.D.N.Y. Dec. 4, 2015) ......................84

*United States v. Pinckney*,
  85 F.3d 4 (2d Cir. 1996)...................................................................77

*United States v. Pirro*,
  212 F.3d 86 (2d Cir. 2000)................................................................68

*United States v. Rahseparian*,
  231 F.3d 1257 (10th Cir. 2000) ....................................................................78

*United States v. Ramos*,
  839 F. Supp. 781 (D. Kan. 1993) ............................................................89, 90

*United States v. Reed*,
  639 F.2d 896 (2d Cir. 1981)................................................................... 64-65

*United States v. Regent Office Supply Co.*,
  421 F.2d 1174 (2d Cir. 1970)...............................................................72

*United States v. Reyes*,
  922 F. Supp. 818 (E.D.N.Y. 1996) ....................................................................51

*United States v. Riley*,
  906 F.2d 841 (2d Cir. 1990)...............................................................31

*United States v. Roche*,
  614 F.2d 6 (1st Cir.1980).....................................................................32

*United States v. Rosa*,
  626 F.3d 56 (2d Cir. 2010)...............................................................32, 37

*United States v. Santiago*,
  987 F. Supp. 2d 465 (S.D.N.Y. 2013)............................................................79, 80

*United States v. Scarpa*,
  913 F.2d 993 (2d Cir. 1990)...............................................................81

*United States v. Schlisser*,
  168 Fed. App'x 483 (2d Cir. 2006)............................................................74, 75

*United States v. Shi Yan Liu*,
  239 F.3d 138 (2d Cir. 2000)...............................................................31

*United States v. Soliman*,
  06-CR-236, 2008 WL 4757300 (W.D.N.Y. Oct. 29, 2008) ..................................54

*United States v. Starks*,
  515 F.2d 112 (3d Cir. 1975)...............................................................65

*United States v. Starr*,
  816 F.2d 94 (2d Cir. 1987)................................................. 70-71, 72, 73

*United States v. Stewart*,
  305 F. Supp. 2d 368 (S.D.N.Y. 2004).............................................................75

*United States v. Sturdivant*,
   244 F.3d 71 (2d Cir. 2001)............................................................................64, 65, 66

*United States v. Switzer*,
   252 F.2d 139 (2d Cir. 1958)........................................................................................77

*United States v. Tamura*,
   694 F.2d 591 (9th Cir.1982) ..............................................................................54, 55

*United States v. Vilar*,
   05-CR-621, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007).........................31, 34, 37

*United States v. Vilar*,
   568 F. Supp. 2d 429 (S.D.N.Y. 2008) ..............................................83, 84, 87, 88

*United States v. Wagner*,
   989 F.2d 69 (2d Cir. 1993)........................................................................................51

*United States v. Walsh*,
   194 F.3d 37 (2d Cir.1999).........................................................................................67

*United States v. Webb*,
   24 F. Supp. 3d 432 (M.D. Pa. 2014) .......................................................................73

*United States v. Westover*,
   812 F. Supp. 38 (D. Vt. 1992)...................................................................................52

*United States v. Young*,
   745 F.2d 733 (2d Cir. 1984)......................................................................................30

*United States v. Zemlyansky*,
   945 F. Supp. 2d 438 (S.D.N.Y. 2013)............................................................ *passim*

*Voss v. Bergsgaard*,
   774 F.2d 402 (10th Cir.1985) ...................................................................................32

*Walczyk v. Rio*,
   496 F.3d 139 (2d Cir. 2007).....................................................................................36

*Wong Sun v. United States*,
   371 U.S. 471 (1963).....................................................................................................29

**Rules and Statutes**

5 U.S.C. § 553...................................................................................................................42

15 U.S.C. § 78c(a)(38).....................................................................................................46

15 U.S.C. § 78ff.....................................................................................................73, 74, 75

15 U.S.C. § 78j(b) ....................................................................................................67, 77

15 U.S.C. § 78m(d) ..................................................................................................73, 74

15 U.S.C. § 78s ...............................................................................................................42

17 C.F.R. § 240.19b-4 ....................................................................................................42

17 C.F.R. § 240.13d-1(a) ...............................................................................................74

18 U.S.C. § 371 .........................................................................................................32, 77

18 U.S.C. § 1341 .............................................................................................................32

18 U.S.C. § 1343 .................................................................................................67, 73, 77

18 U.S.C. § 1348 ......................................................................................................67, 77

18 U.S.C. § 1702 .............................................................................................................66

26 U.S.C. § 7201 .............................................................................................................76

31 U.S.C. § 5324 .............................................................................................................76

Bank Secrecy Act of 1970, §§ 1020.410(b)(5)-(9) .......................................................48

Bank Secrecy Act of 1970, § 1010.311 .........................................................................48

Bank Secrecy Act of 1970, § 1010.313 .........................................................................48

Fed. R. Crim. P. 7(c) ......................................................................................................68

Fed. R. Crim. P. 7(d) ......................................................................................................89

Fed. R. Crim. P. 8(a) ......................................................................................................64

Fed. R. Crim. P. 12(b)(3)(B)(v) .....................................................................................68

Fed. R. Crim. P. 15 ................................................................................................. passim

NASDAQ Rule 5005(a) ..................................................................................................41

SEC Rule 10b–5 ..................................................................................................... passim

SEC Rule 13(d) ...................................................................................................... passim

U.S. Const. Amend. IV .......................................................................................... passim

U.S. Const. Amend. V ...............................................................................................67, 80

U.S. Const. Amend. VI ..................................................................................................67

Defendant Benjamin Wey, by his attorneys, Haynes and Boone, LLP, submits this memorandum of law in support of his pretrial motions to: (a) suppress evidence seized pursuant to search warrants executed on or about January 25, 2012 at the offices of NYG Capital, LLC, located at 40 Wall Street, 38th Floor, New York, New York, and his apartment located at West Street in New York, New York; (b) dismiss the Indictment for various grounds including that certain counts are improperly duplicitous or fail to allege a fraud, and for prejudicial pre-indictment delay; (c) take the deposition of co-defendant Seref Doğan Erbek pursuant to Rule 15; and (d) strike from the Indictment all references to Mr. Wey's purported a/k/as.

## PRELIMINARY STATEMENT

In January 2012, teams of Federal Bureau of Investigation ("FBI") agents executed federal search warrants at both the office and family home of the defendant, Benjamin Wey. The FBI seized virtually every scrap of paper and every electronic device from both locations, and the defense anticipates that the Government plans to introduce at least some of this evidence at trial. But the warrants violated Mr. Wey's constitutional rights, because they were impermissibly overbroad, non-particularized "general warrants" prohibited by the Fourth Amendment. Further, the issuance of the warrants also violated Mr. Wey's rights because the sworn FBI statements upon which the Magistrate Judge based his "probable cause" determinations were materially misleading in multiple respects, premised on dubious legal theories and false allegations about Mr. Wey and his business activities (among other things). Mr. Wey's rights were further violated because, for almost four years after the search, the FBI sat on the entirety of the enormous trove of material they had hauled off, never purging or returning irrelevant seized material, and charging no one, until September *2015* when the grand jury indicted Mr. Wey.

By this motion, Mr. Wey seeks to suppress the fruits of the searches because they violated his Fourth Amendment rights.  He further moves to dismiss the Indictment, and, in the event dismissal is not granted, to preserve for trial the clearly exculpatory testimony of Mr. Wey's Swiss co-defendant, who is not anticipated to appear at Mr. Wey's trial.

*   *   *

The FBI arrived at Benjamin Wey's business, NYG Capital, LLC, d/b/a New York Global Group ("NYGG"), on January 25, 2012, and presented a search warrant facially permitting the agents to seize every conceivable record, in every conceivable format.  The warrant contained no limitations related to subject matter, crimes under investigation, or even timeframe.  The warrant for NYGG's office called for every document and every electronic device relating to NYGG.  And in executing that warrant, the agents indiscriminately vacuumed up every document, computer and electronic device located at NYGG's office.

Even still, apparently the agents failed to find whatever "smoking gun" they theorized they would find, so later that day, they obtained another warrant, this time directed at Mr. Wey's family apartment.  The warrant for his apartment facially granted the FBI permission to seize every document and electronic device relating to the Weys.  Again, the FBI indiscriminately swept up virtually all paper and all phones, computers, camera SD cards, everything, including family finance and health care related documents and children's schooling material.

But they filed no charges against Mr. Wey or any of his employees, or anyone who lived at his home.  The Government did, however, speak to the media about their "raid."  Articles about Mr. Wey and NYGG and the FBI's investigation immediately appeared in multiple news outlets, citing Government sources.  Mr. Wey's business and reputation were effectively destroyed.

The search warrants revealed virtually nothing about what conduct was under investigation.  On their face they sought materials related to practically every business Mr. Wey had ever built, every company he had ever consulted, and every friend, work colleague and business acquaintance he had ever known (as well as people and entities he did not know).  While the warrants contained a list of supposedly relevant people and entities, the list contained more than 200 names, including Mr. Wey, his wife, and NYGG itself.  No criminal code violation was referenced to suggest even the subject of the inquiry.

After the unconstitutional searches, as the days and the years passed by, little clarity emerged, and the investigation went silent.  While the Government provided Mr. Wey with electronic copies of some of what they had taken in 2012,[1] no documents were ever returned, and he was never informed what, if any, of the material taken was deemed non-responsive to the warrants.  The Government simply kept it all.  And, as far as the defense is aware, they still have it all.

Out of the blue, on September 10, 2015, Mr. Wey was awoken at 6:00 a.m. at his family home, handcuffed and taken into custody.  Mr. Wey was charged, along with Seref Doğan Erbek of Switzerland, with eight felony counts of conspiracy, securities fraud, wire fraud and money laundering.  These charges related to the allegedly fraudulent manipulation of the common stock of three NASDAQ-traded China-based companies.  The purported scheme was allegedly perpetrated through a combination of "fraudulent" misdeeds that supposedly add up to an illegal market manipulation conspiracy.  (A separate previously-submitted motion addresses the alarming lack of clarity in the Indictment – especially in light of the length of the Government's investigation and the breadth of their searches.)

---

[1]   It remains unclear to this day whether the Government provided copies of everything they seized.

Shortly after the Indictment, the Government produced to the defense the applications the FBI made in 2012 to support the search warrants.  While some of the Indictment's theories now echo the Government's theories back in 2012, many pieces of those earlier theories appear to have been jettisoned.  What is clear, however, is that the Government's presentation to the Magistrate Judge who authorized the searches was false and misleading in several core respects, raising significant doubt about whether the Magistrate Judge would have signed the warrants had he known the truth.  For example, the warrant applications asserted that NASDAQ had been misled by a scheme to "fraudulently inflate" the number of investors in certain of the companies to satisfy a supposed required threshold for obtaining such listing.  What the FBI's search affidavit omitted, however, was that no such requirement existed, and no fact was concealed from or misrepresented to NASDAQ.  Similarly, the FBI presented misleading and half-true slices of trading data to gin up the impression of manipulative trading practices.  And the application falsely asserted that Mr. Wey's family members had intentionally evaded currency reporting requirements by "structuring" money movements below reporting levels, when in fact no such reporting requirement exists.  In addition, the FBI's heavy reliance on the NASDAQ's decision to "de-list" one of those stocks – CleanTech – in January 2011 for its alleged failure to disclose allegedly "requested" information also turned out to be "baseless," according to the SEC's own unanimous July 2013 ruling, which ultimately reversed that de-listing.[2]

In short, this was no good faith effort to conduct a targeted investigation of specific wrongdoing, but rather, a fishing expedition, conducted against a man whose successful business the FBI chose not to understand.  And the fishing is still going on to this day.  The FBI has retained the entirety of the materials from NYGG's office and Mr. Wey's home, in a perpetual

---

[2]   This last fact could not have been known to the FBI at the time, because the reversal by the SEC post-dated the search application.  Still, it is emblematic of the thinness of the Government's evidence, then and now.

search for proof of some wrongdoing.  The Government's tactics violate Mr. Wey's Fourth Amendment rights to be secure in his "person[], houses, papers, and effects, against unreasonable searches and seizures" and his Fourth Amendment protection that "no Warrants shall issue, but upon probable cause . . . particularly describing the place to be searched, and the persons or things to be seized."  The 2012 search evidence must be suppressed.

Separately, the Indictment fails for several reasons and should be dismissed in its entirety.  First, several of the counts are "duplicitous" because they charge criminal schemes covering multiple potential subjects, leaving the defense (and the jury) to guess from among several possibilities what each covers.  Second, the fraud counts fail to allege any fraudulent or deceptive conduct, or intent to harm, sufficient to support them (or the money laundering or conspiracy counts predicated thereon).  Third, the counts concerning alleged violations of Section 13(d) of the Securities and Exchange Act of 1934 are unprecedented and fatally flawed attempts to criminalize allegations of regulatory negligence.  Fourth, the Indictment should be dismissed on the grounds of pre-indictment delay.

Finally, Mr. Wey also moves to preserve Mr. Erbek's testimony for trial, should this case get that far.  The Government has already interviewed Mr. Erbek (albeit after indicting him), whereupon he informed the Government that their case theory was wrong, irrational and ill-informed.  Mr. Erbek will not be voluntarily appearing to testify at Mr. Wey's trial, and the Government has no apparent plans or ability to compel his appearance.  Because Mr. Erbek's testimony is crucial to the defense, this motion seeks his videotaped deposition pursuant to Rule 15.

## STATEMENT OF FACTS

**1.     Background**

**A.     Mr. Wey's Personal, Educational and Professional Background**

Benjamin Wey was born in China in 1971, the son of a diplomat and an electrical engineer.  He has one sibling, Tian Yi Wei, who lives in China.  When Mr. Wey was a young man, an American family (the Walker family, of Texas) met him by chance on a public bus in China, befriended him, and offered to host him while he attended college in Oklahoma on a scholarship.  Mr. Wey earned his bachelor's degree in 1992, and an MBA in 1999.  In 2013, Mr. Wey was further awarded a Master of Science in Leadership from Columbia University Business School.  Mr. Wey speaks, reads and writes fluently in both Mandarin and English.  In 2001, Mr. Wey became a naturalized United States Citizen.[3]

Around 1998, Mr. Wey met and later married Michaela Wey, who also attended university in Oklahoma.  Mrs. Wey obtained her law degree in 2002, and practiced law between 2002 and 2004 before moving to New York with Mr. Wey and having the first of their three children, now ages 8, 7, and 5.  Mrs. Wey became a naturalized United States Citizen in 2010. Since in or about 2007, the Wey family, as well as Mr. Wey's nephew (Tian Yi Wei's son), have lived in an apartment on West Street in New York, New York (the "Apartment").

Mr. Wey has spent more than 20 years in the finance and corporate securities industry. He understands not only how finance works from a mechanical perspective, but also from a

---

[3]  Mr. Wey's Chinese given name is Tianbing Wei.  Upon his arrival in America in 1992, the Walker family suggested he use the name "Benjamin," which would be easier for locals to pronounce.  Mr. Wey has gone by Benjamin ever since.

Sometime after permanently moving to the United States, having experienced what he regarded as significant anti-Asian discrimination in the professional world, Mr. Wey elected to change his last name from "Wei" to a more Westernized spelling – "Wey."  While the Government has repeatedly attempted to imply that Mr. Wey's name change is somehow emblematic of his purportedly fraudulent character, nothing could be further from the truth.  He legally changed his name in 2004.  (Declaration of David Siegal, dated May 27, 2016 ("Siegal Decl."), Ex. 1)

cultural one, both in the United States and Greater China.  Through family and business

connections he has developed in both countries throughout his life, Mr. Wey has access to and

fluency in the business worlds of the two most divergent social and financial markets in modern

existence, and an ability to bridge their wide cultural, linguistic and social gaps.

### B.      Formation of the NYGG Brand

In the early 2000s, Mr. Wey co-founded several companies under the umbrella of an

entity called New York Global Group, Inc.  Over the years, Mr. Wey's business developed a

reputation, especially in China, for identifying high quality, profitable investment and financing

opportunities in the international capital markets for the Chinese investor base.  For part of that

time, a separate company with a similar name, New York Global Group (Asia) ("NYGG

(Asia)"), operated in China and benefited from the name recognition associated with Mr. Wey's

United States operation.

In about 2007, New York Global Group, Inc. was sold.  At around the same time, Mr.

Wey started a new business, NYG Capital, LLC – a New York limited liability company – which

did business under the trademarked name "New York Global Group" (continuing to capitalize on

the goodwill of that mark, previously used by New York Global Group, Inc.)  ("NYGG," as

defined above).  With the assistance of Mr. Wey's international business marketing skills and

relationships, NYGG focuses on, among other things, "complex funding, market entry,

government relations and critical crisis management issues involving China and elsewhere."

(Siegal Decl., Ex. 2)  Mr. Wey also introduces China-based business opportunities to the United

States capital markets by introducing Chinese companies to leading American underwriters,

accountants, lawyers and other advisers and participants in the financial markets.  Mr. Wey's

Chinese-based clients rely on his introductions and relationships to help them make sound

decisions regarding the professionals they hire and the strategies they adopt to navigate the

complex world of finance and to succeed in a foreign country with unfamiliar language, customs, and practices.

### C.       The Rise of the Chinese Economy and NYGG's Business

Between approximately 2008 and 2011, China was, by almost every measure, the fastest growing economy in the world.  (Siegal Decl., Ex. 3)  By contrast, United States-based companies suffered severely in the wake of the global financial crisis led by subprime mortgage defaults.  New listings by American issuers on U.S. stock exchanges ground to a halt, while the Chinese economy continued to grow at 9% per year.  During those years – which are the focus of this case – China-based companies became the darlings of global investors.  American stock exchanges eagerly opened offices in China to woo new listings.  The NASDAQ and the New York Stock Exchange (the "NYSE") in particular tailored policies to attract Chinese companies. Mr. Wey and NYGG, market leaders in that space, were regularly paid visits and solicited by senior staff of NASDAQ and the NYSE, who competed fervently to attract new China-based listings.  By early 2011, more than 250 China-based companies were listed on the three U.S. stock exchanges (NYSE, NASDAQ, and AMEX), an almost four fold increase from pre-crisis years.  Mr. Wey found himself so in demand that he had to turn away business.

Several, but certainly not most, of the hundreds of new public companies were introduced to United States finance-industry professionals by Benjamin Wey.  The underwriting firms, institutional investors and law firms that participated in deals in which Mr. Wey was involved represent a virtual "who's who" of the corporate finance industry.  These underwriters included some of the largest in the world: Barclays Capital, BMO Capital Markets Corp., Deutsche Bank Securities Inc., Carlyle Group, Cowen and Company (Asia) Limited, Goldman Sachs (Asia) LLC, HSBC Securities, JP Morgan, Morgan Stanley & Co., Inc., Oppenheimer & Co., Inc., and William Blair & Company, L.L.C.  (Siegal Decl., ¶ 6)

These financing deals were acquired in significant proportion by some of the largest and most powerful institutional investors in the world: Fidelity Investments, Janus Capital Group, Oppenheimer Funds, Inc., Wellington Management, Apollo Management, BlackRock, Guardian Insurance, AIG Insurance, State Street Global, Loomis Sayles, Legg Mason, JPMorgan Asset Management, Deutsche Bank Asset Management, UBS Asset Management, Morgan Stanley, Credit Suisse Asset Management, BlackStone, and Neuberger Berman, to name a few.  (Siegal Decl., Exs. 4-5)

Major "AmLaw 100" law firms played roles in financing deals related to these companies: Davis Polk & Wardwell LLP, DLA Piper LLP, Gibson Dunn & Crutcher, LLP, Fried, Frank, Harris, Shriver & Jacobson LLP, Holland & Hart, LLP, Loeb & Loeb, LLP, Morrison & Foerster, LLP, O'Melveny and Myers LLP, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Ropes & Gray LLP, Skadden, Arps, Slate, Meagher & Flom LLP, Sullivan & Cromwell LLP, Orrick, Herrington & Sutcliffe LLP, Pillsbury, Winthrop, Shaw, Pittman, Reid Smith, and Winston & Strawn LLP.  (Siegal Decl., ¶ 6)

### D.     SmartHeat, Inc., Deer Consumer Products, Inc., and CleanTech Innovations, Inc.

Three of the China-based companies that enlisted Mr. Wey's and NYGG's assistance are the subject of the Indictment: SmartHeat, Inc. ("SmartHeat"), a company that produces energy efficient heat exchangers (products that reduce pollution for a greener environment); Deer Consumer Products, Inc. ("Deer"), one of the world's largest manufacturers and sellers of small kitchen appliances such as blenders, juicers, and soy milk makers with more than 100 global clients/branded products such as Black & Decker, Toastmaster and Magic Bullet; and CleanTech Innovations, Inc. ("CleanTech"), a company in the wind turbine tower industry.

### E.      The Investigation Begins, and the Search of the NYGG Office

Special Agent Matthew Komar began investigating NYGG no later than June 9, 2011. (Siegal Decl., Ex. 6) NYGG moved into 40 Wall Street in or about May 2010.[4]  Less than two years later, on January 25, 2012, the FBI searched those offices pursuant to one of the warrants that is a subject of this motion.  Later that same day, the FBI searched the Apartment pursuant to another warrant, also a subject of this motion.[5]  No charges were filed at that time, but after four years of investigation, as set forth below, the Government ultimately obtained the Indictment in this case on or about September 9, 2015.

## 2.      The Investigation

### A.      The Application and Supporting Affidavit to Search The NYGG Office

On January 24, 2012, the Government applied for a warrant to search the offices located at 40 Wall Street, 38th Floor in Manhattan, which the warrant described as the offices of "New York Global Group, Inc." (the "NYGG Office").[6]  (Siegal Decl., Ex. 8)  The supporting affidavit was sworn by FBI Special Agent Matthew Komar.  (Siegal Decl., Ex. 9, and hereafter the "Komar Aff.").  The warrant application sought authorization to search for and seize evidence of violations of the federal securities laws and mail and wire fraud laws.

#### (1)      Probable Cause

The Komar Affidavit broadly asserts that Mr. Wey manipulated stocks and profited by, among other things, participating in the "artificial" inflation of the number of round-lot shareholders (*i.e*., shareholders of at least 100 shares) of China-based reverse-merger issuers in connection with NASDAQ's listing requirements; exercising unspecified control over nominees

---

[4]   Prior to May 2010, NYGG maintained office space at 14 Wall Street, New York, New York.

[5]   The content of the warrants is addressed below.

[6]   In fact, the entity occupying that space was NYG Capital, LLC, *not* New York Global Group, Inc.  (Siegal Decl., Ex. 7)

that bought or sold shares of those issuers; being associated with an issuer that was "de-listed" by NASDAQ; and receiving monies from overseas accounts in his sister's name.  (Komar Aff., ¶¶ 8, 11, 14)

The Komar Affidavit heavily emphasized several purported instances of fraudulent or manipulative activity that are either patently false or highly misleading.  For example, Agent Komar devotes no less than *twenty pages* to establishing that certain shareholders who may have been counted by NASDAQ for purposes of satisfying its listing requirements were related to Mr. Wey by friendship, family or prior business relations, and may have received their shares for a reason other than having "made an independent economic decision" to invest.  (Komar Aff., pp. 19-38)  Agent Komar repeatedly characterized this practice as "fraudulent," "a sham," "artificial," and "a deceptive device," while failing to identify any precedent or evidence that such conduct, if true, would constitute the sort of "manipulation" contemplated by the fraud theory of *market* manipulation.  Further, nowhere does Agent Komar acknowledge that *no rule and no law existed* that made gifting of shares illegal, nor that prohibited the counting of gifted shares to meet NASDAQ's listing thresholds.  Nor did Agent Komar reveal that the fact that shareholders obtained their shares as gifts was not only *not hidden*, but rather was *disclosed* to NASDAQ*, in writing*, in real time *in 2008* during the listing application process for SmartHeat*, to NASDAQ staff by legal counsel from a major law firm.  (Siegal Decl., Ex. 10)  All that information was known (or at least knowable) to Agent Komar at the time he made the warrant application, but he *chose* not to include such information in his application.

The Komar Affidavit is littered with additional misleading assertions of alleged wrongdoing.  For example, Agent Komar describes five wire transfers in May 2006 between Mr. Wey's sister and an account in Mr. Wey's wife's name, and asserts they were "deliberately

broken into increments less than $10,000 to avoid suspicion," asserting that was done to evade "United States currency transaction reporting requirements."  (Komar Aff., ¶¶ 14, 29(i))  In fact, as Agent Komar either actually knew or was reckless in not knowing, currency transaction report requirements *do not pertain to transfers made by wire transmission*.

In a similar vein, Agent Komar damningly asserts that his theory of market manipulation is supported by the fact that the prices of the stock of Deer and SmartHeat rose rapidly in the fall 2009 despite there being "*<u>no public information</u> that could explain such a significant rise . . . .*" (Komar Aff., ¶ 25) (emphasis added).  This is despite the fact that, in the same time frame, Wall Street market analysts from several independent investment banking firms initiated research coverage and issued positive research reports about both Deer and SmartHeat.  Rodman & Renshaw Capital Group ("Rodman and Renshaw") and William Blair & Company LLC ("William Blair") issued positive reports in July, August and December 2009 for Deer, each giving the company their highest available ratings, "Market Outperform" and "Outperform" (meaning "buy").  (Siegal Decl., Exs. 11-12)  And William Blair's report on Smart Heat on September 28, 2009, provided 17 pages of analysis backing up that recommendation and noted that it was projecting long term earnings per share growth of 30%.  (Siegal Decl., Ex. 13)  BMO Capital Markets also issued an equity research report on SmartHeat on the same day with an "outperform" rating, and a target price of $15 (when the price of the stock was then $11.65 and its 52-week high price had been $13).  (Siegal Decl., Ex. 14)  Beyond this, an initial rise in stock price is to be expected from newly listed NASDAQ stocks, especially after large and successful underwritings led by major Wall Street investment banks.  (Siegal Decl., Ex. 15)

During that same time frame, *public SEC filings* announced that (a) William Blair and BMO Investments Inc. – two highly respected Wall Street firms – underwrote a $75 million

secondary public offering of SmartHeat stock, which was approved by the SEC in August 2009

and completed in September 2009; (b) Fidelity Investments – the world's largest mutual fund

company, with more than $5 *trillion* under management – publicly reported in October 2009 that

it had acquired a 12.6% position in SmartHeat's stock; (c) Deer announced in September 2009

that it had sold a $15 million PIPE[7] offering at $5 per share to Asia-based investors, and (d)

BMO and William Blair announced they would underwrite a $75 million offering of new shares

of Deer in November 2009.  (Siegal Decl., ¶¶ 19-22)

Moreover, any casual reader of the financial news could not have missed that Chinese

equities were a hot investment product at the time, and that Deer and SmartHeat were among

dozens of China-based equities that were simultaneously experiencing significant investor

interest.  (Siegal Decl. Ex. 16)  Moreover, during the last four months of 2009, the "CSI 300"

index, a capitalization-weighted stock market index following the performance of 300 stocks

listed on the Shanghai and Shenzhen stock exchanges, experienced a 26 percent rise, and the

S&P Asia 50 Index rose 12 percent over that same period.  (Siegal Decl., Ex. 19)

Agent Komar also describes activity by alleged participants in the purported

manipulation scheme that supposedly inflated demand for Deer and SmartHeat.  He states that

certain retail brokers (defined by him as the "Scholander-Harris Brokers") bought approximately

1.3 million shares of SmartHeat, and 1.5 million shares of Deer between July 1, 2009 and July 1,

2010, for their retail customers.  (Komar Aff., ¶ 21)  Not stated by Agent Komar, however, is

that the Scholander-Harris Brokers (who were market makers in both stocks) sold almost an

identical number of shares as they bought on a daily basis during that same time frame for each

---

[7]    "PIPE" stands for private investment in public equity.

of these stocks.[8]  (Siegal Decl., Ex. 20(A))  This buying and selling activity is to be expected

from the Scholander-Harris Brokers, who were market makers in the stock.  (*See* Siegal Decl.

Ex. 21) (A market maker holds themselves out as being willing to buy and sell a security for

their own account on a regular or continuous basis, and often seeks to buy and sell in equal

quantities so that their inventories remain near their target levels through a two-sided order flow

that includes a mix of buyers and sellers who want to trade equal quantities).

    Agent Komar also misleadingly asserts that nominees sold "at the same time" as the

alleged buying pressure was supposedly being applied.  (Komar Aff., ¶ 27)  But the time frame

Agent Komar references regarding the alleged 'simultaneous' nominee sales is a *different time*

*frame* (January 2009 through January 2010) than he references as the time period of the alleged

buying pressure (July 1, 2009 and July 1, 2010).  (*See* Komar Aff., ¶ 27)  That is, the alleged

"selling" time frame is *six months earlier* than the alleged "buying" time frame – the *opposite* of

what one would expect in a "pump and dump" scheme.

    Beyond the above, the balance of the Komar Affidavit is largely devoted to events long

past that, by Agent Komar's own admission, took place *at locations other than the NYGG Office*,

or to which neither Mr. Wey nor NYGG had any articulable connection.  These include (a)

several pages devoted to alleged wrongdoing that took place *more than a decade earlier*, in

*Oklahoma;* (b) allegedly manipulative activity by third party stock-brokers who, by Agent

Komar's own description, conducted their business *two years earlier*, at a *separate firm*

---

[8]   The volume of trading handled by the Scholander-Harris Brokers must also be viewed in the proper context of
   the larger market.  Both Deer and SmartHeat's stock were highly liquid, and the Scholander-Harris Brokers'
   trading represented only a small fraction of the total volume of trading in these stocks.  On average, their daily
   trading volumes on the NASDAQ were in the *hundreds of thousands of shares*. (Siegal Decl., Exs. 4-5)  Indeed,
   in 2009 and 2010, Smart Heat traded more than 270 *million* shares during this two year period and reached a
   market capitalization of over $500 million, while Deer traded more than 110 million shares and reached a market
   capitalization of over $400 million.  (*Id.,* ¶¶ 24-35, Exs. 17-18)

physically located *at a different location* from the NYGG Office;[9] (c) alleged trading activity by third parties in accounts located and controlled overseas; (d) alleged personal trading activity by Mr. Wey's sister Tian Yi, purportedly at financial institutions not even claimed to be located at the premises; and (e) alleged activities from no later than two years earlier pertaining to AgFeed, Industries, Inc. ("AgFeed"), again with no stated connection to the premises.  (*See* Komar Aff., at ¶ 15) (describing civil sanctions pursuant to settlements of alleged wrongdoing, between 1999 and 2001); ¶¶ 12-13, 20-26 (describing events occurring at Seaboard Securities' 14 Wall Street location in 2009 through February 2010); ¶¶ 14, 27-28 (concerning trading activity through accounts located in, *e.g.*, Geneva, Switzerland and Hong Kong, in the names of Chinese or European citizens); ¶ 29 (concerning trading activity of relatives of Mr. Wey at third party financial firms); ¶¶ 30-32 (allegations related to AgFeed accounting methods discontinued in 2009, and trading ending no later than 2009).[10]

Based on Agent Komar's assertions of various purported wrongdoing having some alleged tangential connection to Mr. Wey, and even while acknowledging the staleness of most of his allegations (*see* Komar Aff., ¶¶ 13, 35), Agent Komar nevertheless asserts that there was probable cause to believe evidence of the alleged fraud crimes would be found at the NYGG Office.  For example, Agent Komar asserts that evidence would be found regarding "defrauding NASDAQ during the listing application process for Cleantech" (sic) (Komar Aff., ¶ 13), despite

---

[9]   While the Komar Affidavit alleges activity in accounts held with the Scholander-Harris Brokers, who did move to the same 70-story office building – 40 Wall Street – in around 2010, Agent Komar did not assert (nor could he) that those brokers' premises or documents were one and the same as the NYGG Office, nor that there was probable cause to believe NYGG had accountholder documents at *its* offices.  Moreover, the FBI neither sought nor obtained permission to search the Scholander-Harris Broker's 40 Wall Street offices.  Indeed, many, if not all, of their documents were admittedly already in the Government's possession at the time the search warrant application was made.  (*See* Komar Aff., ¶ 28(e))

[10]   Agent Komar also asserts that Nominees associated with Mr. Wey sold large qualities of shares in AgFeed, another Mr. Wey-assisted issuer.  (Komar Aff., ¶¶ 33-34)  With respect to AgFeed, Agent Komar implies that Mr. Wey participated in accounting fraud and that he used nominees to conceal his beneficial ownership and/or control of AgFeed Stock.  (Komar Aff., ¶ 34)  The Indictment does not make reference to AgFeed, and the Government has communicated that AgFeed will not be a part of its case-in-chief.

the fact that the round lot share related evidence he identifies concerned only Deer and

SmartHeat, *not* CleanTech.[11]

Indeed, Agent Komar devotes several pages describing generalized theories for why a

business engaged in fraud would keep records constituting evidence of fraud, while pointing to

no actual pieces of evidence at the premises.  Significant passages of Agent Komar's allegations

regarding documents anticipated to be found at the NYGG Office are in effect nothing more than

a description of a normal business operation.  Tellingly, Agent Komar makes his true intent clear

on the face of his application:

> [L]ike any small business, *whether engaged in fraud or not*, NYGG-USA
> needs to retain books, records, account statements, contracts,
> correspondence, personnel files, recent state and federal tax returns,
> invoices, receipts and other records in order to continue in operation as an
> orderly business, maintain its corporate status and its status to conduct
> business in a particular state, and to file state and federal income tax
> returns.  These and other categories of NYGG-USA's business records are
> described in more detail in paragraph 40 and Exhibit A below.  These
> categories of NYGG-USA's business record *will enable the Government to
> understand the full scope of NYGG-USA's business*, and to determine what
> percentage of its revenue and profit is tied to RTO issuers.

(Komar Aff., ¶ 35(b)) (emphasis added).

Finally, in an effort to buttress his claim of probable cause for the searches of the NYGG

Office, Agent Komar suggests that Mr. Wey continued the alleged fraudulent scheme more

recently.  Agent Komar devotes *ten pages* of his affidavit (Komar Aff. at 74-84) to a description

of NASDAQ's January 2011 decision to de-list CleanTech, asserting that CleanTech allegedly

failed to disclose and "deliberately concealed" evidence of Mr. Wey's involvement with the

company and a recent $20 million financing transaction, "even though," according to Agent

---

[11]  Indeed, the Government apparently found no evidence of any fraud on NASDAQ regarding CleanTech's listing
qualifications either prior to, from, or subsequent to the 2012 searches.   Agent Komar did not even allege any
listing-related fraud pertaining to other companies NYGG assisted – not Bodisen Biotech, Inc. nor Nova
Lifestyle, Inc. nor AgFeed.

Komar, "it was obligated to do so under NASDAQ's rules." (Komar Aff., ¶ 36) But Agent

Komar never cites any such "rules," and in fact, the SEC ultimately rejected that assertion and

unanimously reversed NASDAQ's de-listing of CleanTech, finding that "the record does not

show that the grounds on which NASDAQ relied in delisting CleanTech exist in fact. . . . We

therefore set aside NASDAQ's delisting decision." (Siegal Decl., Ex. 22 at 16-17)[12]

Viewed objectively, almost all of the "facts" Agent Komar describes regarding Mr.

Wey's involvement with the issuer companies are either innocuous, commonplace business

practices or communications and actions fully consistent with Mr. Wey's and NYGG's

legitimate role as an outside consultant to these companies, performing services of

communicating instructions from China to U.S. financial sector professionals on behalf of

NYGG's overseas corporate clients.

(2) <b>Specifying documents to be seized</b>

While the Komar Affidavit purports to provide some specificity regarding the

"Categories of records," "Relevant Individuals and Entities," and procedures for searches and

seizures of computer systems (*see* Komar Aff., Exhs. A, B and C), in fact, when viewed in

totality, these passages make it clear that what is sought is *literally* every possible document or

record contained at the NYGG Office.

In the course of twelve numbered paragraphs on Exhibit A to the Komar Affidavit (cross

referenced and incorporated into that Affidavit), every form of document or thing imaginable

---

[12]  Agent Komar also does not mention that Mr. Wey's involvement with CleanTech was *not in fact concealed* from
the investing public. Indeed, Barry J. Cohen, Senior Managing Director of Apollo Capital Management, LLC
(an institutional investment firm with $68 *billion* under management, and owners through one of their investment
funds of, *inter alia*, 595,020 shares of CleanTech), wrote to NASDAQ's Office of General Counsel on April 27,
2011 – 9 months prior to the FBI's searches – that Ben Wey's involvement with the company *was publicly
known* when Apollo invested. Mr. Cohen further opined that Apollo believed Mr. Wey "greatly assisted
[CleanTech] in fund raising" from which CleanTech's shareholders "benefitted." (Siegal Decl. Ex. 30) Given
that the source for this portion of Agent Komar's affidavit appears to have been the Agent's communications
with NASDAQ officials, it is logical to assume that Agent Komar saw, or at least had access to, Mr. Cohen's
letter at the time Agent Komar made his warrant application.

that would be maintained by NYGG (or any business) are catalogued.  This thesaurus of words is untethered to any substantive restriction or legal theory.  The list might just as well have said "seize every form of record."  Exhibit A to the Komar Affidavit contains no date range limitation, nor is there any reference to any content limitation.  There is no suggestion that what is to be seized should be, "related to," for example, "satisfying NASDAQ listing requirements," or even something as broad as "attempts to manipulate securities markets" or "laundering money."  The only purported limitation to types of records to be seized is a cross reference to another attached list – "Exhibit B" – a list of entity and individual names.

Thus, Exhibit A seeks, among other things:

- "financial records *concerning the individuals and entities listed in Exhibit B*" and "personal financial records *of any individuals named in Exhibit B* or any employees, agents, or shareholders *of any of the entities listed in Exhibit B*," including "banking and brokerage firm account statements, checks, and transaction records, wire transfer instructions and similar documents concerning or reflecting movements of funds, account and account holder information, check numbers, account numbers and Federal Reserve routing numbers" (Komar Aff., Ex. A at ¶¶ 1-2)[13] (emphasis added);

- telephone bills, notes, memoranda, photographs, memoranda, internal and external communications "*between, among, or relating to the individuals and entities listed in Exhibit B,*" (Komar Aff., Ex. A at ¶ 3) (emphasis added);

- correspondence, audio and video tapes, hotel, airline and credit card receipts address books, Rolodexes, diaries, income tax returns and calendars," and "marketing materials" – again supposedly concerning *'only'* the individuals and entities listed in Exhibit B (Komar Aff., Ex. A at ¶¶ 4-6, 8);

---

[13]   The same language appears in the exhibits attached to the Affidavit of FBI Special Agent Keith Garwood in support of the application for a search warrant for the Apartment.

- "[i]dentification documents or other documents which may reflect the identities of persons listed in Exhibit B or persons affiliated with the entities listed in Exhibit B," and "[c]orporate documents reflecting the ownership or structure of, or relationship *between and among, any of the entities listed in Exhibit B*," respectively.  (Komar Aff., Ex. A at ¶¶ 9-11) (emphasis added).

Beyond that, Paragraph 7 of Exhibit A seeks the seizure of the *entire contents* of every electronic device on the premises: *all* "[c]omputers, flash drives, internal and external hard drives, diskettes and other magnetic storage media, and files, data and information contained thereon, *used to store names, telephone numbers and addresses, and other information*, including *but not limited to* personal digital assistants such as iPhones, iPads, Blackberrys, smartphones, and cellphones, as well as drafts and final versions of documents and correspondence, used by, or used in connection with the individuals and entities listed in Exhibit B."  (Exs. 1-2 at ¶ 7) (emphasis added).  This paragraph in particular ascribes *no limitation whatsoever* relating to what connection *the materials within* any such devices must bear to anyone, any crime or any subject matter.  Rather, it simply says that each and every electronic device is seizable.

As it turns out, however, even the "limitation" supposedly provided by Exhibit B to the Komar Affidavit is illusory:  Exhibit B identifies more than 200 entities and individuals, <u>*including*</u> *NYGG*[14] *and Benjamin Wey – i.e.*, the name of the very business whose office was searched, as well as the very owner of that business.  (Komar Aff., Ex. B)  As such the Exhibit B list serves as no limitation at all on the scope of the otherwise unlimited set of categories described in Exhibit A.

---

[14]   As noted above, the entity occupying space at the NYGG Office was NYG Capital, LLC, not New York Global Group, Inc. (the company identified by the search warrants, and also listed on Exhibit B).  However, as the search warrants for the office was directed at the "Office of New York Global Group, Inc.," it effectively sought all documents of the company occupying space at 40 Wall Street, 38th Floor, and thus its logic is plainly circular.

The Komar Affidavit also separately set forth provisions with respect to the procedure for handling computers and other electronic storage devices to be searched.  Premised on the notion that such devices have the capacity to store so much information in such complex ways that it would be impractical and forensically unsound to search them on premises, Agent Komar seeks permission to seize or copy them all in their entirety, and to have them examined later, at Government labs, "in the manner described in Exhibit C" to the Komar Affidavit (Komar Aff., ¶¶ 43-45)  Exhibit C, in turn, describes in 15 paragraphs, a list of "methods" that in sum amount to seizing everything for later examination in a controlled environment laboratory by computer experts using technological tools.

Neither the Komar Affidavit nor Exhibit C thereto describe *how* the FBI intended to distinguish information responsive to the warrant from unresponsive material.  While it provides for the return of "computer equipment and storage devices" that "are no longer necessary to retrieve and preserve the data" within a reasonable time upon request, nothing in the Komar Affidavit or the Exhibits thereto address how non-responsive material will be treated, whether or not non-responsive material will be retained (or for how long), and how non-responsive material will be returned or purged (or when).

Exhibit C also contains a footnote pertaining to privileged materials, which states: "Agents will have procedures in place to segregate any potentially privileged materials or files." Nowhere are such procedures described.

### B.      The Warrant to Search The NYGG Office

Magistrate Judge Michael Dolinger approved the warrant on January 24, 2012.  Notably, the warrant on its face does not specify the crimes under investigation.  Attached to the warrant are copies of Exhibits A, B and C to the Komar Affidavit.  But those Exhibits also fail to specify the code sections that are to be the subject of the search.  Indeed, apart from a passing reference

in paragraph 10 of Exhibit A to "proceeds of fraud," neither the warrant nor its attachments provide any hint of the subject of the investigation that might serve as a guide to the agents executing the search.  Rather, Exhibit A is merely a list of document types – and as noted above, essentially an unlimited list.  Similarly, none of the other Exhibits reference a criminal code section or suggest a legal theory.  Nor does the warrant provide a timeframe to suggest a limitation on what may be taken.[15]  The Komar Affidavit was not attached to the warrant.[16]

### C.     The Execution of the Search of the NYGG Office

On January 25, 2012, a team of FBI agents executed a search of the NYGG Office. Consistent with the warrant's directives, the FBI seized virtually every scrap of paper, every computer, every cellphone, and every other electronic device on the premises.[17]  The original paper records seized by the FBI were never returned, and to this day remain in FBI custody (as far as the defense is aware).  Similarly, the electronic devices seized (or electronic "image" copies of them) were permanently retained by the FBI, which provided one set of "copies" of the data back to NYGG and Mr. Wey in 2012, and provided another set to the defense in 2015 (post-Indictment).[18]

### D.     The Apartment Search Warrant and Supporting Affidavit

Apparently dissatisfied with the results of their search of the NYGG Office, later that same day, January 25, 2012, the Government applied for a search warrant for the Apartment.

---

[15]   The only limitation on the face of the warrant was the exclusion of the internal office of NYGG's in-house General Counsel, James Baxter, Esq., from the warrant's scope.  (Siegal Decl., Ex. 8 at Ex. A)

[16]   Indeed, the warrant application (including Agent Komar's affidavit) was sealed pursuant to an order of the Magistrate Judge dated January 24, 2012.

[17]   The FBI seized from the NYGG Office three computers, one phone, four flash drives, nine external hard drives, one backup storage device, one DVD, one server, and imaged four phones.  (Siegal Decl., Ex. 23)

[18]   The Government returned several desktop computers and other original media in 2012.  It remains unclear whether the electronic "copies" of the retained electronic devices given back to NYGG in 2012 were complete. The Government also seized checkbooks belonging to the Weys' trusts in connection with the search of the Apartment, which they only returned *after* the Indictment, in 2015.

(Siegal Decl., Ex. 24)  The supporting affidavit was sworn by FBI Special Agent Keith Garwood (the "Garwood Affidavit"), based largely upon the search warrant for the NYGG Office and Agent Komar's affidavit in support thereof.[19]  (Siegal Decl., Ex. 25) (hereafter, the "Garwood Aff.")

According to the Garwood Affidavit, there was probable cause to believe that "certain books, records, and other documents" located at the Apartment would "constitute evidence of the commission of, or are designed as a means of the violation of, or are contraband or the fruit of the violation of, the federal securities laws and mail and wire fraud laws" as described by the Komar Affidavit.  (Garwood Aff., ¶ 4)  More specifically, Agent Garwood asserts that Mr. Wey caused "documents that are central to this investigation" to be sent to the Apartment, including one or more sets of Deer stock certificates for new round-lot shareholders.[20](Garwood Aff., ¶ 6) According to Agent Garwood, this further search was supported by evidence that Mrs. Wey acted as NYGG's office manager and bookkeeper, and conducted some of that business from the Apartment, including by remote computer access (Garwood Aff., ¶¶ 7, 11), and because certain bank accounts held in Mrs. Wey's name listed P.O. Box addresses located nearby the Apartment. *Id.*  Agent Garwood did not, however, supplement the factual allegations concerning probable cause to believe crimes had been committed, but instead relied on the substantive points made in the Komar Affidavit.  Agent Garwood sought authorization to search the "entirety" of the Apartment "for the categories of records described in paragraphs 35 and 50 of the Komar Aff. and Exhibit A to this affidavit that relate to the individuals and entities described in Exhibit B of this affidavit."  (Garwood Aff., ¶ 16)

---

[19]   Indeed, the Komar Affidavit was attached as an exhibit to the Garwood Affidavit and was incorporated by reference therein.

[20]   Agent Komar theorizes in his affidavit that the NYGG Office would contain stock certificates, because he believed Mr. Wey was engaged in a continuing scheme to hand them out.   (Komar Aff. at ¶ 35(b), (d)).  But no stock certificates were found at the NYGG Office.

Exhibits A, B and C to the Garwood Affidavit cover an identical set of materials as those attached to the Komar Affidavit.[21]  Notably with respect to the Apartment, which the agents knew and understood to be the Weys' permanent residence, again here, Exhibit B is circular, and its purported "limitations" illusory: it seeks to seize all the document types described in Exhibit A with respect to the same list of 200+ names, *which includes both Benjamin and Michaela Wey – i.e.*, both adult residents of the Apartment.

Magistrate Judge Michael Dolinger approved the warrant for the Apartment on January 25, 2012.  As with the warrant for the NYGG Office, the warrant for the Apartment failed to specify the crimes under investigation, either on its face or in the attached Exhibits A, B, and C, which were virtually identical to those from the earlier warrant.[22]  Similarly here, this warrant provides no timeframe.  No affidavit was attached to this warrant either.[23]

### E.    The Execution of the Search of the Apartment

Later on January 25, 2012, the FBI searched the Apartment pursuant to the second warrant.  Consistent with the provisions of the search warrant for the Apartment (and consistent with the agents' execution of the warrant for the NYGG Office), the FBI seized virtually every scrap of paper, every computer, every cellphone, and every other electronic device at the Apartment.[24]  During the execution of the search, an FBI agent inquired, "Where are the stock certificates?" – presumably because they came up empty-handed at the NYGG Office (where they previously asserted these stock certificates would likely be located).  (Siegal Decl., ¶ 34)

---

[21]   Exhibit A to the Komar Affidavit differs from Exhibit A to the Garwood Affidavit in one respect: the former explicitly excludes the individual office of James Baxter, Esq., (within NYGG's Office) from the search area, whereas Exhibit A to the Garwood Affidavit omits that limitation.  In every other respect, all three Exhibits are identical to each other's counterpart.

[22]   Logically, no reference is made to any exclusion of Mr. Baxter's office in relation to the warrant directed to the Apartment.

[23]   This warrant, too, was sealed, pursuant to an order of the Magistrate Judge dated January 25, 2012.

[24]   The agents seized from the Apartment four computers, three phones, seventeen flash drives, one external hard drive, two pieces of software, two backup disks, and one video tape.  (Siegal Decl., Ex. 26)

No stock certificates were found at the Apartment either.  The FBI did, however, sweep up a plethora of non-responsive, personal and irrelevant material, including family documentation such as report cards and high school test results, medical insurance cards, personal correspondence from the 1990s, hospital records (including X-rays of Michaela's Wey's chest and pelvis), copies of passports of the Weys' three minor children (whose names do not appear on Exhibit B), and education and personal financial planning documentation.  (Siegal Decl., Ex. 27)

### F.      After The Searches

The media was notified about the execution of the searches as they were proceeding. Indeed, during the execution of the search warrant at the NYGG Office, the office telephone rang constantly with calls from the press.  In stories published on January 26 and 27, unnamed Government agents were identified as sources in stories publicizing the searches, labeling it a "raid."  *See, e.g.*, Scannell, Kara, *US reverse merger promoter raided*, Financial Times, January 27, 2012 ("US authorities have raided the New York office and home of Benjamin Wey, a promoter of controversial Chinese reverse mergers, according to law enforcement officials"); *see also* Carney, John, *FBI Raids Chinese Reverse Merger Shop*, NetNet@CNBC.com, January 26, 2012 (quoting Boyd, Roddy, *The FBI Pay Benjamin Wey a Visit*, The Financial Investigator, July 26, 2012).  (Siegal Decl., Ex. 28)

At the time the searches were executed, no one was charged with any wrongdoing, either criminally or in any civil enforcement action.  The negative publicity from the Government leaks did, however, effectively destroy Mr. Wey's and NYGG's business reputation.

Subsequent to the searches, Mr. Wey and NYGG obtained legal counsel in connection with the FBI's investigation, and for a time thereafter, active communications took place between Mr. Wey's counsel (the undersigned) and the Assistant United States Attorney handling

the investigation for the Government.  By the end of 2012, however, communications from that

AUSA to counsel for Mr. Wey and NYGG ceased, and in 2013, that AUSA left the Government.

Almost three years passed with no communications from the FBI or the United States Attorney's

Office, up to the date of Mr. Wey's arrest on the Indictment in early September 2015.  (Siegal

Decl., ¶ 37)

3.    **The Indictment and Surrounding Publicity**

The Indictment charges Mr. Wey and co-defendant Mr. Erbek (hereinafter, together with

Mr. Wey, the "Defendants") with securities and wire fraud, failure to disclose ownership in

excess of five percent of certain stocks, conspiracy and money laundering.  The Indictment also

includes forfeiture allegations.  The crux of the Indictment is an alleged fraud scheme involving

reverse merger transactions between Chinese operating companies and United States based

publicly traded companies – referred to in the Indictment as "Shell Companies" – and the alleged

fraudulent manipulation of the market for the stock in these companies.

According to the Indictment, from 2007 through 2011, Defendants conspired to defraud

the investing public by orchestrating Mr. Wey's "undisclosed amassing of beneficial ownership"

of more than five percent of the stocks of certain publicly traded companies including

SmartHeat, Deer and CleanTech, and purportedly fraudulently manipulating the price and

demand for these stocks.  (Indictment, ¶¶ 4-7)

In furtherance of the alleged conspiracy, Mr. Wey allegedly caused certain entities that

were owned or otherwise associated with his sister, Tian Yi Wei, other members of Mr. Wey's

family, and NYGG (Asia) employees (referred to in the Indictment as the "Nominees") to obtain

a substantial portion of the shares of certain Shell Companies, including Pacific Goldrim

Resources, Inc., Tag Events Corp., and Everton Capital Corp.  (Indictment, ¶ 8)  According to

the Indictment, Mr. Wey "possessed and exercised investment authority over shares of stock held

in the names of the Nominees" and "directed other parties to take actions in matters pertaining to the Nominees," including directing Mr. Erbek to trade in the Nominees' accounts.  (Indictment, ¶ 9)

The Indictment further alleges that as part of the conspiracy, Mr. Wey identified Chinese operating companies that hoped to raise capital in the United States markets, and offered NYGG's services to those companies in advising and facilitating reverse mergers with Shell Companies in which Mr. Wey – through the Nominees – held significant ownership stakes, resulting in benefit to Mr. Wey.  (Indictment, ¶¶ 10-12)  And the Indictment alleges that Mr. Wey caused the Nominees "to retain undisclosed control of more than five percent of the shares" in the holdings of the new companies created through the reverse mergers, which Mr. Wey allegedly was required to report pursuant to Section 13(d) of the Securities and Exchange Act, although Mr. Wey allegedly "purposefully . . . structured" the Nominees' holdings in such a way so as to ensure that no single Nominee held a greater-than-five percent beneficial ownership in these companies.  (Indictment, ¶¶ 13-14)

The Indictment goes on to allege that Mr. Wey engaged in deception to gain listing of these new companies on the NASDAQ by causing shares of these companies to be transferred from certain of the Nominees to Mr. Wey's friends, employees and business associates, thereby flouting NASDAQ's listing requirements and "artificially inflating" the number of company shareholders.  (Indictment, ¶¶ 15-17)

Finally, the Indictment alleges that Mr. Wey manipulated the stock prices of these companies by, among other things, causing two retail brokers to solicit their customers to buy stock in these companies, instructing Mr. Erbek to maintain the share prices of the stock held in

certain of the Nominees' accounts, and orchestrating at least one match trade involving 1,000 shares.  (Indictment, ¶¶ 18-19)

The Indictment alleges that Mr. Wey "caused millions' of dollars' worth" of stock and cash generated from stock sales to be transferred from United States-based accounts in the name of Tian Yi Wei and certain other nominees to foreign accounts, and thereafter "repatriated" millions of dollars to the United States for his benefit.  (Indictment, ¶¶ 21-22)

Each of the substantive counts of the Indictment re-asserts and reincorporates some aspect of the conspiracy count.  The money laundering counts (Counts 7 and 8) allege that Mr. Wey engaged in monetary transactions (wire transfers) in property criminally derived from securities fraud.  The Government also seeks forfeiture related to Mr. Wey's alleged actions.

On the day the Indictment was unsealed, the United States Attorney for this District issued a press release stating, among other things: "Ben Wey fashioned himself a master of industry, but as alleged, he was merely a master of manipulation. . . .  As alleged, in making tens of millions in illicit profit, Wey refused to let the securities laws or the rules of a fair marketplace get in the way of his dishonest scheme."  (Siegal Decl., Ex. 29)  The FBI simultaneously issued a press release, as did the SEC, which filed a civil enforcement action against Mr. Wey and others. (*Id.*)  Mr. Wey's arrest resulted in significant media coverage of the charges against him in several media outlets.  (Siegal Decl., ¶ 39)

## ARGUMENT

## I.

## THE SEARCH WARRANTS ARE OVERLY BROAD AND UNREASONABLE "GENERAL WARRANTS"

Mr. Wey's Fourth Amendment rights were violated by the Government's searches of the NYGG Office and the Apartment, because the warrants were unconstitutionally overbroad and

unreasonable "all documents" warrants, permitting the agents indiscriminately to seize every piece of paper and every electronic record at the subject locations.  Accordingly, the fruits of those searches should be suppressed.

## A.      Fourth Amendment Requirements

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularity describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV; *see also United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013); *United States v. Barnes*, 13-CR-387, 2013 U.S. Dist. LEXIS 189631, at *6 (S.D.N.Y. Oct. 21, 2013) (Nathan, J.).  The purpose of the Fourth Amendment warrant clause is to ensure that "those searches deemed necessary should be as limited as possible."  *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

"[T]he specific evil" in the case at bar "is the 'general warrant' abhorred by the colonists, and the problem is not the intrusion per se, but of a general, exploratory rummaging in a person's belongings." *Id.*; *see also United States v. Buck*, 813 F.2d 588, 590 (2d Cir. 1987) (same); *Galpin*, 720 F.3d at 445 ("'[T]he central concern underlying the Fourth Amendment [is] the concern about giving police officers unbridled discretion to rummage at will among a person's private effects.'") (citing *Arizona v. Gant*, 556 U.S. 332, 345 (2009)).  The Constitution limits law enforcement's rights to search only "the specific areas and things for which there is probable cause to search," which requires that "that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

The Fourth Amendment both "requires particularity and forbids overbreadth." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013) (citing *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009)); *see also Barnes*, 2013 U.S. Dist. LEXIS 189631, at *6. The Court must consider "'(1) whether the items listed as to be seized in the warrant were overbroad because they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers.'" *Zemlyansky*, 945 F. Supp. at 450 (quoting *United States v. Hernandez*, 09-CR-625, 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010)).

Evidence seized in violation of the Fourth Amendment, as well as other fruits thereof, are subject to suppression. *See Herring v. United States*, 555 U.S. 135, 129 (2009) (exclusionary rule forbids use of improperly obtained evidence at trial); *United States v. Bin Laden*, No. 98 Cr. 1023, 2000 U.S. Dist. LEXIS 18957, at *9 (S.D.N.Y. 2000) ("The rule that evidence derived from an unconstitutional search or interrogation will be suppressed as 'fruit of the poisonous tree' is firmly established.") (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)).

The primary purpose of the exclusionary rule "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347 (1974); *see also United States v. Bershchansky*, 788 F.3d 102, 112 (2d Cir. 2015) (the rule deters "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence") (quoting *Herring*, 555 U.S. at 144). In this case, the rule should be applied, and the evidence suppressed, because the warrants here amounted to impermissible general warrants, and because (as discussed further in Section II below) the warrants were granted based on applications that, when stripped of their falsehoods, failed to establish probable cause. *See, e.g.*, *United States v. Ganias*,

755 F.3d 125, 136-141 (2d Cir. 2014) ("*Ganias I*"), *rehearing en banc*, 12-240 (2d Cir. May 27, 2016) ("*Ganias II*").[25]

The warrants here violated the Fourth Amendment because they were both insufficiently particularized and overbroad.  Accordingly, the Court should suppress the fruits of both warrants.

**B.     The Warrants Fail to Describe with Particularity the Items To Be Seized**

The search warrants wholly fail to describe with particularity the items to be seized. Instead, the warrants catalog every conceivable record that could exist, with no limitation by, *e.g.,* subject matter, type of activity, date range or otherwise.  (Siegal Decl., Exs. 8, 24)  Neither warrant even identifies the laws supposedly under investigation.  (*Id.*)  The executing agents were thus impermissibly left entirely to their own discretion to determine what to seize. Unsurprisingly under such conditions, they seized virtually everything.  These warrants cannot be described as anything but impermissible "all documents" warrants, and the Government's searches thus violated Mr. Wey's fundamental rights.

The core purposes of the particularity requirement include "'preventing general searches, preventing the seizure of objects upon the mistaken assumption that they fall within the magistrate's authorization, and preventing the issuance of warrants without a substantial factual basis.'"  *Zemlyansky*, 945 F. Supp. at 452 (citing *United States v. Young*, 745 F.2d 733, 759 (2d Cir. 1984)); *see also United States v. George*, 975 F.2d 72, 74 (2d Cir. 1992) ("Because everyone has some kind of secret or other, most people are anxious that their personal privacy be respected.  For that very human reason the general warrant, permitting police agents to ransack one's personal belongings, has long been considered abhorrent to fundamental notions of privacy and liberty.").

---

[25] *See* discussion *infra* at fn. 42 regarding *Ganias II*.

The law prohibits leaving "to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *Zemlyansky*, 945 F. Supp. at 453 (citing *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990)).  Accordingly, a warrant must "contain sufficient specificity 'to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize.'"  *Id.* at 453 (citing *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000)).  A warrant is sufficiently particular only where it "enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *George*, 975 F.2d at 75.

In the Second Circuit, "there is no settled formula for determining whether a warrant lacks particularity." *Zemlyansky*, 945 F. Supp. at 453.  However, in *United States v. Vilar*, the Court noted that there are "two factors that, above others, tend to define a warrant's insufficient particularity":

> First, warrants are generally found to be insufficiently particular where nothing on the face of the warrant tells the searching officers for what crime the search is being undertaken.  Second, warrants will frequently lack particularity where they include a general, catch-all paragraph of provision, often one authorizing the seizure of any or all records of a particular type.

*United States v. Vilar*, 05-CR-621, 2007 WL 1075041, at *22 (S.D.N.Y. Apr. 4, 2007).  Importantly, a defendant need not demonstrate both deficiencies for relief; "rather, one or the other will typically render a warrant unconstitutional." *Zemlyansky*, 945 F. Supp. at 453*; see also George*, 875 F.2d at 75-76 (warrant failed to alert searching officers as to the crimes at issue); *United States v. Buck*, 813 F.2d 588, 591 (2d Cir. 1987) (warrant contained catch-all provisions).  Here, these warrants were deficient in both respects.

*First*, the warrants fail to identify the crime(s) under investigation.  *See Vilar*, 2007 WL 1075041, at *22.  No criminal code section is referenced on their faces, no criminal behavior is

described, and no affidavit is attached or referenced to describe the activity under scrutiny.[26] The warrants and their respective attachments merely list types of documents, provide a long list of names, and give instructions for the seizure of computers and electronics (which effectively say, "take every piece of electronics").  No agent reviewing these warrants could reasonably determine what should be seized and what should not.  For this reason alone, the warrants fail for insufficient particularity.

Importantly, the Government cannot rely on affidavits submitted in the application to supplement the warrants themselves.  The warrants must stand on their own, because "[s]upplementary documents, *including affidavits*" can particularize a warrant "*only if attached and incorporated* into the warrant *by reference*."  *Zemlyansky*, 945 F. Supp. at 453 (emphasis added) (collecting cases, and citing *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) ("[W]e may no longer rely on unincorporated, unattached supporting documents to cure an otherwise defective search warrant.")); *see also Groh v. Ramirez*, 540 U.S. 551, 557 (2004) ("[t]he fact that the application adequately described the things to be seized does not save the warrant from its facial invalidity" because the Fourth Amendment "by its terms requires particularity *in the warrant.*") (emphasis added).  If the warrants (including their attachments A through C) themselves fail to satisfy the particularity edict – as these warrants do - the application paperwork cannot salvage them.

---

[26] The passing reference to "proceeds of fraud" in paragraph 10 of Exhibit A to each warrant cannot suffice to save these warrants; indeed, courts have held that "even warrants that identify catchall statutory provisions, like the mail fraud or conspiracy statutes, may fail to comply" with the particularization requirement.  *Galpin*, 720 F.3d at 445) (citing *United States v. Leary*, 846 F.2d 592, 594 (10th Cir.1988) (warrant authorizing search of export company's business records for violation of the "Arms Export Control Act, 22 U.S.C. § 2778, and the Export Administration Act of 1979, 50 U.S.C.App. § 2410," held overbroad)); *Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir.1985) (warrant specifying 18 U.S.C. § 371 held overbroad); *United States v. Roche*, 614 F.2d 6, 8 (1st Cir.1980) (a limitation of a search to evidence relating to 18 U.S.C. § 1341, the general mail fraud statute, provides "no limitation at all").

*Second*, the warrants impermissibly authorize the seizure of any or all records.  In combination, Exhibit A's list of every conceivable type of document, and Exhibit B's absurdly overbroad list of names, plainly shows that the warrants seek every conceivable document and record from the NYGG Office and the Apartment.  Exhibit A to each warrant describes every form of document or thing imaginable that would be maintained by a business, including financial records, documents concerning movements of funds, telephone bills, notes, memoranda, internal and external communications, computers, flash drives, and other media storage.  If that were not broad enough, the parameter within Exhibit A that purports to act as a limitation to the Exhibit A list – the Exhibit B list of purportedly relevant individuals and entities – provides no actual limitation at all.  By including in Exhibit B a list of more than 200 names, the "limit" is essentially meaningless.  Moreover, this "limitation" is not even applied to electronic devices.

But the *coup de grace* is that Exhibit B includes *the very company* (in the case of the warrant for the NYGG Office) and *the very individual owner/occupants* (in the case of the warrant for the Apartment) occupying those same spaces.  That is, the warrant to search the NYGG Office seeks seizure of every type of document or record "of," "concerning" or "related to *NYGG* (as well as NYGG's owner and sole principal, *Benjamin Wey*), <u>and</u> every electronic device "used by" or "used in connection with" *NYGG* or *Mr. Wey*.  The warrant might as well have said, "take everything in the NYGG Office."

In the same way, the warrant to search the Apartment seeks every type of document or record "of," "concerning" or "related to *Mr. and Mrs. Wey,* <u>and</u> every electronic device "used by" or "used in connection with" *Mr. or Mrs. Wey* (not to mention, *inter alia,* the Weys' then minor nephew, also a sometime resident of the Apartment).  If the requirement of particularity,

or the notion of the impermissibility of a "general warrant," have any meaning at all, they must apply to these warrants.[27]

If that were not enough, the seizure and retention by the FBI of all the electronic devices in particular presents a serious additional problem.  The case law makes clear that there is a serious risk that a "warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant.'" *Galpin*, 720 F.3d at 447 (citing *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010)).  Thus, where, as here, the "property to be searched is a computer hard drive, the particularity requirement assumes even greater importance."  *Galpin*, 720 F.3d at 446.  "As numerous courts and commentators have observed, advances in technology and the centrality of computers in the lives of average people have rendered the computer hard drive akin to a residence in terms of the scope and quantity of private information it may contain."  *Id.*; *see also United States v. Cioffi*, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009) ("The dawn of the Information Age has only heightened . . . [privacy] concerns.  The risk of exposing intimate (and innocent) correspondence to prying eyes is magnified because [c]omputers . . . often contain significant intermingling of relevant documents with documents that the government has no probable cause to seize.") (internal quotations and citations omitted).

Accordingly, this Court must view the warrants with "a heightened sensitivity to the particularity requirement in the context of digital searches," *Galpin*, 720 F.3d at 447, because "the government may claim that the contents of every file it chose to open were in plain view

---

[27] Also missing from the warrants is any temporal limitation on the items to be searched.  *See, e.g.*, *Hernandez*, 2010 WL 26544, at *11 (noting that a "temporal limitation" is an "indic[ium] of particularity") (citation omitted); *Zemlyansky*, 945 F. Supp. at 459 (same); *United States v. Costin*, 5-CR-38, 2006 WL 2522377, at *12 (D. Conn. July 31, 2006) ("[a] warrant's failure to include a time limitation, where such limiting information is available and the warrant is otherwise wide-ranging, may render it insufficiently particular."); *Vilar*, 2007 WL 1075041, at *23 (the "patent lack of particularity is only compounded by the absence of any date restriction on the items to be seized.").  The absence of any time limitation in these warrants with respect to the items to be seized further reinforces the conclusion that the warrants lacked particularity, and functioned as general warrants.

and, therefore, admissible even if they implicate the defendant in a crime not contemplated by the warrant." *Id.* (citing *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010)).

Here, that consideration was simply ignored. Paragraph 7 of the respective Exhibit A to each warrant permits the agents to search and seize the entirety of every computer or electronic storage device, *regardless of file content*. The overwhelming breadth of the computer search parameters, in and of themselves, merits a finding that the warrants violated the Fourth Amendment.

Finally, to the extent there is any doubt from the face of the warrants that they are unconstitutionally lacking in particularity, the FBI's execution of the warrants conclusively demonstrates this to be true. The agents swept up essentially *everything*, indiscriminately. (Siegal Decl., Exs. 23, 26) The warrants left the agents to their own devices in electing what was subject to seizure, and consequently, they simply took it all.

In sum, the warrants are insufficiently particularized in violation of the Fourth Amendment.

## C.    The Lists of Items To Be Seized Are Overbroad and Lack Probable Cause

For the reasons addressed above, the warrants are also impermissibly overbroad because they improperly granted the FBI the authority to rummage through and seize every conceivable record and electronic storage device (and all contents thereof), despite the fact that the Government failed to establish probable cause for such a broad search.

In determining whether a warrant is overbroad, courts focus on whether probable cause exists "to support the breadth of the search that was authorized." *Hernandez*, 2010 WL 26544, at *8 (quoting *United States v. Dinero Express, Inc.*, 99-CR-975, 2000 WL 254012, at *9 (S.D.N.Y. Jan. 6, 2010)). Probable cause is demonstrated where "the totality of circumstances

indicates a 'fair possibility that contraband or evidence of a crime will be found in a particular place.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (citations omitted).  A warrant permitting "fairly broad" seizure of materials is permitted only where "the affidavit in support of the search warrant application provides the necessary basis for a determination of probable cause to seize items in each of those categories."  *Hernandez*, 2010 WL 2544, at *8; *see also Zemlansky*, 945 F. Supp. 2d at 453 (same).

Neither the Komar Affidavit nor the Garwood Affidavit (which is premised almost entirely on the Komar Affidavit) establishes probable cause to seize *all documents or things imaginable that would be maintained by the NYGG Office and the Apartment*.  Rather, those Affidavits suggest, at most, grounds for seeking records relating to particular deals in which Mr. Wey and/or NYGG was involved, and perhaps other related financial records.  However complex a scheme the applications described, they hardly justified permission to seize *everything*.  The agents' allegations simply do not support the all-encompassing sweep conducted pursuant to these warrants.

In a case similar to this one, *United States v. Zemlyansky*, defendants moved to suppress evidence seized from the Tri-State Billing office pursuant to a warrant based on an affidavit that attested that some members of the alleged scheme established billing and collection companies to handle paperwork and deal with billing disputes.  945 F. Supp. 2d at 450-51.  The court found that while that agent provided probable cause for a search and seizure of materials from Tri-State relating to the five clinics at issue, the sweeping list of items enumerated in the warrant was not justified.  The Court held that the Government failed to establish probable cause to search and seize "all patient care records, bank account information, and patient appointment information" and thus held the warrant to be overbroad.  *Id.* at 464-65.  The *Zemlyansky* court explained:

> Together, the Tri-State warrant authorized the officers to search for and seize almost everything that one could expect to find at a billing office: any cash or checks, any document that might be considered to be some sort of "financial instrument," all patient records and everything else related to patient records, and all bank information.  In addition to all that physical evidence, the warrant authorized the unlimited search and seizure of all computers and thumb drives, as well as virtually anything electronic and anything related to the use or operation of those electronics . . . it conferred on the searching officers discretion to seize virtually everything short of any diaries, clothing, and love letters that employees may have brought to work.  The broad, undefined and unambiguous terms of this search warrant render it, for all practical purposes, a prohibited general warrant to search Tri-State for evidence of a crime.

*Id.*; *see also United States v. Rosa*, 626 F.3d 56, 62 (2d Cir. 2010); *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992) ("[A]uthorization to search for 'evidence of a crime,' that is to say, any crime, is so broad as to constitute a general warrant."); *Klitzman v. Krut*, 744 F.2d 955, 960 (3d Cir. 1984) (warrants overbroad where "[i]n effect, the warrants authorized virtually a wholesale search and seizure of the business records of the firm.").

Here too, the warrants described overly broad categories of documents, not anchored to any particular set of crimes alleged, and thus authorized the officers to search for and seize almost everything that one could expect to find at the NYGG Office and the Apartment, without sufficient basis.  Accordingly, as in *Zemlyansky*, the warrants are overly broad.[28]

## II.

## NO PROBABLE CAUSE EXISTED TO SUPPORT THE WARRANTS, BECAUSE THE SUPPORTING AFFIDAVIT WAS MATERIALLY MISLEADING

The Komar Affidavit is rife with false and misleading assertions that Agent Komar knew, or recklessly failed to know, were false when he made them.  These are not mere surface blemishes, but rather, demonstrate that this warrant application was rotten at its core.  As a

---

[28] Any attempt by the Government to avail itself of the "all records" exception or the "good faith" exception despite the insufficient particularity and overbreadth of these warrants should be denied.  *See, e.g.*, *Vilar*, 2007 WL 1075041, at *2; *United States v. Burke*, 718 F. Supp. 1130, 1140 (S.D.N.Y. 1989); *United States v. Leon*, 468 U.S. 897, 919-21 (1984); *Zemlansky*, 945 F. Supp. 2d at 459.

consequence, the application lacked probable cause. Had the Magistrate Judge known the full

truth, he would not have issued the warrants. Together, Agent Komar's misrepresentations and

omissions constituted a violation of Mr. Wey's Fourth Amendment rights, which must be

remedied by suppression of the fruits of the searches. At the very least, the false and misleading

representations described below, taken together, require that the Court hold a hearing pursuant to

*Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), to determine whether sufficient evidence

actually existed to support the issuance of the search warrants, and whether Magistrate Judge

Dolinger was misled into issuing them.

The law "permits a defendant to challenge the truthfulness or factual statements made" in

an affidavit supporting a search warrant application, "and thereby undermine the validity of the

warrant and the resulting search or seizure." *United States v. Mandell*, 752 F.3d 544, 551-52 (2d

Cir. 2014) (citing *Franks*, 438 U.S. at 155-56).

The Supreme Court in *Franks* announced the standard for determining whether a

defendant is entitled to a hearing:

> We hold that where the defendant makes a substantial preliminary
> showing that a false statement knowingly and intentionally or with
> reckless disregard for the truth, was included by the affiant in the warrant
> affidavit, and if the allegedly false statement is necessary to the finding of
> probable cause, the Fourth Amendment requires that a hearing be held at
> the defendant's request.

*Franks*, 438 U.S. at 155-56.

Here, the FBI's justification for the warrants appears to be an alleged market

manipulation scheme involving, significantly, a purported scheme to "fraudulently" obtain listing

on NASDAQ by allegedly deceitfully circumventing certain listing requirements, and to use

retail brokers, among others, to artificially inflate demand for certain securities while

simultaneously selling large blocks of shares through nominees. But Agent Komar's assertions

at the very heart of these theories are demonstrably false and misleading, as described in detail below.  Among other things: (1) Agent Komar's statements concerning the legality of counting gifted round lot shares for purposes of NASDAQ's listing requirements were false and misleading; (2) Agent Komar's assertions regarding the supposed lack of justification of stock price movement of the subject issuers, and about purportedly manipulative trading activity by retail stock brokers, were also recklessly or intentionally misleading; and (3) Agent Komar's assertions concerning purported evasion of "currency transaction reporting requirements" were also false.[29]

A.     **NASDAQ Was Not Defrauded Regarding Issuers' Listing Qualifications**

The Komar Affidavit devotes *no less than 20 pages* in an effort to establish that Mr. Wey supposedly "spearheaded" SmartHeat's efforts to access U.S. capital markets by "artificially" generating round-lot shareholders to satisfy NASDAQ's listing requirement. (Komar Aff., ¶ 18) Specifically, Agent Komar avers that a stock giveaway is a "deceptive device" and a "fraudulent technique."  (*Id.*)  But Agent Komar's assertion is materially misleading for several reasons. First, Agent Komar's claim of wrongdoing is premised on a rule that *does not exist.*  No rule prohibits counting shareholders who received their shares in the form of a gift.  Moreover, nothing about this issue was concealed.  NASDAQ was informed by legal counsel for the issuers during the application process that many shareholders had received their shares as gifts.  (Siegal Decl., Ex. 10)  Agent Komar either knew, or recklessly failed to know and report, both of these facts.  Agent Komar's justification for the search is thus fatally flawed in substantial part, and this "point" must be stripped from consideration in determining whether probable cause to support the searches existed.

---

[29]   Because the Komar Affidavit, which was attached to and incorporated by reference in the Garwood Affidavit, also provided the factual basis for probable cause to search the Apartment, all these arguments apply equally with respect to the search of the Apartment.

The Komar Affidavit avers, based supposedly on discussions with law enforcement officials and "the relevant NASDAQ listing rules in effect in 2008 and 2009" (which he does not quote), as well as "other sources" (which he does not specify), that "NASDAQ's 300 round-lot shareholder listing requirement is intended to ensure that an issuer has sufficient bona fide investor interest to sustain trading on the NASDAQ."  (Komar Aff., ¶ 18(b))  Further, according to Agent Komar, "Wey and others participated in a fraudulent scheme to artificially generate approximately 120 new round-lot shareholders of SmartHeat, each holding exactly 100 shares," when representing to NASDAQ that it had 308 round-lot shareholders, despite the "fact" that those individuals supposedly "did not make a bona fide investment in SmartHeat."  Therefore, according to Agent Komar, "SmartHeat's shareholder base was, at least in part, a sham . . ." (Komar Aff., ¶ 18(c)-(d)); *see also* ¶ 18(e)-(i) (regarding Mr. Wey's alleged participation in creating a "sham shareholder base").

The Komar Affidavit concludes that "[t]he creation of a sham shareholder base in this manner is a fraudulent technique" used to "create the appearance of a bona fide shareholder base and thereby obtain a NASDAQ listing."  (Komar Aff., ¶ 18(i))  The Komar Affidavit further suggests that there is probable cause to believe that Mr. Wey and others used the same "fraudulent techniques" to obtain NASDAQ listing status for Deer.  (Komar Aff., ¶¶ 18(i), 19)  The Komar Affidavit thus suggests that the practice of increasing round lot shareholders to obtain a listing on NASDAQ was illegal.

However, what Agent Komar leaves out – either intentionally or recklessly – is that, in reality, *no such bar exists*.  That is, NASDAQ's listing requirement requires nothing more than that the company be owned by 300 or more shareholders of 100 shares or more.  Period.  *No further requirements exist* regarding how those shareholders came to be so.

It should be noted that, to obtain listing on NASDAQ, a company must fulfill a variety of financial and valuation related requirements such as total shareholder equity (in excess of $5 million), market value of publicly held shares (in excess of $15 million), operating history (2 years), listed securities' market value (in excess of $50 million), net income from continuous operations ($750,000 in prior year or two of last three), number of publicly held shares (1 million), number of market makers (at least 3), and bid or closing price (in excess of $4/share), in addition to a number of corporate governance structure requirements.[30]  Apparently Deer and SmartHeat met *all* these requirements.

As to the sole remaining requirement, the only published rule provides that the company's stock must be owned by 300 separate holders.  There simply is no rule requiring, for example, that shareholders paid for their shares with cash.  There is no requirement even that the shareholders have a present intent to trade the stock.  The NASDAQ listing requirements on this point as it then existed stated that an issuer must have 300 Round Lot Holders.  *See* NASDAQ Rule 5505(a)(3).  The Rules define a "Round Lot" as "100 shares of a security."  NASDAQ Rule 5005(a)(33).  Thus, Agent Komar's "independent economic decision" requirement is not based upon any source of official authority.[31]  Thus there was nothing "artificial" about the shareholder lists at issue, and no basis for any inference of fraud.[32]

---

[30]  *See* NASDAQ Initial Listing Guide, at 9-11 (2016), *available at* https://listingcenter.nasdaq.com/assets/initialguide.pdf; *see also* NASDAQ Rule 5505(a), (b).  Note that, depending on which standard is applied, some of these thresholds may actually have been lower than described here, but in any event, no one has suggested SmartHeat and Deer did not clear the thresholds.

[31]  Agent Komar attempts to fill this void by reference to a 2006-filed SEC case styled *SEC v. China Energy Savings Technology*, No. 06 Cv. 6402 (EDNY).  (Komar Aff., ¶ 18(i))  However, that case resulted in no court decision blessing the SEC's theory.  It merely shows the SEC took that position in another case, which is of no legal moment.  *See United Mun. Distributors Group v. F.E.R.C.*, 732 F.2d 202, 207 n.8 (D.C. Cir. 1984) ("The Commission's approval of an uncontested settlement has *no precedential value* as settled practice.") (emphasis added).

[32]  Even assuming certain NASDAQ officials may have *preferred* additional requirements be placed on the round-lot holder requirement, that could not make it an enforceable rule.  In order for a new rule to be enacted, NASDAQ must undertake a process whereby a proposed new rule is published for comment, and then is

Moreover, Agent Komar's assertion that Mr. Wey engaged in a "fraudulent" scheme to deceive NASDAQ is also simply false.  Neither Mr. Wey nor anyone on his behalf represented to NASDAQ that the new SmartHeat and/or Deer shareholders *purchased* their shares.  To the contrary, legal counsel to the issuer stated truthfully to NASDAQ officials, *repeatedly and in writing*, beginning months before its listing was approved, that many of the shareholders of SmartHeat had received their shares *as gifts*.  (Siegal Decl., Ex. 10)  Accordingly, nothing was hidden from NASDAQ.  No one – not issuers' counsel and certainly not Mr. Wey – represented to anyone at NASDAQ that those shareholders paid cash for their shares.  Nevertheless, NASDAQ approved the listings *knowing that some shareholders had received their shares as gifts*.

Agent Komar either knew all these facts, or at least was reckless in not knowing them.  NASDAQ's listing rules are published, and so he certainly knew the listing requirements provided nothing about round-lot shareholder's "investment intent."  Yet Agent Komar *chose* not to point out that fact to the Magistrate Judge.  Agent Komar also undoubtedly had access to the NASDAQ officials and their communications with company counsel, yet he chose not to address in his Affidavit the fact that no one hid from NASDAQ the fact that shareholders had received shares as gifts.  Rather, he misleadingly asserted that shareholders' investment intent was misrepresented by the companies during the listing process.  In doing so, he *actively misled the Magistrate Judge* into believing that a legitimate business strategy was fraudulent, and moreover, that it was the lynchpin of a fraudulent market manipulation scheme, when he knew or should have known that was not true.  In this significant and central way, the Komar Affidavit was *designed* to lead Magistrate Judge Dolinger to the conclusion that sufficient probable cause

---

officially approved by the SEC.  *See* Securities Exchange Act § 19(b), 15 U.S.C. § 78s, and SEC Rule 19b-4 thereunder, 17 C.F.R. § 240.19b-4; *see also* 5 U.S.C. § 553.  No such process was ever instituted, much less completed, for the rule Agent Komar asserts existed but did not.

existed for the search.  *See Franks*, 438 U.S. at 156 (where the "allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."); *Calderon v. City of New York*, 14-Civ-1082, 2015 WL 5802483, at *12 (S.D.N.Y. Oct. 5, 2015) (search was unlawful where affidavit in support of search warrant contained false statements that were "necessary" and "material" to the establishment of probable cause).

**B.      Agent Komar's Claims of Market Manipulation Are Misleading**

Agent Komar resorts to multiple instances of misleadingly selective data and trading "analyses" to support his "market manipulation" thesis that "coordinated action" was taken to "artificially inflate demand" for the stocks in question . . . so that large blocks of shares controlled by insiders" could be "sold into the market."  (Komar Aff., ¶ 20)  Among other things, Agent Komar insists that Deer and SmartHeat both experienced sharp rises in their stock price when, according to him, he was "aware of no public information that could explain such a significant rise."  (Komar Aff., ¶ 25)  Agent Komar further points to "millions" of shares of buying activity in SmartHeat and Deer through the Scholander-Harris Brokers as evidence of the supposed effort artificially to create demand (Komar Aff., ¶ 20), and the alleged "dumping" of "large quantities" of SmartHeat and Deer stock by Mr. Wey's alleged "nominees" "at the same time."  (Komar Aff., ¶ 27)  Each of these assertions is either false or misleading, as Agent Komar well knew when he made his application.

**(1)      Deer and SmartHeat's Stock Price Rise is Not "Unexplained"**

If Agent Komar was truly aware of *no public information* that might explain the rise of the prices of Deer and SmartHeat in the second half of 2009, then he was clearly reckless in

being so woefully uninformed.  *First*, the independent investment banking analyst community was publicly praising these issuers in multiple reports issued during these same months. Rodman and Renshaw and William Blair gave Deer their highest available ratings of "Market Outperform" and "Outperform," supported by in-depth analysis of market conditions and Deer's fundamentals.  (Siegal Decl., Exs. 11-12)  William Blair proclaimed on September 28, 2009, that SmartHeat was projected to experience long term earnings per share growth of 30%.  (*Id.*, Ex. 13)  Also on the same day, BMO Capital Markets gave SmartHeat an "outperform" rating, with a target price of $15 (two dollars above its 52-week high price of $13).  (*Id.*, Ex. 14) Moreover, their recent "uplist" to the NASDAQ, in and of itself, provides plenty of explanation for these stocks' initial rise in price.  (Siegal Decl., Ex. 15)

*Second*, during that same timeframe, both companies announced public offerings, each underwritten by the highly respected Wall Street firms BMO and William Blair:  (i) SmartHeat completed a $75 million secondary public offering in September 2009 (which was approved by the SEC in August 2009); and (ii) Deer announced the completion of a $15 million PIPE financing in September 2009, *and* a $75 million offering of new shares in November 2009. (Siegal Decl., ¶¶ 19-22)  The success of these offerings represent examples of publicly reported positive news that might explain the rise in value of their shares.

*Third*, during this same time frame, the market for Asian equities, and Chinese equities in particular, was strongly on the rise, as anyone with a Bloomberg terminal could readily see.  For example, the "CSI 300" index, a capitalization-weighted stock market index following the performance of 300 stocks listed on the Shanghai and Shenzhen stock exchanges,[33] experienced a *26 percent* rise from September 1, 2009, to December 31, 2009, and the S&P Asia 50 Index (a

---

[33]  (Siegal Decl., Ex. 19)

stock index of Asian stocks in Hong Kong, South Korea, Singapore, and Taiwan) rose *12 percent* over that same period.  (Siegal Decl., Ex. 19)  The rise in stock price of SmartHeat and Deer mirrored the growth of China and the broader Asian markets.  How is it that Agent Komar could have failed to make himself aware of *any* of these *publicly available* facts before making such a damning assertion?

Investors had all sorts of reasons to invest in the three companies at issue in this case, the *bona fides* of which are apparently not contested by the Government.  Indeed, their solid revenue and earnings growth, both then and thereafter, demonstrate why their attractiveness to institutional ownership in 2009 was justified.

SmartHeat had 2010 revenue of approximately $125 million and net income of approximately $23 million.  (Siegal Decl., ¶ 40)  It was listed at #2 on the Investors Business Daily ("IBD") "top 100" publication on January 19, 2010. (Siegal Decl., Ex. 32)  Its stock was widely held by the world's most sophisticated institutional investors and mutual funds: by the end of September 2009, approximately 40% of its shares were owned by institutions such as Fidelity, Neuberger Berman and Oppenheimer Funds.  (Siegal Decl., Ex. 4)

Deer was ranked a "top 200 growth company" in Asia by Forbes magazine.  (Siegal Decl., Ex. 31)  It was also included on the IBD 100 list.  The company reported 2011 revenue of $226 million, net income of $40 million, earnings per share of $1.18 (a 31% increase from 2010), paid $0.20 per share in cash dividend, generated an annual dividend yield of 9%, $6 per share in net assets and was debt free.  (Siegal Decl., ¶ 43)  Sophisticated institutional investors and mutual funds held Deer stock as well: approximately 20% of its shares in December 2009 were owned by, *e.g,*. Janus and Oppenheimer.  (Siegal Decl., Ex. 5)

Moreover, while not relevant to the 2009 time frame, CleanTech too was a company with strong fundamentals attractive to institutional investors.  Customers for its pollution reducing, energy conserving wind farm products include Fortune Global utility and energy companies.  It reported 2010 revenue of $22 million and $4.3 million in net income, an increase of about 600%.  (Siegal Decl., ¶ 44)  Its institutional shareholders included Apollo Global Management, LLC.  (*Id.*, ¶ 45)  William Blair was its financial adviser, and BMO Capital Markets, Stifel Financial and Cantor Fitzgerald participated in underwriting a $50 million stock offering to their clients.[34]

### (2)    Agent Komar's Selective and Misleading Assertions of Manipulation

Agent Komar also seeks to identify "pumping" activity – *i.e.,* activity by which he asserts that participants in the alleged manipulation scheme acted to inflate demand for Deer and SmartHeat.  For this, he points to the fact that the Scholander-Harris Brokers bought for their retail customers approximately 1.3 million shares of SmartHeat and 1.5 million shares of Deer between July 1, 2009 and July 1, 2010.  (Komar Aff., ¶ 21)  What Agent Komar omits from his narrative was that during the same exact time frame, the Scholander-Harris Brokers (whose firms were market makers in both stocks[35]) *sold* almost an identical number of shares as they bought

---

[34]  In January 2011, just months after the NASDAQ had approved CleanTech's listing application, it issued a ruling delisting the company.  That ruling was premised on the assertion that the company had failed to disclose certain information purportedly requested by NASDAQ, including relating to the company's relationship with Mr. Wey, during the application process.  The Komar Affidavit places great emphasis on the CleanTech delisting action to raise probable cause the believe that Mr. Wey was perpetrating a crime.  (Komar Aff., pp. 78-84)

In July 2013, the SEC, in an order signed by its Chairman, Mary Jo White, unanimously ruled that NASDAQ's delisting decision was baseless and not supported by the facts, and ordered CleanTech's stock be relisted for trading, finding that nothing requested had been withheld.  (Siegal Decl., Ex. 22)

[35]  Agent Komar apparently failed to appreciate a very basic aspect of the industry he was investigating: market makers, whose job it is to actively supply liquidity to the market for particular issues, are apt to trade large quantities of the stocks in which they are making a market.  *See* 15 U.S.C. § 78c(a)(38) (''market maker'' means . . . , any dealer who, with respect to a security, holds himself out . . . as being willing to buy and sell [a] security for his own account on a regular or continuous basis"); *see also* SEC definition of "market maker," *available at* https://sec.gov/answers/mktmaker.htm ("A 'market maker' is a firm that stands ready to buy and sell a particular stock on a regular and continuous basis at a publicly quoted price. . . . Many OTC stocks have more than one market-maker.  Market-makers generally must be ready to buy and sell at least 100 shares of a stock they make a market in."); NASDAQ definition of "market maker," *available at* http://www.nasdaqtrader.com/Trader.aspx?id=marketmakerprocess ("A market maker is a NASDAQ member

on a daily basis for each of these stocks.  (*See, e.g.*, Siegal Decl., Ex. 20(A))  Thus, the "fact" on

which Agent Komar relies for his theory of unidirectional pressure on the stocks to explain their

price rise is, ultimately, completely illusory.

Worse, however, is Agent Komar's assertion that nominees sold "at the same time" as the

alleged buying pressure was supposedly being applied.  (Komar Aff., ¶ 27)  To support this false

and misleading assertion, Agent Komar selectively *chooses* wider time frames than necessary,

thereby creating the false impression of synchronicity between the "buying activity" and the

alleged nominee sales.  For the alleged "demand inflating" buying activity, Agent Komar focuses

on the yearlong period beginning July 1, 2009 and ending July 1, 2010.  (*See* Komar Aff., ¶ 21)

By contrast, for the alleged nominee sales – the "dump" – he chooses a different, *earlier* time

frame:  *January* 2009 through *January* 2010.  (*See* Komar Aff., ¶ 27)  That is, Agent Komar

defined his alleged dumping time frame six months earlier than his alleged pumping time frame,

which is wholly inconsistent with a pump and dump scheme.

Moreover, while the time period of alleged Scholander-Harris buying activity to which

Agent Komar refers does overlap with the time period of alleged nominee sales, *all* the net sales

of SmartHeat, and the vast majority of sales of Deer stock, by alleged nominee York Capital

Management Inc. was completed *before* July 1, 2009 – *i.e.,* before the time period of the alleged

"pump"!  Put another way, for the last six months of the selling time frame Agent Komar

describes, York made *zero* net sales of SmartHeat, and made only a small minority of its sales of

Deer stock.  (*See* Siegal Decl., Ex. 20(B),(C))[36]  But because Agent Komar did not reveal the

timing mismatch of the trading activity – which would thereby undermine his theory that the

---

firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)").

[36]  While York did sell a small amount of SmartHeat shares in July 2009, that selling was matched by its purchases at or around the same time.  And by July 1, 2009, York had completed approximately 80% of its total selling of Deer stock by volume (approximately 70% by dollar amount).  (Siegal Decl., Ex. 20(B)(C))

Scholander-Harris Brokers were actively providing liquidity for the nominees to sell out – Agent

Komar intentionally includes those last six months in his description of the relevant "selling"

time frame.  Surely had the Magistrate Judge appreciated this sleight of hand, he would have

thought twice about whether probable cause was demonstrated.  *See Leon*, 468 U.S. at 923

(suppression appropriate where probable cause was "based on an affidavit so lacking in indicia

of probable cause as to render official belief in its existence entirely unreasonable.").

## C.      No Currency Transaction Reporting Requirements Were Evaded

To further buttress his case for probable cause, Agent Komar misleadingly asserts that his

investigation revealed that certain relatives of Mr. Wey were intentionally structuring wire

transfers *to avoid US currency transaction reporting requirements*.  According to the Komar

Affidavit, as part of the alleged "fraud," money was transferred from Tian Yi Wei to Michaela

Wey in wire transfers in increments of less than $10,000 to avoid raising suspicion, "given the

United States currency transaction reporting requirements with respect to cash transactions over

$10,000."  (Komar Aff., ¶ 29(i); *see also* ¶ 14)  But no such reporting requirement exists for

wire transfers.  The United States currency transaction reporting requirements referenced in

paragraph 29 of the Komar Affidavit *apply only to cash transactions, not wire transfers.  See,*

*e.g.*, Bank Secrecy Act of 1970, §§ 1020.410(b)(5)-(9); 1010.311; 1010.313 (requiring financial

institutions to file a Currency Transaction Report with the Financial Crimes Enforcement

Network for all *cash* transactions in excess of $10,000 during the same business day).  There is

no such limitation for wire transfers, because, under the logic of the CTR requirements, the wire

transfers themselves serve the same recording purpose as a CTR.  Thus, whatever the amounts

transferred, there is no proof at all that anyone was violating CTR requirements, as Agent Komar

suggests.  Whether one assumes that Agent Komar made this wrong assertion knowingly or just

recklessly, either way, this Court must conclude that another aspect of asserted criminality falls away from the probable cause calculus.

**D.      Other Portions of Agent Komar's Affidavit Fail to Establish Probable Cause to Search.**

Once the above false and misleading allegations are stripped from consideration, what remains simply does not demonstrate that probable cause existed to search either premises. The Komar Affidavit is filled with mistaken (if not reckless) factual allegations, purportedly nefarious implications that turn out to be legitimate, innocuous, or irrelevant material unrelated to the alleged criminal activity to which the warrant relates.

For example, Agent Komar relies heavily on NASDAQ's January 2011 decision to de-list CleanTech, which he asserts exemplifies that company's "deliberately conceal[ment]" evidence of Mr. Wey's involvement with the company. (S*ee* Komar Aff., ¶ 36)  While Agent Komar may not have been able to predict at the time that the SEC would ultimately reverse that sanction as baselessly imposed by NASDAQ, nevertheless, these 10 pages of his affidavit entirely fail to support a finding of probable cause.

Similarly, Agent Komar emphasizes that many of the deals in which Mr. Wey has been involved were accomplished through the merger of a dormant, publicly listed domestic company (referred to by the Government as "Shell" companies) and a China-based private operating company through a process commonly referred to as a "reverse merger" transaction.  What Agent Komar fails to acknowledge is that, among other things, a reverse merger is a routine alternative method to an IPO (and sometimes a less costly and faster one) for a company to access the public financial markets.[37]  While the Government suggests, both in the search warrant applications and the Indictment, that reverse mergers are fundamentally suspicious, in

---

[37] *See, e.g.,* http://www.investopedia.com/articles/stocks/09/introduction-reverse-mergers.asp (last accessed on May 27, 2016) (Siegal Decl., Ex. 33)

fact, reverse mergers are neither illegal nor inherently fraudulent.[38]  Some of the world's most successful companies came to market by reverse merger, including Burger King, Berkshire Hathaway, Texas Instruments, and the New York Stock Exchange itself.  Nor is there a basis for concluding that China-based reverse mergers are inherently poor investments.[39]  This fact, too, cannot support of a finding of probable cause.

Another illusory suggestion in the Komar Affidavit is the implication that Mr. Wey's sister was involved in a co-banking relationship with the CEO of CleanTech.  In support of his contention that "Tianyi Wei serves as Mr. Wey's nominee," Agent Komar notes that "[c]ertain . . . transfers are listed in bank records as originating from 'MS WEI TIANYI, AN BEI LU.'" (Komar Aff., ¶29(h))  Indeed, Agent Komar goes so far as to include both names as, effectively, co-owners of the "Originating Party" on a summary chart of money transfers to Michaela Wey.  Closing this spurious loop, Agent Komar notes that "Bei Lu" was a founder of CleanTech's operating company and, post-merger, CleanTech's Chairman and CEO.  (*Id.* n.8).  Agent Komar clearly tries to suggest here that CleanTech is funneling money to Michaela Wey.

But this is false.  What the relevant bank records actually say, on their face, is "OGB: Ms. Wei Tianyi, An Bei Lu Chao Yang District, China."  (Siegal Decl., Ex. 35)  "An Bei Lu" in this context refers to *a street address* (An Bei Road) – not a person – and Chao Yang District refers to a geographic districts of Beijing, China.  (Siegal Decl., Ex. 36)  Whatever scienter one can

---

[38]  A 2013 Stanford University study found that, "Chinese reverse mergers performed much better than their reputation," and had performed better than other similarly sized publicly traded companies in the same industrial sector.  *See* http://gsb.stanford.edu/insights/charles-lee-how-well-do-chinese-reverse-mergers-perform (last accessed May 27, 2016)  (Siegal Decl., Ex. 34)

[39]  Indeed, of the 161 Chinese companies listed by NASDAQ, 81 (or about 51%) were the product of reverse mergers.  The American Stock Exchange had 20 Chinese listings, 16 of which (80%) were reverse mergers.  The NYSE itself not only had a long history of listing Chinese issuers since the 1980s, but also attracted a total of 66 Chinese companies, of which 11 (14%) were the product of reverse mergers.

attribute to Agent Komar from this misstatement, nevertheless, this represents yet another false assertion of wrongdoing that must also be subtracted from the probable cause assessment.

As for the rest, much of Agent Komar's purported evidence is stale, often relating to events that took place as much as a decade or more ago.  And much of the remainder of the "evidence" concerns events and activities that occurred at locations other than the NYGG Office or the Apartment, such as allegedly manipulative activity by third party stock-brokers *two years earlier*, at a *separate firm* physically located *at a different location* from the NYGG Office, and alleged trading activity by third parties in accounts located and controlled overseas with no stated connection to the Premises.  Accordingly, these allegations should also be disregarded in determining whether the application would have established probable cause to search the NYGG Office and the Apartment.  *See, e.g.*, *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993) (warrant may lack probable cause where the evidence has become stale); *United States v. Reyes*, 922 F. Supp. 818, 827 (E.D.N.Y. 1996) (information more than 18 months old was stale).

In sum, once the Komar Affidavit is stripped of the false and misleading allegations, the mistaken or slanted assertions about innocuous facts and events, and the irrelevant information concerning facts and events remote in time and place from the subjects of the searches, what remains simply does not support probable cause to search either the NYGG Office or the Apartment.

**E.      At the Very Least, The Court Should Hold a Hearing Pursuant to *Franks v. Delaware***

To the extent the Court has any doubt that the search warrant applications should have been denied, given the above-described material flaws, the Court should hold a hearing to determine whether Magistrate Judge Dolinger was misled in issuing the search warrants.

Here, Mr. Wey challenges, among other things: Agent Komar's false assertion that NASDAQ listing standards prohibited the counting of gifted shares, and his false assertion that NASDAQ was misled by *anyone* about *anything* related to Deer or SmartHeat's satisfaction of any listing requirements; his false and misleading assertions that no publicly available information could explain the increase in shareholder price of Deer and SmartHeat, his misleading assertion that market making brokers' trading activity demonstrated an effort to create artificial market demand, his misleading statements that purported nominees sold large amounts of stock into that alleged "pump," and his misleading assertion that any actions of relatives of Mr. Wey could constitute evasion of currency transaction reporting requirements.

Taken together, these false and misleading statements, which by their very nature suggest at least recklessness on the part of the FBI, seriously undermine the probable cause supporting issuance of the warrant, especially considering the irrelevance of the balance of the affidavit in establishing probable cause.  At the very least, a *Franks* hearing is warranted.  *See, e.g.*, *United States v. Westover*, 812 F. Supp. 38, 40 (D. Vt. 1992) (granting *Franks* hearing where affidavit submitted in support of search warrant contained allegedly false statements, without which there was insufficient facts to justify a finding of probable cause); *United States v. McMurtrey*, 704 F.3d 502, 510 (7th Cir. 2013) (*Franks* hearing was warranted where the affidavit in support of the search warrant conflicted with the affidavit and account of another law enforcement official); *United States v. Garcia-Zambrano*, 06-CR-00172, 2007 WL 108396, at *2 (D. Colo. Jan. 10, 2007) (granting *Franks* hearing where the affidavit in support of the search warrant was inconsistent with an investigative report created by the affiant); *United States v. Johns*, 851 F.2d 1131, 1134 (9th Cir. 1988) (remanding for a *Franks* hearing where the defendant alleged that portions of the affidavit in support of the search warrant could not have been true).

### III.

**THE GOVERNMENT'S FOUR-YEAR RETENTION OF NEARLY EVERY FILE SEIZED CONSTITUTES AN UNREASONABLE SEARCH AND SEIZURE IN VIOLATION OF MR. WEY'S FOURTH AMENDMENT RIGHTS**

The January 2012 searches of the NYGG Office and the Apartment yielded somewhere between two and three million documents.  Four years later, the Government continues to maintain possession of *all* documents seized (including all hard copy originals, and either original electronic devices or full images of original electronic devices) which includes not only irrelevant material but also personal data, including without limitation copies of passports for the Weys' children, report cards and schooling certificates, and personal financial and health care information, such as insurance cards and Michaela Wey's X-rays.  (Siegal Decl., Ex. 27)  As far as the defense is aware, (1) the Government has retained everything it seized, and has purged nothing; (2) the Government took almost four years to bring charges after seizure; (3) the Government continues to threaten to bring additional charges against the defendant, and (4) at least some of the material the Government now asserts is central to their case, and which the Government only recently isolated, was not particularized in the warrants, yet comes from the computer materials seized four years ago.

This is despite the fact that counsel for NYGG and counsel for Mr. Wey each requested long ago, in writing, the return of the seized materials.  (Siegal Decl., Ex. 37)  The FBI's seizure of virtually all documents and all computers and electronics from the NYGG Office and the Apartment, and its permanent retention and continued use of all those materials through both the initial investigation period in 2011 and 2012, and its apparent resurrection three years later in 2015, presents a separate violation of Mr. Wey's constitutional rights and another ground for suppressing the search fruits.

Courts have become increasingly concerned that the Government's ability to seize entire hard drives for off-site examinations not "become a vehicle" for a plainly unconstitutional "general" searches.  *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010).  Where a warrant authorizes a search through vast quantities of computer files, the Fourth Amendment particularity requirement becomes even more pointed.  *See Galpin*, 720 F.3d at 446; *Ganias I*, 755 F.3d at 135; *United States v. Abdellatif*, 758 F. Supp. 2d at 189, 189 (E.D.N.Y. 2010); *Cioffi*, 668 F. Supp. 2d at 391.

Indeed, as the Second Circuit has made clear – in a case predating this Indictment by more than a year – the Fourth Amendment does not permit officials executing a warrant to "seize and indefinitely retain every file on [a] computer for use in future criminal investigations." *Ganias I*, 755 F.3d at 137.  Rather, the Government is required to cull through seized materials and "identify and return those materials not covered by the warrant."  *United States v. Soliman*, 06-CR-236, 2008 WL 4757300, at *8 (W.D.N.Y. Oct. 29, 2008); *see also United States v. Tamura*, 694 F.2d 591, 597-98 (9th Cir. 1982) (holding the government's retention of material outside the scope of the warrant was an "unconstitutional manner of executing the warrant"); *Comprehensive Drug Testing, Inc.*, 621 F.3d at 1171 (finding the government may only retain material seized from electronic systems if it was specified in the search warrant); *Doane v. United States*, 08-CR-0017, 2009 WL 1619642, at *10 (S.D.N.Y. June 5, 2009) ("[P]ermitting the Government to retain items outside the scope of the warrant . . . would dramatically dilute the right to privacy in one's personal papers.").

Over-seizures are tolerated for the purpose of a *brief off-site review*, but courts enforce "limits . . . upon th[e] power of technology to shrink the realm of guaranteed privacy."  *Kyloo v. United States*, 533 U.S. 27, 34 (2001).  Perhaps the most basic limit – which the Government

itself has recognized – is that the Government must "complete [their off-site] review . . . within a 'reasonable' period of time." *United States v. Metter,* 860 F. Supp. 2d 205, 211-12 (E.D.N.Y. 2012).[40]  While courts have approved delays of a few weeks or months, significant delays have been deemed a "flagrant[]" violation of the Fourth Amendment warranting "blanket suppression." *Metter*, 860 F. Supp. 2d at 216 (15-month delay in reviewing hard drive images was unconstitutional, requiring suppression); *United States v. Debbi*, 244 F. Supp. 2d 235, 238 (S.D.N.Y. 2003) (failure to review search material for *eight months* violated the Fourth Amendment).

Courts require that once the Government completes its review, it must return all non-responsive information which "it ha[d] no probable cause to collect" in the first instance.  *See, e.g.*, *Comprehensive Drug Testing*, 621 F.3d at 1177; *see also Tamura*, 694 F.2d at 596-97 (retention of "documents not described in the warrant . . . for at least six months after locating the relevant documents" was "an unreasonable and therefore unconstitutional manner of executing the warrant"); *Ganias I*, 755 F.3d 125, 137-38 (retention of documents for over a year-and-a-half after they were separated, "clearly violated Ganias's Fourth Amendment rights"). Indeed, without this requirement, the practice of over-seizing documents for offsite review would lead to the indefinite retention of all electronically-stored documents, a clear violation of the Fourth Amendment.  *See, e.g.*, *Comprehensive Drug Testing*, 621 F.3d at 1176; *Metter*, 860 F. Supp. 2d at 216 ("[T]he Fourth Amendment would lose all force and meaning in the digital era and citizens will have no recourse as to the unlawful seizure of information that falls outside the scope of a search warrant and its subsequent dissemination.").

---

[40]   The Government's own internal policy guidance reinforces this requirement.  *See* Exec. Office for U.S. Attorneys, Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations, 77 (2009), *available at* https://www.justice.gov/criminal/cybercrime/docs/ssmanual2009.pdf, DOJ Manual at 92 ("The Fourth Amendment does require that forensic analysis of a computer be conducted within a reasonable time.").

For example, in *Ganias I,* Army investigators obtained search warrants, including one to search the offices of Ganias's accounting business.  755 F.3d at 128.  Pursuant to the search warrant, investigators seized forensic mirror images of the hard drives of three of Ganias's computers, effectively copying "every file on all three computers – including files beyond the scope of the warrant, such as files containing Ganias's personal financial records."  *Id.*  The *Ganias I* court found that:

> [T]he unauthorized seizure and retention of these documents was unreasonable.  The Government had no warrant authorizing the seizure of Ganias's personal records in 2003.  By December 2004, these documents had been separated from those relevant to the investigation of American Boiler and IPM.  Nevertheless, the Government continued to retain them for another year-and-a-half until it finally developed probable cause to search and seize them in 2006.  Without some independent basis for its retention of those documents in the interim, the Government clearly violated Ganias's Fourth Amendment rights by retaining the files for a prolonged period of time and then using them in a future criminal investigation.

*Id.* at 138-139.[41]

---

[41] In an *en banc* opinion, issued this morning, the Second Circuit affirmed the District Court's order without addressing the Fourth Amendment issues present here.  *Ganias II*, 12-240, Doc No. 218.  Instead, the Court found that the Government relied in good faith on a subsequent warrant (a fact not present here), and found that the good faith exception to the exclusionary rule applied, however, the Court "offer[ed] no opinion on the existence of a Fourth Amendment violation in this case."  *Ganias II* at p. 22.  Here, *Ganias I* having been decided in 2014, the Government was clearly on notice that it was and is a Fourth Amendment violation to seize and indefinitely and indiscriminately retain all electronic documents seized during a search.  *Cf. Ganias II* at p. 59 ("At the time of retention, no court in this Circuit had held that retention of a mirrored hard drive during the pendency of an investigation could violate the Fourth Amendment. . . .").  And no argument of good faith will stand here.  *See, e.g.*, *Vilar*, 2007 WL 1075041, at *2; *Leon*, 468 U.S. at 919-21.

In fact, Judge Chin's dissent in *Ganias II* (12-240, Doc. No. 221 (2d Cir. May 27, 2016)) – which *does* address the Fourth Amendment issue – persuasively finds that it is a clear Fourth Amendment violation, warranting exclusion, when the Government indiscriminately retains all of a defendant's electronic files after a search.  Judge Chin notes that the Fourth Amendment "restricts the Government's ability to remove all of an individual's papers for later examination."  *Id.* at p. 11.  In the context of the seizure of electronic materials, after the Government has time to segregate the responsive materials, "the Government's overseizure of files and continued retention of non-responsive documents becomes the equivalent of an unlawful general warrant."  *Id.* at p. 17.  Judge Chin also notes that all eight *amici* and the prevailing scholarly consensus has been that the Government's actions, in indiscriminately retaining all of Ganias's files, is a clear Fourth Amendment violation. *Id.* at p. 5, n.4, n.5.

Similarly, in *United States v. Debbi,* the Government obtained search warrants permitting seizure of items related to allegations of obstruction of justice and health care fraud.  *Debbi*, 244 F. Supp. 2d at 236.  Pursuant to the search warrant, the agents seized electronic and paper files, financial documents, and patient records.  Thereafter, the Government failed to take any steps to separate documents within the scope of the warrant from those clearly outside the scope.  *Id*. at 237.  The *Debbi* court found that:

> the government essentially concedes that virtually no attempt was made at the time of seizure itself to separate evidence of Debbi's alleged fraud and/or obstruction from other documents that were seized; that it was only after repeated demands from defense counsel, extending over months, that even a limited portion of improperly seized items were returned (approximately one box); and that even after the instant motion was brought, no meaningful attempt was made to separate from what was actually seized the only items that the warrant permitted to be seized, i.e., evidence of Debbi's alleged fraud of obstruction.

*Id*. at 237-38.  The *Debbi* court further found that the Government "felt free to invade Debbi's home, seize his records without meaningful limitation and restraint, pick over them for months thereafter without determining which were actually evidence of the alleged crimes, and even now refrain from returning what it was never entitled to seize."  *Id.* at 238.  Accordingly, *Debbi* the court suppressed all seized materials that the Government had not yet determined to be within the scope of the warrant, and scheduled a hearing to determine whether all seized items should be suppressed.  *Id.*[42]

Here, the Government's wholesale seizure and *more than four-year* retention of the documents seized from NYGG and the Apartment (while purging nothing), even in the face of written requests for their return, was and remains a blatant and continuing abuse of Mr. Wey's Fourth Amendment rights.  *See, e.g., Metter*, 860 F. Supp. 2d at 215-217.  As previously

---

[42]   At the hearing, the Government consented to suppression of the "evidence of [Debbi's] alleged fraud or obstruction of justice" obtained during the search.  *United States v. Debbi*, 02-CR-808, 2003 WL 1922928, at *1 (S.D.N.Y. Mar. 31, 2003).

addressed, as a result of the overbroad search warrants, the Government seized virtually every

scrap of paper, every computer, every cellphone, and every other electronic device from both the

NYGG Office and the Apartment.  It is also uncontroverted that the Government copied Mr.

Wey's personal records, including family education and health documentation, copies of

children's' passports, report cards and school certificates, and personal health information.  In

fact, these records remain among the documents the Government *produced in discovery*.  (Siegal

Decl., Ex. 27)[43]  All of these private, personal documents – as well as everything else on the

computers and other electronic devices – were imaged and retained by the Government, and the

Government took no steps to return or destroy anything they seized.  *See, e.g.*, *Comprehensive

Drug Testing*, 621 F.3d at 1176-77.  This is despite the fact that, for all outward appearances, the

Government's original investigation ended in 2012.  The Government nevertheless kept all that

material and revisited it three years later to bring the present charges.

Moreover, the additional policy concerns raised by *Ganias I* (decided in June 2014) and

*Metter* (decided in May 2012, shortly after the search in this case) are similarly raised by the

Government's behavior here.  Four years after the searches, the Government continues to

threaten to expand the charges against Mr. Wey, including into alleged crimes not even

suggested by the initial warrant applications – namely tax charges – while in possession of all the

seized materials.  The Government's lengthy retention of the records and its continued

possession of personal material, without explanation, is clear evidence of misfeasance.

In addition, subsequent to Mr. Wey's Indictment, the defense has asked the Government

to explain its search process regarding how, if at all, it isolated responsive data from

---

[43]   While Mr. Wey's co-defendant, Mr. Erbek, is not yet under this Court's jurisdiction, should he be arrested at
some point, the Government will be obligated to produce discovery to him.  Mr. Wey reserves the right, should
that situation ever arise (or should the Government at some point add other, as yet unnamed, defendants to this
case), to object to the production by the Government of, *inter alia*, the entirety of the seized computer files from
the NYGG Office and the Apartment to the other defendants.  *See Metter,* 860 F. Supp. 2d at 210-211, 216.

unresponsive data.  (Siegal Decl., ¶ 52)  The defense simply does not know when the Government began its review, or when, if ever, it completed it.  The Government has not explained how it attempted to isolate information responsive to the warrants from non-responsive material.  The Government has not explained what it has been doing with the search materials for the past four years, including during an apparently lengthy hiatus in the investigation.  The Government has not explained why it took almost four years to proceed with its case, or to what extent more recent usage of the seized materials put it in a position to bring charges in 2015.  The Government has not explained how it could be that their indefinite retention of everything has not prejudiced the defense, and has not explained how it will prevent that continued retention from further prejudicing him.  And the Government's recent threat of additional tax charges – unreferenced in Agent Komar's affidavit as an investigation topic – raises the further suspicion of continued prejudice to Mr. Wey of the Government's unreasonable seizure tactics.

The Government's over-seizure and failure to return or purge itself of materials it should not have seized is a separate, independent basis for suppressing the search fruits.  *See Ganias I*, 755 F.3d at 136-41.

## IV.

### THE GOVERNMENT SHOULD BE COMPELLED TO DISCLOSE ITS TAINT PROCESS, AND SHOULD BE PROHIBITED FROM REVIEWING PRIVILEGED OR POTENTIALLY PRIVILEGED DOCUMENTS

Mr. Wey's counsel has repeatedly requested from the Government details concerning the "taint" process employed by the Government in connection with the evaluation and review of documents seized from the NYGG Office and the Apartment pursuant to the search warrants, and has continually objected to the Government's review of any privileged or potentially privileged document prior to any determination by this Court.  More specifically, Mr. Wey has sought information from the Government concerning (i) how it identified potentially privileged

materials to avoid invading the attorney client privilege, and (ii) the process by which it marked and/or excluded such files from review by the prosecution team.  (*See id.*)  To date, the Government has failed to respond to these requests, although it has informed the defense that it has identified at least 1,500 files from the searches as "privileged or potentially privileged."

Shortly after January 25, 2012, the Government requested that NYGG and Mr. Wey's counsel provide a list of names of attorneys who may have engaged in communications with NYGG employees and/or Mr. and Mrs. Wey that would be covered by the attorney-client privilege.  The Government stated that the list was for purposes of establishing a "taint" team and procedure to avoid any potential breach of the attorney-client privilege as part of the Government's review of the search materials.  By letters dated May 7, 2012 and June 4, 2012, counsel for NYGG sent the Government a list of counsel it believed may have been a party to or the author of documents or other materials seized during the searches.  (Siegal Decl., Exs. 37-38)

On or about October 22, 2015, the Government informed Mr. Wey's counsel that it had identified privileged or potentially privileged materials within both electronic and hard copy documents collected in response to the search warrants.  (Siegal Decl., ¶ 53)  Mr. Wey's counsel objected to the Government reviewing any privileged or potentially privileged document.  (*Id.*)  On January 5, 2016, Mr. Wey's counsel again objected to the review of any privileged or potentially privileged material by any Government employee.  (Siegal Decl., Ex. 39)  To permit Mr. Wey's counsel to better evaluate the issue, the Government agreed to provide Mr. Wey's counsel with a set of all privileged or potentially privileged documents.

On February 24, 2016, the Government informed Mr. Wey's counsel that it had identified 1,295 "potentially privileged" documents.  (Siegal Decl., Ex. 40)  In an April 1, 2016, letter, Mr. Wey's counsel reiterated their objection to the review of any privileged or potentially privileged

materials by any Government employee.  The Government produced a set of "potentially privileged" documents on or about April 15, 2016.

Separately, on March 8, 2016, Mr. Wey's counsel requested that the Government promptly describe its search and taint process and procedures, including (i) how the Government identified which files to treat as potentially privileged and (ii) the process by which the Government marked and/or excluded such files from review by the investigating team.  (Siegal Decl., Ex. 42)  Mr. Wey's counsel further requested that the Government provide the identities of the case agents, analysts or other personnel involved in the taint process, as well as any notes made during the taint review by such persons and/or the examiner.  (*Id.*)  The Government declined, and has to date provided no detail on this process.

Notably, the taint process was far from perfect.  The Government's Rule 16 production is littered with several clearly privileged communications, including messages between NYGG and its outside counsel, and between, *e.g.,* the Weys and their estate planning lawyer.[44]  *See United States v. Levy*, 577 F.2d 200, 210 (3d Cir. 1978) (reversing conviction and dismissing indictment where prosecution obtained attorney-client confidential information concerning defense strategy from an informant); *State v. Lenarz*, 22 A.3d 536 (Conn. 2011) (prejudice caused by the prosecutor's intrusion into defendant's privileged communications would be irremediable on retrial, warranting dismissal of defendant's conviction).

To date, the Government has failed to provide any details concerning how the "taint" process was undertaken (despite repeated requests for such information).  The Government has

---

[44]  Attached to the accompanying Declaration of David Siegal are redacted copies of examples of such communications.  (Siegal Decl., Ex. 43)  Should the Court wish to examine the unredacted versions *in camera*, the defense is open to discussing a process by which that could be accomplished while maintaining their privileged status.

further represented to Mr. Wey's counsel that, as of today, these "potentially privileged" documents have yet to be reviewed.

As an initial matter, the Government should be directed to respond to Mr. Wey's requests for information concerning the taint process to enable Mr. Wey to evaluate whether the taint procedures employed by the Government were and are appropriate.  *See In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994) (the use of a Government taint team is a "highly questionable" procedure that "should be discouraged" . . . it is "a great leap of faith to expect that members of the general public would believe any such Chinese wall would be impenetrable; this notwithstanding our own trust in the honor of an AUSA"); *see also United States v. Kaplan*, 02-CR-883, 2003 U.S. Dist. LEXIS 21825, at *9 n.4, *37 (S.D.N.Y. Dec. 8, 2003) (disapproving the Government's use of an ethical wall team "where potentially privileged materials are turned over to the trial team and the case agents before any challenge to those determinations can be raised by a Defendant and determined by a court."). Mr. Wey reserves the right to challenge the Government's taint process once that process has been revealed.

Accordingly, Mr. Wey seeks an order from the Court (i) directing the Government to provide him with information concerning the taint process and procedure employed in connection with the review of documents seized pursuant to the search warrants, to determine whether the prosecution team has been tainted, and if so, establish appropriate remedy, and (ii) directing the Government not to review any document designated as privileged or potentially privileged.

# V.

## THE CHARGES SHOULD BE DISMISSED

In the Defendant's First Discovery Motion, filed April 29, 2016 (Doc. Nos. 37-39, 40-42), the defense moved for a bill of particulars because the various counts of the Indictment failed to specify the allegedly criminal conduct.  The defense has the right to move, pre-trial, to dismiss the Indictment for failure to state an offense, but under these circumstances, the ambiguity of the Indictment's allegations severely undercuts the defense's ability to do so.  For example, Count Two alleges "securities fraud" but does not identify the allegedly manipulative trading activity or the specific time frame thereof, and refers to all three issuers at once. Similarly, Count Four alleges wire fraud without identifying any allegedly unlawful wire.  Given additional particulars, the defense might be in a position to move to dismiss on grounds such as statute of limitations, venue, lack of jurisdiction, and failure to state an offense.  The Government apparently seeks to avoid facing motions to dismiss these counts by failing to provide the necessary particulars.[45]

Nevertheless, even as currently framed, the charges in the Indictment fail for several reasons, and they should be dismissed.  First, several counts of the Indictment violate Mr. Wey's constitutional due process rights because they are duplicitous.  Second, the fraud based counts should be dismissed because the Indictment fails to set forth allegations that demonstrate the elements of fraud could be proven.  Third, the counts charging criminal violations of Section 13(d) of the Securities and Exchange Act are not supported by the law.

---

[45]  The defense reserves the right to move to dismiss the charges at an appropriate time after the Government has provided the required particulars.

## A.    Counts One, Two, Three, Four, Seven, and Eight are Duplicitous

Counts One, Two, Three, Four, Seven, and Eight of the Indictment are duplicitous and the Government cannot proceed with the Indictment as is.[46]  "An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby."  *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).

A defendant is impermissibly prejudiced where there is a chance that, due to the duplicity in the Government's charges:

    a.    a general verdict of guilty could conceal a finding of guilty as to one crime and a finding of not guilty as to another,

    b.    jurors may not have been unanimous as to any one of the crimes charged,

    c.    the defendant may not have adequate notice of the charges,

    d.    the Court may not have a basis for appropriate sentencing, or

    e.    the defendant is not protected from double jeopardy in subsequent prosecutions.

*Id.* (internal quotations omitted).

The Government has charged two securities fraud counts, two money laundering counts,[47] one wire fraud count, and one conspiracy count.  However, from the bare details

---

[46]  Mr. Wey reserves the right to move with respect to Counts Five and Six on the grounds of duplicity.  The Government has identified the companies to which those counts refer.  However, until his separately filed request for a bill of particulars is granted (*see* Doc. Nos. 37-39, 40-42), the defense is not in a position to discern whether Counts Five and Six are duplicitous, because the Government has not provided details sufficient to know whether those counts refer to a single crime or multiple distinct crimes.

[47]  Mr. Wey reserves the right to argue that these Counts are also multiplicitous.  *See United States v. Polizzi*, 06-CR-22, 257 F.R.D. 33 (E.D.N.Y. 2009) ("A multiplicitous indictment creates an exaggerated impression of a defendant's criminal activity by 'charging an offense multiple times, in separate counts, when, in law and in fact, only one crime has been committed.'") (quoting *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999); *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981) ("The vice in multiplicity of charges is that it may lead to multiple sentences for the same offense and may improperly prejudice a jury by suggesting that a defendant

supplied in the Indictment, the Government's case involves the alleged market manipulation of three separate securities. Two of these securities (Deer and SmartHeat) traded on NASDAQ for several years, while the other (CleanTech) traded only briefly. Further, the Indictment has identified two allegedly manipulative acts with respect to CleanTech, but has not identified any allegedly market manipulative activity with respect to either Deer or SmartHeat.

The jury will be required to determine whether the Government has proven fraudulent manipulation with respect to three separate stocks. As charged, it will be impossible to discern whether, for instance, a verdict of guilty on Count Two means that the jury determined that Mr. Wey is guilty of manipulation of CleanTech, Deer, or SmartHeat, or some combination or subset of the three. This will also make it difficult for the jury to vote on the counts amongst themselves, because it will be unclear whether they have found unanimously with respect to manipulation of any given stock. Similarly, in the event the Court is asked to hand down a sentence, it will be unable to determine which stocks the jury believed Mr. Wey had manipulated, and, for example if the jury were to find manipulation only with respect to CleanTech, that might result in a loss amount of $0 or less. Moreover, the Government's apparent desire to maintain flexibility, through trial, over what conduct and to which stock issuer each of these charges relates also violates Mr. Wey right to be protected from double jeopardy.

If the Court finds that the Government has alleged duplicitous counts – which it should – the appropriate remedy is to dismiss those counts. *See United States v. Starks*, 515 F.2d 112, 117 (3d Cir. 1975). Alternatively, in *Sturdivant*, the Second Circuit held that under some circumstances, the Government may remedy its duplicitous pleading by electing to proceed on one alleged crime for each Count. *Sturdivant*, 244 F.3d at 79 ("prior to a defendant's conviction,

---

has committed not one but several crimes."). Due to the bare pleading in the Indictment, it is impossible to determine whether the claims are multiplicitous at this time.

prejudice to the defendant can be avoided by having the Government elect to proceed based upon only one of the distinct crimes included within a duplicitous count").

However, courts have made clear that it is inappropriate to permit the Government to elect the crime on which it will proceed where the indictment would nonetheless allege multiple crimes, because such an indictment presents a Constitutional deficiency. *See United States v. Kearney*, 451 F. Supp. 33, 38 (S.D.N.Y. 1978). For example, in *Kearney*, the defendant moved to dismiss as duplicitous three counts of an indictment that charged aiding and abetting the obstruction of correspondence and unlawful wiretapping. *Kearney*, 451 F. Supp. at 34-35. Counts two and three of that indictment charged Kearney with aiding and abetting the delivery of obstructive mails over the course of a one-and-a-half year period. *Id.* In summary, the Government contended that Kearney, a former FBI agent, had wrongfully taken several letters out of the mail in a scheme to discover the whereabouts of fugitives. *Id.* at 36. The Court found that the obstruction of correspondence counts were duplicitous because:

> the charges of violation of 18 U.S.C. §§ 1702 and 2 concern takings from depositories over an eighteen-month period letters addressed to at least ten persons at three addresses (Count II) and over a six month period letters addressed to at least two persons at one address. To accept the government's contentions of one central core of conduct and continuous scheme would virtually obliterate the distinction between substantive offenses and conspiracy, with which Kearney has also been charged in two counts (Counts I and IV) not here in issue.

*Id*. at 37. Similarly here, the Indictment alleges a scheme lasting five years and involving the alleged manipulation of three separate securities. In *Kearney*, the Government argued that it could remedy the duplicity of these counts by electing one of the multiple offenses alleged. *Id.* at 38. The Court rejected that argument and dismissed the counts because the bill of particulars provided by the government failed to identify the specific dates upon which the alleged wrongful takings occurred. *Id*. at 38 (to remedy a duplicitous indictment through the election method, the

Government's indictment must "fully, directly and expressly, without uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished").

Accordingly, the Court should dismiss Counts One, Two, Three, Four, Seven, and Eight unless the Government: (i) provides sufficient detail in a bill of particulars to identify individual acts of securities fraud and wire fraud and a single conspiracy, and (ii) elects one such act/conspiracy for each count.

## B.      Counts Two Through Six Must be Dismissed

Counts Two through Six of the Indictment, which allege securities fraud pursuant to 15 U.S.C. § 78j(b) and 18 U.S.C. § 1348, wire fraud pursuant to 18 U.S.C. § 1343, and failure to disclose ownership interests in excess of five percent of Deer and CleanTech stock, respectively, because each fails to state an offense.  As discussed above, the defense is currently severely limited in the motions it can make with respect to these counts, because the charging instrument has done little to reveal the alleged facts underlying each of these counts.  Accordingly, the defense will be in a better position to move to dismiss these counts when the Government provides particulars with respect to its allegations.

Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  This requirement performs three constitutionally mandated functions: "It fulfills the Sixth Amendment right 'to be informed of the nature and cause of the accusation;' it prevents a person from being subject to double jeopardy as required by the Fifth Amendment; and it serves the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury."  *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999); *United States v. Labate*, 100-CR-632, 2001 WL 533714, at *3 (S.D.N.Y. May 18, 2001).

The two main criteria for testing the sufficiency of an indictment are: (1) whether it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend"; and (2) whether it "enables [the defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). Where a definition of an offense "includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition . . . it must descend to particulars." *Russell v. United States*, 369 U.S. 749, 765 (1962). In sum, "the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000). Where, as here, the factual allegations fail to establish the offenses charged, dismissal is required. *See, e.g.*, *Pirro*, 212 F.3d at 93 (affirming dismissal where the indictment failed to state an essential element of the crime); *United States v. Berlin*, 472 F.2d 1002, 1008 (2d Cir.1973) (reversing conviction based on inadequate indictment that failed to state an essential element of the charged crime); *see also* Fed. R. Crim. P. 7(c)(1) & 12(b)(3)(B)(v).

**(1)     Count Two Fails to Allege any Deceptive Act**

Count Two alleges that Mr. Wey "used and employed manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities" in violation of Section 10(b) and Rule 10b-5 when he "secretly amassed and concealed a beneficial ownership interest in excess of five percent of the common stock of each of SmartHeat, Deer, and CleanTech, and manipulated and caused to be manipulated the market price and demand for the common stock of those public companies." (Indictment, ¶ 28) As discussed above, and in the Memorandum of Law in Support of Mr. Wey's First Discovery Motion, this allegation is impenetrably vague. However, as Count Two is currently pled, the Government appears to allege that Mr. Wey committed securities fraud by failing to file a 13D disclosure. As set forth

below, Count Two must be dismissed because this alleged failure to file fails to constitute a

deceptive act as required by Section 10(b) and Rule 10b-5.

"The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in

securities transactions-to make sure that buyers of securities get what they think they are getting.

*Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984).  Thus, in order to

establish liability pursuant to § 10(b) and Rule 10b-5, the Government must allege that a

defendant committed a deceptive act.  *See United States v. Finnerty*, 533 F.3d 143, 148-49 (2d

Cir. 2008).  "Broad as the concept of "deception" may be, it irreducibly entails some act that

gives the victim a false impression."  *Finnerty*, 533 F.3d at 148.  If consumers are getting

"exactly what they expected," the alleged conduct is neither deceptive nor fraudulent and

therefore is not within the ambit of Section 10(b) and Rule 10b-5.  *See Chemical Bank*, 726 F.2d

at 943.

For example, in *Finnert*y, the defendant, a New York Stock Exchange ("NYSE")

specialist, was charged with securities fraud under Section 10(b) and Rule 10b–5 for violating a

NYSE rule on interpositioning transactions, which related to the practice of arbitrage of the gap

between customers' orders to buy and sell stock, preventing the normal agency trade between

matching public orders.  *See Finnerty*, 533 F.3d at 145–46.  The Second Circuit found that the

defendant could not be found guilty of securities fraud simply because he knowingly violated a

NYSE rule without "some proof of manipulation or a false statement, breach of a duty to

disclose, or deceptive communicative conduct."  *Id.* at 150.  The *Finnerty* court stated: "The

government has identified no way in which Finnerty communicated anything to his customers,

let alone anything false."  *Id.* at 148-49.  Nor had the government attributed anything to the

defendant "that deceived the public or affected the price of any stock: no material

misrepresentation, no omission, no breach of a duty to disclose, and no creation of a false appearance of fact by any means." *Id.* at 151.

Here, as in *Finnerty*, a charge of securities fraud cannot be premised on Mr. Wey's alleged violation of Regulation 13D's disclosure requirements, without more, because that cannot constitute a deceptive or fraudulent act. The mere failure to file a Schedule 13D does not equate to fraud. Importantly, the Indictment fails to make any allegations concerning Mr. Wey's communications to investors, let alone any *false* communications. Moreover, the Indictment does not make any allegations concerning investor expectations, without which there can be no deception. *See Finnerty*, 533 F.3d at 148-49.

In sum, the Government's attempt to expand the reach of Section 10(b) and Rule 10b-5 to encompass Mr. Wey's alleged violation of Schedule 13D is unwarranted and Count Two must be dismissed.

### (2)     Count Three Fails to State an Offense

Count Three must be dismissed, because the Indictment fails to allege the essential elements of securities fraud under Title 18. Count Three of the Indictment alleges that Mr. Wey

> knowingly and intentionally executed a *scheme and artifice to (a) defraud* persons in connection with securities of . . . SmartHeat, Deer, and CleanTech and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of  . . . SmartHeat, Deer, and CleanTech.

(Indictment, ¶ 30) (emphasis added)

The Indictment fails to allege a scheme or artifice to defraud. A scheme or artifice to defraud is "[a]ny plan, device, or course of action that deprives another of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Males*, 459 F.3d 154, 157 (2d Cir. 2006). To state a scheme to defraud, the indictment must allege that a defendant possessed fraudulent intent. *See United States v.*

*Starr*, 816 F.2d 94, 98 (2d Cir. 1987).  As part of that element, the government must demonstrate that a defendant "contemplated some actual harm or injury to their victims." *Id.*  Deceptive conduct alone is insufficient to allege fraudulent intent.  *See United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) ("An intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed.").  Rather, "the deceit must be coupled with a contemplated harm to the victim."  *Starr*, 816 F.2d at 98.

The Indictment is devoid of any allegations concerning how Mr. Wey intended to cause harm to the investing public.  Nor do the allegations concerning the alleged manipulation of issuers' stock prices sufficiently allege a scheme to defraud.  To the extent the Indictment alleges any manipulative behavior, it only references two trades – both of which were in CleanTech. The Government cannot sustain a charge with respect to Deer, SmartHeat, and CleanTech, while only alleging manipulative trading with respect to CleanTech.  At a bare minimum, the Court should dismiss Count Two with respect to Deer and SmartHeat.

Even the two allegedly manipulative trades in CleanTech fails to state an offense.  The Indictment alleges that "WEY sent an email to ERBEK stating, "CleanTech just traded at $4.50 per share. Please make sure the trader buys the stock at $5 per share, stay at $5 per share bid price not less. Please make sure this happens right away."  (Indictment, ¶ 18)  This is an instruction for a limit order. [48]  It is unclear what the Government seeks to demonstrate by this allegation or how it could support a market manipulation theory, but the Government must do more than allege facts that are "at least as consistent with innocence as with guilt."  *See United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (citations omitted).

---

[48]    Indeed, as noted below, Mr. Erbek himself informed the Government that this instruction was in fact understood by him to be a limit order and treated as a limit order by the executing financial institution.  (*See* discussion, *infra*, Section VI).

The Government's second and final allegedly manipulative trade also falls flat.  The Government alleges that a single 1000-share "match trade" of a company with, *inter alia*, 25 million shares outstanding was somehow able to manipulate the market for that security.  (Indictment, ¶¶ 18-19)  This incredible assertion is plainly insufficient to support a scheme to defraud.  *See United States v. Mulheren*, 938 F.2d 364, 371 (2d Cir. 1991) (securities manipulation where domination is sustained over a significant period of time).  Indeed, "the extent to which an investor controls or dominates the market at any given period of time cannot be viewed in a vacuum."  *Id.*  Rather, "[t]he percent of domination must be viewed in light of the time period involved and other indicia of manipulation."  *Id.*  Here, the Indictment does not allege facts sufficient to establish the degree to which Mr. Wey allegedly dominated the market or any "other indicia of manipulation."  *See id.*  Consequently, the Indictment fails to allege a scheme to defraud with respect to the alleged match trade.[49]

Accordingly, Counts Three and Four of the Indictment fail because they do not state the elements of the offenses they charge, and should thus be dismissed.[50]

---

[49]  The Government's reference to an alleged "tout" in this same paragraph is apparently intended to give the Court the misimpression that this 1,000-share match trade somehow led to an increase in the price of CleanTech by 70%.  However, this is highly misleading and irresponsible.  The alleged "tout" email referenced by the Government in connection with this match trade merely reports, *accurately* and innocuously, the price at which the stock last traded: "CleanTech Innovations, Inc. (www.ctiproduct.com), wind power and clean energy solutions.  The highly profitable company is based in China's northeast.  Stock symbol: EVCPD, last trade $5.1 SEC filing 8k attached, filed before market opened this morning."  This so-called "tout" nowhere references a 70% increase in stock price.

[50]  The Indictment also alleges in purely summary fashion that Mr. Wey "caused two retail brokers located in Manhattan to solicit their customers to buy shares of common stock of the Issuers, often on margin, while those brokers simultaneously actively discouraged the sale of these stocks by their customers."  (Indictment, ¶ 18)  There are no specific allegations with respect to how Mr. Wey allegedly "caused" these brokers to do anything or what exactly these brokers allegedly did.  Moreover, there is nothing inherently deceptive about brokers soliciting customers to buy stocks while discouraging its sale, nor is this evident of any intent to harm the investing public.  *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179-82 (2d Cir. 1970) (reversing fraud conviction because there was no showing defendants' agents made any false representations in connection with sale of goods).  Importantly, the Indictment does not allege that Mr. Wey caused these "two retail brokers" to make any fraudulent misrepresentations to their customers or that the brokers' customers did not receive what they paid for.  *See Starr*, 816 F.2d at 99 (intent to defraud not shown where no misrepresentation to customers and customers received exactly what they paid for).

### (3)   Count Four Should Be Dismissed For Failure to Allege Wire Fraud

"[I]t is axiomatic that, to be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001). The elements of mail and wire fraud are (1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of wire transmissions in furtherance of the scheme.  18 U.S.C. § 1343.  The Indictment fails to sufficiently allege any of the elements of wire fraud.

Count Four should be dismissed, because, as discussed above, the Indictment does not sufficiently allege that Mr. Wey intentionally deceived and contemplated some actual harm or injury to his alleged victims.  *Starr*, 816 F.2d at 98.  More fundamentally, Count Four should be dismissed because the Indictment does not identify any allegedly fraudulent wires.  *See United States v. Webb*, 24 F. Supp. 3d 432 (M.D. Pa. 2014) (dismissing wire fraud charge for failure to allege an interstate wire).  The Government's failure to identify allegedly fraudulent wire transmissions, besides being an obvious infirmity to adequately stating an offense, prevents the defense from asserting a plethora of defenses and motions that could be made if it understood, *e.g.*, the nature, content, and timing of the allegedly criminal wire.  Accordingly, dismissal of Count Four is warranted.

### (4)   Counts Five and Six Should Be Dismissed Because the Indictment Fails to Allege Willfulness

Counts Five and Six, which allege that Mr. Wey willfully and knowingly failed to disclose his alleged beneficial ownership interests in excess of five percent of Deer and CleanTech common stock in violation of 15 U.S.C. §§ 78m(d) and 78ff, must be dismissed because they fail to allege willfulness as required by the statute.

As an initial matter, in an unprecedented fashion, Counts Five and Six seek to criminalize what is essentially an allegation of regulatory negligence.  As far as the defense can tell, these counts  represent the *first and only* time the Government has attempted to hold an individual criminally responsible for failing to file a disclosure form concerning his ownership interests in stock.  *See* R. Colombo, *Effectuating Disclosure Under the Williams Act*, 60 Cath U. L. Rev. 329, 351 n.278 (2011) (stating that there is no single documented case of criminal liability for failure to file a Schedule 13D); s*ee also* C. Lavecchia & R. Stephen Nelson, Jr., Note, *Dan River Inc. v. Icahn: Disclosure Violations-Relief for Subject Management?*, 18 U. Rich. L. Rev. 375, 399 (1984) (noting that "criminal sanctions are extremely uncommon" for failing to make required SEC disclosures).

Notwithstanding the fact that criminal prosecutions for failure to make securities disclosures are exceedingly rare (if not nonexistent), Counts Five and Six are inadequate because they fail to allege that Mr. Wey acted willfully in failing to disclose his alleged beneficial ownership interests in Deer and CleanTech.  Section 13(d) of the Exchange Act provides that a beneficial owner must make a disclosure within 10 days of acquiring more than five percent beneficial ownership of a public company. 15 U.S.C. § 78m(d); 17 CFR § 240.13d-1(a). Section 32, in turn, provides that criminal liability attaches to "[a]ny person who *willfully violates* any provision of this chapter … or any rule or regulation thereunder the violation of which is made unlawful."  15 U.S.C. § 78ff (emphasis added).  A "willful" violation of a statute is one in which "the defendant acted with knowledge that his conduct was unlawful."  *United States v. Schlisser*, 168 Fed. App'x 483, 485 (2d Cir. 2006) (citing *Bryan v. United States*, 524 U.S. 184, 191-92 (1998)).

With respect to securities fraud, the government must prove "a realization on the defendant's part that he was doing a wrongful act" and that the act was "wrongful under the securities laws." *Schlisser*, 168 Fed. App'x at 485 (quoting *United States v. Dixon*, 536 F.2d 1388, 1397 (2d Cir. 1976)).  The government must prove specific intent "when those activities classified as illegal do not on their own provide notice of their criminality, either because of the difficulty of comprehending the legally acceptable parameters of the activity or because the criminal *actus reus* can often be undertaken with a lawful purpose." *Schlisser*, 168 Fed. App'x at 486 (quoting *United States v. George*, 386 F.3d 383, 390 (2d Cir. 2004)).

The Indictment appears to make two allegations in support of the contention that Mr. Wey acted willfully in failing to disclose his alleged beneficial ownership interests in excess of five percent of Deer and CleanTech common stock pursuant to Section 13(d).  Each of these allegations fails to support a criminal charge.  First, the Indictment makes a blanket assertion that Mr. Wey "intentionally failed to file the requisite reports under Section 13(d) and Regulation 13D, even though he was well aware of this reporting requirement."  (Indictment, ¶ 14)  However, awareness of a duty to act is not sufficient to establish that an individual acted willfully in failing to perform that duty.  *See, e.g.*, *United States v. Stewart*, 305 F. Supp. 2d 368, 377 (S.D.N.Y. 2004) (defendant's knowledge of a statement's falsity was insufficient to establish willfulness under 15 U.S.C. § 78ff); *United States v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010) ("[Defendant's] presumed knowledge of GAAP as a qualified CFO does not make him criminally responsible for his every conceivable mistake.").  The Government's conclusory allegations concerning Mr. Wey's intentions based solely on his alleged awareness of the existence of the applicable securities law is wholly insufficient to establish that Mr. Wey acted willfully in not filing a Schedule 13D.  *United States v. Mattice*, 186 F.3d 219, 225 (2d Cir.

1999) (holding that willfulness requires knowledge of a legal duty and an intentional violation of that duty); *Cheek v. United States*, 498 U.S. 192, 201 (1991) ("Willfulness . . . requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty."). If mere awareness of securities laws were enough to establish willfulness, then any missed filing could potentially trigger criminal liability without regard to intent.[51]

In sum, the Indictment fails to allege that Mr. Wey acted with specific intent not to disclose his (alleged) beneficial ownership interests in excess of five percent of Deer and CleanTech common stock pursuant to Regulation 13D. Nor are there any allegations that Mr. Wey authorized or directed anyone else to abstain from making such disclosures. The Government's attempt to elevate what is essentially an allegation of regulatory negligence into a federal crime is unprecedented and is a blatant example of prosecutorial overreach. *See Goyal*, 629 F.3d at 922 (affirming acquittal and noting that the prosecutor overreached "by trying to stretch criminal law beyond its proper bounds"). Accordingly, Counts Five and Six should be dismissed.

## C.     Counts One, Seven and Eight Also Fail

Count One (charging conspiracy to commit wire and securities fraud) must be dismissed because a conspiracy to commit securities and wire fraud cannot stand where, as here, an essential element of the object offenses is not met. Counts Seven and Eight (charging money laundering) also fail because the alleged wire and securities fraud claims upon which they are

---

[51]     Unlike tax evasion and currency structuring – which criminalizes affirmative acts of evasion – Section 13(d) does not criminalize dividing holdings among multiple accounts. Criminal tax evasion under 26 U.S.C. § 7201 requires an affirmative act with intent to evade or defeat the payment of the tax. *United States v. Josephberg*, 562 F.3d 478, 488 (2d Cir. 2009). Currency structuring under 31 U.S.C. § 5324 requires that a transaction be structured "for the purpose of evading [CTR] reporting requirements."

predicated fail.  That is, if there was no wire or securities fraud to begin with, it cannot be a

crime to conduct monetary transactions with the proceeds of such non-fraudulent activity.

Count One charges Mr. Wey with conspiracy to commit securities and wire fraud in

violation of 18 U.S.C. § 371.  Conspiracy requires proof of: (1) an agreement among the

conspirators to commit an offense; (2) specific intent to achieve the objective of the conspiracy;

and (3) an overt act to effect the object of the conspiracy.  *United States v. Pinckney*, 85 F.3d 4, 8

(2d Cir. 1996) (citing *United States v. Montour*, 944 F.2d 1019, 1024 (2d Cir.1991)).  "Although

the government need not prove commission of the substantive offense" to secure a conspiracy

conviction, "it must prove that the intended future conduct [the conspirators] agreed upon

includes all the elements of the substantive crime."  *United States v. Coplan*, 703 F.3d 46, 66 (2d

Cir. 2012).  To this end, the government must allege that Mr. Wey "agreed to participate in what

he knew to be a collective venture toward a common goal" of committing securities and wire

fraud.  *See United States v. Kapelioujnyj*, 547 F.3d 149, 155 (2d Cir. 2008) (citing *United States

v. Geibel*, 369 F.3d 682, 689 (2d Cir.2004)).

Here, the substantive crime of securities fraud under 15 U.S.C. § 78j(b) requires proof of

a "deceptive act" and the substantive crimes of securities fraud under 18 U.S.C. § 1348 and wire

fraud under 18 U.S.C. § 1343 both require proof of a "scheme to defraud."  As discussed above,

the facts as alleged in the Indictment with regard to these substantive offenses (under Counts

Two, Three, and Four) were insufficient to establish the essential elements in each offense and,

as a result, any agreement to commit such offenses.  Although "a conspiracy indictment need not

describe the substantive crime with the particularity of an indictment for that offense," *United

States v. Switzer*, 252 F.2d 139, 142 (2d Cir. 1958), the Indictment still must allege that Mr.

Wey's agreement embraced all elements essential to constitute the substantive offenses.  *See*

*Coplan*, 703 F.3d at 66; *Kapelioujnyj*, 547 F.3d at 155.  Because the essential elements of these offenses appear nowhere on the face of the Indictment, the conspiracy charge to commit these substantive offenses subsequently also fails.  *See*, *e.g.*, *Kapelioujnyj*, 547 F.3d at 153 (reversing conspiracy conviction because evidence did not establish that defendant was aware of essential elements in the substantive offense); *United States v. Eisenminger*, 16 F.2d 816, 818 (D. Del. 1926) ("[A] conspiracy indictment is not sufficient if it appears upon its face that one or more of the elements of an offense are wanting in the acts agreed to be done.").  Accordingly, Count One must be dismissed.

Counts Seven alleges that Mr. Wey engaged in transactions "designed in whole and in part to conceal the disguise the nature, the location, the source, the ownership, and the control of the proceeds of *specified unlawful activity*."  (Indictment, ¶ 38)  Likewise, Counts Eight alleges that Mr. Wey engaged in transactions "with the intent to promote the carrying on of *specified unlawful activity*."  (Indictment, ¶ 40)  According to the Indictment, the specified unlawful activity is "fraud in the sale of securities and wire fraud" as charged in Counts Two through Four of the Indictment.  (Indictment, ¶¶ 38, 40)  Because the predicate offenses charged in Count Two through Four must be dismissed, there is no basis to support the money laundering charges in Counts Seven and Eight.  Therefore, Counts Seven and Eight must be dismissed as well.  *United States v. D'Alessio*, 822 F. Supp. 1134, 1146 (D.N.J. 1993) (dismissing money laundering counts after mail fraud charges had been dismissed because mail fraud was specifically alleged as the underlying unlawful activity for the money laundering counts); *see also United States v. Rahseparian*, 231 F.3d 1257, 1267 (10th Cir. 2000) (reversing money laundering conviction where the underlying fraud was not proven); *United States v. Finn*, 919 F. Supp. 1305, 1351-52

(D. Minn. 1995) (agreeing that if the mail fraud and theft charges were dismissed, there would be no basis upon which to support the money laundering charges).

### D.      The Government's Prejudicial Pre-Indictment Delay Requires Dismissal of the Indictment.

Although the Government executed its searches on January 25, 2012, it waited *nearly four years* to obtain the Indictment.  This unwarranted and unexplained delay either has prejudiced or threatens to prejudice Mr. Wey because, among other things, crucial witness testimony necessary to defend the allegations may no longer be available at the time of trial.  Further, given the lack of specificity in the Indictment and the defense's present inability to know against which transactions it must ultimately defend (*see* Memorandum of Law in Support of Mr. Wey's First Discovery Motion, filed on April 29, 2016), it is likely that the delay has prejudiced his ability to defend this case in other, as yet unknown, ways as well.  Because the Government's unjustified delay has compromised, and will likely continue to compromise, Mr. Wey's constitutional rights to due process and a fair trial, the Indictment should be dismissed.

Generally, "a citizen's primary guarantee against stale or long-delayed criminal prosecution was the statute of limitations."  *United States v. Santiago*, 987 F. Supp. 2d 465, 484 (S.D.N.Y. 2013); *see also United States v. Marion*, 404 U.S. 307, 322 (1971) ("applicable statute of limitations ... is ... the primary guarantee against bringing overly stale criminal charges.").  In certain cases, however, the limitations period does not effectively protect against stale charges, especially where, as here, "evidence has been lost, memories have faded, and witnesses have disappeared." *Marion*, 404 U.S. at 322 n.14.  In these circumstances, the Due Process Clause of the Fifth Amendment safeguards against excessive and unnecessary pre-indictment delay.  *Id*. at 324; *see also Santiago*, 987 F. Supp. 2d at 498 (dismissing indictment as a result of the government's near five-year delay in bringing charges).

An indictment must be dismissed where (1) the delay causes actual prejudice to a defendant and (2) proceeding to trial would violate "fundamental conceptions of justice." *Schurman v. Leonardo*, 768 F. Supp. 993, 998 (S.D.N.Y. 1991) (citing *United States v. Lovasco*, 431 U.S. 783, 795 n.17 (1977)).

A defendant suffers actual prejudice where he is prevented from presenting evidence that would have been available but for the government's excessive and unnecessary delay in filing charges. *See, e.g.*, *Santiago*, 987 F. Supp. 2d at 485 (finding actual prejudice where the government's near five-year delay resulted in lost exculpatory testimony); *United States v. Gross*, 165 F. Supp. 2d 372 (E.D.N.Y. 2001) (finding actual and severe prejudice where near ten-year pre-indictment delay resulted in loss of crucial witness testimony and documentary evidence); *United States v. Jackson*, 488 F. Supp. 2d 866, 873 (D. Neb. 2007) (two-year delay resulted in actual prejudice warranting dismissal of charges); *Marion*, 404 U.S. at 325-26 ("[A]ctual prejudice" shown where "memories . . . dim, witnesses become inaccessible, and evidence [is] lost.").

In this case, because of the four year delay since the Government executed the search warrants, at least one critical witness who might otherwise have been available to testify for the defense recently suffered a stroke, and may be unable to testify at trial.  A former member of the board of directors for all three of SmartHeat, Deer and CleanTech, now more than 70 years old, suffered a stroke in or about late 2015 and is living in a rehabilitation center.  (Siegal Decl., ¶ 62) His testimony would undoubtedly exculpate Mr. Wey by providing evidence concerning the *bona fides* of SmartHeat, Deer and CleanTech as investment opportunities, and contradicting the Government's theories that Mr. Wey somehow controlled these companies and their stock.  But for the Government's excessive delay in pursuing this investigation, this witness in all likelihood

would have been available to testify at a trial.  The Government's delay may have prevented that witness from testifying at trial, thereby severely prejudicing Mr. Wey's defense. This is precisely the sort of prejudice contemplated by the law, and thus the Indictment should be dismissed.  *See Lovasco*, 431 U.S at 789.[52]

In addition, another important witness, a lawyer with intimate familiarity with Mr. Wey's business practices and operations, is in his 70s and may be suffering from failing health and unavailable to testify at trial.  (Siegal Decl., ¶ 63)

Under the circumstances here, "forcing [Mr. Wey] to trial in the face of Government-created prejudice would offend traditional notions of justice, fair play, and decency." *Santiago*, 987 F. Supp. 2d at 484; *see also United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir. 1990); *see also United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979) (dismissal warranted where a defendant suffered prejudice as a result of "unjustifiable government conduct.")  Courts within the Second Circuit have dismissed charges as a result of the government's "gross negligence" in timely filing charges.  *See, e.g.*, *United States v. Gross*, 165 F. Supp. 2d 372, 385 (E.D.N.Y. 2001); *United States v. Morrison*, 518 F. Supp. 917, 919 (S.D.N.Y. 1981); *see also Doggett v. United States*, 505 U.S. 647, 655 (1992) (reversing conviction where government's negligence resulted in more than 8 year delay between the defendant's arrest and subsequent indictment, finding that such an "extraordinary [ ] lag . . . . presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.").

---

[52]  Beyond this, the defense is not yet in a position to fully know the extent to which its ability to defend this case due to the Government's delay.  As made clear in the defense's earlier-filed discovery motion, the defense is still largely in the dark about what the Government's case is, and what transactions the Government intends to prove were fraudulent or manipulative.  And upon information and belief, the Government has yet to provide the defense with broad categories of potentially exculpatory evidence, or at least leads thereto.  Accordingly, it is highly likely that other forms of evidence have become unavailable as a consequence of the Government's unjustified delay in bringing this case.

Here, the Government can proffer no justification for the delay.  For all outward appearances, the Government's investigation languished and/or was shut down entirely for three or more years.  Moreover, nothing about this case suggests the delay was designed to further a legitimate investigative purpose, since it appears the Government has not uncovered any substantial new evidence since the FBI executed the search warrants in January 2012.  Rather, the Government inexplicably sat on its heels for several years without any valid explanation for doing so, and to the material detriment of Mr. Wey's ability to defend against the charges.  *See United States v. Jackson*, 488 F. Supp. 2d 866, 873 (D. Neb. 2007) (dismissing indictment where case file "languished on the desk of [of the prosecutor] for two years.").

Accordingly, permitting the Government to proceed with its case would violate "fundamental conceptions of justice … which define 'the community's sense of fair play and decency.'" *Lovasco*, 431 U.S. at 790 (citations omitted).  The Indictment should be dismissed in the interests of justice.[53]  In the alternative, the defense reserves the right to supplement this motion at a later date, in the event and to the extent further elements of prejudice become clear from any later production of discovery and/or *Brady/Giglio* material to the defense.

### VI.

### MR. WEY SHOULD BE PERMITTED TO TAKE A PRE-TRIAL DEPOSITION OF CO-DEFENDANT SEREF DOĞAN ERBEK PURSUANT TO RULE 15

Should this matter proceed to trial, Mr. Wey's ability to prove his innocence will depend in large part on whether the jury is permitted to hear testimony from his co-defendant, Mr. Erbek, Mr. Wey's alleged co-conspirator.  Not surprisingly, Mr. Erbek, a Swiss citizen, has no plans to travel to the United States, and is beyond the subpoena power of this Court.  Mr. Erbek

---

[53]  At a minimum, a hearing should be held in order to determine whether the Government's extraordinary delay in bringing charges is justified.  *See United States v. Hoo*, 825 F.2d 667, 668-69 (2d Cir. 1987) (evidentiary hearing required to determine reason for government's delay); *Gross*, 165 F. Supp. 2d at 380-85 (same).

has not been arrested, and the defense is not aware of any efforts being made to seek his extradition.  However, the Government has spoken to Mr. Erbek (albeit only recently, post-indictment), and Mr. Erbek voluntarily provided a lengthy statement to the Government at a meeting in London set up for exactly that purpose.  Mr. Erbek's statement – a FBI report of which was provided to the defense on April 16, 2016 – amounts to a full-throated exculpation of both himself and Mr. Wey of the alleged conspiracy between them.  (Siegal Decl., Ex. 43) Given the critical nature of his anticipated testimony for the defense, Mr. Wey therefore should be granted permission to take Mr. Erbek's deposition in advance of trial, to preserve that testimony and make it available to the jury.

Federal Rule of Criminal Procedure 15(a)(1) provides that, in pertinent part, a party "may move that a prospective witness be deposed in order to preserve testimony for trial.  The court may grant the motion because of exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(A)(1).  A Rule 15 deposition is proper where "(1) the prospective witness is unavailable for trial, (2) the witness's testimony is material, and (3) the testimony is necessary to prevent a failure of justice." *United States v. Vilar*, 568 F. Supp. 2d 429, 437 (S.D.N.Y. 2008) (quoting *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001)).  "The decision to grant or deny a motion to take a deposition rests within the sound discretion of the trial court." *United States v. Johnpoll*, 739 F.2d 702, 708 (2d Cir. 1984).

As set forth below, (1) Mr. Erbek will offer material, exculpatory testimony that is not attainable from any other source; (2) Mr. Erbek is unavailable to testify in the United States; and (3) Mr. Erbek's testimony is necessary to prevent a failure of justice.  Accordingly, Mr. Wey should be granted permission to take Mr. Erbek's deposition pursuant to Rule 15.

**A.      Mr. Erbek Will Offer Material, Non-Cumulative Exculpatory Testimony Unattainable From Any Other Source**

Testimony is "material" within the meaning of Rule 15 where it is "highly relevant to a central issue in the case." *Vilar*, 568 F. Supp. 2d at 440; *see also United States v. Pham*, 12-CR-423, 2015 WL 7871348 (S.D.N.Y. Dec. 4, 2015).  Moreover, a prospective deponent's testimony is deemed material where it "would challenge central aspects of the government's allegations." *United States v. Grossman*, 03-CR-1156, 2005 WL 486735, at *4 (S.D.N.Y. Mar. 2, 2005).

Mr. Erbek's prospective testimony easily meets the materiality standard.  According to the FBI's report of their recent interview of Mr. Erbek,[54] the defense anticipates that Mr. Erbek will substantially refute core allegations of the Indictment regarding Mr. Wey's alleged involvement in a conspiracy to commit securities and wire fraud.  *First*, Mr. Erbek's testimony will directly contradict the assertion in the Indictment that Mr. Wey "possessed and exercised investment authority over shares of stock held in the names of the Nominees" and "directed other parties to take actions in matters pertaining to the Nominees," including directing Mr. Erbek to trade in the Nominees' accounts.  (Indictment, ¶ 9).  Mr. Erbek will testify that Mr. Wey *never* had transactional authority in connection with any alleged Nominee accounts, and further, that he (Mr. Erbek) never did *any* business with, nor received any payment from, Mr. Wey.  (Siegal Decl., Ex. 43 at p. 12)

*Second*, Mr. Erbek's testimony will refute the Indictment's allegations that Mr. Wey instructed Mr. Erbek with respect to trading in certain alleged Nominee accounts.  Instead, Mr. Erbek will attest that Tian Yi Wei or her colleagues in Asia — *not* Mr. Wey – were the people with whom Mr. Erbek dealt.  (Siegal Decl., Ex. 43 at p. 5)  Mr. Erbek's testimony would also

---

[54]   The description in this section of what Mr. Erbek will say in his anticipated testimony is based solely on the notes and memorandum provided by the Government to the defense purporting to memorialize the Government's discussions with Mr. Erbek and his counsel.  The defense has not had an opportunity to interview Mr. Erbek, and for purposes of this motion, we assume the accuracy of those notes and memorandum.

rebut the notion (suggested by, *inter alia*, the search warrant affidavits), that all people and entities in China who invested in these companies are either fictional, or mere shills for Benjamin Wey.  Rather, Mr. Erbek says that Tian Yi Wei informed him that several different fund managers in China were discussing and advising her on the investments being managed by Mr. Erbek.  (Siegal Decl., Ex. 45 at BW_00216047)

*Third,* Mr. Erbek will contradict the allegation in the Indictment that Mr. Wey instructed him to "artificially maintain" the price of stock held in certain alleged Nominee's accounts, and the Indictment's reference to a specific communication on February 7, 2011 that supposedly amounted to such an instruction.  (Indictment ¶¶ 18, 26).  Mr. Erbek will testify, to the contrary, that the instruction (which as far as he knew, came from his client Tian Yi Wei), was understood by him (Mr. Erbek) to be a limit order, and moreover, that the instruction was treated as such by Credit Suisse, and thus, could not have manipulated the stock price.  (Siegal Decl., Ex. 44, Notes at 1-2; Ex. 45, Letter at p. 2)

*Fourth*, Mr. Erbek's testimony will contradict the theory espoused in the Indictment that Mr. Wey caused purported Nominees "to retain undisclosed control of more than five percent of the shares" of public companies and "purposefully . . . structured" the Nominees' holdings "in such a way so as to ensure that no single Nominee held a greater-than-five percent beneficial ownership in these companies."  (Indictment, ¶¶ 13-14)  Mr. Erbek will testify to specific communications he had with Tian Yi Wei and Credit Suisse representatives who discussed the fact that the alleged Nominee entities were under the control of "a different group of advisers in China advising [Tian Yi Wei] with respect to the securities holdings by each of her companies." (Siegal Decl., Ex. 43 at p. 7)

*Finally*, Mr. Erbek's testimony will also make clear that Credit Suisse independently evaluated the issue of whether 13D filings needed to be made after openly discussing the issue with Mr. Erbek and Tian Yi Wei and reviewing the pertinent account information.  Credit Suisse – one of the world's largest financial institutions – determined that no 13D filings were required. (Siegal Decl., Ex. 43 at p. 15)  Yet, remarkably, the Government has now charged Mr. Wey criminally for allegedly failing to make these filings.

Each of these elements of Mr. Erbek's anticipated testimony will deal severe, if not fatal, blows to the Government's case theories, and thus are clearly material to the defense.  Moreover, Mr. Erbek's testimony is unattainable from any other source because he was the only person who served as a fiduciary for the various alleged Nominees' accounts and, therefore, the only person who could issue securities or monetary transaction orders.  (Siegal Decl., Ex. 43 at p. 5) Moreover, Mr. Erbek will offer testimony concerning specific interactions that he (and he alone) had with Tian Yi Wei that contradict the Government's theory that Mr. Wey was in control of the alleged Nominees.  In particular, Mr. Erbek's testimony will demonstrate that Tian Yi Wei was "quite sophisticated" from a financial perspective (Siegal Decl., Ex. 43 at p. 4) and that her "lifestyle in China was consistent with that of a businesswoman of the considerable wealth that was evident in her bank accounts."  *(Id.*, Ex. 43 at p. 9)  Moreover, Mr. Erbek can testify to specific face-to-face interactions between himself, Tian Yi Wei, and Swiss bank representatives during which Mr. Wey was not present.  *(Id.*, Ex. 43 at p. 9)

In sum, Mr. Erbek's testimony will, in and of itself, create reasonable doubt about the Government's contention that Mr. Wey participated in an international conspiracy to commit securities and wire fraud, and whether Mr. Wey could be liable for allegedly failing to disclose

*his* purported beneficial ownership of more than five percent of publicly traded companies.  For all the above reasons, Mr. Erbek's testimony is material within the meaning of Rule 15.

**B.      Mr. Erbek Is Unavailable to Testify in the United States**

A witness's unavailability is "determined according to the practical standard of whether under the circumstances the [moving party] has made a good-faith effort to produce the person to testify." *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984).  Where a witness is a foreign national beyond the Court's subpoena power and has indicated a refusal to voluntarily appear in the United States, the Second Circuit has deemed such witnesses unavailable.  *See id.* (holding Swiss witnesses unavailable under Rule 15 because they were outside the Court's subpoena power and refused to travel to the United States to testify); *see also Vilar*, 568 F. Supp. 2d, at 439-40 (finding witnesses based in the United Kingdom unavailable for same reason).

Here, Mr. Erbek is unavailable to testify because, as a citizen of Switzerland, he is beyond this Court's subpoena power and does not intend to travel to the United States to testify at trial.[55]  (Siegal Decl., ¶ 61)  Mr. Wey has attempted in good faith to secure Mr. Erbek's appearance in the United States to testify at Mr. Wey's trial, but Mr. Erbek's counsel has stated that Mr. Erbek is unwilling to do so.  (*Id.*)  Accordingly, Mr. Erbek must be deemed unavailable pursuant to Rule 15.

**C.      Mr. Erbek's Testimony Is Necessary to Prevent a Failure of Justice**

Where a witness is unavailable and his testimony is material, a Rule 15 deposition "is necessary to prevent a failure of justice."  *Vilar*, 568 F. Supp. 2d at 442-43; *United States v. Moon*, 93 F.R.D. 558, 559 n.1 (S.D.N.Y. 1982).  "[B]ecause federal courts frequently lack the

---

[55]  Mr. Erbek's reluctance to travel to the United States is not surprising in light of the presumptively outstanding warrant for his arrest.  *See United States v. Mostafa*, 14 F. Supp. 3d 515, 522 (S.D.N.Y. 2014) (finding foreign witness unavailable where he asserted that he would not travel to the United States as a result of an outstanding arrest warrant).

power to compel a foreign national's attendance at trial, Rule 15 may offer the only practicable means of procuring critical evidence." *United States v. McKeeve*, 131 F.3d 1, 7-10 (1st Cir. 1997) (upholding admissibility of foreign deposition); *Vilar*, 568 F. Supp. 2d at 442-43 ("[W]hen a substantial likelihood exists that the prospective deponents will be unavailable for trial and their testimony is highly relevant to a central issue in the case, *justice generally requires preservation of that testimony.*" (emphasis added)).

The Government cannot plausibly argue that allowing Mr. Wey to depose Mr. Erbek would be prejudicial, since the Government has already had the opportunity to interview Mr. Erbek.  Simply put, the interests of justice require affording Mr. Wey the same opportunity, especially where, as here, Mr. Erbek (and Mr. Erbek alone) is able to offer testimony that is critical to the defense on many issues at the heart of the Government's case.  Accordingly, Mr. Wey's Rule 15 motion to depose Mr. Erbek should be granted.

## VII.

### THE INDICTMENT SHOULD BE STRIPPED
### OF ALL REFERENCES TO MR. WEY'S "A/K/AS"

Mr. Wey moves to strip the Indictment of all references to his alleged "a/k/as." Specifically, the Indictment refers to the defendant repeatedly as "Benjamin Wey, a/k/a 'Benjamin Wei,' a/k/a 'Tianbing Wei.'"  (*See* Indictment, caption and ¶¶ 2, 7-10, 14-26, 28, 30, 32, 34, 36, 38, 40-43)  Whether intentional or not, this verbiage unfairly suggests that Mr. Wey has used various names for himself, interchangeably, as an act in furtherance of the fraudulent schemes alleged in the Indictment.  But Mr. Wey legally changed his name more than a decade ago, and absent some proof that Mr. Wey has strategically used multiple names in connection with the fraud alleged here, that suggestion is unfairly prejudicial and should be stricken.

Federal Rule of Criminal Procedure 7(d) provides that a defendant may move to "strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). "Motions to strike surplusage are granted 'where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial.'" *United States v. Allen*, 09-CR-329, 2014 WL 1745933, at *5 (W.D.N.Y. Apr. 30, 2014) (citing *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001)); *see also United States v. Malachowski*, 604 F. Supp. 2d 512, 518 (N.D.N.Y. 2009) (surplusage may be stricken from an indictment "so long as the language is not relevant to the offenses and is either prejudicial or inflammatory."). Typically, an indictment may not contain references to aliases unless "the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment." *United States v. Ramos*, 839 F. Supp. 781, 787 (D. Kan. 1993) (citing *United States v. Clark*, 541 F.2d 1016, 1018 (4th Cir. 1976)).

As an initial matter, "Benjamin Wei" and "Tiangbing Wei" are not proper "aliases"[56] for Mr. Wey as he was neither "also called" nor "otherwise known as" Benjamin Wey or Tiangbing Wei. As noted above, Mr. Wey's given Chinese name is Tianbing Wei. Upon his arrival in the United States in 1992, he began using the name "Benjamin" because, as suggested by his sponsoring American family, it was easier to pronounce, and he has gone by "Benjamin" ever since. In 2004, after experiencing significant anti-Asian discrimination in the professional world, Mr. Wey (who by then had become a naturalized U.S. citizen) legally changed his last name from "Wei" to the more Westernized spelling of "Wey," and his first name from "Tianbing" to "Benjamin" (Siegal Decl., Ex. 1) Since that time, he has gone by "Benjamin Wey." Accordingly, "Benjamin Wei" and "Tiangbing Wei" are not proper "aliases" for Mr. Wey.

---

[56] "Alias" is defined as "also called" or "otherwise known as." *See* "alias," Merriam-Webster.com (2016) http://www.merriam-webster.com/dictionary/alias (last accessed May 27, 2016)

In any event, reference to those alternative names to describe Mr. Wey has no bearing on the Government's case and is inflammatory and prejudicial. The acts alleged in the Indictment do not in any way relate to Mr. Wey's given Chinese name or the prior spelling of his last name: in fact, the acts alleged in the Indictment occurred no less than *three years after* Mr. Wey legally changed the spelling of his last name, and *almost twenty years* after he started to go by "Benjamin."

The Government cannot plausibly argue that Mr. Wey's Chinese given name is relevant to the alleged criminal conduct. To the contrary, any reference to Mr. Wey's prior use of "Tiangbing Wei" or "Benjamin Wei" serves only to imply in an inflammatory and prejudicial fashion that Mr. Wey's name change is somehow emblematic of his purportedly fraudulent character, or worse, that persons with foreign names are somehow inherently suspicious. Accordingly, the Indictment should be stripped of reference to Mr. Wey's prior name spellings. *See, e.g.*, *United States v. Grant*, 14-CR-391, 2015 WL 321586, at *5-6 (N.D. Tex. Jan. 26, 2015) (granting a motion to strike aliases from the indictment because they were not relevant to identify the defendant and could not be linked to any of the evidence to be used at trial); *United States v. Davis*, 94-CR-381, 1995 WL 608464, at *4 (E.D. La. Oct. 13, 1995) (striking references to an alias and finding the government had the burden to move to reinstate the aliases upon submission of relevant evidence); *United States v. Ramos*, 839 F. Supp. 781, 788 (D. Kan. 1993) (striking aliases from the indictment where the government failed to demonstrate relevance).[57]

---

[57] The Indictment contains other surplusage which should also be stricken from the Indictment. For example, Paragraph 26 of the Indictment provides that in furtherance of the alleged conspiracy, Mr. Wey "caused the following overt acts, *among others*, to be committed in the Southern District of New York and elsewhere." (Indictment, ¶ 26) (emphasis added) The use of the phrase "among others" implies that Mr. Wey committed additional overt acts not charged in the Indictment. And Paragraph 18 provides, in pertinent part, that Mr. Wey "explicitly instructed Erbek to maintain the share prices of *at least* two Issuers' stock held in certain of the Nominees' accounts." (Indictment, ¶ 26) (emphasis added) Paragraph 18 thus implies that Mr. Wey allegedly manipulated *more than* two stocks, without any support whatsoever in the Indictment to this effect. These phrases impermissibly expand the charges against Mr. Wey without any specific allegations of additional

## CONCLUSION

Based on the foregoing, Mr. Wey respectfully requests an Order,  (1) suppressing the fruits of the searches of both the NYGG Office and the Apartment, (2) dismissing the Indictment, or (3) if it does not dismiss the Indictment, to strike the surplusage from the Indictment, and (4) permit the defense to take the deposition of Mr. Erbek pursuant to Rule 15, together with such other and further relief as it deems just and proper.


Dated:  May 27, 2016

> HAYNES and BOONE, LLP
> Counsel for Defendant
> BENJAMIN WEY
>
>
> By:  s/ David Siegal
>     David Siegal
>     Sarah Jacobson
>     Joseph Lawlor
>     30 Rockefeller Plaza
>     26th Floor
>     New York, New York 10112
>     Telephone: (212) 659-4995
>     david.siegal@haynesboone.com
>
>     Barry F. McNeil
>     2323 Victory Avenue, Suite 700
>     Dallas, Texas 75219-7672
>     Telephone: (214)-651-5580
>     barry.mcneil@haynesboone.com

---

wrongdoing and should therefore be stricken from the Indictment.  *See United States v. Kassir*, 04-CR-356, 2009 WL 995139, at *4 (S.D.N.Y. Apr. 9, 2009) (striking language that would impermissibly "expand the charge" against defendant).