UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA               :

   – v. –                                          :               15 Cr. 611 (AJN)

BENJAMIN WEY,                              :
     a/k/a "Benjamin Wei,"
     a/k/a "Tianbing Wei," and          :
SEREF DOGAN ERBEK,
     a/k/a "Dogan Erbek,"               :

              Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT BENJAMIN WEY'S MOTIONS FOR A BILL
OF PARTICULARS, PRODUCTION OF *BRADY* AND *GIGLIO* MATERIAL,
IMMEDIATE IDENTIFICATION OF GOVERNMENT TRIAL EXHIBITS, AND
OTHER EARLY TRIAL-RELATED DISCLOSURES**


                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the United States
                                            of America.

Sarah Eddy McCallum
Michael Ferrara
Ian McGinley
Assistant United States Attorneys


   -Of Counsel-

**TABLE OF CONTENTS**

TABLE OF CASES ...................................................................................................ii

BACKGROUND ........................................................................................................1

   I.     THE INDICTMENT ....................................................................................1

   II.    THE SEARCH WARRANT AFFIDAVIT ........................................................5

   III.   DISCOVERY AND ACCOMPANYING GUIDANCE TO DEFENSE
        COUNSEL .................................................................................................6

   IV.   DISCUSSIONS CONCERNING A SUPERSEDING INDICTMENT............9

   V.     STATEMENTS BY ERBEK ............................................................................9

ARGUMENT ...........................................................................................................10

   I.     THE COURT SHOULD DENY WEY'S MOTION FOR A BILL OF
        PARTICULARS .......................................................................................10

       A.     Applicable Law ................................................................................10
       B.     Discussion .......................................................................................14

   II.    THE COURT SHOULD DENY AS MOOT WEY'S MOTION FOR
        *BRADY* MATERIAL .................................................................................22

   III.   THE COURT SHOULD DENY WEY'S MOTION FOR
        IMMEDIATE DISCLOSURE OF *GIGLIO* MATERIAL...............................23

   IV.   THE COURT SHOULD DENY WEY'S MOTION FOR
        IMMEDIATE DISCLOSURE OF ITS EXHIBIT LIST .................................23

   V.     THE COURT SHOULD DENY WEY'S REQUEST FOR A
        DECEMBER 6, 2016 DEADLINE FOR PRODUCTION OF A
        WITNESS LIST AND *JENCKS* ACT MATERIAL .......................................24

CONCLUSION........................................................................................................25

## TABLE OF CASES

*Brady* v. *Maryland*, 373 U.S. 83 (1963) .................................................................. 22

*Giglio* v. *United States*, 405 U.S. 150 (1972) .......................................................... 22

*Hemphill* v. *United States*, 392 F.2d 45 (8th Cir. 1968) ......................................... 12

*United States* v. *Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003) ............................. 13

*United States* v. *Bonventre*, 2013 WL 2303726 (S.D.N.Y. 2013) ........................ 14, 16, 20, 24

*United States* v. *Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) .......................... 10, 11, 19

*United States* v. *Cuti*, 2009 WL 3154310 (S.D.N.Y. 2009) ....................... 11, 14, 16

*United States* v. *D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010) ................... 11, 13

*United States* v. *Dames*, 380 F. Supp. 2d 270 (S.D.N.Y. 2005) ............................. 23

*United States* v. *Davidoff*, 845 F.2d 1151 (2d Cir. 1988) ....................................... 19

*United States* v. *Earls*, 2004 WL 350725 (S.D.N.Y. 2004) ............................. 11, 23

*United States* v. *Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001) ............................. 13

*United States* v. *Guttenberg*, 2007 WL 4115810 (S.D.N.Y. 2007) ................... 14, 16

*United States* v. *Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) ...................... 11, 13, 14

*United States* v. *Heredia*, 2003 WL 21524008 (S.D.N.Y. 2003) ................... 14, 15, 20

*United States* v. *Jacques Dessange, Inc.*, 2000 WL 280050 (S.D.N.Y. 2000) ....................... 23

*United States* v. *Kaplan*, 2003 WL 22880914 (S.D.N.Y. 2003) ............................. 23

*United States* v. *Kazarian*, 2012 WL 1810214 (S.D.N.Y. 2012) ............................ 12

*United States* v. *King*, 2011 WL 1630676 (S.D.N.Y. 2011) ................................... 23

*United States* v. *Leonelli*, 428 F. Supp. 880 (S.D.N.Y. 1977) ........................... 10, 12

*United States* v. *Levy*, 2013 WL 664712  (S.D.N.Y. 2013) .............................. 12, 20

*United States* v. *Lino*, 2001 WL 8356 (S.D.N.Y. 2001) ............................. 19, 20, 24

*United States* v. *Mahabub*, 2014 WL 4243657 (S.D.N.Y. 2014) ................ 10, 12, 13

*United States* v. *Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ............................ 12

*United States* v. *Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ......................... 12, 13

*United States* v. *Monserrate*, 2011 WL 3480957 (S.D.N.Y. 2011) ......................... 11

*United States* v. *Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................ 11, 19, 23

*United States* v. *Rajaratnam*, 2010 WL 2788168 (S.D.N.Y. 2010) ........................................ 18

*United States* v. *Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003) .................................... 12, 14

*United States* v. *Rodriguez*, 496 F.3d 221 (2d Cir. 2007) ......................................................... 23

*United States* v. *Samsonov*, 2009 WL 176721 (S.D.N.Y. 2009) ................................. 11, 13, 14

*United States* v. *Savin*, 2001 WL 243533 (S.D.N.Y. 2001) ............................................... 19, 21

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990) ................................................. 10, 12, 13

*United States* v. *Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ................................. 11, 14, 23

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999) ................................................................. 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

    – v. –                                    :            15 Cr. 611 (AJN)

BENJAMIN WEY,                          :
       a/k/a "Benjamin Wei,"
       a/k/a "Tianbing Wei," and        :
SEREF DOGAN ERBEK,
       a/k/a "Dogan Erbek,"              :

              Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANT BENJAMIN WEY'S MOTIONS FOR A BILL
### OF PARTICULARS, PRODUCTION OF *BRADY* AND *GIGLIO* MATERIAL,
### IMMEDIATE IDENTIFICATION OF GOVERNMENT TRIAL EXHIBITS, AND
### <u>OTHER EARLY TRIAL-RELATED DISCLOSURES</u>

       The Government respectfully submits this memorandum of law in opposition to

defendant Benjamin Wey's motions for (1) a bill of particulars; (2) production of *Brady* and

*Giglio* material; (3) immediate identification of the Government's trial exhibits; and (4) a

deadline three full months prior to trial for the Government's production of its witness list

and *Jencks* Act material.  The Court should deny Wey's first, third, and fourth motions as

unsupported.  It should deny Wey's motion for production of *Brady* material as moot, since

the Government agrees it must identify and produce *Brady* material well in advance of trial,

has been doing so, and will continue to do so.  Wey's accompanying request for immediate

production of *Giglio* material should be denied as premature.

### <u>BACKGROUND</u>

### I.      THE INDICTMENT

       Indictment 15 Cr. 611 (AJN) (the "Indictment"), returned on September 8, 2015,

charges Wey in eight counts.  Count One charges conspiracy to commit securities fraud and

wire fraud, in violation of Title 18, United States Code, Section 371.  Counts Two and Three charge securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2 (Count Two), and in violation of Title 18, United States Code, Sections 1348 and 2 (Count Three).  Count Four charges wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2.  Counts Five and Six each charge failure to disclose beneficial ownership of stock as required by the securities laws, in violation of Title 15, United States Code, Sections 78n(d) & 78ff, Title 17, Code of Federal Regulations, Section 240.13d-1, and Title 18, United States Code, Section 2.  Finally, Counts Seven and Eight charge money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2 (Count Seven), and in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2 (Count Eight).  Wey's co-defendant, Seref Dogan Erbek, is charged alongside Wey in Counts One through Four.

Each of these charges is supported by the requisite statutory allegations, and each count contains a "to wit" clause describing in general terms the factual basis for the charge. All of the charges are supported, moreover, by an 11-page "speaking" portion of the Indictment, which offers a description of the fraudulent scheme giving rise to the charges. This description is targeted and particularized, and contains both identifiers and references to particular pieces of evidence.

The scheme alleged in the Indictment is not a particularly novel or complicated one: Wey, with the help of co-conspirators, secretly amassed stock ownership in companies that he then brought public, used various means (including corrupt retail brokers, match trading, and well-timed bulk purchases by nominees) to artificially inflate and support the value of the shares in those companies, and then liquidated his positions for substantial profits that he subsequently laundered.  The Indictment describes in detail each component of the charged

scheme.  It explains, first, that Wey used his family members and associates, and entities owned by or associated with those family and associates (together, "Nominees"), to acquire stock in certain shell companies (the "Shell Companies")—three of which (Pacific Goldrim Resources, Inc., Tag Events Corp., and Everton Capital Corp.) are named in the Indictment. (Ind. ¶¶ 8-9).  The Indictment specifies some of the ways in which Wey exercised control of the Nominees, noting that he "possessed and exercised investment authority over shares of stock held in the names of the Nominees," "closely tracked the Nominees' holdings," and "directed other parties to take action in matters pertaining to the Nominees," including by instructing Erbek to trade stocks in Nominee accounts.  (Ind. ¶ 9).

Next, the Indictment explains that, having amassed control of the Shell Companies in this manner, Wey caused those entities to engage in so-called "reverse mergers" with Chinese operating companies that he had identified through his "consulting" company, New York Global Group, Inc. ("NYGG"), and its Chinese counterpart located in Beijing ("NYGG-Asia").  At completion of each reverse merger, management of the Chinese operating company would own a majority of the outstanding shares of the newly formed public company, but management's holdings would typically be subject to lock-up agreements precluding disposition of stock for a period of years.  (Ind. ¶ 11).  The Indictment identifies by name and gives brief descriptions of three public companies—"Issuers"—born of these Wey-orchestrated reverse mergers: SmartHeat, Inc., Deer Consumer Products, Inc. ("Deer"), and CleanTech Innovations, Inc. ("CleanTech").  (Ind. ¶¶ 4-6, 12).

The Indictment further explains that, as a result of his pre-merger amassing of Shell Company stock through Nominees and the mechanics of the reverse mergers, Wey would end up controlling more than five percent of the resulting Issuers.  (Ind. ¶ 13).  Although applicable securities regulations—of which Wey was aware—required disclosure of this beneficial ownership, no disclosure was made.  (Ind. ¶ 14).  In fact, as the Indictment details,

Wey structured the Nominees' holdings to "obscure from the investing public the extent to which he owned and exercised control over Issuers' stock," by ensuring that "no single one of the Nominees held a greater-than-five percent beneficial ownership interest in any of the Issuers" at a given time.  (Ind. ¶ 14).  The Indictment even offers a description of an instance in which Wey directed such structuring.  (*Id.*).

Having detailed the components of the scheme by which Wey acquired and then hid his beneficial ownership interests in the Issuers, the Indictment proceeds to outline the steps Wey took to profit from his investments.  It explains that Wey used deceptive means to artificially increase the number of "round-lot" shareholders for some of the Issuers, so that these Issuers would be able to get listed on the Nasdaq, allowing them to trade more broadly while furnishing Wey with a better market in which to offload his holdings.  (Ind. ¶¶ 15-17).  The Indictment further alleges that Wey manipulated the Issuers' stock prices in various ways: (1) by causing "two retail brokers located in Manhattan to solicit their customers to buy shares of common stock of the Issuers, often on margin, while those brokers simultaneously actively discouraged the sale of these stocks by their customers" (Ind. ¶ 18); (2) by instructing his Swiss banker, Erbek, to maintain share prices "of at least two Issuers' stock held in certain of the Nominees' accounts" (*id.*); and (3) by orchestrating match trades (Ind. ¶ 19).  The Indictment again goes yet deeper, offering a specific example of a particular instruction given by Wey to Erbek regarding one Issuer, and another specific example of a particular match trade.  (Ind. ¶¶ 18-19).

Finally, the Indictment describes the manner in which Wey is alleged to have caused the laundering of his illicit gains.  It explains that Wey first "caused millions of dollars' worth of the Issuers' stock and cash generated from sales of [Issuer] stock to be transferred" from U.S. accounts to overseas accounts, and then caused the proceeds to be funneled back to the United States.  (Ind. ¶¶ 21-22).  Once more, the Indictment offers a specific example

4

involving a $20 million transfer of proceeds from Hong Kong into U.S. accounts controlled by Wey and/or his wife.  (Ind. ¶ 22).

## II.   THE SEARCH WARRANT AFFIDAVIT

The Indictment is not the only document in Wey's possession that details the facts underlying the charges.  He also has a copy of a 97-page affidavit supporting an application by the Federal Bureau of Investigation ("FBI") for a warrant to search the NYGG offices in 2012 (the "Affidavit").[1]  The Affidavit, which is still sealed and attached as Exhibit A hereto (under seal), is laden with detail about Wey's involvement in the reverse mergers that created the Issuers, his control over the Nominees, his retention of undisclosed beneficial interests in the Issuers, his artificial generation of round-lot shareholders to gain Nasdaq listing for certain Issuers, his stock manipulation with the help of the "two retail brokers" referred to in the Indictment (hereinafter, the "Retail Brokers"), and his offloading of Issuer holdings for personal profit.  Although, as is commonly the case, the *Indictment* does not name any Nominees, co-conspirators, or Retail Brokers involved in the scheme, the Affidavit does. (*See, e.g.*, Aff. ¶¶ 12 (identifying by name not just the "two lead brokers" of the "hand-picked team of retail brokers that Wey worked with to artificially inflate demand for SmartHeat, Deer and other issuers," but also 31 other brokers who worked under those two leaders); ¶¶ 18(e)(iv), 27, 28 (identifying Nominee Entities associated with Wey's sibling and the CEO and other associates of NYGG-Asia, who in turn are identified by name); ¶¶ 29(a), 32, 35(a), 36(b) (identifying other Nominees); ¶¶ 18(f) & 19(f) (identifying particular transactions in which SmartHeat and Deer shares were transferred from named Nominees to round-lot holders); ¶¶18(f) & 19(g)-(i) (charts identifying over 100 Deer and SmartHeat round-lot shareholders by name); ¶ 38 (identifying particular holdings of SmartHeat, Deer, and CleanTech stocks by five Nominee Entities)).  The Affidavit also offers specific detail about

---

[1] Indeed, this application is the subject of a separate motion, with lengthy discussion, filed by Wey on May 27, 2016.  (*See* Docket Entry Nos. 44, 45, & 46).

particular price-support activities in which Wey and the two Retail Brokers engaged regarding SmartHeat and Deer stock from mid-2009 through early 2010, as well as details concerning the roughly contemporaneous Issuer stock selling that Wey, through the Nominees, was doing at the time.  (Aff. ¶¶ 20(a)-25, 27-29).  And, in connection with the money laundering allegations, it identifies particular transfers of proceeds from Wey's sibling to accounts held by Wey's wife.  (Aff. ¶ 29(h)).

## III.    DISCOVERY AND ACCOMPANYING GUIDANCE TO DEFENSE COUNSEL

To supplement the roadmap furnished by the speaking Indictment in this case, as amplified by the Affidavit, the Government has produced extremely voluminous discovery to the defense.  Cognizant of that volume, and of the defense's understandable need to review it, the Court at the December 14, 2015 status conference in this matter set a trial date of March 6, 2017—nearly 15 months after the December conference.  (*See* Tr. of Proc. dated Dec. 14, 2015 (attached as Exhibit B hereto)).

Far from leaving Wey floundering in a sea of unidentified material, the Government has furnished defense counsel with detailed guidance concerning its discovery productions. Every production has been accompanied by a description of its contents.  In instances where the materials have been produced from the files of this Office or of the FBI, they have been categorized and indexed for the convenience of the defense.[2]  As the Government has communicated to defense counsel, these materials comprise the "core" discovery in the case. They comprise (1) approximately 266,000 pages of individually Bates-stamped documentary material (of which approximately 40,000 pages represent a re-production made for technical reasons); (2) two databases of material provided to the Government from (a) an accounting firm that acted for several of the Issuers, and (b) an investment bank that handled a secondary offering for one of the Issuers, which comprise approximately 53,000 pages and 126,000

---

[2] Upon service of this memorandum upon the defense, the Government is also producing an updated index of these core materials.

pages of documents, respectively; and (3) copies of electronic material seized during the

January 2012 searches of the NYGG offices and of Wey's home.[3]  The sources of all these

materials have been identified for the defense, categorized by type (*e.g.*, "Bank Records"),

and indexed with accompanying Bates ranges.  The vast majority of this core production

consists of trading records (including bluesheet data), bank records, transfer agent records,

and documents from investment banks related to secondary offerings of Issuer stock.

Beyond these core materials, the Government has taken the unusual measures of

producing (1) all transcripts of depositions and testimony given by all witnesses in related

investigations undertaken by the Securities and Exchange Commission (the "SEC") and the

Financial Industry Regulatory Authority ("FINRA"), and (2) the SEC's entire database of

documents related to its parallel investigation of Wey.[4]  As the Government has explained to

defense counsel, the SEC database is in substantial part duplicative of the materials already

disclosed as part of the core discovery material.  Although very large (totaling approximately

2.7 terabytes of data), the SEC database comprises three distinct components: (1) a 1.7-

terabyte production of materials from an entity called Global Hunter, which the Government

has communicated it does not view as likely to contain materials to be used at trial;[5] (2) a

---

[3] After the FBI conducted its January 2012 searches, it imaged the seized electronic devices and returned them to Wey, along with copies of the files on those devices.  Since the case was indicted in September 2015, the Government has provided the defense with various subsets of material from the electronic devices, including (1) a hard drive containing a forensic report cataloguing all documents identified as responsive to the search warrants and non-privileged; (2) a hard drive containing all documents marked as possibly privileged (documents as to which the Government has yet to conduct a thorough taint review); and (3) discs with documents and records related to Erbek, including email communications involving Erbek.

[4] Shortly after a grand jury sitting in this District returned the Indictment against Wey, the SEC filed a detailed, 46-page civil complaint against him, Erbek, and others, including several people named in the Affidavit.  *See* Complaint, *United States* v. *Wey*, No. 15 Civ. 7116 (PKC).

[5] Global Hunter is a research and investment banking firm that issued favorable reports about the Issuers.  In response to a request for documents, it produced a mass of material, most of which is not even arguably relevant.  The Government inadvertently produced the Global

225-gigabyte production, comprising approximately 778,440 documents, of materials from FINRA's investigation of the Retail Brokers; and (3) a remaining 761-gigabyte production, comprising approximately 2.27 million documents, of materials collected by the SEC in its investigation, many of which, as noted, are duplicative of materials produced by this Office as part of the core discovery, and approximately 415,000 documents of which are duplicative of the FINRA investigation production.  For this third component, the Government is in the process of assembling an index of the documents with brief descriptions of their sources and indications of duplication.  It will furnish that to the defense as soon as it is completed.

Finally, the Government is, as Wey notes, continuing to produce documents as it receives them.  Among these are bluesheets for the three Issuers identified in the Indictment: Deer, SmartHeat, and CleanTech.  This data is of course voluminous, as it includes detail of every trade in a stock over a given period.  It is puzzling, however, to find Wey complaining about that volume.  (*See* Wey Mem. at 10 & n.9).[6]  The Government's recent efforts to collect full "runs" of bluesheet data—rather than data covering more discrete periods—were prompted by the defense's specific request for those materials.  (*See* Siegal Decl. Ex. D at 2).[7]

---

Hunter production to Wey twice—once as part of the SEC database, and another time as a stand-alone hard drive production.  Accordingly, approximately 3.4 of the roughly 5 terabytes of data produced to the defense to date consist of material that the Government has adjudged to be immaterial to its case.

[6] "Wey Mem." refers to the Memorandum of in Support of Defendant Benjamin Wey's First Discovery Motion, filed in this matter on May 2, 2016.  "Siegal Decl." refers to the Declaration of David Siegal, Esq., filed in connection with that motion on May 2, 2016.

[7] That request was contained in a March 8, 2016 letter from Wey to the Government that included a litany of discovery demands.  Far from "largely ignor[ing]" these demands (*see* Wey Mem. at 11), the Government has carefully considered each of them and has—as in the case of bluesheet data, for example—produced responsive materials.  The Government is also actively undertaking its *Brady* review, cognizant of the particular considerations Wey outlines in his March 8 letter.  (*See* Siegal Decl. Ex. D at 6-7).

## IV.    DISCUSSIONS CONCERNING A SUPERSEDING INDICTMENT

Wey gives the impression that the Government represented to him and the Court that it would return a superseding indictment containing yet more particularization than is contained in the Indictment.  (*See* Wey Mem. at 2 ("On several prior occasions the defense has raised with the Government that the Indictment is insufficient and that a bill of particulars is required.  The Government initially promised to supersede and then failed to do so.")).  Wey is mistaken.  The Government represented no such thing, for good reason.  As explained above and argued below, the Indictment, particularly when viewed in light of the Affidavit and the voluminous, indexed discovery supplied to date, offers more than ample detail about Wey's crimes, and the Government has never taken a different view or articulated an intent to ask the grand jury to return a more detailed charging instrument.  As a fair reading of the December 14, 2015 transcript that Wey cites for his contrary assertion makes plain, the Government's purpose in seeking to return a superseding indictment was to add tax charges—not further detail about the existing charges.  (*See* Ex. B at 4 ("Candidly, we are awaiting materials in order to be able to return that superseder.  The superseding charges relate to potential tax charges.")).

## V.    STATEMENTS BY ERBEK

Peppered throughout Wey's moving papers are gratuitous references to statements made by Erbek and Erbek's counsel at (1) a Government meeting with Erbek's counsel in December 2015, and (2) an in-person proffer of Erbek himself, in London, which Erbek urged the Government to conduct so that it might be persuaded of his purported innocence and dismiss the charges against him.  (*See* Wey Mem. at 7 n.5, 8 n.6, 18-19).  The Government afforded Erbek the process he requested, and then promptly disclosed to Wey as potential *Brady* material the notes of the meeting with Erbek's counsel, the notes of the Erbek

proffer, and the FBI report of the proffer.  The Government did not find Erbek's account

credible, and Erbek's self-serving statements are irrelevant to Wey's instant motions.

**ARGUMENT**

**I.      THE COURT SHOULD DENY WEY'S MOTION FOR A BILL OF PARTICULARS**

Wey's motion for a bill of particulars, which is predicated on an incomplete account

of the relevant factual background, has no merit.  Far from establishing a true dearth of

notice—the foundational prerequisite for granting of the requested relief—Wey's moving

papers only confirm that his demand is driven by the improper purpose of preventing the

Government from further developing its proof as trial approaches.

**A.      Applicable Law**

The proper purpose of a bill of particulars under Federal Rule of Criminal Procedure

7(f) is "to provide a defendant with information about the details of the charge against him if

this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial."

*United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (quotation marks and citation

omitted; emphasis added).  Accordingly, "[a] bill of particulars is required only where the

charges of the indictment are so general that they do not advise the defendant of the specific

acts of which he is accused."  *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)

(quotations marks and citation omitted); *see United States* v. *Mahabub*, 2014 WL 4243657, at

*2 (S.D.N.Y. 2014); *United States* v. *Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) ("The

purpose of a bill of particulars is to apprise defendant of the essential facts of a crime.").

In exercising its broad discretion to determine whether the charges are "so general"

that they require supplementing, the Court should consider not just the text of the Indictment,

but also discovery and other information supplied to the defendant to date.  *See United States*

v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *United States* v. *Torres*, 901

F.2d at 234 (affirming denial of request for bill of particulars where defendants had "'been

10

provided with a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits'") (quoting district court); *United States* v. *Monserrate*, 2011 WL 3480957, at *4 (S.D.N.Y. 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States* v. *D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (denying bill of particulars request where supplementary facts supplied to defense by way of letter); *United States* v. *Cuti*, 2009 WL 3154310, at *3-4 (S.D.N.Y. 2009) (in accounting fraud case, denying request for particulars identifying all fraudulent transactions, payments, and statements made in furtherance of charged scheme where Government had furnished more than a million pages of discovery and, by letter, identified a series of fraudulent transactions and payments); *United States* v. *Samsonov*, 2009 WL 176721, at *4 (S.D.N.Y. 2009) (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial); *United States* v. *Earls*, 2004 WL 350725, at *4-5 (S.D.N.Y. 2004) (denying motion for bill of particulars in fraud case where, among other things, Government had "furnished the defendant with voluminous discovery"); *United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of particulars request in stock fraud case where indictment was 15 pages long and substantial discovery had been provided); *United States* v. *Henry*, 861 F. Supp. 1190, 1198 (S.D.N.Y. 1994) ("In determining whether to grant a motion requesting a bill of particulars, the Court must ascertain whether the information sought has been provided elsewhere, such as through pre-trial discovery, voluntary disclosure by the government, or the indictment itself."). Although the Government's provision of "mountains of documents to defense counsel who [a]re left unguided as to which documents" are relevant to the charges does not substitute for a bill of particulars where one would otherwise be required, *see United States* v. *Bortnovsky*,

820 F.2d at 575; *United States* v. *Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the

provision of voluminous discovery in combination with some guidance about what is most

relevant can vitiate a need for further particulars, *see, e.g.*, *United States* v. *Kazarian*, 2012

WL 1810214, at *25 (S.D.N.Y. 2012); *United States* v. *Mandell*, 710 F. Supp. 2d 368, 385

(S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where

the indictment was 34 pages long and Government had provided voluminous, organized

discovery).  In no event should volume of discovery alone warrant a bill of particulars;

"[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of

materials that continue to be produced," that concern is addressed by granting the defense

sufficient time in which to conduct the review in advance of trial.  *See United States* v. *Levy*,

2013 WL 664712, at *13 (S.D.N.Y. 2013).

Bills of particulars would undoubtedly be helpful to the defense in any case.  But

because "the law does not impose upon the Government an obligation to preview its case or

expose its legal theories," *United States* v. *Leonelli*, 428 F. Supp. at 882, "[t]he ultimate test

must be whether the information sought is necessary, not whether it is helpful."  *United

States* v. *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001); *United States* v. *Mahabub*, 2014

WL 4243657, at *2 ("The purpose of a bill of particulars is to ensure that a defendant has the

information necessary to prepare a defense, not to turn over all information that would aid the

defendant."); *United States* v. *Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003)

(denying bill of particulars request as "an impermissible attempt to compel the Government

to provide the evidentiary details of its case") (citation and quotation marks omitted).  A bill

of particulars should not be misused to compel the Government to disclose "the manner in

which it will attempt to prove the charges, the precise manner in which the defendant

committed the crime charged, or a preview of the Government's evidence or legal theories."

*United States* v. *Mitlof*, 165 F. Supp. 2d at 569; *see also Torres*, 901 F.2d at 234

("'Acquisition of evidentiary detail is not the function of the bill of particulars.'") (quoting *Hemphill* v. *United States*, 392 F.2d 45, 49 (8th Cir. 1968)).  The "'wheres, whens and with whoms'" are "beyond the scope of a bill of particulars."  *Mitlof*, 165 F. Supp. 2d at 569 (citing *Torres*, 901 F.2d at 233-34); *see also, e.g.*, *United States* v. *D'Amico*, 734 F. Supp. 2d at 335 ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'") (quoting *United States* v. *Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)); *United States* v. *Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *United States* v. *Henry*, 861 F. Supp. at 1197 ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.").

There are good reasons why bills of particulars are warranted only where the allegations in the Indictment, as supplemented by discovery and elsewise, are so general as to render it impossible to prepare a defense.  Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case."  *Id.*; *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in deciding whether to order a bill of particulars because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"); *United States* v. *Samsonov*, 2009 WL 176721, at *3 ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches.").

Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197. These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.*

Applying these principles, courts routinely deny demands for bills of particulars identifying (1) "all acts" the defendant is alleged to have undertaken as part of the crime charged, *id.* at 1197 (noting that this demand "fall[s] clearly outside the ambit of a bill of particulars"), including trades made and other acts undertaken in furtherance of a securities fraud scheme, *see, e.g.*, *United States* v. *Bonventre*, 2013 WL 2303726, at *5-7 (S.D.N.Y. 2013); *United States* v. *Cuti*, 2009 WL 3154310, at *3-4; *United States* v. *Guttenberg*, 2007 WL 4115810, at *4-5 (S.D.N.Y. 2007); and (2) "where, when, and with whom" the Government will prove the defendant conspired, *United States* v. *Trippe*, 171 F. Supp. 2d at 240; *United States* v. *Heredia*, 2003 WL 21524008, at *9 (S.D.N.Y. 2003); *see also, e.g.*, *Samsonov*, 2009 WL 176721, at *4 (noting that demand for particulars identifying co-conspirators was "a veiled attempt to discern who is cooperating with the Government"); *United States* v. *Rittweger*, 259 F. Supp. 2d at 292 ("There is no need to provide a list of all unindicted co-conspirators.").

## B.    Discussion

Wey does not need a bill of particulars to defend this case. He *wants* one in order to cabin the Government's proof months before trial and tailor his own case to that proof. This is an abuse of Rule 7(f) and should not be countenanced.

### i.    *Wey Has Already Received Ample Particulars*

There is no need for further particulars here, because Wey has been more than

14

sufficiently apprised of the nature of the charges he faces.  He has a 24-page speaking
Indictment, a 97-page Affidavit detailing his crimes, a carefully indexed production of core
discovery, and further voluminous discovery that the Government is in the process of
indexing for him.  Wey cannot, under these circumstances, colorably assert that he lacks the
necessary guidance to defend himself, and courts have time and again rejected requests like
his.

In *United States* v. *Heredia*, for example, the court denied a motion for a bill of
particulars in a case where the defendants, like Wey, had been charged with securities fraud,
wire fraud, and conspiracy to commit the same.  2003 WL 21524008, at *9.  The scheme in
*Heredia* bore striking similarity to the one charged here: it involved a stock promoter who
had partnered with a retail broker-dealer to pump the stock of a publicly traded company that
had previously been a shell, and in which the defendants and others had secretly amassed
ownership interests through use of nominee entities.  *Id.* at *1-2.  The indictment charged that
the scheme spanned approximately nine months, from January 1997 to September 1997, and
offered a specific example from September 1997 in which the defendants had artificially
inflated the stock price of the subject company from $2 a share to $6.75 a share.  *Id.* at *2.

The court in *Heredia* denied the defendants' motion for a bill of particulars,
emphasizing that "[t]he Government is not required to disclose the manner in which it will
attempt to prove the charges, nor the means by which the crimes charged were committed."
*Id.* at *9.  The court noted that the indictment specified the "*nature* of the acts with which the
defendants are charged," with accompanying "dates and approximate place of where and
when the alleged events occurred," even if it did not detail every act in furtherance of the
scheme and conspiracy.  *See id.* (emphasis added).  In denying the defendants' request for an
inventory of "the 'wheres, when, and with whoms' regarding the charges," the court held that
"defendants are not entitled to such information, disclosure of which could serve to limit the

15

Government's proof at trial."  *Id.*

Wey's demand for particulars should be denied for the same reasons.  Even confining the analysis to the Indictment, and ignoring for a moment the Affidavit and other guidance supplied, Wey has approximately the same level of detail about his crimes as did the defendants in *Heredia*.  The Indictment clearly identifies the nature of the acts giving rise to Wey's criminal liability—namely, the surreptitious and undisclosed acquisition of stock through Nominees in the Shell Companies that would become the Issuers, followed by a pattern of manipulation that involved three specified means: pairing with the corrupt Retail Brokers to promote the Issuers' stock and discourage sales thereof, directives to Swiss banker Erbek to prop up the stock prices of at least two Issuers, and match trading.  (Ind. ¶¶ 18-19). Like the indictment in *Heredia*, the Indictment here offers specific examples, with accompanying specific dates, of particular acts of price support and match trading.  (*Id.*). Also like the indictment in *Heredia*, the Indictment here details only select examples.  Wey is entitled to no more than that.  It is axiomatic that, at least in cases where some specific examples are offered, the Government is not required to furnish an inventory of every act it plans to prove furthered the fraud.  *See, e.g.*, *United States* v. *Bonventre*, 2013 WL 2303726, at *5-7 (in case involving largest Ponzi scheme in U.S. history, which spanned decades, denying request for bill of particulars identifying, among other things, "the specific arbitrage trades in which [a defendant] was involved that the Government alleges are fraudulent," the "dates and stock names for all alleged backdated transactions," "all unnamed clients and allegedly fake trades referred to in" a particular count, and all allegedly false documents and records); *Cuti*, 2009 WL 3154310, at *3-4 (in accounting fraud case alleged to have spanned years, denying request for bill of particulars identifying every fraudulent transaction); *United States* v. *Guttenberg*, 2007 WL 4115810, at *4-5 (in insider trading case, denying request for bill of particulars itemizing trades alleged to have been based on material nonpublic

information).

Not only does the Indictment alone supply sufficient detail, but even if did not, Wey still would not be entitled to a bill of particulars because has received a wealth of supplemental detail through other means.  The Affidavit furnishes, among many other things, (1) the names of the Nominees and details about their roles with respect to acquisition and disposal of Issuer stock (Aff. ¶¶ 18(e)(iv), 27, 28, 29(a), 32, 35(a), 36(b)); (2) evidence establishing Wey's control of the Nominees (Aff. ¶ 29); (3) the names of, and transactions involving, hundreds of round-lot shareholders alleged to have been used by Wey and others to gain Nasdaq listing for Deer and SmartHeat (Aff. ¶¶ 18-19); (4) the names of the Retail Brokers with whom Wey conspired to artificially inflate Issuer stock (Aff. ¶ 12); (5) the details of a corrupt arrangement, involving a $350,000 undisclosed commission, between Wey and the Retail Brokers (Aff. ¶ 26); (6) the names of two Issuers the stock of which the Retail Brokers, in conspiracy with Wey, pushed their employees to sell to customers (and then prevent customers from in turn selling) (Aff. ¶¶ 20, 22-24); (7) time frames and share price increases associated with manipulative acts by Wey and the Retail Brokers related to the stock of those two Issuers in late 2009 and early 2010 (Aff. ¶¶ 27-29); and (8) particular transfers of illicit proceeds, with accompanying dates and amounts, from Wey's sibling to his wife (Aff. ¶ 29(i)).[8]  Beyond these additional, particularized allegations, the Government has supplied the defense with voluminous core discovery, along with a detailed index and accompanying guidance.  The materials from the SEC—which, as noted, are in substantial part duplicative of the core discovery—are in the process of being indexed for counsel's convenience.

---

[8] The Affidavit contains detailed allegations about Issuers other than the three specifically named in the Indictment (SmartHeat, Deer, and CleanTech).  (*See* Aff. ¶¶ 11, 30-34, 37). Although the Government may introduce evidence related to these other Issuers at trial, and has produced discovery relating to them, the core of its evidentiary presentation will focus on the Issuers named in the Indictment.

In view of this supplemental detail, which Wey ignores in his moving papers, Wey's claims that he faces "trial by ambush," and that he "has been left to guess what wrong(s) he is charged with committing" (Wey Mem. at 1-2), are unfounded. The Government is unaware of any case in which a defendant armed with this level of detail and specificity has been granted a bill of particulars along the lines Wey demands.

Certainly, none of the cases Wey cites helps him. Most involve crimes other than stock manipulation, which limits their persuasive value in analyzing application of Rule 7(f) to this case.[9] The point is perhaps best illustrated by examination of *United States* v. *Rajaratnam*, 2010 WL 2788168 (S.D.N.Y. 2010). There, the district court granted in part and denied in part the request by the defendant, who had been charged with insider trading, that the Government supply a bill of particulars furnishing additional details about his alleged insider trading in 31 different stocks. *Id.* at *4. The court directed the Government to supply additional detail, to the extent possible, about the substance and dates of some of the tips. *Id.* Whatever the merits of that ruling in the insider trading context, *cf.* Op. & Order dated Jan. 16, 2016, *United States* v. *Stewart*, No. 15 Cr. 287 (LTS), at 19-21 (denying request for bill of particulars furnishing details of tips), by no stretch does it support an itemization of fraudulent acts in a securities fraud case of the kind at issue here. Because the crux of a tipper-tippee insider trading case is the tip, the nature of the charge necessarily centers on the substance and timing of the alleged tip. By contrast, stock manipulation charges like the ones brought here (and in *Heredia*) center not on any particular conveyance of information but instead on concerted action taken over time to move the price of a given stock or set of stocks. The Government's proof will include, for example, testimony from employees of the Retail Brokers who will discuss improper pressure they faced to ensure that their clients did not sell Deer or SmartHeat stock. This testimony, along with other evidence, will prove one

---

[9] Wey cites one stock manipulation case, *United States* v. *Lino*, 2001 WL 8356 (S.D.N.Y. 2001), but, as noted below, that case hurts rather than helps him.

aspect of the manipulation scheme charged.  The Government does not expect, and is not required, to identify every single instance in which a customer of the Retail Brokers was persuaded to hold stock that he or she otherwise would have sold.  *See United States* v. *Lino*, 2001 WL 8356, at *7, 11 (S.D.N.Y. 2001) (refusing to order bill of particulars regarding portion of stock manipulation scheme involving use of corrupt retail brokers to pump stock price, because the fraudulent activity "to promote or hold various securities is allegedly the means by which the enterprise operated on a day-to-day basis").  *Rajaratnam* is, therefore, simply inapposite.

The other cases Wey cites are distinguishable because they involved instances in which the Government had alleged that some but not all of a universe of transactions were fraudulent, had produced undifferentiated and apparently unindexed discovery relating to the entire universe of transactions, and had failed to guide the defense as to which of the transactions within the universe the Government believed were fraudulent.  *See Bortnovsky*, 820 F.2d at 575 (in insurance fraud case, holding that bill of particulars should have been granted where Government refused to identify at any point before trial which of 15 burglaries that were the subject of discovery and proof at trial were alleged to have been fabricated and thus the subject of fraudulent insurance claims); *United States* v. *Savin*, 2001 WL 243533, at *3 (S.D.N.Y. 2001) (in case where investment advisor was charged with misappropriating client funds through a number of fund transfers, and Government had produced voluminous documents evidencing fund transfers without specifying which transfers were alleged to have constituted misappropriation, bill of particulars request granted in part); *United States* v. *Nachamie*, 91 F. Supp. 2d at 571 (in Medicare fraud case, applying *Bortnovsky* to require Government to identify those of the 2,000 Medicare claims for which it had produced discovery were alleged to have been fraudulent); *cf. United States* v. *Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (holding that bill of particulars should have been ordered to

19

apprise defendant of the identities of the companies he was alleged to have extorted as part of a RICO scheme).

Both the nature of the instant charges and the level of specificity already supplied in this case render it readily distinguishable from these other cases. Wey hyperbolically asserts that the Government, by disclosing voluminous trading data, "is effectively requiring the defense to analyze every tick of the price of three, separate, actively traded stocks . . . over a *five year* period." (Wey Mem. at 2). That is nonsense. The Government has given Wey the tools he needs to identify which trades and periods of trading are likely to be the subject of its case in chief. Specifically, the Government has identified the means by which Wey and his co-conspirators are alleged to have artificially inflated Issuer stock, and has given examples of particular instances in which particular acts of those kinds occurred. Wey thus need not review every single trade in the subject stocks over a five-year period; he can confine his review to those that coincide with the categories of manipulative acts specifically identified: actions by the Retail Brokers, at Wey's urging, to push their customers to buy Issuer stock and discourage them from selling; large block purchases by Nominees of Issuer stock to support stock prices; and trades in which a Nominee is on one side of the transaction and either another Nominee or a Retail Broker customer is on the other. Where this kind of specificity regarding means and methods of a securities fraud scheme has been furnished, courts in this District have held that bills of particulars are unwarranted. *See Bonventre*, 2013 WL 2303726, at *6-7; *Heredia*, 2003 WL 21524008, at *9; *see also, e.g.*, *United States* v. *Levy*, 2013 WL 664712, at *4, 13 (in case charging stock manipulation through false representations by corrupt brokers, denying bill of particulars "recounting of each specific misrepresentation and omission alleged" denied as "simply a request to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars") (citation and quotation marks omitted); *Lino*, 2001 WL 8356, at *10-11

20

(denying request for particulars concerning "pump and dump" stock manipulation scheme where the Government had identified the basic components and timeframe of the scheme, as well as the issuers in question).

ii.   *Wey's Motion Has an Improper Purpose*

For all of the foregoing reasons, Wey's motion for a bill of particulars is meritless. What is more, the improper purpose behind the motion is evident from the manner in which Wey has presented his argument to the Court and the particulars he claims to need.

First, it is noteworthy that Wey nowhere in his moving papers acknowledges the 97-page Affidavit particularizing various aspects of the scheme described in the Indictment. Only by ignoring the Affidavit can Wey claim to still require, for example, the identities of the Retail Brokers and a list of round-lot shareholders to whom gifts were made. (*See* Wey Mem. at 29; *see also id.* at 26 ("Mr. Wey cannot prepare a defense against allegations that he 'caused two retail brokers . . . to solicit customers,' without knowing the identity [*sic*] of these alleged 'retail brokers.'")). The Retail Brokers and 31 of their employees are named in the Affidavit, which also contains lengthy charts of over 100 round-lot shareholders. (*See* Aff. ¶¶ 12, 18-19).

Second, Wey frames his demands for particulars in terms of exhaustive lists. He would require the Government to identify *every* "false or misleading statement or representation," *every* "manipulative trade," *every* act of manipulation promoting demand for Issuer stock, *all* "acts of alleged money laundering," and, indeed, "[a]ll information the Government intends to rely on to show the existence of an agreement between or among the alleged conspirators." (Wey Mem. at 24-25). As discussed above, demands for exhaustive inventories of this kind are not properly brought under Rule 7(f), the purpose of which is to

21

give defendants sufficient notice of the crimes charged, not detailed offers of proof.[10]

Third, and finally, Wey's claim that he requires identification of particular wire transmissions furthering the fraud again ignores the particulars supplied in the Indictment and Affidavit, which identify email transmissions from Wey in New York to Erbek and others, as well as the records produced in discovery, which evidence not just numerous phone calls between Wey and Erbek but also (among many other wirings) online stock transactions conducted from the NYGG offices in Manhattan.

What all of this reveals is the absence of a genuine *necessity* for further particulars, and the presence, instead, of an improper purpose to lock the Government into the details of its proof long in advance of trial. Wey's request should be denied in its entirety.

## II.   THE COURT SHOULD DENY AS MOOT WEY'S MOTION FOR *BRADY* MATERIAL

Wey asks the Court to order the Government to conduct a review for *Brady* material—including in productions already made to the defense—and produce any such material immediately upon identification. This motion should be denied as moot. The Government recognizes its obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), and will alert the defense to any *Brady* materials it identifies in a timely fashion. As Wey acknowledges, the Government has already produced some *Brady* material. It is actively continuing its review, which includes examination not just of the documents produced to the defense to date but also of notes and memoranda of interviews and proffers to identify any potentially exculpatory material. The Government will produce any such material promptly.

---

[10] The same goes for Wey's various demands to know how, precisely, the Government believes he "caused" certain acts. (*See* Wey Mem. at 25-26). These are not appropriate particulars requests. *See, e.g.*, *United States* v. *Savin*, 2001 WL 243533, at *5 (denying as "inappropriate" portion of particulars request which sought specification of defendant's "alleged role" with respect to a number of actions).

### III.   THE COURT SHOULD DENY WEY'S MOTION FOR IMMEDIATE DISCLOSURE OF *GIGLIO* MATERIAL

Wey's motion for an order directing the Government to immediately produce *Giglio* material stands on a different footing, and should be denied as premature.  The Government recognizes that *Giglio* v. *United States*, 405 U.S. 150 (1972), requires disclosure of any materials that might be used to impeach key witnesses "in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously."  *United States* v. *Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).  The Government, accordingly, intends to disclose all *Giglio* material well in advance of the subject witnesses' testimony, at the time that it produces materials under the *Jencks* Act, 18 U.S.C. § 3500.  *See, e.g.*, *United States* v. *King*, 2011 WL 1630676, at *7 (S.D.N.Y. 2011) (noting, and approving over defense objection, Government's agreement to produce *Giglio* material at same time as *Jencks* Act disclosures); *United States* v. *Earls*, 2004 WL 350725, at *8 (in denying motion for early *Giglio* disclosure, noting "there is no general right of pre-trial discovery because such material ripens into evidentiary material for purposes of impeachment only if and when the witness testifies at trial") (citations, alteration, and quotation marks omitted); *Trippe*, 171 F. Supp. 2d at 238 ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as *Jencks* Act material[.]").  Wey's demand for yet earlier disclosure is unfounded.  *See, e.g.*, *United States* v. *Dames*, 380 F. Supp. 2d 270, 272-73 (S.D.N.Y. 2005) (denying motion for early *Giglio* disclosure); *United States* v. *Jacques Dessange, Inc.*, 2000 WL 280050, at *9 (S.D.N.Y. 2000) (same).

### IV.   THE COURT SHOULD DENY WEY'S MOTION FOR IMMEDIATE DISCLOSURE OF ITS EXHIBIT LIST

The Court should likewise deny Wey's motion, purportedly brought pursuant to Rule 16(a)(1)(C), for an order that the Government "identify for the defense the documents upon

which it will rely at trial." (Wey Mem. at 34). The theory that Rule 16(a)(1)(C) supplies authority for such an order has been rejected in this District—indeed, it was rejected in a case Wey himself cites for his bill of particulars motion. *See Nachamie*, 91 F. Supp. 2d at 569-70; *see also, e.g.*, *United States* v. *Kaplan*, 2003 WL 22880914, at \*20–21 (S.D.N.Y. 2003) (denying motion and cases cited in support of it as resting on faulty reasoning grounded in old text of Rule 16). This is not to say that the Government would resist an order, based on the Court's general supervisory powers, requiring it to disclose an exhibit list before but reasonably close to trial. *See, e.g.*, *Bonventre*, 2013 WL 2303726, at \*7 (in connection with Madoff Ponzi scheme case, ordering Government to furnish exhibits 60 days before six-month-long trial); *Lino*, 2001 WL 8356 (denying motion for immediate identification of exhibits under Rule 16(a)(1)(C) because defendants had received, among other things, detailed discovery indices, but urging the Government to disclose its exhibit list no later than 15 days before trial). In this case, the Government respectfully submits that its exhibit list should be furnished no later than 15 days before trial, and the defense's exhibit list should be due to the Government one week before trial.

## V. THE COURT SHOULD DENY WEY'S REQUEST FOR A DECEMBER 6, 2016 DEADLINE FOR PRODUCTION OF A WITNESS LIST AND *JENCKS* ACT MATERIAL

The Court should deny Wey's motion for a deadline three months prior to trial for disclosure of the Government's witness list and accompanying *Jencks* Act material. The Government is unaware of any case of comparable complexity and scope in which such an early deadline has been set for witness-related disclosures. Even in *Bonventre*, which involved the largest Ponzi scheme in U.S. history, five defendants, charges spanning decades, and a six-month trial, the Government was ordered to disclose its witness list, *Jencks* Act material, and *Giglio* material only 45 days before trial. *See* 2013 WL 2303726, at \*7-8.

Moreover, there are particular concerns in this case, not present in most, that counsel

24

strongly against early disclosure of a witness list and statements. ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████ █

Separately, the Government has evidence—disclosed to Wey in discovery as part of a FINRA

deposition transcript—that Wey offered a $50,000 bribe to a witness in the Retail Broker-

related hearings in exchange for the witness not discussing Wey during those proceedings.

These facts generate a well-founded concern about witness tampering, and should give the

Court serious pause in considering an order of early witness-related disclosures.  Under the

circumstances, the Government proposes to provide its witness list, *Jencks* Act material, and

any *Giglio* material 15 days before trial.  It also requests that the defense be ordered to make

reciprocal disclosures one week before trial.

## CONCLUSION

The Government respectfully submits that the Court should deny Wey's motions for a

bill of particulars and early discovery.


Dated: New York, New York                    Respectfully submitted,
      May 31, 2016

                                                  PREET BHARARA
                                                  United States Attorney


               By:     _____/s/_____
                                      Sarah Eddy McCallum
                                      Michael Ferrara
                                      Ian McGinley
                                      Assistant United States Attorneys
                                      Tel.: (212) 637-1033/2526/2257

---

11 ███████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████