UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> BENJAMIN WEY and <br> SEREF DOĞAN ERBEK, <br><br> Defendants. | Crim. Action No.: 15-CR-00611 (AJN) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANT BENJAMIN WEY'S FIRST DISCOVERY MOTION**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ..................................................................................................... 6

I.  THE GOVERNMENT MUST PROVIDE A BILL OF PARTICULARS........................ 6

    A.  The Ambiguity of the Charges Warrants a Bill of Particulars.................................. 6

        (1)  The Indictment Does Not Identify the Alleged Fraudulent Conduct ............ 6

        (2)  The January 2012 Search Warrant Affidavit Does Not Provide Sufficient Detail of the Current Charges Against Mr. Wey ........................ 13

    B.  Contrary to the Government's Argument, the Voluminous Discovery Exacerbates Rather Than Obviates the Need for Particulars.................................... 19

    C.  A Bill of Particulars Would Not Preclude the Government From Continuing its Investigation ........................................................................... 21

    D.  The Complexity of the Government's Allegations Warrants a Bill of Particulars ................................................................................................ 22

II.  THE GOVERNMENT RECOGNIZES ITS OBLIGATION TO PRODUCE AND IDENTIFY BRADY AND GIGLIO MATERIAL ........................................................ 24

CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Citigroup, Inc., Auction Rate Sec. Mktg. Litig.*,
  08-CV-05016, 2011 U.S. Dist. LEXIS 19854 (S.D.N.Y. 2011)................................................7

*In re College Bound Consol. Litig.*,
  94-CV-2348, 1995 WL 450486 (S.D.N.Y. 1995).....................................................................7

*In re UBS Auction Rate Securities Litigation*, 08-CV-2967, 2010 U.S. Dist.
  LEXIS 59024 (S.D.N.Y. 2010) ................................................................................................8

*United States v. Bagley*,
  473 U.S. 667 (1985).................................................................................................................24

*United States v. Bortnovsky*,
  820 F.2d 572 (2d Cir. 1987).........................................................................................17, 22, 23

*United States v. Cuti*,
  08-CR-972, 2009 WL 3154310 (S.D.N.Y. 2009)...................................................................24

*United States v. D'Amico*,
  734 F. Supp. 2d 321 (S.D.N.Y. 2010).....................................................................................23

*United States v. Davidoff*,
  845 F.2d 1151 (2d. Cir. 1988) ................................................................................................23

*United States v. Guttenberg*,
  07-CR-141, 2007 WL 4115810 (S.D.N.Y. Nov. 14, 2007)....................................................24

*United States v. Heredia*,
  02-CR-1246, 2003 WL 21524008 (S.D.N.Y. Jul. 3, 2003) ....................................................12

*United States v. Hsia*,
  24 F. Supp. 2d 14 (D.D.C. 1998) ............................................................................................18

*United States v. Leonelli*,
  428 F. Supp. 880 (S.D.N.Y. 1977)..........................................................................................23

*United States v. Levy*,
  11-CR-62, 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013)........................................................23

*United States v. Lino*,
  00-CR-63, 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ..................................................17, 19, 22

*United States v. Lonzo,*
    783 F. Supp. 57 (N.D.N.Y. 1992) .......................................................................24

*United States v. Mitlof,*
    165 F. Supp. 2d 558 (S.D.N.Y. 2001) ................................................................23

*United States v. Mulheren,*
    938 F.2d 364 (2d Cir. 1991) ........................................................................7, 10

*United States v. Padilla,*
    94-CR-313, 1995 WL 105280 (S.D.N.Y. Mar. 13, 1995) ....................................25

*United States v. Rajaratnam,*
    09-CR-1184, 2010 U.S. Dist. LEXIS 70385 (S.D.N.Y. July 13, 2010) ......................12, 22, 23

*United States v. Regent Office Supply Co.,*
    421 F.2d 1174 (2d Cir. 1970) ..........................................................................9

*United States v. Salyer,*
    271 F.R.D. 148 (E.D. Cal. 2010) ...................................................................25

*United States v. Samsonov,*
    07-CR-1198, 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) .....................................24

*United States v. Savin,*
    00-CR-45, 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ........................................22

*United States v. Thomas,*
    981 F. Supp. 2d 229 (S.D.N.Y. 2013) ..............................................................25

*United States v. Trie,*
    21 F. Supp. 2d 7 (D.D.C. 1998) .....................................................................18

*United States v. Trippe,*
    171 F. Supp. 2d 230 (S.D.N.Y. 2011) ..............................................................23

*United States v. Trupin,*
    97-CR-97, 1999 WL 322656 (S.D.N.Y. May 20, 1999) ......................................22

**Statutes**

18 U.S.C. § 3500 ......................................................................................................1

Fed. R. Crim. P. 7(f) ..............................................................................................22

Defendant Benjamin Wey submits this reply memorandum of law in further support of his motion for an Order requiring the Government to provide a bill of particulars and to promptly disclose and identify *Brady* and *Giglio* material.[1]

## PRELIMINARY STATEMENT

The Government's opposition to Mr. Wey's motion for a bill of particulars utterly fails to address the gaping factual hole of its case – a *market manipulation fraud* case – which is: how, when, and by what means did Benjamin Wey (in their words) "artificially inflate and support the value of the shares of those companies"?  The Government's failure to provide the defense and the Court with further information regarding the alleged five-year-long market manipulation and money laundering claims merely serves to confirm that the defense is entitled to a bill of particulars.

As we made clear in our opening papers on this motion, the Indictment charges the defendant with a scheme to fraudulently manipulate the stock of *three separate issuer companies* over a *five year* period.  For six of the eight counts of the Indictment, the charges appear to cover *all three issuers* together, without distinguishing among them.  As the chart on page 6 of the opening brief on this motion starkly demonstrates, however, the Indictment wholly fails to specify *any* allegedly market manipulative activity *at all* with respect to two of those three stocks.  Zero transactions, zero trades, and zero trading instructions are identified with respect to either SmartHeat *or* Deer.  These are stocks that, during the alleged time frame, were traded, on average, in hundreds of thousands of shares each day, sometimes *multiple millions of shares* in a

---

[1]   This motion originally sought additional relief in the form of an order requiring the Government to promptly identify the documents upon which it will rely at trial, and to disclose Jencks Act, 18 U.S.C. § 3500 ("3500"), material and its witness list by a date certain.  Subsequently, the defense and the Government have reached an agreement concerning the timing of turnover to the defense of the Government's witness and exhibit lists and 3500 material, and accordingly, the defense hereby withdraws those aspects of its motion.

day.  These were liquid stocks, widely held by institutional investors and broadly followed by multiple, independent Wall Street research firms.

This is a *fraud* case, yet the Government will not (or cannot) identify the fraudulent, misleading, or manipulative activity that supposedly constituted the criminal wrongdoing.  The Indictment points to no false statements in, for example, press releases or email blasts, no false or unsupported price predictions, no factually false representations about the *bona fides* of the issuers, and no false statements or promises to customers by the allegedly "corrupt" retail brokers.  Rather, the Indictment's theory of fraudulent manipulation appears to rest primarily on an assertion of deceptive trading activity.  In the vaguest terms possible, the Government points to the Indictment's surface allegations of unspecified actions of the supposedly "corrupt" retail brokers, "well-timed" bulk purchases by nominees (the timing and size of which are nowhere identified, much less the issuer involved or the market effect), and "match trad*ing*" (where only one alleged match trade, relating to only one of the three issuers, is identified).  Far from "going deep[]," in the absence of additional specifics, this is the epitome of vagueness.

Rather than provide the defense and the Court with any guidance on these central issues of fraud and manipulation, the Government misdirects the Court to allegations relating to Mr. Wey's supposedly undisclosed control of nominees, and urges in conclusory fashion that, ergo, he "used" that control to manipulate the market.  But nowhere does the Government actually say *how* he used that alleged control to *manipulate* the market, or to *defraud* the investing public.  It is just not there.  The Government appears to contend that because Mr. Wey's alleged nominees owned shares, which he allegedly "monitored," and which were allegedly later sold at a profit which found its way, in part, to him, the Court and the jury must conclude that whatever

happened in the market to make that ownership profitable was caused by him, for his benefit, and was necessarily fraudulent.  But asserting that does not make it so.

The other opaque assertions of allegedly fraudulent activity are equally empty.  The Indictment asserts that the defendant instructed co-defendant Erbek "to maintain share prices of 'at least two issuers' stock."  Which issuers did Erbek manipulate?  The Government will not even tell us *that*.  What instructions?  Again here, the Indictment identifies *one* instruction, which, even if the Indictment's characterization of it was not demonstrably misleading,[2] would still nevertheless say nothing about manipulation of either Deer or SmartHeat stock price or demand, because that instruction related only to a CleanTech trade.

Indeed, not only does the Government refuse to narrow the window of alleged manipulative activity, in effect it expands that time frame back before even the period when these companies *were these companies*.  The Government suggests that, in order to discover the allegedly market-manipulative activity, the defense should search through trading activity that took place prior to when the mergers that created the subject three issuers took place, and before they even became NASDAQ-listed.  So the defense cannot even confine its review to the millions of trades captured in the voluminous Blue Sheet data.

---

[2]   As demonstrated in the opening papers on this motion, as well as in the separate Motion to Suppress, to Dismiss the Indictment, and for Other Relief (Doc. Nos. 44-46), according to Mr. Erbek, this supposedly manipulative "instruction" was plainly a limit order, and was treated as such by the executing institution.  (*See* Suppression Mem. (Doc. No. 45) p. 71)  Further, discovery produced to the defense just last week fully corroborates Mr. Erbek's explanation on this key point.  The trading records of the executing institution (Credit Suisse) reflect that this trade order was treated as a limit order by Credit Suisse.  (*See* Siegal Reply Decl. Ex. A)  The order permitted Credit Suisse to fill it at its own discretion with trades at or below $5 until filled, and gave Credit Suisse eight months to complete the buy order – the expiration date is set at December 30, 2011.  The records further show that the execution of the order took approximately a week to complete, at an average price *below* $5.  So much for the Government's assertion that Mr. Erbek's account is not credible.

(In the opening brief on this motion, we erroneously described the number of shares in this order as 1,000.  (*See* Memorandum of Law in Support Defendant Benjamin Wey's First Discovery Motion (Doc. No. 41) ("Wey Mem."), p. 19)  While not specified in the Indictment, in fact, the newly produced trading records show that it was a 50,000 share order – a detail that was accurately reported by Mr. Erbek through counsel in the October 20, 2015 attorney proffer.)

It is difficult to fathom how a trial of this case could even logically proceed without additional detail, given the sweeping and diffuse nature of the Government's claims, and the sheer volume of discovery produced.  At the conclusion of the trial of this case, the Court will be required to instruct the jury as to the questions it must answer to return a verdict.  For example, Your Honor will need to instruct the jury on money laundering, and ask the jury to decide whether one or more money transfers constituted a transaction involving proceeds of specified unlawful activity.  To fairly adjudicate such an issue, the jury must know which transfers it must examine.  (Here, the Government misleadingly asserts that the Indictment identifies "*a* $20 million transfer of proceeds."  But the Indictment says no such thing, and in fact, the Government does not and cannot identify any $20 million transfer from any account to any other account, because no such transfer ever took place.)[3]  In effect, the Government is asserting that any transfer of money from Mr. Wey's sister to Mr. Wey's wife could potentially be the laundering of criminal proceeds.  Of course, the Government could not possibly prove that broad an assertion, the defense cannot possibly be in a position to meet such an assertion, and no jury could possibly be expected to come to a unanimous meeting of the minds about such a broad claim.[4]

The same is true for the wire fraud and securities counts:  The jury will need to decide whether a particular wire furthered a fraud scheme (not to mention whether or not the wire or wires were within the statute of limitations, whether they were transmitted over a state or national border, and whether this court has venue over such wire(s)), and will be required to decide similar questions relating to the purchase(s) and/or sale(s) of securities.  The

---

[3]   What the Indictment actually says is that "transfer*s*" (plural) took place during the *five year period* between 2007 and 2011, which were delivered into "bank accoun*ts*" (plural) in the United States that the defendant "and/or" his wife controlled.  (Indictment, ¶¶ 21-22)

[4]   Indeed, the Government attempts to cure its failure of particularity by directing the Court to five transfers from *2006* – the year *before* the beginning of the alleged fraud timeframe.  (*See infra*, p. 18)

Government's hiding of the ball on these particulars leaves the Court, the defense, and the jury in an impossible position.  Among other things, the substantive counts will necessarily fail for duplicity, as it will never be knowable whether all 12 jurors reached agreement on the same transaction(s).  Some jurors may believe one wire furthered the fraud while others believe that same wire did not, and vice versa.  This sort of ambiguity is untenable.

The defense is not attempting to box the Government in, or to prevent the Government from later supplementing a list of transactions to the extent necessary.  Rather, Mr. Wey is merely requesting to know what the wrongdoing is that he is charged with committing, so he can join issue on the Government's fraud theory, and so the jury and this Court may know what transactions they must adjudicate.  Moreover, the Government's suggested work assignments for the defense (*see* Gov't Opp., p. 20) are both non-narrowing and actually not doable, given the form and the size of the produced data.  And the Government's reliance on detail asserted in Special Agent Matthew Komar's 2012 search warrant affidavit is curious.  Are the Court and the defense to assume that the Government's case has not progressed in 4 years (and despite the intervening searches)?  Given that the Government has already conceded that significant parts of that affidavit will not be part of its case, and given that other portions of it are clearly false (in 2013 the SEC reversed the 2011 delisting of CleanTech, for example) and misleading (demonstrably, no currency transaction reporting requirements were evaded), the defense should not be required to prepare to defend all 97 pages of scattershot contained in that document.

As Your Honor can see from the motions already filed, this case is enormously complex, breathtaking in scope, and overwhelmingly voluminous in terms of data.  It is incumbent upon the Government to take reasonable steps to identify facts upon which it will rely at trial, to enable the Court to rule on the adequacy of the Government's charges, the jury to understand

their duties and provide a meaningful verdict, and the defense to prepare an adequate defense.  A

bill is required here, for the benefit of the defense, the jury, and the Court alike.

## ARGUMENT

## I.

## THE GOVERNMENT MUST
## PROVIDE A BILL OF PARTICULARS

The Government should be required to provide a bill of particulars in this case because (i)

the government has not provided sufficient information to put the defense on notice of the

alleged fraudulently manipulative wrongdoing; (ii) the information and guidance provided to

date is insufficient, given the nature, size, and complexity of this case, and (iii) the law

unequivocally supports Mr. Wey's request.

The Government argues that it has provided sufficient detail in three sources: (1) the

Indictment, (2) the January 2012 search warrant affidavit, and (3) the Rule 16 discovery.  For the

reasons discussed below, these assertions fail.  Nor, contrary to the Government's suggestion, is

Mr. Wey's request improperly motivated.   His request is well founded, and fully supported by

precedent.

**A.      The Ambiguity of the Charges Warrants a Bill of Particulars**

**(1)      The Indictment Does Not Identify the Alleged Fraudulent Conduct**

As made clear in the opening brief on this motion, the Indictment fails to provide

necessary specificity with respect to the key facts Mr. Wey needs to know to adequately prepare

a defense: (i) what the allegedly fraudulent or manipulative acts are that constituted the alleged

scheme to fraudulent manipulate the price of and demand for the three stocks at issue; (ii) what

the alleged interstate or foreign wire transactions are that furthered such a fraudulent scheme

(with respect to the wire fraud count), and the purchases or sales of securities (with respect to the

securities fraud counts) that constituted those offenses; and (iii) what the alleged transfers of funds are that constitute money laundering.

Rather than provide the missing information or demonstrate where that information exists in the Indictment, the Government responds instead with adjectives, asserting, *ipse dixit*, that its case is not "particularly novel or complicated," and that the Indictment contains "targeted and particularized" descriptions that provide "detail" of "each component."  But with few exceptions, those "components" explain nothing about the crux of the alleged *fraud*.  Rather, most of those "components" are irrelevant to the issues that will be contested at this trial.

The Government, for example, trumpets the fact that it has identified the names of the predecessor entities to Deer, CleanTech and SmartHeat, and described the "mechanics of reverse mergers,"[5] as if any of that "detail" was of any material moment.  The names of the pre-reverse merge entities are publically available and the Government's rudimentary description of reverse mergers does little to elucidate the fraud theory of this case.  This background detail does not begin to address *how* any manipulation of those issuers' stock was undertaken, fraudulently or otherwise, and is thus non-responsive to Mr. Wey's request for a bill of particulars.  The particularity that is missing concerns what, precisely, was the deceptive or manipulative market conduct that constituted the fraud regarding these three companies.  *See, e.g, United States v. Mulheren*, 938 F.2d 364, 370-71 (2d Cir. 1991) (noting that typical fraudulent manipulation cases require proof of market domination in combination with "*other indicia of manipulation*") (emphasis added) (collecting cases); *In re College Bound Consol. Litig.*, 94-CV-2348, 1995 WL 450486, at *6 (S.D.N.Y. 1995) (highlighting the importance of, typically, showing market dominance "*in tandem* with other *fraudulent* actions") (emphasis added); *see also In re*

---

[5]   The defense has already made clear that reverse mergers are a fully legitimate and common business strategy for becoming publicly traded, and invoked by some of the world's most successful companies, including the New York Stock Exchange itself.  (*See* Suppression Mem. (Doc. No. 45), pp. 49-50)

*Citigroup, Inc., Auction Rate Sec. Mktg. Litig.*, 08-CV-05016, 2011 U.S. Dist. LEXIS 19854, at *23 (S.D.N.Y. 2011) (Section 10(b) "requires a showing that an alleged manipulator engaged in '*market activity aimed at deceiving investors* as to how other market participants have valued a security.' . . . The concept of deception necessarily means *giving a false impression*.") (quoting *In re UBS Auction Rate Securities Litigation*, 08-CV-2967, 2010 U.S. Dist. LEXIS 59024 (S.D.N.Y. 2010) (emphasis added)).

Buried in all the misdirection and distraction is the Government's half-hearted attempt to address central the issue: the Government asserts that the co-conspirators used "various means" to "artificially inflate and support the value of the shares in those companies": it points to (1) corrupt retail brokers, (2) "match trading," and (3) "well timed bulk purchases by nominees." (Gov't Opp., pp. 2, 16)  The problem is that each of these assertions falls woefully short of supplying sufficient detail to adequately inform the defense of the nature of the Government's claims, under the circumstances of this case.

With respect to the "corrupt retail brokers," although the Indictment does not identify them, the Government credits itself for having supplied the names of the alleged "corrupt brokers" in the January 2012 Search Warrant Affidavit.  (Gov't Opp., p. 5)  However, listing the identity of dozens of alleged "corrupt brokers" does nothing to inform the defense of: (i) what the basis is for the alleged "corruption"; and (ii) how the supposed "corruption" of these brokers manifested itself *into market manipulative activity* by any of those brokers*, what the "pattern of manipulation"* was, or where or how such a "pattern" can be found in any of the Government's disclosures.  What did those supposedly corrupt brokers *do*, and when did they do it, to manipulate which stocks?  According to the Government, they supposedly solicited their customers to buy, while "actively discourage[ing]" their customers from selling the same issuers.

This alleged "detail" fails on several fronts: it does not identify fraudulent *activity* of any sort undertaken by those brokers,[6] it does not specify when any such activity took place, and does not put the defense in a position to respond.  In the end the Government appears to concede this is relevant information, arguing instead that the defense can figure out from the produced data how the "corrupt" brokers manipulated the stock.  (That incorrect assertion is addressed below).

Next, the Government's asserted specification of "match trading" is unavailing (not to mention misleading).  As an initial matter, the Indictment does not actually identify "trad*ing*." Rather, it identifies *one* purported match *trade*.  Further, that single purported match trade pertains to only one of the three subject issuer companies – CleanTech.  The Government simply cannot contend that this trade – whatever its true nature – demonstrates anything about how the stock price or demand for SmartHeat or Deer was fraudulently manipulated, much less a "pattern" of fraudulent manipulation.  If the Government intends to argue that "match trading" was the (or even *a*) method by which Mr. Wey and his alleged co-conspirators manipulated the market for either SmartHeat or Deer, the Government should be required to identify match trades regarding those issuers, so that Mr. Wey may have an opportunity to prepare to defend such an allegation.  If it cannot identify any, then it must abandon this contention as a supposed theory of fraudulent manipulation, at least with respect to SmartHeat and Deer.[7]

---

6   Notably the Indictment nowhere suggests the brokers said anything false or misleading to any customers.  *See, e.g., United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179-82 (2d Cir. 1970)  (reversing fraud conviction because there was no showing defendants' agents made any false representations in connection with sale of goods).

7   In its opposition, the Government asserts that the Indictment specifies manipulative instructions pertaining to "at least two Issuers."  (Gov't Opp., p. 16 (citing Indictment, ¶¶ 18-19)  Even assuming the February 7, 2011 communication concerning a limit order can be characterized as a manipulative instruction, we are unclear what the Government is referencing as the second – and there is no such detail in the paragraphs cited by the Government.  (*See* Indictment, ¶¶ 18-19)  As far as the defense can tell, there are no trading instructions relating to either Deer or SmartHeat specified in the Indictment.

With respect to supposedly "well-timed bulk purchases by nominees," this allegation is perhaps the vaguest of all.  (Gov't Opp., p. 2)  The Government does not explain what they mean by "bulk" purchases.  It could mean purchases on the open market when the stocks were trading on the NASDAQ.  But in fact, thousands of purchases were made over the years by the dozen or more entities and individuals the Government has deemed "nominees" of Mr. Wey.  Perhaps it refers to purchases of stock in over-the-counter transactions predating the respective NASDAQ listings.  The defense is left to guess.

Most importantly, however, the Government nowhere explains (nor is it otherwise obvious) how open market purchases of stock, no matter how "well timed," can constitute fraudulent or manipulative behavior.  *See Mulheren*, 938 F. 2d at 372 (reversing convictions premised on allegations of open market stock trading activity that were based on evidence that was "at least as consistent with innocence as with guilt") (internal quotes and citations omitted). In any event, if the "well timed" nature of these alleged bulk purchases are one of the three pillars of the Government's fraud theory, surely the defense has the right to know what that timing is, and what size trade constitutes "bulk."  Again here, the Government essentially concedes this is relevant information, declining to provide that core particularity because, they contend, the defense can figure it out from the produced data.  This too is untrue, and frankly, an attempt to send the defense on a wild goose chase through the Blue Sheets.  Even assuming the defense could isolate some manageable number of relatively larger purchases, how could it choose among them those that the government will contend were "well timed," when the Government has not specified what the relevant time period is for bulk purchasing to have had a manipulative effect?  Is the defense to assume that the Government contends any large purchase, in and of itself, identifies the "well timed" nature of that purchase?  Of course it cannot.

With respect to the money laundering counts, the Government falsely states that "the Indictment offers *a* specific example involving *a* $20 million transfer of proceeds from Hong Kong into U.S. accounts controlled by Wey and/or his wife."  (Gov't Opp., pp. 4-5)  However, no such transaction exists.  The Government falsely implies here that Mr. (or Mrs.) Wey received a $20 million transfer from Mr. Wey's sister, and so surely the defense should be able to locate that transfer and defend any charges relating to it.  However, this is not actually what the Indictment states (nor is it consistent with the facts, and the defense would search vain through the hundreds of produced statements to find such a transfer).  Rather, the Indictment alleges that "more than $20 million in cash was transferred from a Hong Kong account in the name of Wey's Sibling to bank accounts in the United States that WEY and/or WEY's wife controlled" (Indictment, ¶ 22) -- *i.e.*, not one transaction, but several, aggregated.  This is a tremendously important distinction.  The allegation clearly encompasses some undisclosed number of transactions of varying sizes, during undisclosed times, between undisclosed accounts.  Mr. Wey cannot defend money laundering charges with this lack of detail.

The Government is similarly opaque when discussing the facts underlying its wire fraud charge.  It is obvious that now, nine months after indicting Mr. Wey, the Government continues to be non-committal regarding which wire(s) it will offer to support its wire fraud count:

> Wey's claim that he requires identification of particular wire transmissions furthering the fraud again ignores the particulars supplied in the Indictment and Affidavit, which identify email transmissions from Wey in New York to Erbek and others, as well as the records produced in discovery, which evidence not just numerous phone calls between Wey and Erbek but also (among many other wirings) online stock transactions conducted from the NYGG offices in Manhattan.

(Gov't Opp., p. 22)  How is a jury expected to vote on a wire fraud count if presented with this morass?  How is Mr. Wey expected to present legal arguments attacking the sufficiency of the

wire charged if the Government is permitted to proceed on such a nebulous theory?  It is entirely unfair and unconstitutional to require Mr. Wey to defend a wire fraud count based on "emails," "online stock transactions," "phone calls," and "many other wirings."  "Many other wirings" does not put Mr. Wey on notice of the charges against him, does not enable the Court to understand the nature of the charge and adjudicate Rule 29 motions, and will preclude the jury from rendering a legitimate verdict.[8]

Similarly, with respect to the securities fraud substantive counts, the Government cannot maintain its flexibility in perpetuity as to which trades it will contend constitute the allegedly offensive conduct.  Of course, the Government can assert that many stock trades took place, but which ones constitute the conduct charged in the substantive counts?  The Court only need refer to the indictment in one of the cases the Government cites for the sort of specificity the defense is requesting here.  (*See* Siegal Reply Decl. Ex. B at pp. 32-33 (indictment in *United States v. Rajaratnam*, 09-CR-1184 (S.D.N.Y.), specifying, in each of 9 separate substantive counts, the date, number of shares, issuer, and nature of trade); *see also* Wey Mem., p. 20 n.15)  The *Rajaratnam* indictment is the proper way to put the defense on notice of the charges.  There is no reason why the Government should not provide similar guidance here, for the defense, Court, and jury.

---

[8]  The Government devotes nearly two pages of its brief to *United States v. Heredia*, a case which only serves to underscore the merits to Mr. Wey's request, because in that case, the charges actually were sufficiently specific for the defense to be on notice of the fraudulent conduct at issue.  (Gov't Opp., pp. 15-16)  For starters, the scheme alleged in *Heredia* was confined to a nine month period and involved only one stock.  02-CR-1246, 2003 WL 21524008, *1-2 (S.D.N.Y. Jul. 3, 2003).  More importantly, the charges in that case specified that the price manipulation took place *over five consecutive days* in September 1997.  *Id.*  Further, that indictment specified a fraudulent representation made during that five day window, in tandem with alleged long-lasting control of the market – namely a false statement by the defendant to an identified victim on September 24, 1997.  *Id.* at *2.  Thus, contrary to the Government's characterization, *Heredia* does not bear a "striking similarity" to this case – nothing the Indictment provides here remotely approaches that same sort of specificity.  (Gov't Opp., pp. 15-16)  Rather, it is precisely the sort of detail present in the *Heredia* case that the defense seeks by this motion.

    **(2)**      **The January 2012 Search Warrant Affidavit Does Not Provide Sufficient Detail of the Current Charges Against Mr. Wey**

The Government asserts that the January 2012 search warrant affidavit supplies the particulars that the Indictment does not regarding the charges against Mr. Wey. (Gov't Opp., p. 17) This response fails for several reasons. First, this search warrant affidavit is more than four years old and was written before the search and seizure of virtually the entirety of Mr. Wey's home and office. Surely the Government is not now telling this Court that, four years later, their case amounts to, effectively, what they knew in January 2012. Surely the Government has refined its case, has crystallized its then-nascent and diffuse theories of probable cause into some articulable case of provable fraud. While the defense is not attempting by this motion to preclude the Government from later *further* refining or supplementing its proof or its specified transactions subsequent to providing a bill of particulars, it is another thing entirely for the Government to take the position that the only particulars they need provide are those they knew (or surmised) at the investigation's inception four years ago.

Second, as Mr. Wey's separate suppression motion makes clear, large swathes of the search warrant affidavit are demonstrably false, misleading or both, or for other reasons, can hardly now be relied upon by the Court or the defense as a guide to this criminal prosecution. (Suppression Mem., pp. 37-52) For example, it cannot be that the "specificity" supplied by Agent Komar in his chart (on page 57 of his affidavit) asserting that CleanTech's CEO sent several tranches of money to Mr. Wey's wife should be regarded as guidance for the defense in this case, when it has now been demonstrated that "Bei Lu" in the context of the bank transactions refers not to a person *but to a street address in China*. (Suppression Mem., pp. 50-51)

Nor can the affidavit's allegations relating to purported currency transaction reporting evasion be expected to be a part of this case, now that the defense has brought to the Government's attention the fact that wire transfers are not subject to such requirements. (Suppression Mem., pp. 48-49)  Likewise, the defense would be surprised to learn that the Government still intends to rely on the NASDAQ's January 2011 decision to de-list CleanTech, or the rationale behind that decision, as proof in this case of fraudulent behavior by Mr. Wey, given that the SEC reversed that decision in 2013 for its lack of factual basis.  Indeed, Agent Komar's central contention in his January 2012 affidavit was his abiding belief that stock certificates of the subject issuers would be found at Mr. Wey's home or office.  (Gov't Opp., Ex. A (January 2012 Search Warrant Affidavit) ("Komar Aff.") at p. 66)  Is it now the Government's position that it intends to make these same baseless arguments to the jury?  Is the Government's contention that the defense must prepare to meet the 97 page, 2012 version of its investigation?[9] Apart from the above, what portions of that Affidavit are still in play, in the form they existed back then?  Why will the Government not say?

Third, and most importantly, the Affidavit simply does not provide the particulars sought by this motion, contrary to the Government's assertion.  While the Government in its opposition papers lists eight (8) categories of information purportedly supplied by the Komar Affidavit (Gov't Opp. p. 17), in fact, the Affidavit fails to provide the key information Mr. Wey seeks through this motion, and is simply no proxy for a proper bill of particulars.  None of those categories addresses the core of what is missing from both the Indictment and the search warrant – what is the fraudulently manipulative conduct, and when did it occur?   How did Mr. Wey's alleged control coincide with any deceptive market conduct.  Similarly, none of those categories

---

[9]   The Government has further already informed the defense that it does not intend to make Agfeed a part of its trial presentation.

supply the missing specifics of which wires the Government will contend furthered the fraud, to support the wire fraud substantive count.  Or the bank transfers that constitute the money laundering counts.

The Government alleges, for example, that it has provided "(2) evidence establishing Wey's control of the Nominees (Aff. ¶ 29)."  (Gov't Opp., p. 17)  There is no such information in paragraph 29 of the affidavit.  This paragraph alleges that Mr. Wey had trading authority over U.S. brokerage accounts for his sister (who lives in China) and his father in law, who also lives overseas.  It does not mention any other nominees at all.  It also does not describe how Mr. Wey "control[led]" either of these individuals.  The Government clearly concedes that this information is necessary to prepare Mr. Wey's defense, and it should be ordered to provide this information for all alleged "nominees."  But again, even assuming the control issue was specified, that is not enough.

The Government's "specification" of the issuers whose stock was purportedly manipulated is *necessary* information, but far from sufficient to put the defense on notice of what the claim of fraud is.  (Gov't Opp., p. 17)  Of course the defense is aware that the case concerns Deer, SmartHeat, and CleanTech.  The Indictment provides that information.  Informing the Court that the Komar affidavit, too, supplies that information is simply underscores how little useful information the Government has provided to the defense.

The Government proffers that paragraphs 27 through 29 of the Affidavit provides "time frames and share price increases associated with manipulative acts by Wey and the Retail Brokers related to the stock of those Issuers in late 2009 and early 2010."  (Gov't Opp., p. 17)  But as noted above, this information is too superficial and vague to be useful.  The Government fails to identify any allegedly manipulative trades for either of the stocks in play at that time

(Deer and SmartHeat), stocks that traded in volumes of hundreds of thousands of shares per day in that period.  Moreover, again here, there is no information about what the allegedly manipulative *trading behavior* was.  The Government asserts that the affidavit alleged a "pattern of manipulation," but it fails to explain how one alleged wash trade in 2011 concerning CleanTech establishes a "pattern" of anything with respect to an alleged manipulation in 2009 and 2010 (of Deer, SmartHeat, or any other then-existing stock).  (Gov't Opp., p. 16)

Perhaps in the context of a search warrant application, the Magistrate Judge could excuse the FBI agent's rank speculation, at that stage of the investigation, that the stock prices of Deer and SmartHeat had advanced in "unexplained" fashion during that time frame.  (Komar Aff., ¶ 25)  Agent Komar did not in his affidavit attempt to provide the missing pieces, presumably because that is what he hoped to discover through the search.  Putting aside the fact (as proven by our motion to suppress, *see* Suppression Mem., pp. 43-46) that innocuous, publicly available information fully explained these stocks' price rises in the time frame identified by Agent Komar, if it is still the Government's intention to assert that this 12 or 18-month window is the relevant time frame for the alleged manipulation of Deer and SmartHeat, the Government ought now to be able to supply more specific information about what actions constituted the alleged manipulation.  It cannot be that the Government will argue at trial that the stock price went up without explanation, and therefore this *must* have been a manipulation.  It must prove manipulative actions and/or fraudulent acts.  What is their theory?  What was done in that window, by whom and when, that constituted fraudulent behavior?  Was it wash trades or matched orders?  If so, it should specify them.  Was it false press releases, or other misleading information about these companies provided to market participants?  If so, what were those misrepresentations?

The January 2012 search warrant affidavit also fails to specify *how* the Scholander-Harris brokers "promoted the issuers" stock and discouraged sales thereof,[10] or how that allegation specifies a "pattern" of anything.  (Gov't Opp., p. 16)  Agent Komar's affidavit is no more specific on this point than the Indictment.  He pointed to a compliance officer who reported "in or about 2010" that he heard one such broker make "improper representations," and that a compliance consultant reported that other examiners saw at least one incident of high pressure sales being used, and "false statements" being made.  (Komar Aff., ¶ 22)  What statements?  What was false about them?  Who made them?  When?  To Whom?  These conclusory, vague assertions, which perhaps may be excused in the context of a search warrant application, do not come close to the specificity necessary to put the defendant on notice of the charges he must meet in a criminal trial.  The defense is entitled to know this basic information.  *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987); *United States v. Lino*, 00-CR-63, 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001).  This again highlights the fallacy of the government's contention that the defense can look to a 4-year old search application for the necessary particulars.  Simply put, the particulars are not to be found in Agent Komar's affidavit, and the defense has been left in the dark about what it is supposed to be defending.[11]

---

[10]  In its opposition, the Government makes varying references to proof of either "discouraging" of sales or "preventing" sales.  (*Compare* Gov't Opp. p. 4 *with* p. 17)  We have searched in vain for any evidence in the Affidavit of any prevention of selling.

[11]  As part of its list, the Government now purports to identify the entities and individuals that Mr. Wey has been requesting: "(1) the name of the Nominees and the details about their roles"; "(3) the names of . . . hundreds of round-lot shareholders alleged to have been used by Wey and other to gain Nasdaq listing for Deer and SmartHeat"; "(4) the names of the Retail Brokers with whom Wey conspired to artificially inflate Issuer stock (Aff. ¶ 12)."  (Gov't Opp., p. 17)  If the Government confirms that this information is accurate and complete to date, Mr. Wey will withdraw his requests for particulars regarding those issues.

We note that at least some of this is still unclear however.  For example, the Government's brief cites paragraph 28 of the Komar Affidavit as one place where the "Nominees" are identified.  (Gov't Opp., p. 17)  Paragraph 28 of that Affidavit describes four individuals with Chinese surnames as nominees – not of Mr. Wey, but rather, of the CEO of SmartHeat.  Is the Government now contending these are instead nominees of Mr. Wey?  Again, this ambiguity exposes the fallacy in suggesting the particulars are contained in that 2012 document.

The Government's contention that specific transfers relevant to the money laundering count can be found at paragraph 29(i) of Agent Komar's affidavit is simply wrong.  (Gov't Opp., p. 17)  That paragraph references five transfers from May 2006 – *none* of which are within either the alleged laundering time frame of 2007 through June 8, 2011, all of which pre-date the alleged fraud schemes, and all of which are beyond the statute of limitations.

Finally, the Government has failed to state whether it intends to introduce facts beyond those identified in Agent Komar's January 2012 Affidavit.[12]  It is not enough for the Government to point to a single "match trade" relating to CleanTech *as an example*, when it could have no bearing on Deer or SmartHeat.  On the current posture, the Government could attempt to prove up forty "match trades" or twenty or two, or just the one, at trial.  *See United States v. Trie*, 21 F. Supp. 2d 7, 21-22 (D.D.C. 1998) (The Government's failure to provide this information is "inconsistent with the presumption of innocence" and "smacks of gamesmanship.").  Mr. Wey and the Court have no idea, because the Government is intent on presenting a trial by ambush. Allowing this case to proceed to trial without requiring the Government to provide these necessary basic particulars would violate both the Rules of Criminal Procedure and the constitutional protections afforded Mr. Wey.  Mr. Wey is not asking the Government to provide every detail of its case and trial strategy.  Instead, he has only requested targeted information that gets to the bare facts the Government must prove to meet the elements of the crimes charged.

---

[12]  In the emaining item (5), the Government lists a purported "corrupt" bribe paid to two brokers.  (Gov't Opp., p. 17)  First, this allegation is without merit.  The January 2012 Search Warrant affidavit does not even allege that Mr. Wey knew about or played any role in this alleged $350,000 payment from an issuer to one of its placement agents.  (Koma Aff., ¶ 26)  Nor does the Affidavit trace any stock sale proceeds to the alleged interfamilial transfers.

Second, neither the Indictment nor the Komar affidavit suggests which, if any, of the "corrupt" brokers shared in this alleged payment or even knew about it, much less that any of them misrepresented anything about it to their customers, or that Mr. Wey "caused" any such misrepresentations.  *See United States v. Hsia*, 24 F. Supp. 2d 14, 32 (D.D.C. 1998) (requiring particularization of how defendant caused false statements); *United States v. Trie*, 21 F. Supp. 2d at 21-22 (requiring government to provide specifics describing the false statements, what made them false, who made them and how the defendant "caused" them).

**B.      Contrary to the Government's Argument, the Voluminous Discovery Exacerbates Rather Than Obviates the Need for Particulars**

The Government does not dispute that the volume of discovery in this case is extraordinary – made up of millions of documents, terabytes of data, and Blue Sheet trading data relating to heavily-traded public stocks over five years of trading.  This fact alone supports an Order requiring the Government to provide a bill of particulars.  *See, e.g., Lino*, 2001 WL 8356.  The Government argues, falsely, that "[t]he Government has given Wey the tools he needs to identify which trades and periods of trading are *likely* to be subject of its case in chief."  (Gov't Opp., p. 20 (emphasis added))  According to the Government, at best, Mr. Wey is able to identify the trading and time period that is "*likely* to be the subject of its case in chief."  It is telling that the Government – for all of its bluster – is not even willing to argue that Mr. Wey *is* able to identify the trading and time periods that *will* be subject to its case in chief.  This is a fatal admission, warranting a bill of particulars.

Further, a review of the "tools" the Government has allegedly provided demonstrates the impossibility of Mr. Wey's task.  For the first time, the Government states that the allegedly manipulative trading it will seek to prove at trial relates to: "[i] actions by the Retail Brokers, at Wey's urging, to push their customers to buy Issuer stock and discourage them from selling; [ii] large block purchases by Nominees of Issuer stock to support stock prices; and [iii] trades in which a Nominee is on one side of a transaction and either another Nominee or a Retail Broker customer is on the other."[13]  (Gov't Opp., p. 20)

---

[13]  The Government also argues that Mr. Wey can utilize indices provided with its productions to narrow the voluminous discovery.  (Gov't Opp., pp. 6-7)  The broad indices provided by the Government to Mr. Wey – and which the Government did not provide to the Court – do not permit the defense to narrow their review of the voluminous discovery materials.  Siegal Reply Decl., Ex. C)  While the Government describes the production as "carefully indexed" (Gov't Opp., p. 15) the indices provide only the name of the document custodians or broad category, with no additional descriptive language.  (*See id.*)  Mr. Wey cannot utilize the indices to dispense with the review of certain documents without more particular knowledge about what alleged conduct will be the subject of the Government's case.

This guidance is essentially worthless in practice.  First, it includes so many potential trades as to not meaningfully narrow the scope of discovery.  Mr. Wey has no idea what the Government means by "actions by the Retail Brokers" or to which trades that relates.  As the Government knows, these Retail Brokers were market makers in Deer and SmartHeat.  As a result of this market making activity, their firms traded millions of shares in these stocks.[14]  Accordingly, the Blue Sheet data produced by the Government covers trades in millions of shares relating to these Retail Brokers and their firms.[15]  Moreover, as the Government well knows, that data merely reports the execution of a trade.   It provides no information whatsoever regarding how a broker obtained the order for the trade.  No trade data will reveal which trades, for example, were ordered in response to urging by a "corrupt" broker (as opposed to an order placed through an unsullied broker), nor will the data reveal instances where brokers supposedly discouraged investors from selling.

Further, the Blue Sheets simply do not provide the identities of both parties to any given transaction.  The listed counterparty (to the extent that data is even provided) for any given trade record is simply the brokerage house clearing the trade -- such as Goldman Sachs or Raymond James -- and does not reveal the identity of the counterparty broker's customer.  As a result, the Blue Sheets simply do not provide a reliable way of identifying all the trades in which a

---

[14]   Overall, these stocks traded hundreds of millions of shares.

[15]   The Government's comments regarding Mr. Wey's request for additional Blue Sheet data highlights the disconnect between the Government's characterization of the level of detail provided to Mr. Wey and the actual facts.  (Gov't Opp., p. 8)  The Government represents that it is "puzzling" to find Mr. Wey "complaining" about the volume of Blue Sheet data after Mr. Wey requested additional data.  (*Id.*)  However, as the Court knows, the Indictment is no more specific than to say the alleged market manipulation relates to Deer, SmartHeat, and CleanTech during the period 2007 through 2011.  In its initial production of Blue Sheet data, several months of trading data during that alleged fraud scheme period were missing.  Given that the time frame stretched from 2007 through 2011, Mr. Wey was compelled to ask the Government to fill in those data gaps.  (Siegal Decl., Ex. D at Section A.1)  Even to this date, the Government has not said that Mr. Wey should ignore the trading that occurred during the time periods for which Blue Sheets were initially omitted.  Instead, the Government criticizes Mr. Wey for requesting them while asking for a bill of particulars, when in reality those positions are entirely consistent: Mr. Wey cannot narrow the scope of his discovery requests until the Government provides particulars with respect to its charges that would help narrow them.

Nominee is on one side of a transaction and either another Nominee or a Retail Broker customer is on the other.

Similarly, suggesting that the defense can also focus their review on "large block purchases by Nominees," is equally useless in narrowing the scope of trading data.  (Gov't Opp., p. 20)  First, "large block purchase," has no defined meaning.  Is a "large block" 1,000 shares, 10,000 shares, 100,000 shares?  Depending on what the threshold is, this task could require the defense to review a thousand trades or more (even assuming all "Nominee" trades could be identified in the Blue Sheets, which they cannot).

Finally, the Government's clues for how the defense should sift through the data to find the transactions it will rely up on at trial are also under-inclusive.  To date, the Government has only identified two allegedly manipulative trades, and it is not apparent that either of these trades would be captured by these "confin[ing]" categories.  The alleged 1,000 share match trade in CleanTech does not seem related to a Retail Broker, is probably not a "large block purchase" since it only involved 1,000 shares, and it is unclear from the Blue Sheets who is the counterparty to that trade.  (Indictment, ¶ 19)  The February 7, 2011 $5 limit order in CleanTech similarly fails to fit neatly into any of these categories.  (Indictment, ¶¶ 9-10)  It seems the Government just created some arbitrary parameters for the purposes of this motion, without any regard for how they fit the allegations in the Indictment or the case it will present at trial.

## C.    A Bill of Particulars Would Not Preclude the Government From Continuing its Investigation

The Government baselessly asserts that the defense has made this motion for an improper purpose, and exaggerates the ramifications of granting a bill of particulars, arguing that granting

this request would somehow hinder its ability to continue its investigation.[16]  (Gov't Opp., pp.

13-14, 21-22)  A bill of particulars will not, as the Government suggests, improperly cabin the

Government's case long before trial and provide the defendant an opportunity to "tailor [his]

testimony."  (Gov't Opp. p. 14)  These are not unique concerns, and the Federal Rules deal with

this issue: the Government "may amend its bill of particulars subject to such conditions as justice

requires."  Fed. R. Crim. P. 7(f).  In *Lino*, the court followed a sensible approach and allowed the

Government to supplement its bill of particulars at any time up to thirty days prior to trial.  *See*

*Lino*, 2001 WL 8356, at *9; *see also United States v. Trupin*, 97-CR-97, 1999 WL 322656, at *4

(S.D.N.Y. May 20, 1999) (government permitted to amend bill of particulars on motion).  The

Government's suggestion that the defense is seeking a bill for improper motives simply has no

basis.

## D.    The Complexity of the Government's Allegations Warrants a Bill of Particulars

In a complex case such as this, a bill of particulars is warranted because "the potential for

unfair surprise and the difficulty of preparing a defense are amplified."  *See United States v.*

*Rajaratnam*, 09-CR-1184, 2010 U.S. Dist. LEXIS 70385, at *4 (S.D.N.Y. July 13, 2010); *see*

*also Bortnovsky*, 820 F.2d at 573.  The Indictment alleges an apparently[17] complex securities,

wire fraud, and money laundering scheme involving the manipulation of three separate publicly-

traded stocks over the course of five years.  As discussed in Mr. Wey's opening brief, even less

complex cases warrant bills of particulars.  *See, e.g., Rajaratnam*, 2010 U.S. Dist. LEXIS 70385,

---

[16]   This is a case that the Government has already been investigating for over four and a half years and that will go
to trial more than one and a half years after indictment.

[17]   The complexity of any scheme that could manipulate the share price of heavily-traded NASDAQ-listed stocks
with market capitalizations in the hundreds of millions over the course of five years is self-evident.  This
complexity is buttressed by the volume of data produced by the Government and the Government's estimated
length of trial.

at *4-5[18]; *United States v. Davidoff*, 845 F.2d 1151 (2d. Cir. 1988); *Bortnovsky*, 820 F.2d at 575;

*United States v. Savin*, 00-CR-45, 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001).

Indeed, the government does not dispute the complicated nature of its case.  Rather, it

seeks to ignore the complexity of this case by relying on a number of inapposite cases.  (Gov't

Opp., pp. 10-15)  It cites a host of cases where it was not required to provide a bill of particulars.

But, in those cases, the Government brought charges arising from straightforward theories of

fraud, or otherwise voluntarily provided detailed clarification of more complicated charges,

thereby mooting the pre-trial motions.  (*See* Gov't Opp., pp. 10-15, citing *Monserrate*, 2001 WL

3480957 at *1 (charges were limited in time, geography, and number of payments at issue and

indictment fully set forth "(1) when the crime took place; (2) where the crime took place; and (3)

the manner in which the defendant committed the crime."); *United States v. Levy*, 11-CR-62,

2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013) (indictment described "the types of material

misrepresentations and omissions" the defendant made, and his participation in the

manipulation); *United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2011) (simple bribe

theory and defendant only sought identities of alleged co-conspirators); *United States v. Mitlof*,

165 F. Supp. 2d 558 (S.D.N.Y. 2001) (false advertising case arising from water ferry accident);

*United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) (simple bribery case); *United

States v. D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010) (Government submitted a 25-page

"Notice of Enterprise Evidence" letter (Doc. No. 37) expressly setting forth the dates, names, and

locations each predicated act underlying the conspiracy and the evidence that the Government

---

[18]   The Government's attempts to distinguish *Rajaratnam* fail.  (Gov't Opp., p. 18)  In that case, unlike here, the
Government had already provided a chart of trade data in the Indictment.  (Siegal Reply Decl., Ex. B)
Nonetheless, the Court ordered the Government to provide additional particulars given the complexity of the
case.  *See United States v. Rajaratnam*, 2010 WL 2788168 (S.D.N.Y. 2010).  Here, the Government has not
provided any detail in the Indictment.  Contrary to the Government's assertion, a bill of particulars is more
appropriate here than in *Rajaratnam*.

intended to introduce at trial); *United States v. Cuti*, 08-CR-972, 2009 WL 3154310, *8

(S.D.N.Y. 2009) (Government voluntarily supplied explicit list identifying the 17 fraudulent real

estate transactions and the $15 million in return payment transactions central to case); *United*

*States v. Samsonov*, 07-CR-1198, 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) (Government

"voluntarily provided the defendant with detailed information relating to the conduct with which

he [was] charged" and "detailed discovery letters"); *United States v. Guttenberg*, 07-CR-141,

2007 WL 4115810, *5 (S.D.N.Y. Nov. 14, 2007) (Government agreed to provide "charts listing

trades for each relevant account")).  Simply put, the law amply supports Mr. Wey's application

for a bill of particulars under the circumstances of this case.

## II.

### THE GOVERNMENT RECOGNIZES ITS OBLIGATION TO PRODUCE AND IDENTIFY BRADY AND GIGLIO MATERIAL

The Government recognizes its obligation to produce *Brady* and *Giglio* material.  (Gov't.

Opp., pp. 22-23).  With respect to *Brady* material, the Government acknowledges that it will

continue to produce "any such material promptly" as it undertakes its review of the documents.

(*Id.*, p. 22)  With respect to *Giglio* material, however, the Government contends that the time for

such disclosures is "premature," and argues that the time to produce these documents should

coincide with the production of "materials under the Jencks Act." (*Id.*, p. 23)

But, *Giglio* material does not stand on a different footing from *Brady* material.  Indeed,

the United States Supreme Court has expressly "rejected any . . . distinction between

impeachment evidence and exculpatory evidence."  *United States v. Bagley*, 473 U.S. 667, 676

(1985); *United States v. Lonzo*, 783 F. Supp. 57, 60 (N.D.N.Y. 1992) (disclosure of *Giglio*

material required as soon as it became known to the government).  As such, the Government has

no basis to withhold *Giglio* material until the eve of trial, especially if it has already has these

materials in its possession.  *See United States v. Padilla*, 94-CR-313, 1995 WL 105280

(S.D.N.Y. Mar. 13, 1995) (*Giglio* material is not tethered to *Jencks* material; court thereby has

ultimate discretion to order production of *Giglio* material at any time).

The Government also does not address or oppose to Mr. Wey's request for the

identification of any *Brady/Giglio* material in the 5 terabytes of documents produced to date.

Indeed, the Government is hard pressed to provide any explanation as to why the equities would

require Mr. Wey to sift through over three million documents in search for exculpatory evidence.

*See United States v. Thomas,* 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013); *United States v. Salyer*,

271 F.R.D. 148, 155 (E.D. Cal. 2010);

Accordingly, the Government should be directed to produce and identify both *Brady* and

*Giglio* materials in the production to date and as soon as it they become known to the

Government.

## **CONCLUSION**

Based on the foregoing and his opening papers, Mr. Wey respectfully requests an Order

requiring the Government to (i) promptly provide a bill of particulars consistent with the requests

made in this motion, and (ii) promptly disclose and identify *Brady* and *Giglio* material, together

with such other and further relief as it deems just and proper.

Dated:  June 20, 2016

HAYNES AND BOONE, LLP
*Counsel to Defendant Benjamin Wey*

By:   s/David Siegal_____
David Siegal
Joseph Lawlor
        30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-4995
david.siegal@haynesboone.com