UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

    – v. –                 :          15 Cr. 611 (AJN)

BENJAMIN WEY,            :
       a/k/a "Benjamin Wei,"
       a/k/a "Tianbing Wei," and    :
SEREF DOGAN ERBEK,
       a/k/a "Dogan Erbek,"      :

                Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BENJAMIN WEY'S MOTIONS TO SUPPRESS EVIDENCE, PREVENT A PRIVILEGE REVIEW, DISMISS THE INDICTMENT, TAKE HIS CO-DEFENDANT'S DEPOSITION ABROAD, AND STRIKE REFERENCES TO ALIASES

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America.

Sarah Eddy McCallum
Michael Ferrara
Ian McGinley
Assistant United States Attorneys

    -Of Counsel-

## TABLE OF CONTENTS

TABLE OF CASES ........................................................................................................... iii

BACKGROUND ................................................................................................................ 2

    I.      THE SEARCH WARRANT AFFIDAVITS ...................................................... 3

         A.     The NASDAQ Round-Lot Holder Deceptive Conduct ............................. 5

         B.     Market Manipulation ............................................................................... 7

         C.     The AgFeed Accounting Fraud ................................................................ 9

         D.     The NYGG Premises ............................................................................. 10

    II.     THE NYGG WARRANT .................................................................................... 13

    III.    EXECUTION OF THE NYGG WARRANT .................................................. 13

    IV.    THE WEY APARTMENT SEARCH ............................................................ 15

    V.     SEARCHES OF THE ELECTRONIC EVIDENCE ...................................... 16

    VI.    THE INDICTMENT ......................................................................................... 18

ARGUMENT ..................................................................................................................... 19

    I.      THE COURT SHOULD DENY WEY'S PARTICULARITY,
         OVERBREADTH, AND PROBABLE CAUSE CHALLENGES TO
         THE SEARCH WARRANTS .......................................................................... 19

         A.     Applicable Law ....................................................................................... 20

         B.     Discussion ............................................................................................... 27

    II.     THE COURT SHOULD DENY WEY'S MOTION TO SUPPRESS
         BASED ON RETENTION OF ELECTRONIC EVIDENCE ........................ 45

         A.     Applicable Law ....................................................................................... 46

         B.     Discussion ............................................................................................... 47

    III.    THE COURT SHOULD DENY WEY'S MOTION TO PREVENT
         THE GOVERNMENT FROM CONDUCTING A PRIVILEGE
         REVIEW ........................................................................................................... 52

    IV.    THE COURT SHOULD DENY WEY'S MOTION TO DISMISS THE
         INDICTMENT ................................................................................................. 54

         A.     Counts One Through Four, Seven, and Eight Are Not Duplicitous ......... 54

         B.     Counts Two Through Six Properly State Offenses................................... 59

C.    Wey's Motion to Dismiss the Indictment on Due Process Grounds Should Be Denied ..................................................................................67

V.    THE COURT SHOULD DENY WEY'S MOTION TO TAKE ERBEK'S RULE 15 DEPOSITION .................................................................72

VI.    THE COURT SHOULD DENY WEY'S MOTION TO STRIKE HIS ALIASES ...........................................................................................................72

CONCLUSION..................................................................................................................74

## TABLE OF CASES

*DeMichele* v. *Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784 (2d Cir. 1999)....................68

*Franks* v. *Delaware*, 438 U.S. 154 (1978)...............................................................................42

*Groh* v. *Ramirez*, 540 U.S. 551 (2004) .................................................................................20

*Hamling* v. *United States*, 418 U.S. 87 (1974) .......................................................................60

*Herring* v. *United States*, 555 U.S. 135 (2009) ....................................................25, 26, 41, 47

*In re Search Warrant for Law Offices Executed on March 19, 1992,*153 F.R.D. 55 (S.D.N.Y. 1994) ..............................................................................................................................54

*Levy* v. *United States*, 626 F. App'x 319 (2d Cir. 2015) ........................................................64

*Russell* v. *United States*, 369 U.S. 749 (1962).......................................................................60

*SEC* v. *Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007)............................................................65

*U.S. Postal Serv.* v. *C.E.C. Servs.*, 869 F.2d 184 (2d Cir. 1989)............................................23

*United States* v. *Abboud*, 438 F.3d 554 (6th Cir. 2006)..........................................................24

*United States* v. *Ageloff*, 809 F. Supp. 2d 89 (E.D.N.Y. 2011) .............................................64

*United States* v. *Alameh*, 341 F.3d 167 (2d Cir. 2003)...........................................................68

*United States* v. *Alfonso*, 143 F.3d 772 (2d Cir. 1998)..........................................................67

*United States* v. *Bianco*, 998 F.2d 1112 (2d Cir. 1993)....................................................21, 30

*United States* v. *Bowen*, 689 F. Supp. 2d 675 (S.D.N.Y. 2010) .......................................24, 38

*United States* v. *Buck*, 813 F.2d 588 (2d Cir. 1987) ........................................................22, 27

*United States* v. *Burke*, 718 F. Supp. 1130 (S.D.N.Y. 1989)................................................24

*United States* v. *Butler*, 351 F. Supp. 2d 121 (S.D.N.Y. 2004) ............................................74

*United States* v. *Clark*, 638 F.3d 89 (2d Cir. 2011) ...................................................20, 25, 38

*United States* v. *Cohan*, 628 F. Supp. 2d 355 (E.D.N.Y. 2009) .......................................23, 24

*United States* v. *Cohen*, 260 F.3d 68 (2d Cir. 2001)...............................................................72

*United States* v. *Cornielle*, 171 F.3d 748 (2d Cir. 1999)...........................................68, 69, 71

*United States* v. *Cwibeker*, 2014 WL 7423106 (E.D.N.Y. 2014)...........................................40

*United States* v. *D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010).......................21, 23, 24, 37

*United States* v. *Dioguardi*, 428 F.2d 1033 (2d Cir. 1970) ....................................73

*United States* v. *Dixon*, 536 F.2d 1388 (2d Cir. 1976) ........................................66

*United States* v. *Dupree*, 781 F. Supp. 115 (E.D.N.Y. 2011)................................23

*United States* v. *Feng Ling Liu*, 2014 WL 101672 (S.D.N.Y. 2014) .............................passim

*United States* v. *Filippi*, 2015 WL 5789846 (N.D.N.Y. 2015).........................................46, 51

*United States* v. *Finnerty*, 533 F.3d 143 (2d Cir. 2008) ...............................60, 62, 63

*United States* v. *Galpin*, 720 F.3d 436 (2d Cir. 2013)..................................21, 22, 30

*United States* v. *Ganias*, 755 F.3d 125 (2d Cir. 2014)..........................................47

*United States* v. *Ganias*, No. 12-240-cr, --- F.3d ----, 2016 WL 3031285 (2d Cir. May 27, 2016)....................................................................47, 48, 49

*United States* v. *George*, 975 F.2d 72 (2d Cir. 1992) ...................................21, 30, 31

*United States* v. *Goldberg*, 756 F.2d 949 (2d Cir. 1985).........................................67

*United States v. Gonzalez*, 2000 WL 1721171 (S.D.N.Y. 2000)..............................70

*United States* v. *Grant*, 2004 WL 1171258 (S.D.N.Y. 2004)..................................54

*United States* v. *Hernandez*, 2010 WL 26544 (S.D.N.Y. 2010)............................23, 24, 25, 38

*United States* v. *Hickey*, 16 F. Supp. 2d 223 (E.D.N.Y. 1998)................................24

*United States* v. *Jacobson*, 4 F. Supp. 2d 515 (E.D.N.Y. 2014)............................22, 23, 27, 38

*United States* v. *Johnpoll*, 739 F.2d 702 (2d Cir. 1984) .........................................72

*United States* v. *Kaiser*, 609 F.3d 556 (2d Cir. 2010) ..........................................66

*United States* v. *Kaplan*, 2003 WL 22880914 (S.D.N.Y. 2003)...............................54

*United States* v. *Kurniawan*, 627 Fed. Appx. 24 (2d Cir. 2015) ..............................59

*United States* v. *Leon*, 468 U.S. 897 (1984) ........................................................25

*United States* v. *Levy*, 2012 WL 5830631 (S.D.N.Y. 2012)......................................42

*United States* v. *Levy*, 2013 WL 664712 (S.D.N.Y. 2013)..................................23, 38

*United States* v. *Lustyik*, 57 F. Supp. 3d 213 (S.D.N.Y. 2014)............................22, 27

*United States* v. *Margiotta*, 646 F.2d 729 (2d Cir. 1981)........................................55

*United States* v. *Marion*, 404 U.S. 307 (1971) .....................................................68

iv

*United States* v. *Martin*, 411 F. Supp. 2d 370 (S.D.N.Y. 2006) ................................................67

*United States* v. *Martinez*, 1995 WL 10849 (S.D.N.Y. 1995) ................................................71

*United States* v. *Matias*, 836 F.2d 744 (2d Cir. 1988) ................................................46

*United States* v. *Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) ..........................46, 47, 50, 51

*United States* v. *Moloney*, 287 F.3d 236 (2d Cir. 2002) ................................................59

*United States* v. *Olmeda*, 461 F.3d 271 (2d Cir. 2006) ................................................59

*United States* v. *Peltz*, 433 F.2d 48 (2d Cir. 1970) ................................................66

*United States* v. *Persico*, 621 F. Supp. 842 (S.D.N.Y. 1985) ................................................73

*United States* v. *Rickard*, 534 F. App'x 35 (2d Cir. 2013) ................................................25

*United States* v. *Riley*, 906 F.2d 841 (2d Cir. 1990) ................................................20, 21, 22, 27

*United States* v. *Rodriguez*, 734 F. Supp. 116 (S.D.N.Y. 1990) ................................................73

*United States* v. *Romain*, 2014 WL 6765831 (S.D.N.Y. 2014) ................................................46

*United States* v. *Rosa*, 626 F.3d 56 (2d Cir. 2010) ................................................20, 26, 40, 41

*United States* v. *Santiago*, 987 F. Supp. 2d 465 (S.D.N.Y. 2013) ................................................68, 70

*United States* v. *Scala*, 388 F. Supp. 2d 396 (S.D.N.Y. 2005) ................................................68, 70, 71

*United States* v. *Shi Yan Liu*, 239 F.3d 138 (2d Cir. 2000) ................................................47, 51

*United States* v. *Smith*, 9 F.3d 1007 (2d Cir. 1993) ................................................20, 36

*United States* v. *Starr*, 816 F.2d 94 (2d Cir. 1987) ................................................64

*United States* v. *Stringer*, 730 F.3d 120 (2d Cir. 2013) ................................................60

*United States* v. *Sturdivant*, 244 F.3d 71 (2d Cir. 2001) ................................................55

*United States* v. *Tutino*, 883 F.2d 1125 (2d Cir. 1989) ................................................55

*United States* v. *Vilar*, 2007 WL 1075041 (S.D.N.Y. 2007) ................................................21, 28, 37

*United States* v. *Vilar*, 729 F.3d 62 (2d Cir. 2013) ................................................55, 60, 64

*United States* v. *Walker*, 254 F. App'x 60 (2d Cir. 2007) ................................................59

*United States* v. *Winters*, 2006 WL 2789864 (S.D.N.Y. 2006) ................................................54

*United States* v. *Yannotti*, 541 F.3d 112 (2d Cir. 2008) ................................................60, 64

*United States* v. *Young*, 745 F.2d 733 (2d Cir. 1984) ................................................21, 22, 27

*United States* v. *Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013) ....................29, 37, 40, 41

*Van Stuyvesant* v. *Conway*, 2007 WL 2584775 (S.D.N.Y. 2007) ...........................................68

*VanCook* v. *SEC*, 653 F.3d 130 (2d Cir. 2011).......................................................................62

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :

     – v. –                                      :              15 Cr. 611 (AJN)

BENJAMIN WEY,                         :
        a/k/a "Benjamin Wei,"
        a/k/a "Tianbing Wei," and        :
SEREF DOGAN ERBEK,
        a/k/a "Dogan Erbek,"             :

                Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BENJAMIN WEY'S MOTIONS TO SUPPRESS EVIDENCE, PREVENT A PRIVILEGE REVIEW, DISMISS THE INDICTMENT, TAKE HIS CO-DEFENDANT'S DEPOSITION ABROAD, AND STRIKE REFERENCES TO ALIASES

The Government respectfully submits this memorandum of law in opposition to defendant Benjamin Wey's motions to (1) suppress evidence; (2) prevent a privilege review; (3) dismiss the Indictment; (4) take co-defendant Seref Dogan Erbek's deposition abroad; and (5) strike Wey's aliases from the Indictment. The Court should deny all of these motions.

*First*, the search warrants of Wey's office and apartment were supported by robust statements of probable cause, and Wey's accusations of fabrication and deception are untenable. The warrants were also painstakingly detailed in their description of the things to be seized. They were broad in scope, but justifiably so; Wey's crimes were wide-ranging and permeated his business, New York Global Group, Inc. ("NYGG" or "NYGG-USA"). If there were any doubt on this score, the scrupulous manner in which the Federal Bureau of Investigation ("FBI") executed the warrants would preclude suppression in this case. Relatedly, the fact that the Government has retained rather than destroyed the files it seized

pursuant to the warrants in 2012 cannot possibly ground a cognizable Fourth Amendment claim.

*Second*, Wey's effort to prevent the Government from conducting a "taint" review of documents it designated preliminarily as potentially privileged—based on a pages-long list of lawyers compiled using information from Wey's and NYGG's counsel shortly after the searches—is unprecedented and unsupported.  It must be denied.

*Third*, the Indictment easily satisfies all applicable pleading standards, and Wey's arguments to the contrary reduce to attacks on the Government's evidence.  These attacks are the stuff of jury addresses, not motions to dismiss.  Nor can Wey colorably claim that the passage of time between the execution of search warrants on his apartment and office in January 2012 and the return of the Indictment in September 2015 was the product of nefarious government conduct causing him such significant prejudice so as to warrant the extraordinary measure of dismissal.

*Fourth*, Wey's motion to take co-defendant Erbek's deposition pursuant to Federal Rule of Criminal Procedure 15 ("Rule 15") fails because Wey has not shown that Erbek is "unavailable" to testify at trial.  The Government will grant Erbek safe passage to testify in Wey's defense.

*Finally*, Wey's motion to strike all references to his aliases must be denied because neither alias carries inflammatory or prejudicial connotations, and both have relevance to the Government's case.

## BACKGROUND

Included in Wey's moving papers are several pages of self-serving factual assertions that have no genuine bearing on any legal claim Wey seeks to advance.  Wey describes his personal background and the history of his company, NYGG, in some detail.  Omitted from these recitations are, among other things, the fact that Oklahoma barred Wey from securities

dealing in 2002 (after which he changed his name from one of the aliases listed on the Indictment), and Wey's long record of publishing defamatory and extremely offensive blog postings attacking scores of people, including potential witnesses in this case, with whom Wey has had differences.  The Government does not, in this memorandum, catalog the inaccuracies and omissions in the personal and professional history Wey has offered, but simply asks that the Court recognize their lack of relevance to the issues at hand and understand that, in the Government's view, the picture Wey has painted is far from balanced.

The facts pertinent to the instant motions are as follows:

## I.       THE SEARCH WARRANT AFFIDAVITS

On January 24, 2012, FBI Special Agent Matthew F. Komar, who was the lead case agent in the investigation of Wey, swore out an affidavit supporting an application to search the offices of Wey's "consulting" firm, NYGG (the "NYGG Affidavit").  (*See* Decl. of Matthew Komar, dated July 8, 2016 ("Komar Declaration" or "Komar Decl."), ¶ 3 & Ex. 1 at 2-98).[1]  The NYGG Affidavit, which runs to 97 pages, carefully outlines the ample probable cause to believe that Wey was engaged in securities fraud, mail fraud, and wire fraud, and that he was "perpetrat[ing] this scheme through" NYGG, a firm he had founded in 2004. (Komar Decl., Ex. 1 ¶¶ 9, 16).

The next day, based on evidence gathered during the subsequent search of the NYGG offices, FBI Special Agent Keith Garwood swore out an affidavit supporting an application to search Wey's apartment (the "Wey Apartment Affidavit").  (*See* Komar Decl. ¶ 11 & Ex. 4). The Wey Apartment Affidavit incorporates and substantially relies upon the NYGG Affidavit.

The NYGG Affidavit explains that since at least 2004 Wey and NYGG had specialized in "reverse mergers" or "reverse takeovers" ("RTOs") between U.S. publicly-

---

[1] The NYGG Affidavit was filed under seal.  Exhibit 1 to the Komar Declaration is a redacted version.

traded companies and China-based operating companies—transactions that allowed Chinese companies to access U.S. capital without having to do an initial public offering. (Komar Decl., Ex. 1. ¶¶ 10-11). The issuers resulting from these RTOs had included Bodisen Biotech, Inc. ("Bodisen"), and CleanTech Innovations, Inc. ("CleanTech"), both of which were subsequently delisted from major U.S. stock exchanges in part for failure to disclose relationships with Wey, as well as Smartheat, Inc. ("Smartheat"), and Deer Consumer Products, Inc. ("Deer"). (*Id.* ¶ 11; *see id.* ¶ 17 (recounting 2006 delisting of Bodisen for failure to disclose earlier "consulting" payments to NYGG subsidiaries of over $6 million; *id.* ¶ 36 (recounting delisting of CleanTech in 2011 for failure to disclose ties to Wey)). The NYGG Affidavit notes that Smartheat, Deer, and CleanTech all shared common outside counsel, a common audit committee chair, and a common auditor that was a small firm in California. (*Id.*).

The gist of Wey's scheme, as outlined in the NYGG Affidavit, was that he had (1) engaged in deceptive acts to gain NASDAQ listing for at least two of NYGG's "clients" (that is, the Chinese operating companies that became U.S. issuers through Wey-engineered RTOs) and, (2) with the help of a corrupt retail brokerage (the "Retail Brokerage"), created artificial demand for the stock of the resulting issuers. (*Id.*). The Retail Brokerage was so closely entwined with Wey that it at one time sub-leased its office space from NYGG. (*Id.* ¶ 12). Only after the Financial Industry Regulatory Authority ("FINRA") conducted a surprise on-site examination of the Retail Brokerage did that operation—described by a former NYGG employee as a "boiler room" (*id.* ¶ 35(f))—move to another location, 40 Wall Street. (*Id.* ¶ 13). Wey followed suit a few months later, moving NYGG to 40 Wall Street as well, to the suite of offices described as the "Premises" in the NYGG Affidavit (the "NYGG Premises"). (*Id.*).

4

Before describing the components of Wey's scheme in detail, the NYGG Affidavit notes that Wey "instructed the staff of NYGG-USA to maintain electronic records and information in an unconventional and highly suspicious manner." (*Id.* ¶ 6). For example, Wey would direct employees to save all files not to their computers, but to external flash drives that must be left on the employees' desks at night. (*Id.*). He would also insist that employees communicate with him over Skype rather than regular email, and that they use the "PIN" function on their Blackberrys or other smartphones rather than regular text or calling to contact Wey. (*Id.*). Wey further directed employees to purge their emails every 30 days, and save any necessary ones to their flash drives rather than their hard drives. (*Id.*).

As additional background, before outlining the specifics of Wey's scheme, the NYGG Affidavit offers details of other misconduct in which Wey engaged prior to his RTO scheme. Most notably, it explains that shortly before he founded NYGG, Wey had been censured by the securities regulatory authority in Oklahoma and permanently barred from the securities industry in that state. (*Id.* ¶ 15(b)). According to the Oklahoma authority's allegations— which Wey, as part of his settlement with that authority, neither admitted nor denied—Wey had been acting as an investment advisor and promoting to his investor clients stock in two issuers with which Wey had undisclosed financial arrangements. (*Id.*).

### A.      The NASDAQ Round-Lot Holder Deceptive Conduct

The NYGG Affidavit describes in detail the deceptive acts Wey undertook to secure NASDAQ listing for two of NYGG's "clients": Smartheat and Deer. (*See id.* ¶¶ 18, 19). In sum, the scheme was to create the false appearance that these issuers had garnered greater investment interest than they really had by allocating, for no consideration, 100-share certificates ("round-lot" certificates) to sundry friends, acquaintances, and business associates. By these means, Wey and his co-conspirators, employees, and agents could artificially satisfy one of the key prerequisites for listing on NASDAQ: namely, that the

5

applicant have at least 300 round-lot shareholders.  (*See id.* ¶¶ 18, 19).  This requirement, and Wey's flouting of it, mattered because "NASDAQ's 300 round-lot shareholder listing requirement is intended to ensure that an issuer has sufficient bona fide investor interest to sustain trading on the NASDAQ."  (*Id.* ¶ 18(b)).

The NYGG Affidavit does not claim that NASDAQ or any other entity had in place a formal rule banning the gifting of shares in connection with a listing application.  What is alleged instead is that Wey engaged in deceptive acts to cause his "clients" (issuers in which he in fact had substantial personal stakes) to circumvent the 300 round-lot shareholder requirement, by bestowing blocks of shares on a mind-boggling assortment of people who manifestly lacked any bona fide investor interest.  For the two issuers in question, in other words, the "shareholder base was, at least in part, a sham, rather than the result of genuine economic interest in the company."  (*Id.* ¶ 18(d); *see also id.* ¶ 19(d)).

Moreover, as described in the NYGG Affidavit, Wey did not simply "gift" the issuers' shares.  He played a shell game with them.  Wey would have an NYGG employee send bulk packages of share certificates owned by individuals and entities acting as his nominees (the "Nominees") from NYGG's offices to the issuer's transfer agent, Interwest, and instruct Interwest to re-issue roughly enough 100-share lots of the certificates to generate 300 round-lot shareholders.  (*Id.* ¶ 18(e)).  Wey would supply Interwest with the list of new shareholders, but would direct Interwest to simply send all the new certificates back to NYGG's offices or to Wey's apartment.  (*Id.*; *id.* ¶ 19(d)).  Based on these and other facts set forth in the NYGG Affidavit, Agent Komar concludes that "there is probable cause to believe that Wey beneficially owned and/or controlled" the subject stock certificates, "and that many or all of [the] new 100-share shareholders did not make an independent economic decision to invest" in Smartheat or Deer.  (*Id.* ¶ 18(g); *see id.* ¶ 19(j)).

This was fraudulent conduct.  As the NYGG Affidavit correctly notes (but as Wey acknowledges only grudgingly, in a footnote of his brief on these motions, *see* Mem. of Law in Supp. of Def. Benjamin Wey's Mot. to Suppress, to Dismiss the Indictment, and for Other Relief, dated May 27, 2016 ("Wey Mem."), at 41 n.21), the Securities and Exchange Commission ("SEC") had brought an enforcement action against an RTO issuer before for engaging in a similarly "deceptive device of a stock giveaway" to meet NASDAQ listing requirements.  (Komar Decl., Ex. 1 ¶ 18(i)).

### B.    Market Manipulation

The second component of Wey's scheme described in detail in the NYGG Affidavit is the manipulation of the market for the RTO issuers' stock, in which the Retail Brokerage features prominently:

> Under the influence of Wey, the [Retail Brokerage] artificially inflated demand for Smartheat and Deer by aggressively soliciting their retail customers to buy shares of these issuers, by actively discouraging customers from selling shares of these issuers, and by failing to disclose to their customers, at least in the case of Deer, a kickback payment of $350,000 that the [Retail Brokerage] used to pay startup expenses[.]

(*Id.* ¶ 20).  The purpose of this part of the scheme—like the part that involved deceptively securing NASDAQ listings—was to grow and stabilize the market for the issuers' stock, of which Wey, through his Nominees, was a substantial, secret holder. (*Id.*).  By pumping the stock price and demand, Wey could sell off his own holdings at greater profits.

The allegations regarding this "pump-and-dump" aspect of the scheme, again like those relating to the NASDAQ listing scheme, are highly particularized.  The NYGG Affidavit notes that in the year spanning July 1, 2009 through July 1, 2010, the Retail Brokerage, acting at Wey's direction, bought for their customers about 1.3 million Smartheat shares ($11.5 million worth), and about 1.5 million Deer shares ($20.5 million worth).  (*Id.* ¶ 21).  As recounted by witnesses identified in the NYGG

Affidavit, the tactics used to get customers to buy these stocks were high-pressure and corrupt, and Wey occasionally weighed in personally to ensure such tactics were being used. (*Id.* ¶¶ 22-24). For example, when one Retail Brokerage employee sold Deer stock for one of his clients, Wey demanded to know why he had done so. (*Id.* ¶ 24). When the employee responded that he had sought to diversify the client's portfolio, Wey suggested that "diversification" be accomplished by purchases of other Wey-promoted stock—Smartheat or AgFeed. (*Id.*).

These corrupt tactics worked. In the four months from July 17, 2009 to November 27, 2009, Deer's share price shot up 190 percent. (*Id.* ¶ 25). In the seven months from July 16, 2009 to January 11, 2010, Smartheat's share price rose 186 percent. (*Id.*). Not surprisingly, giving these whopping increases, Agent Komar observes that he is "aware of no public information that could explain such a significant rise in the marketplace valuation of these stocks." (*Id.*). His belief, as articulated in the NYGG Affidavit, is that the stock prices rose so high and so quickly "at least in part because of the aggressive buying activity of the [Retail Brokerage], working in concert with Wey." (*Id.*).

The NYGG Affidavit goes on to detail a back-door $350,000 commission that Wey arranged to funnel to the Retail Brokerage under the thin veil of a "consulting fee" for a trip one Retail Brokerage employee took to China purportedly on behalf of Deer. (*Id.* ¶ 26). Agent Komar's commonsense observation about this corrupt payment is that it presumably was not disclosed to the Retail Brokerage's customers who were being pressured to buy and hold Deer stock. (*Id.* ¶ 26(b)).

While Wey and the Retail Brokerage were pumping Deer and Smartheat, Wey's Nominees were selling off large quantities of their own holdings, and squirreling the proceeds away in overseas bank accounts. (*Id.* ¶ 27). One of these

8

entities sold about $4 million worth of Deer and about $6 million worth of Smartheat from January 2009 to January 2010—a period overlapping by about six months with the period of heavy buying by the Retail Brokerage of those same stocks.  (*Id.* ¶ 27(a)).  Over the same period, another Nominee sold about $6 million worth of Deer and about $8 million worth of Smartheat.  (*Id.* ¶ 27(b)).  Overall, on 36 separate trading days in 2009, there were both (a) sales of Deer and/or Smartheat by these two Nominees and (b) purchases of Deer and/or Smartheat by the Retail Brokerage for its customers.  (*Id.* ¶ 27 (c)).  And this does not count the large sales of Deer and Smartheat over the same general period by other Nominees.  From October 2009 through November 2009, for example, two of Wey's other Nominees (his sibling and father-in-law) sold about $5.2 million worth of Smartheat and about $7.9 million of Deer from Raymond James accounts Wey personally controlled.  (*Id.* ¶ 29).[2]

### C.    The AgFeed Accounting Fraud

Wholly apart from the NASDAQ listing and pump-and-dump schemes relating to Deer and Smartheat, the NYGG Affidavit offers pages of detail regarding another RTO issuer, AgFeed, that was also a Wey and NYGG "client."  (Komar Decl., Ex. 1 at 58-63).  Here, the evidence that Agent Komar marshals shows that Wey caused AgFeed to falsify its books and records, making it appear more profitable than it really was.  (*Id.* ¶¶ 30-31).  At the same time, Wey, through his Nominees, was selling off AgFeed stock at prices artificially inflated by the false financials.  (*Id.* ¶ 32).  Although this conduct would not ultimately be

---

[2] The NYGG Affidavit alleges several facts making plain that stock holdings of the Nominees, including of Wey's siblings and several companies she nominally owed, were in fact beneficially owned by Wey.  (*See, e.g.*, Komar Decl., Ex. 1 ¶ 29 (detailing Wey's trading authority over his sibling's Raymond James and Morgan Stanley accounts, his statement to a co-worker that his sibling's holdings were in fact his own, his false denials to NASDAQ officials concerning knowledge of his sibling's holdings, and large transfers of money from the sibling's accounts overseas to Wey's wife's accounts in the United States)).

charged in the 2015 Indictment against Wey, discussed below, it properly furnished yet

further support for Agent Komar's probable cause determination.

>    **D.    The NYGG Premises**

Probable cause regarding Wey's crimes having been overwhelmingly established

from the foregoing facts, the NYGG Affidavit proceeds to explain why there is probable

cause to believe that evidence of those crimes will be found at the NYGG Premises, and to

describe the categories of documents and records that will likely constitute such evidence.

(*Id.* ¶¶ 35-40).[3]   For example, although NYGG had moved its offices to the NYGG Premises

in approximately May 2010, after much of the NASDAQ listing and pump-and-dump activity

described in the NYGG Affidavit had occurred, the NYGG Affidavit explains that there is

reason to believe that templates and related documents evidencing the earlier crimes

remained on NYGG's computers.   (*Id.* ¶ 35(a)).   Other documents, too, would likely have

been preserved for record-keeping purposes—particularly where, as here, the offender would

want to be able to establish a paper trail of stock ownership by other, purportedly independent

third parties.   (*Id.* ¶ 35(b), (d), (g)).   More broadly, as Agent Komar explains, this is a case in

which any records reflecting NYGG's "overall revenue and expenses from 2008 to the

present are particularly important," because Wey had repeatedly told authorities that NYGG's

and Wey's only source of revenue was a regular flat fee from its Chinese counterpart,

NYGG-Asia.   (*Id.* ¶ 35 (c)).[4]

---

[3] Wey asserts that "the entity occupying" the NYGG Premises was a Wey company called "NYG Capital, LLC," rather than NYGG.   (Wey Mem. at 10 n.6; *see also id.* at 19 n.14). This is a purely semantic point.   The name emblazoned across the reception area at the time of the search was "New York Global Group."   (*See* Decl. of Thomas McGuire, dated July 8, 2016 ("McGuire Decl."), Ex. 1).   Moreover, correspondence received by the Government from counsel for the occupant of the NYGG Premises in 2012 identified the relevant entity as "NYG Capital, LLC, d/b/a New York Global Group."

[4] In his moving papers, Wey asserts that NYGG-Asia is a "separate company with a similar name" to NYGG-USA, which merely "benefited from the name recognition associated with Mr. Wey's United States operation."   (Wey Mem. at 7).   This is misleading.   As the

The NYGG Affidavit also describes evidence that Wey was continuing to actively advise Deer (Komar Decl., Ex. 1 ¶ 35(e)), was continuing to work with the Retail Brokerage (*id.* ¶ 35(f)), and had recently engineered the RTOs for CleanTech and Nova Lifestyle, two other China-based companies (*id.* ¶ 36).  Moreover, in late 2010, several of Wey's Nominees had been deeply involved in two financing transactions—a loan and a private placement.  (*Id.* ¶ 36(b), (c), (d)).  CleanTech's withholding from NASDAQ of documents relating to these transactions had resulted in the company's being delisted in July 2011.  (*Id.* ¶ 36(e)).[5]

Finally, the NYGG Affidavit describes what categories of records and documents Agent Komar believes, based on all the foregoing, will likely be (1) relevant to the investigation of the fraud charges identified earlier in the NYGG Affidavit and (2) found on the NYGG Premises.  (Komar Decl., Ex. 1 ¶¶ 39-40).  The categories, each of which includes an illustrative list of records (not repeated here), are as follows:

a) Financial records for the business;

b) Personal financial records of individuals associated with NYGG or a related entity;

c) Telephone bills and other records of communication;

d) "Correspondence, audio tapes, and videotapes";

e) "Hotel, airline and credit card receipts reflecting the dates and locations of meetings or travel to meetings";

f) "Photographs, address books, Rolodexes, diaries, income tax returns and calendars";

g) Marketing materials concerning, relating to, or describing securities used to entice potential buyers of securities;

_____

Government will demonstrate at trial, NYGG-Asia was run by Wey's sibling and her partner, under the direction of Wey himself, who acted like and described himself to others as the boss of both outfits.

[5] In July 2013, after the subject search warrants were executed, the SEC vacated CleanTech's delisting, finding insufficient evidence that CleanTech deliberately violated an explicit request for information related to Wey when it withheld Wey-related documents.  (*See* Ex. A hereto).

h) Documents identifying owners of securities, and "other documents concerning or reflecting the identities and participation of investors in such schemes";

i) Documents reflecting ownership of property "purchased with the proceeds of the fraud";

j) "Identification documents and other documents which reflect the identities of persons affiliated with the entities involved in the fraudulent scheme";

k) "Corporate documents reflecting the ownership, structure, and relationships among the entities involved in the fraudulent scheme"; and

l) Electronic devices, to be searched for relevant documents and records according to a protocol set forth in Exhibit C to the NYGG Affidavit.

(*Id.* ¶ 40).  To ensure that the records seized are tethered to the crimes under investigation, the NYGG Affidavit specifies that documents falling within one or more of the above categories will be seized only if they relate to an individual or entity listed in Exhibit B, which comprises those entities and individuals believed to have been involved in Wey's fraudulent scheme—whether as co-conspirators, Nominees, agents, employees, shareholders, or victims.  (*Id.* ¶ 42).  The list at Exhibit B is long, largely because it includes the names of all round-lot shareholders to whom Wey had assigned issuer stock as part of his NASDAQ listing scheme.  (*See id.* at 101-10).  And, given the scope and duration of the scheme described in the NYGG Affidavit, as well as the importance of understanding NYGG's financials and operations in light of Wey's representations to regulators, one of the entities listed in Exhibit B is NYGG itself.  (*Id.* at 101).

Finally, the NYGG Affidavit requests permission to seize the entirety of any electronic device and search it off-site "for the evidence described"—namely, the categories specified above, as limited by the list of names in Exhibit B.  (*Id.* ¶ 45).

## II.     THE NYGG WARRANT

Having reviewed the NYGG Affidavit, and having made the independent determination that probable cause existed to search the NYGG Premises for the evidence specified by Agent Komar, U.S. Magistrate Judge Michael H. Dolinger signed and authorized a warrant for that search (the "NYGG Warrant").  (Komar Decl. ¶ 4).  Attached to and incorporated into the NYGG Warrant are: (Exhibit A) a particularized list of evidence categories that tracks the list in the NYGG Affidavit, described above, except that each category is explicitly limited by reference to the names in Exhibit B; (Exhibit B) the same limiting list of people and entities referred to in the NYGG Affidavit; and (Exhibit C) the computer search protocol referred to in the NYGG Affidavit.  (*See* Komar Decl., Ex. 2).  Exhibit C expressly specifies that any electronic device seized on the NYGG Premises will be searched "in order to extract and seize any data that falls within the list of items to be seized set forth herein"—namely, in Exhibit A.  (*Id.* at 15).  The way in which such data will be reviewed is by employing "different techniques," including opening files seriatim and key word searches, to identify material "related to the subject matter of the investigation."  (*Id.* at 15-16).  The protocol also calls for "'scanning' storage areas to discover and possibly recover recently deleted data."  (*Id.*).

The Premises to be searched pursuant to the NYGG Warrant are defined expressly to exclude the office of NYGG's general counsel at the time.  (*Id.* at 3).

## III.     EXECUTION OF THE NYGG WARRANT

On January 24, 2012, the day before the planned search of the NYGG Premises, Agent Komar and the Assistant U.S. Attorney then assigned to the investigation met personally with members of the search team to brief them on the nature of the investigation and the scope of the search.  (*See* Komar Decl. ¶ 6).  Agent Komar prepared and circulated either in advance of or during this briefing an "Operations Order Form" (the "Ops Form")

which gave a short synopsis of the case, explaining that Wey, "acting through [NYGG] and other entities, has committed securities fraud and manipulated the market for securities of various small-capitalization issuers." (Komar Decl. ¶ 5 & Ex. 3 at 1). The Ops Form also offered an overview of the components of Wey's scheme:

> WEY introduces Chinese companies to the U.S. markets and arranges reverse mergers and assists these companies [to] get listed on markets such as NASDAQ. It appears he has artificially inflated the number of round-lot shareholders for the purpose of meeting listing requirements. WEY then retains undisclosed beneficial ownership and/or control of large blocks of shares of the Chinese companies that are held in the name of nominees. WEY creates an artificial demand for the securities by working directly with a hand-picked team of retail stock brokers[.] . . . . Once the artificial demand is created and the stock price goes up, Wey sells the large block of nominee held shares.

(Komar Decl., Ex. 3 at 1). Regarding the search itself, the Ops Form states that it "will be for documents related to Wey assisting Chinese reverse mergers falsify their records to meet the listing standards for NASDAQ," and "Wey may have additionally controlled the trading volume in these Chinese companies, through a number of associated broker dealers." (*Id.* at 5). During the January 24 briefing, Agent Komar made the NYGG Affidavit available to members of the search team. (Komar Decl. ¶ 6). He also shared it with the leader of the search team. (*Id.*)

The search of the NYGG Premises began at approximately 9:10 a.m. on January 25, 2012, and concluded at approximately 2:45 p.m. (*Id.* ¶ 7). Agent Komar was present throughout. (*Id.*). He stationed himself near the reception area of the NYGG Premises so that he could field questions from searching agents about whether or not to seize certain items. (*Id.* ¶ 9). Agent Komar had in his possession on the scene a copy of the NYGG Warrant and a copy of the NYGG Affidavit. (*Id.* ¶ 8). Other agents had copies of the NYGG Warrant, and still others were using copies of Exhibit B to the NYGG Warrant to cull through the records found at the location. (*Id.* ¶ 8). In several instances, Agent Komar instructed

14

members of the team not to seize items that, on closer inspection, did not appear relevant to the investigation.  (*Id.* ¶ 9).

The agents did not seize every record found at the NYGG Premises.  To the contrary, they took their time to sift through the materials, seizing only those that appeared relevant to the investigation.  (*See id.* ¶ 9; *see also* Decl. of Thomas McGuire, dated July 8, 2016 ("McGuire Decl."), ¶ 4).  In the end, only approximately 4,500 pages of hard-copy documents were seized.  (Komar Decl. ¶ 9).  Some electronic devices were imaged on the scene, while other such devices and computer evidence, including thumb drives, were seized for review off-site by the FBI's Computer Analysis Response Team ("CART").  (Komar Decl. ¶ 10).  All electronic devices and computer evidence that were seized were taken with a view to conducting later searches for electronic files and documents described in items 1 through 6 and 8 through 12 of Exhibit A to the NYGG Warrant, as limited by the list of names supplied in Exhibit B to the NYGG Warrant.  (*Id.*).

## IV.    THE WEY APARTMENT SEARCH

During the course of the NYGG Premises search, agents learned that at least some of NYGG's books and records were maintained by Wey's wife at their apartment in Battery Park (the "Wey Apartment").  (*See* Komar Decl. ¶ 11).  At approximately 11:14 a.m., while the NYGG Premises search was still underway, two agents who had been involved in the search traveled to the Wey Apartment and served Wey's wife with a grand jury subpoena that called for production of broad categories of records.  Meanwhile, another agent who had been helping with the NYGG Premises search, Special Agent Keith Garwood, applied for a warrant to search the Wey Apartment (the "Wey Apartment Warrant").[6]  (*See* Komar Decl.

---

[6] Among the many baseless, speculative observations Wey makes in his moving papers is that the FBI's decision to seek a warrant for the Wey Apartment reflected that agents were "dissatisfied with the results of their search of the NYGG Office."  (Wey Mem. at 21).  The agents obviously had not had a chance to digest the evidence seized from the search of the NYGG Premises (including the damning evidence from the electronic devices) by the time

¶ 11).  Judge Dolinger was still on duty, and approved the requested warrant.  (*Id.* ¶ 12).  As

noted, the application for the warrant relied principally on the NYGG Affidavit, as

supplemented with the new information about the presence of key NYGG records in the Wey

Apartment.  (*See* Komar Decl., Ex. 4).  The Wey Apartment Warrant is substantially identical

to the NYGG Warrant, except for its description of the premises to be searched.  (*See* Komar

Decl., Ex. 5).

Execution of the Wey Apartment Warrant began at approximately 4:30 p.m., nearly

two hours after the completion of NYGG Premises search, and was effectuated by

substantially the same team as had been involved in the search of the NYGG Premises.

(Komar Decl. ¶ 13).  Once again, Agent Komar was present on the scene and available to

answer any questions that arose.  (*Id.*).  During this search, arrangements were made to

ensure the segregation of potentially privileged materials for retention by counsel for Wey's

wife, who was present during at least part of the search.  (*Id.*).  As with the NYGG Premises

search, not all of the hard-copy records in the Wey Apartment were seized.  The total volume

was approximately 4,000 documents.  (*Id.*).  Electronic devices and other computer evidence

were seized for later searching in accordance with the protocol set forth in Exhibit C to the

Wey Apartment Warrant—that is, with a view to conducting later searches for electronic files

and documents described in items 1 through 6 and 8 through 12 of Exhibit A to the Wey

Apartment Warrant, as limited by the list of names supplied in Exhibit B to the Wey

Apartment Warrant.  (*Id.* ¶ 14).

## V.   SEARCHES OF THE ELECTRONIC EVIDENCE

Within a few weeks of the searches, the FBI had imaged all seized electronic devices

and computer evidence, and had returned to counsel for NYGG and Wey either the devices

themselves (in the case of computers) or electronic images of the evidence seized (in the case

---

the Wey Apartment Warrant was sought, much less by the time they had served the grand
jury subpoena on Wey's wife, a mere two hours into the NYGG Premises search.

of, for example, thumb drives).  (Komar Decl. ¶ 15).  Later, in or about August 2012, the

Government provided defense counsel with scans of the hard-copy documents seized from

both locations.  (*See id.* ¶ 16).

In or about June 2012, and after having received guidance from the U.S. Attorney's

Office and defense counsel regarding the scope of potentially privileged materials contained

within the computer evidence that had been seized, a special team of "wall" FBI agents (the

"Wall FBI Team") began conducting searches to identify and segregate all such potentially

privileged materials.  (*Id.* ¶¶ 17-19).  To conduct these searches, the Wall FBI Team ran

search terms based on a long list of attorney and firm names that had been supplied in part by

defense counsel.  (*Id.* ¶ 18).  The list included approximately 115 names of individuals and

firms, including Wey's wife (herself a lawyer), who might at one time or another have

represented Wey, Wey's wife, and/or NYGG.  (*Id.*).  This "cut" yielded a universe of 1,295

electronic documents marked as potentially privileged.  (McGuire Decl. ¶ 6).  At the request

of Wey's counsel, the FBI has refrained to date from conducting a further review of those

documents, pending resolution of Wey's instant motions.[7]

Following the initial privilege cut, the agent who had succeeded Agent Komar as lead

case agent, Special Agent Thomas McGuire, searched the remaining electronic materials.

(McGuire Decl. ¶¶ 5-8).  To conduct the search, Agent McGuire used a list of key word

terms.  (McGuire Decl. ¶ 6 & Ex. 2 (list of search terms)).  The majority of the terms on this

list were the same ones in Exhibit B to both the NYGG Warrant and the Wey Apartment

Warrant, and the remaining terms were further particularizations (for example, specific bank

names) of categories of records listed in the warrants.  (*See* McGuire Decl., Ex. 2).  Agent

McGuire reviewed and "tagged" any responsive results, and provided those to the U.S.

Attorney's Office.  (McGuire Decl. ¶¶ 7-8).  The Government has produced to the defense

---

[7] A taint team also reviewed the hard-copy documents seized from the NYGG Premises and
the Wey Apartment.  Those were returned to Wey after he was indicted.

both the responsive electronic documents as well as (under separate cover) the 1,295 files that had been identified by the Wall FBI Team as potentially privileged.

* * * * *

The evidence seized from the searches of the NYGG Premises and the Wey Apartment was substantial and valuable.  Much of the most critical evidence—including emails between Wey and co-defendant Erbek—was located by FBI forensic analysts within the so-called "slack space" of some of the electronic devices seized at both locations, meaning that the files had been deleted but could be recovered with appropriate time and care.  (*Id.* ¶ 9).  As described below, some of this evidence would feature prominently in the charges against Wey and Erbek.

## VI.   THE INDICTMENT[8]

On September 8, 2015, a grand jury in this District returned Indictment 15 Cr. 611 (AJN) (the "Indictment"), which charges Wey with conspiracy to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371 (Count One); substantive securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2 (Count Two), and in violation of Title 18, United States Code, Sections 1348 and 2 (Count Three); wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2; failure to disclose beneficial ownership of stock as required by the securities laws, in violation of Title 15, United States Code, Sections 78n(d) & 78ff, Title 17, Code of Federal Regulations, Section 240.13d-1, and Title 18, United States Code, Section 2 (Counts Five and Six); and money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2 (Count Seven), and in violation of Title 18, United States Code,

---

[8] The Indictment is summarized in more detail in Argument Part IV, below.

Sections 1956(a)(2)(A) and 2 (Count Eight).  Wey's co-defendant, Seref Dogan Erbek, is charged alongside Wey in Counts One through Four.

The scheme alleged in the Indictment is essentially the one described in the NYGG Affidavit, with one principal omission and two principal additions.  The differences are that (1) the Indictment, unlike the NYGG Affidavit, omits allegations regarding the AgFeed accounting fraud; (2) the Indictment clearly alleges that Wey knew and willfully violated SEC regulations requiring disclosure of his beneficial ownership of Deer, Smartheat, and CleanTech stock (which had been described in broad terms in the NYGG Affidavit) (*see* Ind. ¶¶ 13-14); and (3) the Indictment amplifies the NYGG Affidavit's market manipulation allegations to include allegations of price support and match trading evidenced by, among other things, emails between Wey and Erbek.  (Ind. ¶¶ 18-19).

## ARGUMENT

## I. THE COURT SHOULD DENY WEY'S PARTICULARITY, OVERBREADTH, AND PROBABLE CAUSE CHALLENGES TO THE SEARCH WARRANTS

The search warrants in this case are supported by extraordinarily detailed probable cause statements, and are also painstakingly particularized.  Because the crimes described in the NYGG Affidavit are complex, wide-ranging, and of long duration, the warrants, correspondingly, call for the seizure of many documents and records.  This is appropriate, and fully compliant with the Fourth Amendment.  Even if the warrants had stepped over the line somehow (and they did not), the good faith doctrine would preclude suppression in this case.

Wey's other attacks on the warrants and the ensuing searches and seizures are baseless.  The NYGG Affidavit presents the facts in a scrupulous manner, and the Court should swiftly dismiss Wey's irresponsible accusations of deception and falsehood.

### A.      Applicable Law

The Warrants Clause of the Fourth Amendment provides that "no Warrants shall
issue, but upon probable cause, supported by Oath or affirmation, and particularly describing
the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

#### i.      Probable Cause

Probable cause is a "flexible, common-sense standard," *Texas* v. *Brown*, 460 U.S.
730, 742 (1983), which requires a case-by-case analysis of the totality of the circumstances,
*see Illinois* v. *Gates*, 462 U.S. 213, 230 (1983).  In close cases, where the existence of
probable cause is in doubt, resolution "should be largely determined by the preference to be
accorded to warrants."  *United States* v. *Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quotation
marks and citations omitted).  Moreover, review for existence of probable cause is not *de
novo*; "[a] magistrate's determination of probable cause should be paid great deference by
reviewing courts."  *Id.* (quotation marks and citations omitted).

#### ii.      Particularity

The particularity requirement of the Warrants Clause, which is distinct from the
probable cause requirement, "guards against general searches that leave to the unguided
discretion of the officers executing the warrant the decision as to what items may be seized."
*United States* v. *Riley*, 906 F.2d 841, 844 (2d Cir. 1990); *see also United States* v. *Clark*, 638
F.3d 89, 94 (2d Cir. 2011) ("Particularity concerns frequently arise in circumstances where
the description in the warrant of the place to be searched is so vague that it fails reasonably to
alert executing officers to the limits of their search authority[.]").  The requirement is
satisfied if the warrant, including its attachments, enables the executing officer to ascertain
and identify with reasonable certainty those items that the magistrate judge has authorized
him or her to seize.  *See Groh* v. *Ramirez*, 540 U.S. 551 (2004); *United States* v. *Rosa*, 626
F.3d 56, 58 (2d Cir. 2010).  This does not mean that the warrant must leave *nothing* to the

discretion of the executing officer.  To the contrary, "[o]nce a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category."  *United States* v. *Riley*, 906 F.3d at 845.  Moreover, "[c]ourts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant."  *United States* v. *Young*, 745 F.2d 733, 759 (2d Cir. 1984).

To satisfy the particularity requirement, the crime or crimes under investigation generally should be apparent from the face of the warrant; a warrant cannot, for example, call for seizure of all "records," or all evidence "relating to the commission of a crime," without further particularization.  *United States* v. *Bianco*, 998 F.2d 1112, 1116 (2d Cir. 1993) (warrant permitting seizure of all "papers," "records," and other items, without any "more particular limiting language" or tethering "to particular crimes," was insufficiently particularized); *United States* v. *George*, 975 F.2d 72, 76 (2d Cir. 1992); *see also United States* v. *Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) ("[A] warrant must identify the specific offense for which the police have established probable cause."); *United States* v. *Vilar*, 2007 WL 1075041, at *22 (S.D.N.Y. 2007) ("warrants are generally found to be insufficiently particular where 'nothing on the face of the warrant tells the searching officers for what crime the search is being undertaken'") (quoting *United States* v. *George*, 975 F.2d at 76).[9]

---

[9] As one court in this District has observed, "there is no constitutional *requirement* that a warrant must specify the crime for which a search is being conducted."  *See United States* v. *D'Amico*, 734 F. Supp. 2d 321, 364 (S.D.N.Y. 2010).  "Rather, specifying the crime is important when it helps guard against general searches by delineating the scope of the search and allowing executing officers to determine what they are authorized to seize."  *Id.*  Where

Relatedly, "the warrant must specify the 'items to be seized by their relation to designated crimes.'" *United States* v. *Galpin*, 720 F.3d at 446; *United States* v. *Buck*, 813 F.2d 588, 590-92 (2d Cir. 1987) (warrant authorizing seizure of "any papers, things or property of any kind relating to" the crime under investigation was insufficiently particular). In this regard, however, a warrant that calls for seizure of "all evidence" of a given crime or crimes is sufficiently particular if it offers a list of illustrative items. *See Riley*, 906 F.2d at 844-45 (warrant containing list of illustrative items to seize was sufficiently particular notwithstanding provision allowing, as well, seizure of "other items that constitute evidence of the offenses" identified); *United States* v. *Young*, 745 F.2d at 759-60 (warrant allowing seizure of listed items plus "other evidence of" the crimes specified was sufficiently particular); *United States* v. *Lustyik*, 57 F. Supp. 3d 213, 227-28 (S.D.N.Y. 2014) (warrant permitting seizure of all "evidence, fruits, or instrumentalities" of specified crimes was sufficiently particular because it contained "an illustrative list of items to be seized," even though illustrative list was preceded by phrase "including but not limited to"); *United States* v. *Jacobson*, 4 F. Supp. 2d 515, 524 (E.D.N.Y. 2014) ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants.").

### iii. Overbreadth

The probable cause and particularity requirements intersect in the doctrine of overbreadth. As to each category of evidence identified for seizure in the warrant, there must exist probable cause to believe it is relevant to the investigation at issue. *See Galpin*, 720 F.3d at 448 (warrant was overbroad where it allowed seizure of items related to crimes as to which no probable cause showing had been offered or made); *United States* v. *Lustyik*, 57 F. Supp. 3d at 228 ("the overbreadth inquiry asks whether the warrant authorized the search and

---

that concern either is (1) addressed by other aspects of the warrant which limit the searching officers' discretion or (2) inapplicable because the "all records" exception, discussed below, applies, explicit identification of the crimes under investigation may not be necessary. *See id.* This point is discussed further below.

seizure of items as to which there was no probable cause") (quotation marks and citation omitted); *United States* v. *Hernandez*, 2010 WL 26544, at *7-8 (S.D.N.Y. 2010) (framing overbreadth inquiry as "whether the magistrate judge authorized search warrants that were constitutionally overbroad because they provided for the seizure of specific items for which there is no probable cause").  Naturally, the broader the crime or crimes under investigation, the broader the categories of documents and records that may properly be seized.  *See, e.g.*, *United States* v. *Jacobson*, 4 F. Supp. 2d at 522 (breadth of warrant, which contained no timeframe limitation, was justified because "the crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity"); *United States* v. *Levy*, 2013 WL 664712, at *8 (S.D.N.Y. 2013) (in pump-and-dump case, broad warrant with no timeframe limitation was justified by breadth and complexity of fraud described in underlying affidavit); *United States* v. *Dupree*, 781 F. Supp. 115, 149 (E.D.N.Y. 2011) ("The nature of the crime . . . may require a broad search," such as where "complex financial crimes are alleged"); *United States* v. *Hernandez*, 2010 WL 26544, at *9 (broad warrant with no timeframe limitation justified by complexity of investigation); *United States* v. *Cohan*, 628 F. Supp. 2d 355, 362 (E.D.N.Y. 2009) ("the degree to which a warrant must state its terms with particularity varies inversely with complexity of the criminal activity investigated") (quotation marks, citation, and alteration omitted).

iv. *The "All Records" Doctrine*

Indeed, where there is probable cause to believe that a business under investigation is "'pervaded' or 'permeated' with fraud, seizure of *all records* of the business is appropriate, and broad language used in a search warrant will not offend the particularity requirement." *United States* v. *D'Amico*, 734 F. Supp. 2d at 360 (emphasis added) (quoting *U.S. Postal Serv.* v. *C.E.C. Servs.*, 869 F.2d 184, 187 (2d Cir. 1989)); *United States* v. *Feng Ling Liu*, 2014 WL 101672, at *7 (S.D.N.Y. 2014) (applying "all records" doctrine to uphold warrant

against particularity and overbreadth challenges); *Hernandez*, 2010 WL 26544, at \*10 (same); *United States* v. *Bowen*, 689 F. Supp. 2d 675, 683 (S.D.N.Y. 2010) ("The all records exception allows for the seizure of all of an enterprise's records when the enterprise is primarily engaged in unlawful activity and sufficient evidence is presented of the pervasiveness of that unlawful activity within the enterprise.");[10] *cf. United States* v. *Abboud*, 438 F.3d 554, 575 (6th Cir. 2006) ("In a business fraud case, the authorization to search for general business records is not overbroad.").  In such a case, "it is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrating that every part of the enterprise in question is engaged in fraud."  *United States* v. *Burke*, 718 F. Supp. 1130, 1139 (S.D.N.Y. 1989); *United States* v. *Feng Ling Liu*, 2014 WL 101672, at \*7.  "Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are 'just the tip of the iceberg.'"  *United States* v. *Burke*, 718 F. Supp. at 1139 (citation omitted); *see D'Amico*, 734 F. Supp. 2d at 360-361 (applying "all records" doctrine even though Government acknowledged business had some "legitimate activity").  Relatedly, where the affidavit underlying the warrant has established probable cause to search for and seize both a business's crime-related records as well as records related to any legitimate business (for comparative purposes, for example), the warrant properly may encompass both categories.  *See, e.g.*, *United States* v. *Cohan*, 628 F. Supp. 2d at 364.

   *v.*  *Good Faith*

   Even if a warrant lacks probable cause or particularity, or is overbroad, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary

---

[10] Although frequently referred to in the shorthand as an "exception" to the particularity requirement and/or the rule against overbreadth, the "all records" doctrine is really just "'a recognition that a warrant—no matter how broad—is, nonetheless, legitimate if its scope does not exceed the probable cause upon which it is based.'"  *Id.* at 683 n.6 (quoting *United States* v. *Hickey*, 16 F. Supp. 2d 223, 240 (E.D.N.Y. 1998)).  The all records doctrine, if it applies in a given case, thus defeats objections based on both particularity and overbreadth.

rule applies." *Herring* v. *United States*, 555 U.S. 135, 140 (2009).  In fact, exclusion should be a "last resort" rather than a "first impulse."  *Id.*  Thus, suppression will not be warranted where the evidence at issue was "obtained in objectively reasonable reliance on a subsequently invalidated search warrant."  *United States* v. *Leon*, 468 U.S. 897, 922 (1984).

Although the burden is on the Government to establish good faith, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.*[11]  Accordingly, in light of this exception, "[m]ost searches will be upheld."  *United States* v. *Rickard*, 534 F. App'x 35, 37 (2d Cir. 2013) (summary order).  Only if one of the following circumstances obtains will the searching officers' good faith not have been established:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States* v. *Clark*, 638 F.3d at 100 (quotation marks and citations omitted).  The "so lacking in indicia of probable cause" concern "most frequently arises when affidavits are bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations."  *Id.* at 103.  "At the opposite end of the spectrum are cases in which a defective warrant issued based on an affidavit providing detailed factual allegations in support of probable cause."  *Id.*  "Such cases almost invariably demonstrate reasonable reliance."  *Id.*

Where the warrant is defective for lack of particularity rather than probable cause, the good faith analysis focuses on whether the officers' execution of the warrant reflected a reasonable belief that they were operating within the confines of the Fourth Amendment—

---

[11] No hearing is necessary to resolve the good faith question where, as here, the relevant facts (that is, those relating to the conduct of the FBI agents involved in executing the search warrants) are sufficiently uncontested.  *See, e.g.*, *Hernandez*, 2010 WL 26544, at *7.

either because they executed the search in a manner tethered to the underlying affidavit and its statement of probable cause, or because they reasonably believed they were authorized to seize all records.  *See United States* v. *Rosa*, 626 F.3d at 64 (although facial validity of the warrant must be assessed independent of unattached affidavit, affidavit was "still relevant to our determination of whether the officers acted in good faith," to the extent the officers searched for evidence based on the affidavit's probable cause statement); *see also Feng Ling Liu*, 2014 WL 101672, at \*9 (good faith will save search where officers reasonably believed "all records" doctrine applied).  If the affidavit identifies the crimes being investigated and the evidence sought, the agent who swore out the affidavit participated personally in the execution of the search, and the team relied on "their knowledge of the investigation and the contemplated limits" set forth in the affidavit, suppression should not be ordered notwithstanding a valid particularity challenge.  *See Rosa*, 626 F.3d at 64-66 (in child pornography case, applying good faith exception to affirm denial of suppression motion where face of warrant allowed blanket search of "computer equipment" and other electronic devices for anything "which would tend to identify criminal conduct" of any kind).

Finally, even if a court finds that the searching officers' reliance on the warrant was unreasonable for one or more of the reasons identified above, suppression still will not be warranted if there is an absence of deliberate, culpable conduct:  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring* v. *United States*, 555 U.S. at 144; *see also Rosa*, 626 F.3d at 64, 66 (emphasizing that suppression will not be warranted, even if standards for overcoming qualified immunity are met, absent evidence of deliberate and culpable behavior by law enforcement agents).

**B.    Discussion**

The warrants at issue here were particularized and amply supported in every way by the probable cause articulated in the affidavits underlying them.  If there were any doubt on this score, the good faith doctrine would preclude suppression.

*i.    The Warrants Satisfy the Particularity Requirement*

Often, warrants are framed as permitting seizure of any and all evidence of specified crimes, "including but not limited to" illustrative categories of documents and records.  As noted, courts routinely uphold such warrants against particularity challenges, notwithstanding the apparent blanket permission to seize "all evidence," reasoning that the illustrative list, coupled with the reference to the crimes of which evidence is sought, supplies sufficiently limiting guidance.  *See, e.g.*, *Riley*, 906 F.2d at 843-45; *Young*, 745 F.2d at 759-60; *Lustyik*, 57 F. Supp. 3d at 227-28 (warrant permitting seizure of all "evidence, fruits, or instrumentalities" of specified crimes was sufficiently particular because it contained "an illustrative list of items to be seized," even though illustrative list was preceded by phrase "including but not limited to"); *Jacobson*, 4 F. Supp. 2d at 524 (upholding warrant for "[a]ny and all records, data and correspondence constituting evidence, fruits and instrumentalities of" specified crimes, "in any form wherever that they may be stored or found including, but not limited to" specified categories); *cf. United States* v. *Buck*, 813 F.2d at 591 (warrant that permitted seizure of "any papers, things or property of any kind relating to" specified crime was insufficiently particular because unaccompanied by an illustrative list).

In contrast to warrants of this kind, the NYGG Warrant and the Wey Apartment Warrant (together, the "Warrants") contain no blanket permission to seize "all evidence" of specified crimes under investigation.  They leave *less* to the discretion of the searching agents, and instead identify an exhaustive—not illustrative—list of documents and records that may be seized, with many items on the list yet further particularized with illustrative lists

of their own.  (*See, e.g.*, Komar Decl., Ex. 2 at 3 ("Financial records concerning the individuals and entities listed in Exhibit B, . . . including banking and brokerage firm account statements, checks, and transaction records, wire transfer instructions and similar documents concerning or reflecting movements of funds, account and account holder information, check numbers, account numbers and Federal Reserve routing numbers.")).  Ironically, this effort to maximize particularity furnishes the hook for Wey's suppression motion.  He contends that the Warrants should have contained a recitation of the crimes under investigation (a recitation that, along with the illustrative list of items, typically qualifies the blanket permission to seize "all evidence"), and that the absence of such a recitation dooms the Warrants.[12]

The Court should reject this argument.

*First*, even if identification of the crimes being investigated were required under these circumstances, such identification occurred here.  It is plain from the faces of the Warrants that this is a financial fraud case involving securities fraud in particular.  The first two categories of documents identified are "financial records," enumerated with specificity to include "banking and brokerage firm account statements" as well as documents showing fund transfers.  (Komar Decl., Ex. 2 at 3 ¶¶ 1-2).  Another category comprises "[m]arketing materials," defined to include "offering materials, private placement memoranda, sales scripts, investor 'lead' lists, investment agreements, financial statements, and other documents concerning, [or] relating to, the purchase or sale of securities."  (*Id.* at 4 ¶ 8).  Yet another category is "[d]ocuments identifying shareholders or investors in the entities listed in Exhibit B," defined to include "transfer agent records, stock certificates, investor lists, investor files, investment subscription agreements," other investment-related materials, "and

_____

[12] Citing *Vilar*, 2007 WL 1075041, Wey also advances the related argument that the categories of evidence identified in the Warrants' exhaustive lists are themselves insufficiently particular because they permit seizure of, for example, "financial records" without limitation by reference to specified offenses.  This argument, which the Government submits is better viewed through the lens of overbreadth, is addressed below.

28

other documents concerning or reflecting the identities and participation of investors in such schemes." (*Id.* at 4 ¶¶ 8-9). The next category calls for seizure of documents reflecting purchases made "with the proceeds of fraud." (*Id.* at 4 ¶ 10). Where, as here, the crimes under investigation are so clearly inferable from the face of the warrant, it would be sophistic to insist upon a formulaic incantation of the relevant statutory provisions. Certainly, nothing in the governing case law imposes such a rigid requirement.

The case upon which Wey relies most heavily for this point, *United States* v. *Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013), is readily distinguishable. There, the only category in the warrant rider that contained any reference to the crimes under investigation was the category describing the search of electronic devices. *See id.* at 454-55. The other categories listed were terse, extremely broad, and disparate enough from one another that the offense or offenses under investigation could not reasonably be inferred from their inclusion together. *See id.* at 451 (noting that warrant to search health care billing company called for, among other things, "bank account information" and "records related to patient care," without reference to any entity or individual names). The court reasoned that the inclusion of the crimes referenced in the computer search provision did not solve the particularity issue, because "an officer tasked only with conducting a physical search might well miss this supposed limit, as might any officer who reads the warrant in a straightforward fashion and observes that the reference to these federal crimes is confined to a specific subsection of the electronic evidence." *Id.* at 455.

No similar confusion could have arisen here. Any reasonable officer reviewing the Warrants would discern that the crimes under investigation were financial fraud offenses, including securities fraud offenses. Thus, to the extent the Warrants Clause demands identification of the crimes being investigated even in the absence of blanket permission to

seize "all evidence, including but not limited to" specified categories, that demand is met here.

      *Second*, and more fundamentally, no crime-identification requirement applies or should apply where, as here, (1) the subject warrant does not include a blanket permission to seize "all evidence" or "all documents," and (2) the categories of evidence to be seized are otherwise described with particularity.  *Galpin* (which post-dates execution of the Warrants) does state without apparent caveat that "a warrant must identify the specific offense for which the police have established probable cause."  *Galpin*, 720 F.3d at 445.  But that statement must be read in the context in which it was made.  The warrant at issue in *Galpin* was essentially an "all evidence" or "all records" warrant of the kind considered in the two cases *Galpin* cites for the quoted statement: *Bianco* and *George*.  *See id.* (citing *Bianco* and *George*); *United States* v. *Bianco*, 998 F.2d at 1115-16 (warrant permitted seizure of any and all "notes, Ledgers, Envelopes, Papers, and Records Containing Initials, Names, Addresses, Dollar Amounts, Codes, Figures, and the Like"); *George*, 975 F.2d at 74 (warrant permitted seizure of any "evidence relating to the commission of a crime").  The *Galpin* warrant allowed for the seizure of all "data . . . which may reveal evidence and substantiates violations of" any and all New York state and federal statutes.  *Galpin*, 720 F.3d at 441, 447. Given the blanket permission thus granted, it is no surprise that the *Galpin* Court—like the *Bianco* and *George* Courts before it, when faced with similar blanket permissions—found the warrant insufficiently particularized absent reference to the crimes under investigation. Indeed, the Government conceded the point.  *See Galpin*, 720 F.3d at 447 (noting that Government did "not dispute that insofar as the warrant generally authorized officers to search Galpin's physical property and electronic equipment for evidence of violations of 'NYS Penal Law and or Federal Statutes,' the warrant violated the Fourth Amendment's particularity requirement").

But to the extent the language of *Galpin* can be construed more broadly to require identification of crimes on the face of *every* warrant, whatever else the warrant might say, that language can and should be viewed as *dicta*.  A rule of such sweep would generate perverse results.  It cannot be, for example, that a warrant in a felon-in-possession case calling for seizure of a particularly described firearm—and nothing else—would fail the particularity test merely because it did not recite the crime being investigated.

Indeed, the Second Circuit's decision in *George*—which, as noted, *Galpin* cites—makes plain that such is not the import of the particularity requirement.  The warrant in *George* authorized seizure of several very specific items (*e.g.*, "keys to the Honda motorcycle," "McDonalds uniform," "Handgun") not defined by reference to any given crime, and also "any other evidence relating to the commission of a crime."  *Id.* at 74.  Officers executing the warrant seized a 12-gauge shotgun (not the "Handgun" specified in the warrant), and prosecuted the defendant for being a felon in possession of a weapon.  *Id.* at 75.  The Second Circuit, affirming the district court's suppression order, concluded that the "any other evidence" provision stood alone and constituted a "general warrant."  *Id.* at 77.  Notably, however, the Court of Appeals viewed the remaining provisions of the warrant as valid—notwithstanding that they too did not recite a crime under investigation—and remanded to the district court for further proceedings to determine whether the valid portions could be severed from the invalid blanket permission, and whether, if severance was appropriate, the shotgun might be deemed admissible under the "plain view" doctrine.  *Id.* at 79-80.

What *George* strongly implies is that the need to specify the crimes under investigation in the face of the warrant matters only to the extent that some provision of the warrant could otherwise be construed as tantamount to a general warrant—authorizing a roving search for evidence of *any* crime.  After all, the other items described in the *George*

warrant, though certainly particularized, were not identified by reference to any crime.  Yet the Court evidently believed those descriptions did not fail for non-particularity.

Applying *George*, there was no need here to refer to the crimes under investigation. The Warrants contain no blanket authorization to search for and seize "all evidence," or "all records," or "all documents."  They identify an exhaustive list of 11 categories of records to be seized, most (where further guidance may be needed) accompanied by illustrative lists. Each and every one of these categories is further limited by reference to an exhaustive (not illustrative) list of names, all of which appear in, and the relevance of each of which is apparent from, the NYGG Affidavit.[13]  The only remaining category of evidence to be seized is that which describes electronic devices, and the Warrants outline with particularity how those devices will be treated, including by specifying that any such device "will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized"—namely, the 11 categories of records and documents specified in Exhibit A.  (Komar Decl., Ex. 2 at 15 ¶ 1(c)).  In sum, the notion that this 17-page warrant, which was drafted painstakingly to *avoid* the kind of blanket provision that has given rise to suppression litigation in the past, could colorably be characterized as lacking in particularity is untenable.

Finally, and relatedly, Wey misconstrues the Warrants when he asserts, repeatedly, that they allow for permanent seizure, as evidence, of the entire contents of any electronic device.  (*See* Wey Mem. at 19, 33, 34, 35).  That is incorrect.  Although electronic devices are described broadly as a category of item to be seized in Exhibit A, the relevant paragraph (paragraph 7) explicitly states that any such devices will be searched for evidence in the manner described in Exhibit C.  (Komar Decl., Ex. 2 at 4-5 ¶ 7).  Exhibit C, in turn, makes clear that the files to be searched for and seized in these devices are essentially the electronic

---

[13] Wey's complaint that this list included NYGG, Wey, and Wey's wife is considered below, as part of the overbreadth analysis.

forms of any records described in the remaining categories set forth in Exhibit A, as limited

by the names list in Exhibit B.  (*See id.* at 15 ¶ 1(c) (stating that devices "will be reviewed by

appropriately trained personnel in order to extract and seize any data that falls within the list

of items to be seized")).[14]

     ii.  *The Warrants Are Not Overbroad*

   Wey's other principal complaint about the form of the Warrants—that they permit

seizure of any document or record in one of the 11 specified categories that relates to NYGG,

Wey, or Wey's wife—is, in the Government's view, better characterized as an allegation of

overbreadth rather than a particularity challenge.  It should in any event be rejected.

     (a)  <u>Probable Cause Supported all Categories Identified</u>

   First, as to some of the categories identified in the Warrants, any overbreadth

complaint would be frivolous.  "Marketing materials" concerning "the purchase or sale of

securities" (Komar Decl., Ex. 2 at 4 ¶ 8), "[d]ocuments identifying shareholders or investors"

(*id.* at 4 ¶ 9), documentation concerning purchases made "with the proceeds of fraud" (*id.* at 4

¶ 10), and "documents reflecting the ownership or structure of, or relationship between and

among, any of the entities listed in Exhibit B" (*id.* at 4 ¶ 12), are obviously directly relevant

to the investigation at issue.

   As for the remaining items—"financial records" (*id.* at 3 ¶¶ 1-2); records of

communication (*id.* at 3 ¶ 3); correspondence, audio tapes, and video tapes (*id.* at 3 ¶ 4);

meeting records (*id.* at 3 ¶ 5); photographs, records of events and contacts, and income tax

returns (*id.* at 3 ¶ 6); and identification documents (*id.* at 4 ¶ 11)—these are also plainly

relevant to proving the charges under investigation (*see* Komar Decl., Ex. 1 at ¶¶ 40-41).

And there can be no question—indeed, Wey does not appear to seriously contest—that

probable cause had been established as to each of these categories insofar as they pertained to

---

[14] As discussed above and in the accompanying declarations of Agents Komar and McGuire,
the agents executing the Warrants followed this protocol to the letter.

the long list of NYGG clients, Nominees, Retail Brokerage principals and employees, round-lot shareholders, and associated personnel identified in the NYGG Affidavit. All of this evidence was properly sought to further establish (among other things) Wey's and NYGG's relationship to the RTO issuers and Nominees; the shareholder makeup of the RTO issuers and Nominees; Wey's and NYGG's financial stakes in the issuers and the Nominees; Wey's and NYGG's relationship (financial and otherwise) with the Retail Brokerage and its employees; and the roles of Wey's family members, including his sibling and father-in-law, in NYGG, the RTO issuers, and the Nominees.

Wey's objection, instead, appears to be that insofar as the Warrants permitted seizure of records and documents that related to NYGG, Wey, or Wey's wife but were *not* tied in one way or another to the particular issuers, transactions, Nominees, brokers, and shareholders identified in the NYGG Affidavit, they were overbroad. (*See* Wey Mem. at 33-37). That objection fails because Agent Komar scrupulously supplied the probable cause necessary to support seizure of such items beyond those tethered specifically to transactions and entities identified by name in the NYGG Affidavit.

In the 97 pages Agent Komar offered for Judge Dolinger's consideration, he describes a scheme of such scope, and such sustained duration, that broad categories of documents and records properly were identified as relevant to the investigation. The NYGG Affidavit explains that Wey founded NYGG in 2004, on the heels of his Oklahoma securities authority troubles. (*See* Komar Decl., Ex. 1 at ¶15(b)). The operation specialized in RTOs—precisely the kinds of transactions described in detail in the NYGG Affidavit. (*Id.* ¶ 11). The first such transaction that the NYGG Affidavit describes in detail as being part of Wey's fraudulent scheme dates back to NYGG's very inception, in approximately 2004. (*See id.* ¶ 17)). And, as Agent Komar takes pains to explain, Wey's and NYGG's continued connections to issuers,

the Retail Brokerage, and others tied to the fraudulent scheme extended all the way up to the point at which the Warrants were being sought.

The wide variety of documents and records potentially relevant to Wey's scheme is also evident from the face of the NYGG Affidavit.  Wey's scheme depended for its operation on dealings and communications of all kinds—in person, over the phone, by email, by mail, by Skype, by other means—with a broad range of people and institutions: hundreds of round-lot shareholders, many of whom were Wey's friends and business associates and acquaintances; Wey's extended family, some of whom he used as Nominees; a variety of brokerage firms and banks; transfer agents; regulators of different kinds; investors of all stripes; NYGG staff; the Retail Brokerage and its employees; contacts at numerous issuers; and so on.  Quite properly, then, the Warrants called for seizure of such things as "correspondence" with NYGG, the entity through which—from its inception—Wey perpetrated his scheme.

The breadth of the scheme described also plainly justifies the search for and seizure of "financial records" related to NYGG, Wey, Wey's wife, and the other individuals and entities listed in Exhibit B.  Wey's conduct, as related in the NYGG Affidavit, rendered all such documents relevant.  Among many other things, Wey controlled large blocks of issuer stock through Nominee-owned brokerage accounts, paid out a huge secret commission to the Retail Brokerage, used his Nominees (including family members) to squirrel away millions of dollars in secret trading profits into overseas bank accounts, had the profits funneled back to his wife under the guise of "gifts," and then reported to regulators that his business's only income was a fixed fee from its Chinese affiliate, NYGG-Asia.  (*See* Komar Decl., Ex. 1 at ¶ 35(c)).  Under the circumstances, which are described in meticulous detail by Agent Komar, any financial record found at the NYGG Premises or the Wey Apartment constituted potential evidence of the crimes under investigation.

Finally, if there were any doubt concerning the existence of probable cause sufficient to justify seizure of the materials described in the Warrants, that doubt would have to be resolved in favor of the magistrate judge's determination, to which great deference is owed. *See, e.g.*, *United States* v. *Smith*, 9 F.3d at 1012.

> (b)    Had the Warrants Authorized Seizure of "All Records,"
>         That Would Have Been Permissible Here

As discussed in the Background section, above, this was not a case in which execution of the subject search involved seizure of "all records" at a given location. To the contrary, the agents took care to seize only those records called for by the Warrants, and to ask Agent Komar if they had questions about the relevance of a given document. In the end, the agents seized only about 4,500 pages of hard-copy documents from the NYGG Premises, and approximately 4,000 hard-copy documents from the Wey Apartment. (*See* Komar Decl. ¶¶ 9, 13). They also later seized approximately 105,000 electronic files. (McGuire Decl. ¶ 8). Nonetheless, it bears observing that, *had* the agents taken "all records," such a seizure would have been justified. The evidence described in the NYGG Affidavit supports the inference that Wey's and NYGG's corrupt practices extended to virtually all—if not all—of NYGG's business. In October 2004, when interviewed about NYGG, Wey described NYGG's business as involving the payment of bribes. (Komar Decl., Ex. 1 ¶ 16 (quoting interview in which Wey stated: "If you have a problem, we solve the problem. Government regulations, licenses, how to pay someone a bribe – we do it. We get over the hurdles.")). More generally, NYGG employees had described for Agent Komar an operation with highly suspicious record-keeping practices—practices that applied to all aspects of the business, not just the specific issuers and transactions described in the NYGG Affidavit. (*Id.* ¶ 6). While Agent Komar candidly acknowledged he could not be sure that *all* of NYGG's business was laced with fraud (*see id.* ¶ 35(b)), he nonetheless offered Judge Dolinger more than sufficient facts to conclude there was probable cause to believe that at least most of it was. *See*

*D'Amico*, 734 F. Supp. 2d at 361 (applying all records doctrine where Government acknowledged subject business engaged in some legitimate activity). *Compare Vilar*, 2007 WL 1075041, at *21 ("all records" doctrine inapplicable where affidavit did not purport to justify seizure of all records and fraudulent transactions admittedly involved only approximately $25 million out of $1.2 billion in assets).

These facts easily distinguish this case from *United States* v. *Zemlyansky*, upon which Wey again relies, this time for his overbreadth argument and related contention that the "all records" doctrine does not apply. (*See* Wey Mem. at 36-37 & n.28). The affidavit in *Zemlyansky*, which sought permission to search six different premises in one fell swoop, offered two lone paragraphs about the particular billing company the search of which was being challenged. *See Zemlyansky*, 945 F. Supp. 2d at 451, 463. Based on these two "scant and conclusory" paragraphs and a single other generic description of billing companies' relevance to the scheme under investigation, the warrant authorized seizure of, among other things, *all* patient care records and bank records. *See id.* at 450-51, 463-64. The district court concluded that such broad authorization was unwarranted where, as far as the allegations in the affidavit were concerned, the entity being searched might well have been "a business that provided an array of mostly legitimate administrative and billing services to a plethora of customers." *Id.* at 463-64.

Here, by contrast, we have an extraordinarily detailed 97-page affidavit that contains a wealth of evidence suggestive of an entity permeated with fraud, and a pair of correspondingly detailed, appropriately broad warrants.

(c)    <u>No Timeframe Specification Was Required</u>

Finally, on the issue of asserted overbreadth, the Court should reject Wey's footnote objection that the Warrants were impermissibly broad because they failed to give a timeframe. (*See* Wey Mem. at 34 n.27). Timeframe specification, while relevant to the

37

particularity and overbreadth analyses, is not a stand-alone requirement—particularly where, as here, the crimes under investigation are reasonably believed to have spanned many years. *See, e.g.*, *Hernandez*, 2010 WL 26544, at *11; *Jacobson*, 4 F. Supp. 3d at 526.  Moreover, as noted, NYGG only came into being in 2004, and its involvement with Bodisen, one of the RTO issuers later delisted by NASDAQ, began in or about that very year.

        iii.       *Even If The Warrants Were Defective, the Good Faith Exception Would Apply*

Even if the Warrants were either insufficiently particularized or overbroad (and they were not), the good faith doctrine would apply to preclude suppression.  This simply was not a case in which any problem with particularization or probable cause to search and seize would have been apparent to a reasonable agent.

*First,* the NYGG Affidavit was, by any measure, extraordinarily detailed and robust. A reasonable agent familiar with its contents—as Agent Komar was (*see* Komar Decl. ¶¶ 6-8)—would reasonably have believed that probable cause supported seizure of the documents and records described in the Warrants.  *See, e.g.*, *Clark*, 638 F.3d at 103 (cases involving a "defective warrant issued based on an affidavit providing detailed factual allegations in support of probable cause" "almost invariably demonstrate reasonable reliance"); *Feng Ling Liu*, 2014 WL 101672, at *8-9 (even if "all records" warrant might have been overbroad, agents reasonably relied on broad statement of probable cause in concluding such a warrant was appropriate);*United States* v. *Levy*, 2013 WL 664712, at *10 ("Given the nature of the complex financial crimes and conspiracy alleged, executing officers would reasonably expect to find fairly broad categories of financial documents to be seized."); *Bowen*, 689 F. Supp. 2d at 684 (applying good faith exception in alternative to finding that "all records" doctrine applied); *Hernandez*, 2010 WL 26544, at *12 (where case was one involving complex fraud, "a government agent would likely expect to find fairly broad categories" of documents to be seized described in the warrant).

*Second*, the absence of a clause in the Warrants reciting the specific crimes under investigation would not have caused a reasonable agent to doubt the validity of the Warrants. As discussed above, the Warrants here were drafted in a way that *avoided* a common potential weakness—namely, a blanket authorization to seize "all evidence" or "all records" related to the crimes under investigation—and instead sought to furnish an exhaustive list of items to be seized.  Moreover, it was clear from the faces of the Warrants that the investigation involved financial fraud, and securities fraud in particular.  To the extent the law requires more than this by way of crime identification, even in cases where the warrant at issue does not incorporate what would otherwise constitute a blanket permission to seize all evidence of any crime, that requirement was by no means clear in 2012, before *Galpin*.

*Third*, the manner in which the Warrants were executed speaks volumes about the agents' good faith.  Agent Komar worked with the lead prosecutor to make sure that members of the search team were familiar with the investigation and had proper guidance about what kinds of documents and records should be searched for and seized.  He prepared and circulated a detailed Ops Form, held an advance briefing for the search team, shared the NYGG Affidavit with the search team leader and made it available to others, supplied agents with the Warrants, positioned himself on the scenes of both searches to make sure he was available to answer questions, and took pains to respect concerns related to attorney-client privilege.  Turning to the electronic evidence, the agents assigned to the matter worked with the U.S. Attorney's Office and the defense to try to identify and segregate from review documents and files that might be privileged, and waited until the FBI Wall Team had completed its review before conducting searches for relevant documents based on the terms of the Warrants.  Such conduct can hardly be deemed anything other than conscientious and consistent with best practices.

*Fourth*, and relatedly, the agents did not simply seize everything at the NYGG Premises or the Wey Apartment.  Wey struggles to identify materials seized from either location that suggest a blanket seizure of materials untethered to the NYGG Affidavit's probable cause statement.  (*See* Wey Mem. at 24).  The approximately 65 pages of materials he comes up with (*see* Siegal Decl., Ex. 27) principally comprise (1) a flight record for Wey's wife's travel abroad in January 2012, and passports for the children who accompanied her; (2) a 1992 letter from one of the round-lot shareholders specified in the NYGG Affidavit to Wey; (3) materials related to a minor Wey used as one of his Nominees; and (4) documents reflecting Wey's wife's maiden name, which is also the name of her father, a Nominee.  (*Id.*).  All of these materials fall within the scope of the Warrants and, based on the allegations in the NYGG Affidavit, have potential relevance to the investigation.  The only documents in the collection that are difficult to square with the terms of the Warrants and the NYGG Affidavit are a collection of x-rays.  These should not have been seized.  But the fact that Wey must hang his overbreadth assertion on this lone collection of irrelevant documents only underscores the agents' good faith in executing the searches.

The foregoing facts dispositively foreclose a finding of deliberate, culpable conduct on the agents' part.  *See Rosa*, 626 F.3d at 64-66 (on similar facts regarding execution, finding "nothing to suggest deliberateness and culpability on the officers' part"); *see also, e.g.*, *United States* v. *Cwibeker*, 2014 WL 7423106, at *9 (E.D.N.Y. 2014) (same).  They are also a far cry from *Zemlyansky*, which Wey cites.  As noted, the affidavit in *Zemlyansky* supplied just three paragraphs of probable cause pertinent to the business at issue, one of which described billing companies generically.  *See* 945 F. Supp. 2d at 463-64.  On the basis of this "scant and conclusory" showing, the warrant permitted seizure of broad categories of items—"bank account information," "records related to patient care," "computers," "thumb drives"—the relevance of which to any given crime was not, the court found, apparent.  *See*

*id.* at 456-58.  Unlike Agent Komar, the agent who swore out the affidavit for the warrant in *Zemlyansky* did not participate in the search.  *See id.* at 473.  And the agents in *Zemlyansky* did not explain how they had conducted searches of the electronic materials seized—leaving the court to "assume that the unknown officers conducting the search of all electronics seized from [the billing company] have no knowledge whatsoever of [the affiant agent], his affidavit, or even of the few specifics of the case provided to" other agents involved.  *Id.* at 474.  Here, by contrast, the agent principally responsible for the electronic searches, Agent McGuire, was the case agent assigned to the matter at the time he conducted the searches.  (*See* McGuire Decl. ¶¶ 5-8).  He used a list of key word terms carefully crafted to identify responsive files.  All of this was done against a backdrop of a scrupulous privilege review.

     *Finally*, even if one could find fault with the agents' conduct in this case—and the Government submits that one cannot—any such conduct plainly was not "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Herring*, 555 U.S. at 144; *Rosa*, 626 F.3d at 64, 66 (suppression unwarranted absent evidence of deliberate and culpable behavior by law enforcement agents).  On one side of the equation, any supposed misconduct could at most be characterized as mild and inadvertent.  On the other side, weighing "the price paid by the justice system" as a result of suppression, the impact of suppression in this case would be draconian.  Agent Komar's 97-page affidavit offers a window into the extraordinary resources, time, and effort that the FBI and other government officials committed to investigating this case over many years.  The evidence seized pursuant to the Warrants, some of which is described with particularity the Indictment, is critical to this prosecution.  Its suppression would be an extraordinarily disproportionate remedy.

41

### iv.     The NYGG Affidavit Was Not Misleading

Having first argued overbreadth of the Warrants, Wey proceeds to then argue that the Warrants lacked probable cause altogether because the NYGG Affidavit was "rotten at its core." (Wey Mem. at 37). This is a preposterous assertion, supported by a series of baseless accusations that, stripped down, are revealed as (at best) factual disputes that have no place in a motion to suppress. Wey's motion to suppress on this ground should be denied, as should his alternative demand for a hearing pursuant to *Franks* v. *Delaware*, 438 U.S. 154 (1978). *See, e.g.*, *United States* v. *Levy*, 2012 WL 5830631, at *7-8 (S.D.N.Y. 2012) (no *Franks* hearing warranted absent "a substantial preliminary showing that the Affirmations contained false or misleading misstatements or omissions").

*First*, there is no merit to Wey's contention that Agent Komar falsely represented the existence of a "rule prohibit[ing] counting shareholders who received their shares in the form of a gift." (Wey Mem. at 39). The NYGG Affidavit nowhere contains such a representation. It instead asserts, with citation to a specific SEC case (something Wey acknowledges only in a footnote of his brief, *see* Wey Mem. at 41 n. 31), that the collection of deeply deceptive acts in which Wey engaged—allocating 100-share certificates to sundry friends, family members, and associates for the sole purpose of inflating the round-lot shareholder numbers for two separate RTO issuers, and having the share certificates sent to NYGG and his own apartment—constituted fraudulent conduct. (Komar Decl., Ex. 1 ¶¶ 18-19). It was fraudulent because it was designed to circumvent the NASDAQ's 300 round-lot shareholder rule, which in turn is designed to ensure that an issuer has sufficient bona fide investor interest to sustain trading on the exchange before it gets listed.

*Second*, and relatedly, Wey's assertion that NASDAQ knew what Wey was doing is breathtaking in its audacity. Even the select email communications that Wey chooses to marshal in support of this assertion only underscore the seriousness of the deception here.

(*See* Siegal Decl., Ex. 10).  What they show, and what the Government's other evidence at trial will further demonstrate, is that (1) NASDAQ was concerned about the possibility that some of the subject issuers' shareholder base was comprised of individuals who had received their shares as gifts; (2) NASDAQ wanted to better understand the circumstances under which the gifts had been made (for example, were they gifts but to individuals with genuine interest in the issuers?); and (3) Wey and his agents and coconspirators actively misled NASDAQ about those circumstances.  As reflected in Wey's own exhibits, for example, when NASDAQ asked an attorney acting at Wey's direction what relationship a particular individual who had made gifts to several round-lot holders, including the attorney himself, had to Smartheat, the attorney (a) at first failed to reveal that the gifter was Wey's own sibling, and then (b) falsely described the gifter as "a social friend in China who is a shareholder and is not an affiliate of the Company."  (Siegal Decl., Ex. 10 at 2-3).

*Third*, Wey's irresponsible claim that Agent Komar lied to Judge Dolinger when he stated that he was "aware of no public information that could explain such a significant rise in the marketplace valuation" of Smartheat and Deer in 2009 (Komar Decl., Ex. 1¶ 25)—*viz.*, leaps of 186 percent and 190 percent, respectively—is similarly baseless.  The litany of other factors Wey offers for why Smartheat and Deer might have experienced *some* stock price rise (their public offerings and the 12 percent rise in the S&P Asia 50 Index, for example, *see* Wey Mem. at 43-46) by no stretch contradict Agent Komar's conclusion that other forces could not explain "*such a significant* rise" in the prices of those stocks.

*Fourth*, there is nothing misleading in the NYGG Affidavit's description of the timeframes related to the pump-and-dump allegations.  Just because the periods of "pumping" do not overlap in month-by-month  perfection with the periods of "dumping"— facts that are in any event not hidden but plain from the face of the NYGG Affidavit—hardly means there was no pump-and-dump.  (*Cf.* Wey Mem. at 47).  Wey does not dispute that

there were, in fact, periods during which Retail Brokerage customers were buying Deer and Smartheat while the Nominees were selling.  Moreover, Wey's efforts to undermine Agent Komar's allegations on this point are themselves misleading.  For example, Wey uses "bluesheet" data to try to show that Retail Brokerage customers sold roughly the same number of Deer and Smartheat stocks as they bought through the Retail Brokerage.  (Wey Mem. at 46-47).  But several of the Nominees were themselves customers of the Retail Brokerage, and so of course were selling.  This fact supports rather than undercuts the manipulation theory.

*Fifth*, there is nothing misleading in Agent Komar's observation that multiple sequential wire transfers of funds from Wey's sibling to Wey's wife over a period of one week, each at the level of $25 or less below $10,000, reflected a desire "to avoid raising suspicion, given the United States currency transaction reporting requirements with respect to cash transactions over $10,000."  (Komar Decl., Ex. 1 ¶ 29(i)).  As this observation expressly notes, the actual rule relates to "cash transactions."  But that does not preclude the inference that an individual wishing to "avoid suspicion," given this rule, would structure wire transfers in the same way, just to be safe.  That is all Agent Komar is saying here, and his clear statement that the $10,000 reporting requirement relates to "cash" makes plain he is drawing an inference about intent rather than concluding there has been an actual violation of a reporting requirement.  It also fully discloses the relevant facts to the magistrate judge.

*Sixth*, there is nothing misleading in Agent Komar's statements that CleanTech was delisted by NASDAQ for failure to fully disclose its relationship with Wey.  It was delisted for that reason.  Only after the Warrants were executed did the SEC vacate the delisting decision, finding an absence of *intent* on CleanTech's part to deliberately withhold the relevant documents.  (*See* Ex. A).

*Seventh*, Wey's attack on the "suggest[ion]" made in the NYGG Affidavit—and, indeed, the Indictment—that RTOs are "suspicious" (Wey Mem. at 49) barely merits comment.  Wey here identifies no purportedly false or misleading statement, and appears instead to be using this opportunity to make a public relations point regarding NYGG's overall business.

*Finally*, Wey makes much of a passing observation in a footnote of the NYGG Affidavit that certain transfers from Wey's sibling to his wife bear a reference to "Bei Lu," which is the name of one of the CleanTech founders.  (Wey Mem. at 50-51).  While Wey is correct that the noted connection here was an error, and that "Bei Lu" in this context refers to a street name rather than a person, the notion that this error could remotely undermine the overwhelming probable cause laid out in the NYGG Affidavit is absurd.  Indeed, Agent Komar offers no inference for the magistrate to draw from the observation.  And to the extent that the magistrate might himself have inferred from the observation a connection between Wey and CleanTech, that connection was already so fully established by the other facts in the NYGG Affidavit that the erroneous observation was certainly harmless.

## II. THE COURT SHOULD DENY WEY'S MOTION TO SUPPRESS BASED ON RETENTION OF ELECTRONIC EVIDENCE

Wey next contends that the Government's "four-year retention of nearly every file seized" from the NYGG Premises and the Wey Apartment "constitutes an unreasonable search and seizure in violation of" his rights under the Fourth Amendment to the U.S. Constitution. (Wey Mem. at 53).  Because the Government did not "seize" paper records that fell outside the scope of the Warrants, and because the Government's retention of electronic media was reasonable, the Court should reject this argument.

### A.    Applicable Law

Federal Rule of Criminal Procedure 42(e)(2)(B) provides:

A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic
storage media or the seizure or copying of electronically stored information.
Unless otherwise specified, the warrant authorizes a later review of the media
or information consistent with the warrant. The time for executing the warrant
in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the
media or information, and not to any later off-site copying or review.

The advisory committee's notes to the 2009 amendment of the Federal Rules of

Criminal Procedure specifically rejected "a presumptive national or uniform time period

within which any subsequent off-site copying or review of the media or electronically stored

information would take place."  Fed. R. Crim. P. 41(e)(2)(B) advisory committee's notes to

the 2009 Amendments.

"[T]here is no established upper limit as to when the government must review
seized electronic data to determine whether the evidence seized falls within
the scope of a warrant," and the issue "requires a careful case-by-case factual
analysis because what may be appropriate under one set of facts and
circumstances may not be so under another."

*United States* v. *Filippi*, 2015 WL 5789846, at *8 (N.D.N.Y. 2015) (quoting *United States* v.

*Metter*, 860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012)); *see also United States* v. *Romain*, 2014

WL 6765831, at *8 (S.D.N.Y. 2014) ("[T]here is no defined time period in which the

Government must segregate the data responsive to the Warrant from the unresponsive . . . .").

Where execution of a warrant is found not to be reasonable, wholesale suppression is

typically not the appropriate remedy.

[W]hen items outside the scope of a valid warrant are seized, the normal
remedy is suppression and return of those items, not invalidation of the entire
search. Courts have also indicated that the drastic remedy of the suppression
of all evidence seized is not justified unless those executing the warrant acted
in flagrant disregard of the warrant's terms.

*United States* v. *Matias*, 836 F.2d 744, 747-48 (2d Cir. 1988) (internal quotation marks and

citations omitted). "Government agents 'flagrantly disregard' the terms of a warrant so that

wholesale suppression is required only when (1) they effect a 'widespread seizure of items

that were not within the scope of the warrant,' and (2) do not act in good faith." *United States* v. *Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (citation omitted) (quoting *United States* v. *Matias*, 836 F.2d at 748).

> The rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search. Accordingly, to satisfy the first prong of the two-part test described above, the search conducted by government agents must actually resemble a general search.

*Id.* at 141 (citations omitted). In short, "the benefits of deterrence must outweigh the costs." *Herring*, 555 U.S. at 141. The exclusionary "rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging its application." *Id.* (alteration omitted).

### B.    Discussion

The Government's retention of the seized electronic evidence was reasonable. First and dispositively, after initially determining which electronic information fell within the Warrants' scope, the Government did not then attempt to review any electronic evidence deemed outside their scope. Rather, for reasons discussed below, the Government simply preserved during the pendency of an ongoing investigation originals and/or mirror copies of the seized electronic evidence "to permit the accurate extraction of the primary evidentiary material sought pursuant to the warrant[s]; to secure metadata and other probative evidence stored in the interstices of the storage medium; and to preserve, authenticate, and effectively present at trial the evidence thus lawfully obtained." *United States* v. *Ganias*, No. 12-240-cr, --- F.3d ----, 2016 WL 3031285 (2d Cir. May 27, 2016) (en banc) ("*Ganias II*"). Retention is not a search, and therefore there is no basis for suppression.

Second, the primary case upon which Wey relies, *United States* v. *Ganias*, 755 F.3d 125 (2d Cir. 2014) ("*Ganias I*"), was vacated (on the day Wey filed his motions) by the

Second Circuit sitting en banc.  *See Ganias II*.  The defendant in that case had moved to

suppress evidence seized in connection with a 2006 warrant, arguing that

> the Government violated his Fourth Amendment rights when, after lawfully
> copying three of his hard drives for off-site review pursuant to a 2003 search
> warrant, it retained these full forensic copies (or "mirrors"), which included
> data both responsive and non-responsive to the 2003 warrant, while its
> investigation continued, and ultimately searched the non-responsive data
> pursuant to a second warrant in 2006.

*Ganias II*, 2016 WL 3031285, at *1.  The en banc Court concluded "that the Government

relied in good faith on the 2006 search warrant, and that this reliance was objectively

reasonable," and therefore did "not decide whether retention of the forensic mirrors violated

the Fourth Amendment."  *Id.*

Nevertheless, the *Ganias II* Court made "some observations bearing on the

reasonableness of the agents' actions, both to illustrate the complexity of the questions in this

significant Fourth Amendment context and to highlight the importance of careful

consideration of the technological contours of digital search and seizure for future cases."  *Id.*

at *6.  Among other things, *Ganias II* questioned analogizing hard drives to file cabinets:

> Though to a user a hard drive may seem like a file cabinet, a digital forensics
> expert reasonably perceives the hard drive simply as a coherent physical
> storage medium for digital data—data that is interspersed throughout the
> medium, which itself must be maintained and accessed with care, lest this data
> be altered or destroyed.

*Id.* at *10.

For example, "[e]ven the most conventional 'files'—word documents and

spreadsheets such as those the Government searched in this case—are not maintained, like

files in a file cabinet, in discrete physical locations separate and distinct from other files," but

rather are "fragmented" across physical locations.  *Id.*  Moreover, a "computer stores unseen

information about any given 'file,'" such as "metadata about when the file was created or

who created it" and "prior versions or edits that may still exist . . .—further interspersing the

data corresponding to that 'file' across the physical storage medium."  *Id.*

Files therefore "are not as discrete as they may appear to a user," and "[t]heir interspersion throughout a digital storage medium . . . may affect the degree to which it is feasible . . . to fully extract and segregate responsive data from nonresponsive data." *Id.* Courts therefore "must be attuned to the technological features unique to digital media as a whole and to those relevant in a particular case—features that simply do not exist in the context of paper files." *Id.*

*Ganias II* did not limit its discussion to computer "files," but also noted "that a good deal of the information that a forensic examiner may seek on a digital storage device . . . does not even remotely fit into the typical user's conception of a 'file." *Id.* at *11.  The Court went on to describe such information, including "evidence sufficient to reconstruct a deleted file," "metadata about a user's activities, or the manner in which information has been stored, to show such things as knowledge and intent," and evidence "that something *did not happen*," such as a virus attack.  *Id.*

Because of these complexities, the *Ganias II* Court recognized the "potential challenges to parties seeking to preserve digital evidence, authenticate it at trial, and establish its integrity for a fact-finder—challenges that materially differ from those in the paper file context." *Id.* at *12.  The Court again gave examples, including that extracting "specific data files . . . can alter, omit, or even destroy portions of the information," and that therefore "[p]reservation of the original medium or a complete mirror may be necessary in order to safeguard the integrity of evidence that has been lawfully obtained or to authenticate it at trial." *Id.*  Such preservation "is not simply a concern for law enforcement" but "may also be necessary to afford criminal defendants access to that medium or its forensic copy so that, relying on forensic experts of their own, they may challenge the authenticity or reliability of evidence allegedly retrieved.  *Id.*

For all of these reasons, the *Ganias II* Court, while not deciding the issue, remarked that the Government had "plausibly" argued that

> a digital storage medium or its forensic copy may need to be retained, during the course of an investigation and prosecution, to permit the accurate extraction of the primary evidentiary material sought pursuant to the warrant; to secure metadata and other probative evidence stored in the interstices of the storage medium; and to preserve, authenticate, and effectively present at trial the evidence thus lawfully obtained.

*Id.* at *13.

Therefore, though *Ganias II* did not decide the issue, it favorably discussed powerful reasons why the Government's retention of the electronic evidence seized here was reasonable.[15]  Those reasons support the Government's decision here to retain all of the seized electronic evidence throughout the pendency of the investigation.  That retention inures to Wey's benefit as well as the Government's, as it will allow Wey to reconstruct the forensic record and potentially authenticate relevant evidence for the defense.

Moreover, Wey's reliance on *United States* v. *Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012), is misplaced.  In *Metter*, the Government had (in the court's view) delayed too long in developing and implementing a plan "to *begin* review" of the electronic evidence.  *Id.* at 215 (emphasis in original).  In contrast, the review here began shortly after the search, and was completed years ago.  The results of the FBI's execution of the Warrants on the electronic evidence have been produced to Wey.  The Government has not reviewed any nonresponsive information since initially segregating that information from responsive evidence.  On these facts, the Court should reject Wey's argument that the Government's retention or search of the seized electronic evidence has been conducted unreasonably.  Suppression is therefore not warranted.

---

[15] For the most part, the FBI here retained mirror copies, and within just a few weeks of the searches returned the original electronic media to Wey and NYGG, further underscoring the Government's attempt to act in the least disruptive way while still achieving the investigative and evidentiary goals discussed above and in *Ganias II*.

Finally, even if the Court were to find that the Government's retention of the unresponsive portions of the electronic media in this case was unreasonable, wholesale suppression would not be the appropriate remedy. Neither prong of the "flagrant disregard" standard is satisfied. *Shi Yan Liu*, 239 F.3d at 140. First, the Government "seized" only those electronic files that fell within the four corners of the Warrants. The Government has not reviewed any evidence outside the Warrants' scope since the initial review necessary to segregate responsive information from nonresponsive information. Therefore the Government's retention of the seized electronic evidence was not a "widespread seizure of items that were not within the scope of the warrant." *Id.* (internal quotation marks omitted). As discussed above, the Government retained the entirety of the seized electronic evidence not to continue searching material initially deemed nonresponsive, but to accomplish the legitimate investigative and litigative goals discussed in *Ganias II*. Therefore the only true "search and seizure" was the initial search to find responsive information in the seized electronic evidence, and the segregation of that evidence from non-responsive information.

Nor has the Government acted in bad faith. In *Metter*, the Government had not commenced its review within approximately 15 months of the search "despite repeated requests from defense counsel and directions from the Court to do so." 860 F. Supp. 2d at 216. Here, the Government immediately imaged the electronic media and returned the originals or (as appropriate) mirror copies to the defense, worked with the defense to protect its claims of attorney-client privilege, employed a Wall FBI Team to conduct a careful review for potentially privileged material, reviewed the seized electronic evidence in a timely manner, separated responsive from nonresponsive information, and promptly produced a copy of the results to Wey after he was indicted. Thus, it cannot be said that law enforcement flagrantly disregarded the terms of the Warrants. *See Filippi*, 2015 WL 5789846, at *10 (denying suppression motion where search of electronic media occurred after court-ordered

search-completion deadline where "the government did not exceed the substantive scope of the search warrant," and "the search involved reviewing data that had already been lawfully extracted from the phone").

Accordingly, the remedy for any violation relating to the Government's retention of the seized electronic evidence search should be limited to suppression (and return, if practical) of any records beyond the scope of the warrants.

## III.   THE COURT SHOULD DENY WEY'S MOTION TO PREVENT THE GOVERNMENT FROM CONDUCTING A PRIVILEGE REVIEW

Having supplied the Government with a long list of attorneys that he, his wife, and NYGG purportedly used over the years, in an effort to facilitate the Government's identification of potentially privileged documents seized during the searches, Wey now seeks to prevent a taint team—which will be comprised of agents and prosecutors not otherwise involved in this case—from actually reviewing these potentially privileged documents to determine whether the documents are, in fact, privileged.  This request is unsupported by the law and should be denied.

By way of background, and as previously noted, the first step agents took in reviewing the electronic evidence seized from the NYGG Premises and the Wey Apartment was to segregate any potentially privileged communications, without reviewing these communications.  Before doing so, the Government engaged with defense counsel, and agreed to be guided by an approximately 9-page-long list of names of attorneys that defense counsel represented had acted on Wey's behalf, his wife's behalf, or NYGG at one time or another.  Notably, two of the attorneys on this list—Robert Newman and William Uchimoto—have been charged by the SEC for participating in the RTO scheme with Wey. This list was plainly over-inclusive, and resulted in the identification of 1,295 electronic documents as potentially privileged.  (*See* McGuire Decl. ¶ 6).  At the request of defense counsel, the Government has not yet had a taint team review any of these potentially

privileged files.  On April 15, 2016, the Government produced a blind copy (meaning the

Government did not see the contents of the communications) to Wey of the 1,295 potentially

privileged documents.

The Government has already provided Wey with all of the relevant information about

the "taint procedure" used thus far.  (Wey Mem. 62).  In fact, Wey was involved in

developing this procedure.  As previously noted, the Government took the extraordinary step

of letting the defendant's over-inclusive privilege name list guide the initial identification of

the potentially privileged documents.  To the extent that a few potentially privileged

documents were regrettably not captured by this search (Wey Mem. 61), that is a result of

imperfect search terms (developed in consultation with the defense), and not any bad faith

efforts by the Government.

Going forward, the Government plans to have a taint team review the 1,295

potentially privileged documents.  This taint team will not communicate any information

learned in the course of the communications review to the trial team.  Once the taint review is

finished, a "wall" Assistant U.S. Attorney assigned to the matter will provide to defense

counsel a list of documents that the taint team has determined are not privileged.  Should the

defense disagree with these determinations, Wey would then have an opportunity to object

and seek court intervention before the communications are reviewed by the trial team.  While

a handful courts have expressed concern over the Government's use of a wall AUSA to

review potentially privileged documents, the use of a taint team is widely recognized as an

appropriate procedure for the Government's identification of privileged documents seized

from defendants, particularly where, as here, the defendant will have an opportunity to

challenge that taint team's privilege determinations before any materials are turned over to

the trial team.[16]  *See Feng Ling Liu*, 2014 WL 101672, at *12 (holding that the Government's use of an FBI "filter agent" to review materials seized for privilege did not breach the privilege); *United States* v. *Winters*, 2006 WL 2789864, at *2 (S.D.N.Y. 2006) ("[T]he Government's proposed employment of a 'wall Assistant' adequately protects the defendant's asserted privilege." (internal citation omitted)); *United States* v. *Grant*, 2004 WL 1171258, at *2-3 (S.D.N.Y. 2004) (approving of the Government's use of a taint team and noting that the defendant would not be prejudiced because "after the privilege team reviews the documents for privilege, the Defendant will have the opportunity to make objections to the Court before any documents are turned over to the trial team").  Thus, the Government's taint team should be permitted to review the 1,295 documents that have been marked as potentially privileged.

## IV.   THE COURT SHOULD DENY WEY'S MOTION TO DISMISS THE INDICTMENT

Wey next moves to dismiss the charges in the Indictment on various grounds.  That motion also fails.  No count is duplicitous and the Indictment here amply alleges all that must be alleged to satisfy Federal Rule of Criminal Procedure 7 and the underlying constitutional principles it was designed to protect.

### A.   Counts One Through Four, Seven, and Eight Are Not Duplicitous

Wey first argues that Counts One, Two, Three, Four, Seven, and Eight are duplicitous.  (Wey Mem. at 64-67).  The argument is meritless, as each count charges a conspiracy or single continuing scheme.

#### 1.   *Applicable Law*

An indictment is impermissibly duplicitous if (1) it combines two or more distinct crimes into one count, in contravention of Federal Rule of Criminal Procedure 8, and (2) the

---

[16] Indeed, in the two cases cited by Wey which disapprove of the Government's use of a taint team, *see United States* v. *Kaplan*, 2003 WL 22880914, at *11-12 (S.D.N.Y. 2003); *In re Search Warrant for Law Offices Executed on March 19, 1992,* 153 F.R.D. 55, 59 (S.D.N.Y. 1994), it does not appear that the defendants had the opportunity to object to the taint team's privilege determinations before the taint team provided documents to the prosecution team.

defendant is thereby prejudiced.  *See United States* v. *Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).  Duplicitous indictments can present three types of prejudice: (1) lack of notice of the crime charged and its maximum penalty; (2) the possibility that a second trial on the same charge would not be barred by the Double Jeopardy Clause, and (3) potential uncertainty with respect to the jury's verdict and the sentencing implications of that verdict.  *See id.* at 77-78.

That does not mean, however, that an indictment is prejudicial merely because it charges in one count what it could have charged in several; "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme."  *United States* v. *Vilar*, 729 F.3d 62, 79 (2d Cir. 2013) (alteration and internal quotation marks omitted).  "As long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible."  *United States* v. *Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989); *see also United States* v. *Alacri*, 968 F.2d 1512, 1518 (2d Cir. 1992); *United States* v. *Margiotta*, 646 F.2d 729, 732-33 (2d Cir. 1981) (approving the inclusion of multiple fraudulent mailings used to carry out one overarching scheme in a single mail fraud charge).  And "[i]t has been established for at least seventy years that the allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime, and that is one, however diverse its objects."  *United States* v. *Vilar*, 729 F.3d at 79 (alteration and internal quotation marks omitted).

### 2.    *The Charges Are Not Duplicitous*

Counts One charges a conspiracy to commit securities fraud and wire fraud, Counts Two and Three charge securities fraud, Count Four charges wire fraud, and Counts Seven and Eight charge money laundering.  Wey argues that each of these counts is duplicitous because "the Government's case involves the alleged market manipulation of three separate securities," and "the Indictment has identified two allegedly manipulative acts with respect to

CleanTech, but has not identified any allegedly market manipulative activity with respect to either Deer or SmartHeat."  (Wey Mem. at 65).

But Wey ignores the fact that the manipulative acts were part of a single continuing scheme.  The Indictment alleges that Wey, with the help of co-conspirators, secretly amassed stock ownership in companies that he then brought public, used various means (including the corrupt Retail Brokerage, match trading, and well-timed bulk purchases by Nominees) to artificially inflate and support the value of the shares in those companies, and then liquidated his positions for substantial profits that he subsequently laundered.  The Indictment explains that Wey used his family members and associates, and entities owned by or associated with those family members and associates, to acquire stock in certain shell companies (the "Shell Companies").  (Ind. ¶¶ 8-9).  The Indictment specifies some of the ways in which Wey exercised control of the Nominees, noting that he "possessed and exercised investment authority over shares of stock held in the names of the Nominees," "closely tracked the Nominees' holdings," and "directed other parties to take action in matters pertaining to the Nominees," including by instructing co-defendant Erbek to trade stocks in Nominee accounts.  (Ind. ¶ 9).

Next, as set forth in the Indictment, having amassed control of the Shell Companies in this manner, Wey caused those entities to engage in RTOs with Chinese operating companies that he had identified through NYGG and NYGG-Asia.  At completion of each RTO, management of the Chinese operating company would own a majority of the outstanding shares of the newly formed public company, but management's holdings would typically be subject to lock-up agreements precluding disposition of stock for a period of years.  (Ind. ¶ 11).  The "Issuers" born of these Wey-orchestrated reverse mergers included Smartheat, Deer, and CleanTech.  (Ind. ¶¶ 4-6, 12).

The Indictment further explains that, as a result of his pre-merger amassing of Shell Company stock through Nominees and the mechanics of the reverse mergers, Wey ended up controlling more than five percent of the resulting Issuers. (Ind. ¶ 13). Although applicable securities regulations—of which Wey was aware—required disclosure of this beneficial ownership, no disclosure was made. (Ind. ¶ 14). In fact, as the Indictment details, Wey structured the Nominees' holdings to "obscure from the investing public the extent to which he owned and exercised control over Issuers' stock," by ensuring that "no single one of the Nominees held a greater-than-five percent beneficial ownership interest in any of the Issuers" at a given time. (Ind. ¶ 14).

Having detailed the components of the scheme by which Wey acquired and then hid his beneficial ownership interests in the Issuers, the Indictment proceeds to outline the steps Wey took to profit from his investments. It explains that Wey used deceptive means to artificially increase the number of round-lot shareholders for some of the Issuers, so that these Issuers would be able to get listed on the NASDAQ, allowing them to trade more broadly while furnishing Wey with a better market in which to offload his holdings. (Ind. ¶¶ 15-17). The Indictment further alleges that Wey manipulated the Issuers' stock prices in various ways: (1) by causing "two retail brokers located in Manhattan to solicit their customers to buy shares of common stock of the Issuers, often on margin, while those brokers simultaneously actively discouraged the sale of these stocks by their customers" (Ind. ¶ 18); (2) by instructing his Swiss banker, Erbek, to maintain share prices "of at least two Issuers' stock held in certain of the Nominees' accounts" (*id.*); and (3) by orchestrating match trades (Ind. ¶ 19).

Finally, the Indictment describes the manner in which Wey is alleged to have caused the laundering of his illicit gains. It explains that Wey first "caused millions of dollars' worth of the Issuers' stock and cash generated from sales of [Issuer] stock to be transferred" from

U.S. accounts to overseas accounts, and then caused the proceeds to be funneled back to the United States.  (Ind. ¶¶ 21-22).

The allegations in the Indictment therefore make clear that Wey engaged in one scheme, described above, which involved Smartheat, Deer, and CleanTech, not three separate, distinct schemes involving each of those Issuers.[17]

Wey's reliance on *United States* v. *Kearney*, 451 F. Supp. 33 (S.D.N.Y. 1978)—a district court decision almost four decades old—is misplaced.  There, the court concluded that two counts of obstruction of correspondence, in violation of Title 18, United States Code, Sections 1702 and 2, and one count of interception of wire communications, in violation of Title 18, United States Code, Sections 2511(1)(a), were duplicitous.  *Id.*  Each of the obstruction counts alleged that Kearney unlawfully took mail addressed to multiple addresses and/or multiple people, over a six-or-more-month time period.  *Id.* at 35.

The court began by analyzing whether the charged statutes by their "very nature, contemplate that several separate transactions may form a single, continuing scheme, and may therefore be charged in a single count.'"  *Id.* at 36 (quoting *United States* v. *Daley*, 454 F.2d 505, 509 (1st Cir. 1972) (alteration omitted)).  The court noted that neither statute prohibited a "scheme," *id.* at 36-37, and that prosecutions brought under Section 1702 were "based on the theory of either 'one letter-one count,' i.e., each taking of a single letter is charged in a single count, or 'one depository-one count,' i.e., each taking from a single depository, despite the amount of discrete pieces of mail involved, is charged in one count." *Id.* at 36.

Here, of course, Count One charges a conspiracy, and the securities fraud and wire fraud statutes, unlike Sections 1702 and 2511(1)(a), criminalize schemes.  *See* 15 U.S.C.

---

[17] Closer to trial, the Government will propose jury instructions regarding unanimity, and a verdict form, which together will further ensure that there is no confusion or prejudice to Wey.

§ 78j(b); 18 U.S.C. §§ 1343, 1348; 17 C.F.R. § 240.10b-5; *see also United States* v. *Kurniawan*, 627 Fed. Appx. 24, 27 (2d Cir. 2015) (summary order) (holding that mail-fraud count was not duplicitous where alleged string of mailings "'could be characterized as part of a single continuing scheme'" (quoting *United States* v. *Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006))); *United States* v. *Walker*, 254 F. App'x 60, 61-63 (2d Cir. 2007) (summary order) (holding that bank-fraud count involving multiple banks and executions was not duplicitous where count "on its face charged a single scheme and which the government argued as such"). In addition, the Second Circuit has squarely held that "a single money laundering count can encompass multiple acts provided that each act is part of a unified scheme," such as "extended sequences of acts designed to obscure the provenance of dirty money." *United States* v. *Moloney*, 287 F.3d 236, 241 (2d Cir. 2002). That is precisely what the Indictment alleges here.

In any event, far from being prejudiced by what he claims to be duplicity, the Government's charging decisions actually inure to Wey's benefit. First, including all three Issuers in one overarching scheme limits the maximum penalties Wey faces. *See United States* v. *Olmeda*, 461 F.3d at 281. Second, it avoids Wey's "portrayal to the jury as the perpetrator of multiple crimes." *Id.* (internal quotation marks and alteration omitted).

For all of these reasons, the challenged Counts are not duplicitous—and certainly not prejudicially so—and the Court should deny Wey's motion to dismiss them.

## B.     Counts Two Through Six Properly State Offenses

Wey next argues that Counts Two through Six each fail to state an offense. (Wey Mem. at 67-76). For the reasons discussed below, Wey's arguments are meritless.

### 1.     Applicable Law

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the

offense charged.'"  *Vilar*, 729 F.3d at 80 (quoting Rule 7(c) (alterations omitted)).  To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *United States* v. *Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted).  Although there are circumstances in which greater specificity is required to pass muster under Rule 7(c) and the constitutional provisions it implicates, that heightened standard is limited to "very rare cases," such as those involving refusal to answer questions before Congress, in which "specification of how a particular element of criminal charge will be met . . . is of such importance to the fairness of the proceeding that it must be spelled out in the indictment."  *United States* v. *Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) (discussing the special case of *Russell* v. *United States*, 369 U.S. 749 (1962)).

Otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *Stringer*, 730 F.3d at 124 (quoting *Hamling* v. *United States*, 418 U.S. 87, 117 (1974)); *see also United States* v. *Yannotti*, 541 F.3d at 127.

Moreover, even in cases involving very bare-bones charges, courts will not dismiss the indictment absent a showing of prejudice.  *Stringer*, 730 F.3d at 124.  Where a defendant has been given sufficient notice of the charges against him by means of, for example, a criminal complaint or discovery, prejudice will not have been shown, and the indictment should stand.  *See, e.g.*, *id.* at 124-25; *Yannotti*, 541 F.3d at 127.

       *2.*   *Discussion*

       i.   <u>Count Two Sufficiently Alleges Deceptive Acts</u>

First, relying largely on *United States* v. *Finnerty*, 533 F.3d 143 (2d Cir. 2008), Wey argues that Count Two must be dismissed because it is premised merely on Wey's alleged

violation of SEC Regulation 13D, and fails to allege a deceptive act.  (Wey Mem. at 68-70).

Because Count Two is not premised solely on Wey's violation of Regulation 13D, but rather

alleges that Wey violated that regulation as part of a scheme involving deceptive acts and

market manipulation, Wey's argument fails.

The Indictment is replete with discussion of Wey's deceptive acts.  For example,

Count Two alleges (by incorporation) that "[a]lthough records associated with the Nominee

Entities . . . identify certain of the Nominee Owners as the sole shareholders, directors, and/or

signatories of the Nominee Entities, in truth and in fact, and unbeknownst to the investing

public, the Nominee Entities were actually controlled by" Wey.  (Ind. ¶ 9).  Count Two also

alleges that Wey "intentionally failed to file the requisite reports under Section 13(d) and

Regulation 13D, even though he was well aware of this reporting requirement," and that, "to

further obscure from the investing public the extent to which he owned and exercised control

over Issuers' stock," Wey "purposefully caused the Nominees' holdings to be structured in

such a way as to ensure that no single one of the Nominees held a greater-than-five percent

beneficial ownership interest in any of the Issuers."  (Ind. ¶ 14).

Count Two also alleges that Wey, in order to

satisfy the Nasdaq's round-lot shareholder requirement, . . . deceptively caused
shares of some of the Issuers to be transferred from certain of the Nominees to
dozens of WEY's friends, employees, and business associates and/or their
family members as gifts or unsolicited bonuses in increments of 100 or more,
thereby artificially inflating the number of shareholders in each of the issuers.
In certain instances, round-lot share holdings were issued in the names of
individuals who never actually received the share certificates and had no idea
they owned such shares.

(Ind. ¶ 17).  As alleged in Count Two, Wey undertook this conduct despite the NASDAQ's

warnings to the Issuers' lawyers "that gifted shares could not contribute to the minimum

shareholder requirement for listing on its exchange because such shares did not establish

'sufficient public float, investor base, and trading interest' in the company."  (Id. ¶ 17).

Count Two then goes on (again, by incorporation) to describe Wey's manipulation of the share price of Issuers' stock, including by (1) instructing brokers to solicit their customers to buy Issuer stock and discourage sales, and (2) instructing Erbek to maintain the share price of at least two Issuers' stock.  (Ind. ¶ 18).

The allegations in Count Two are thus distinguishable from the facts of *Finnerty*. *Finnerty* was a specialist on the floor of the New York Stock Exchange ("NYSE") "whose job was to match executable orders from public customers."  *VanCook* v. *SEC*, 653 F.3d 130, 139 (2d Cir. 2011) (distinguishing *Finnerty*).  *Finnerty* "was accused of trading for his own proprietary account and generating profits for himself" through a type of trading called "interpositioning."  *Id.* at 139-40.  The Government had argued that Finnerty's interpositioning violated NYSE rules and also violated Title 15, United States Code, Section 78j and Title 17, Code of Federal Regulations, Section 240.10b-5, "because his customers had expected Finnerty to abide by those rules and Finnerty had implicitly misled them."  *Id.* at 140.  The *Finnerty* court "concluded that there was 'no evidence' in the record that, through his interpositioning, Finnerty had 'conveyed an impression that was misleading' to his victims," and "noted that the government had 'identified no way in which Finnerty communicated anything to his customers, let alone anything false.'"  *Id.* (quoting *Finnerty*, 533 F.3d at 148-50).

> It was not sufficient that the customers might have "expected that Finnerty would not engage in" interpositioning simply because NYSE rules prohibit the practice; we held that "unless the customers' understanding was based on a statement or conduct by Finnerty, he did not commit a primary violation of Section 10(b)."

*Id.* (quoting *Finnerty*, 533 F.3d at 150 (alteration omitted)).

Whereas in *Finnerty* there was no evidence that "Finnerty had 'conveyed an impression that was misleading' to his victims," *id.* (quoting *Finnerty*, 533 F.3d at 149-50), Count Two alleges several ways, described above, in which Wey misled NASDAQ and the

investing public, and manipulated the share price of Issuers' stock.  Indeed, what Wey's argument to dismiss misunderstands is the nature and role of the rules at issue in each case.  In *Finnerty*, the Government alleged that Finnerty had violated Section 240.10b-5 by violating an NYSE rule regarding interpositioning.  Here, Count Two invokes SEC Regulation 13D to establish that Wey had a duty to disclose his beneficial ownership in the Issuers but did not.  Regulation 13D creates a duty to disclose that Wey intentionally flouted.  The rules at issue in *Finnerty* created no such duty.  533 F.3d at 145-46 (describing rules).  Wey took affirmative steps to circumvent Regulation 13D entirely, by spreading his holdings among numerous Nominees.  Thus, through his failure to disclose required information, Wey conveyed an impression that was misleading to the investing public, namely that he did not control more than five percent of the shares of each of the Issuers.  *Finnerty* therefore is inapposite.

Because Count Two is not premised entirely on Wey's violation of Regulation 13D, and alleges deceptive acts, the Court should deny Wey's motion to dismiss Count Two.

ii.    <u>Count Three Sufficiently States an Offense</u>

Wey next asks the Court to dismiss Count Three because it "fails to allege the essential elements of securities fraud under Title 18."  (Wey Mem. at 70).  This argument is meritless.

Oddly, Wey asserts that "[t]he Indictment fails to allege a scheme or artifice to defraud" one sentence after quoting, and emphasizing, the language in Count Three alleging that Wey "'knowingly and intentionally executed a *scheme and artifice to (a) defraud* persons in connection with securities of . . . SmartHeat, Deer, and CleanTech . . . .'"  (Wey Mem. at 70 (first ellipsis in original) (quoting Ind. ¶ 30)).  Wey therefore implicitly concedes, as he must, that Count Three in fact alleges a scheme or artifice to defraud.  In suggesting that more is required, Wey ignores well-established law, set out above, that "'the indictment or

information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged,'" *Vilar*, 729 F.3d at 80 (quoting Fed. R. Crim. P. 7(c) (alterations omitted)), and "need do little more than . . . track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Yannotti*, 541 F.3d at 127 (internal quotation marks omitted). Wey's argument therefore fails.

Relatedly, Wey's reliance on *United States* v. *Starr*, 816 F.2d 94 (2d Cir. 1987), is unavailing—not just because *Starr* concerned sufficiency of the evidence rather than sufficiency of the indictment, but also because here, as is evident from the face of the Indictment, Wey's material omissions and manipulative conduct were designed to generate an economic benefit for Wey at the expense of other market actors. *Cf. id.* at 97. Count Three alleges that Wey engaged in market manipulation and defrauded the investing public by failing to disclose his beneficial ownership in the stock of Smartheat, Deer, and CleanTech, and by manipulating the market price and demand for the stock of those companies, i.e., by "artificially affecting market activity in order to mislead investors," *Levy* v. *United States*, 626 F. App'x 319, 322 (2d Cir. 2015) (summary order). The Indictment is explicit that Wey conspired to defraud "the investing public." (Ind. ¶ 7; *see also* Ind. ¶¶ 9, (describing how, "unbeknownst to the investing public, the Nominee Entities were actually controlled by' Wey); 14 (describing how Wey structured the Nominees' holdings "to further obscure from the investing public the extent to which he owned and exercised control over Issuers' stock")).

Those allegations are more than sufficient to meet Rule 7(c)'s pleading requirements. *See United States* v. *Ageloff*, 809 F. Supp. 2d 89, 91 (E.D.N.Y. 2011) (in context of restitution decision, noting that defendant engaged in market manipulation against unsuspecting individual investors through a pump-and-dump scheme in which brokers used high-pressure sales tactics and misled customers to persuade them not to sell); *SEC* v. *Masri*,

523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007) ("[I]f an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation.").

Because Count Three sufficiently alleges the elements of securities fraud, the Court should deny Wey's motion to dismiss it.

iii.   <u>Count Four Sufficiently Alleges Wire Fraud</u>

Wey next argues that Count Four should be dismissed because it does not (1) allege that Wey intentionally deceived and contemplated some actual harm to investors (the same argument Wey made as to Count Three, addressed immediately above), or (2) identify any allegedly fraudulent wires.  (Wey Mem. at 73).

Wey's first argument is meritless for the reasons described immediately above with respect to Count Three.  As to Wey's second argument, Count Four clearly alleges that Wey

> transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, WEY and ERBEK sent certain emails communications between New York, New York and, among other places, Switzerland, in furtherance of a scheme to manipulate the market price and demand for the common stock of SmartHeat, Deer, and CleanTech.

(Ind. ¶ 32).

Again, these allegations are sufficient under Rule 7(c), but the Indictment goes farther and, despite Wey's assertions to the contrary, identifies examples of specific wire communications.  For example, Count Four alleges (by incorporation) that "on or about July 21, 2010, WEY sent an email to ERBEK, instructing ERBEK to allocate shares among the Nominees so that no one Nominee possessed more than five percent of the outstanding shares of Deer stock."  (Ind. ¶ 14).  In that same paragraph, the Indictment describes "another email sent by WEY to ERBEK on or about September 20, 2010," in which Wey "exhibited his

awareness of and intent to avoid his obligations under Section 13(d) and Regulation 13D."
(Ind. ¶ 14).

These allegations meet and exceed what is required by Rule 7(c), and the Court
should deny Wey's motion to dismiss Count Four.

iv.      Counts Five and Six Sufficiently Allege Willfulness

Wey next asks the Court to dismiss Counts Five and Six because "they fail to allege
willfulness as required by the statute." (Wey Mem. at 73).  This argument is meritless.

Counts Five and Six each allege that Wey "willfully and knowingly failed" to comply
with the requirements of Title 15, United States Code, Section 78m(d).  (Ind. ¶¶ 34, 36).
"[W]hatever 'willful' might mean for purposes of other statutes, for the purposes of Section
32(a) [i.e., Title 15, United States Code, Section 78ff], it does not encompass the requirement
that a defendant knew he was violating the law." *United States* v. *Kaiser*, 609 F.3d 556, 568
(2d Cir. 2010); *United States* v. *Dixon*, 536 F.2d 1388, 1395 (2d Cir. 1976) ("'A person can
willfully violate an SEC rule even if he does not know of its existence.'" (quoting *United
States* v. *Peltz*, 433 F.2d 48, 54 (2d Cir. 1970))).

Again, the Indictment's allegations go beyond what Rule 7(c) requires.  In addition to
the statutory allegations described above, which are alone sufficient, Counts Five and Six
also allege (by incorporation) that Wey "was well aware of" Regulation 13D's reporting
requirement and sent Erbek an email on or about September 20, 2010, in which Wey
"exhibited his awareness of and intent to avoid his obligations under Section 13(d) and
Regulation 13D by explaining that, 'Under SEC filing requirements, any individual or entity
owning more than five percent of a company's total outstanding shares must file SEC 13D or
13G forms.'"  (Ind. ¶ 14).  Counts Five and Six therefore meet and exceed Rule 7(c)'s
requirements.

66

Wey's other complaints regarding Counts Five and Six are essentially challenges to the sufficiency of the evidence.  For example, Wey argues that "[t]he Government's conclusory allegations regarding Mr. Wey's intentions based solely on his alleged awareness of the existence of the applicable securities law is wholly insufficient to establish that Mr. Wey acted willfully in not filing a Schedule 13D."  (Wey Mem. at 75).  That argument is a challenge to the sufficiency of the Government's evidence, and thus is premature and inappropriate in a motion to dismiss.  *United States* v. *Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (holding that "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment"); *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985) ("In reviewing the district court's dismissal of the indictment, we accept as true all of the allegations of the indictment . . . . Contrary assertions of fact by the defendants will not be considered."); *United States* v. *Martin*, 411 F. Supp. 2d 370, 372 (S.D.N.Y. 2006) ("[T]he sufficiency of the government's evidence . . . is not considered on a motion to dismiss the indictment.").

The Court therefore should deny Wey's motion to dismiss Counts Five and Six.

v.    <u>Counts One, Seven, and Eight Are Properly Charged</u>

Finally, Wey asks the Court to dismiss Counts One, Seven, and Eight because they are predicated on substantive charges that Wey alleges fail for reasons discussed in Wey's challenges to the substantive charges themselves.  (Wey Mem. at 76).  For the reasons discussed above, the substantive charges are properly alleged and the Court should deny Wey's motion to dismiss Counts One, Seven, and Eight.

**C.    Wey's Motion to Dismiss the Indictment on Due Process
        Grounds Should Be Denied**

Wey next moves to dismiss the Indictment on the ground that the untimeliness of the prosecution violates the Fifth Amendment's Due Process Clause.  (Wey Mem. at 79).  For the reasons set forth below, this argument is untenable.

67

"The statute of limitations is 'the primary guarantee against bringing overly stale criminal charges.'" *United States* v. *Cornielle*, 171 F.3d 748, 751 (2d Cir. 1999) (internal quotation marks omitted) (quoting *United States* v. *Marion*, 404 U.S. 307, 322 (1971)). Accordingly, the Second Circuit has "held that timely brought criminal prosecutions are only rarely dismissed." *Id.* at 752; *see also United States* v. *Alameh*, 341 F.3d 167, 176 (2d Cir. 2003) (rejecting due process argument where Government waited nearly 15 years after defendant's marriage and almost 10 years after his application for citizenship to indict him for obtaining citizenship on the basis of fraud); *cf. DeMichele* v. *Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 788-92 (2d Cir. 1999).

A defendant claiming that an indictment filed within the statute of limitations nonetheless must be dismissed on due process grounds "bears the heavy burden of proving both that he suffered actual prejudice because of the alleged pre-indictment delay *and* that such delay was a course intentionally pursued by the government for an improper purpose." *United States* v. *Cornielle*, 171 F.3d at 752; *United States* v. *Scala*, 388 F. Supp. 2d 396, 399 (S.D.N.Y. 2005). In this context, "prejudice" means "that sort of deprivation that impairs a defendant's right to a fair trial," such as "the loss of documentary evidence or the unavailability of a key witness." *Cornielle*, 171 F.3d at 752. The defendant's "proof of prejudice must be definite and not speculative." *United States* v. *Santiago*, 987 F. Supp. 2d 465, 484 (S.D.N.Y. 2013) (citing *United States* v. *Birney*, 686 F.2d 102, 105-06 (2d Cir. 1982)). "Without definite proof as to this essential element, no due process claim is stated." *Id.* (citing *Birney*, 686 F.2d at 106). Moreover, "[w]here an indictment is brought within the statute of limitations, there is a presumption that the [defendant] was not prejudiced." *Van Stuyvesant* v. *Conway*, 2007 WL 2584775, at *42 (S.D.N.Y. 2007).

Here, Wey has not overcome this "presumption," *id.*, and has not remotely carried his

"heavy burden" of proof. *Cornielle*, 171 F.3d at 752. As to the "actual prejudice" prong of

the two-part *Cornielle* test, *see id.*, Wey makes two arguments. First, Wey argues that a

> former member of the board of directors for all three of SmartHeat, Deer and
> CleanTech, now more than 70 years old, suffered a stroke in or about late
> 2015 and is living in a rehabilitation center. (Siegal Decl., ¶ 62)[.] His
> testimony would undoubtedly exculpate Mr. Wey by providing evidence
> concerning the *bona fides* of SmartHeat, Deer and CleanTech as investment
> opportunities, and contradicting the Government's theories that Mr. Wey
> somehow controlled these companies and their stock. But for the
> Government's excessive delay in pursuing this investigation, this witness in all
> likelihood would have been available to testify at a trial. The Government's
> delay may have prevented that witness from testifying at trial, thereby severely
> prejudicing Mr. Wey's defense.

(Wey Mem. at 80-81).

As a threshold matter, Wey's counsel's declaration (the "Siegal Declaration" or

"Siegal Decl.") does not support many of the points made in the lines quoted above. For

example, the Siegal Declaration says nothing about whether this witness's information would

exculpate Wey, or whether the witness would be unavailable to testify. (Siegal Decl. ¶ 62).

In fact, in the Siegal Declaration, Wey's counsel made clear that he (counsel) "recently spoke

with a potential witness." (*Id.*). If Wey's counsel was able to speak with the witness, it is

likely that the witness is not so infirm as to be unable to testify. And the fact that Wey's

counsel described the witness as "a *potential* witness" suggests that Wey might still call the

witness.

Second, Wey argues that "another important witness, a lawyer with intimate

familiarity with Mr. Wey's business practices and operations, is in his 70s and may be

suffering from failing health and unavailable to testify at trial." (Wey Mem. at 81). This

adds nothing. Individuals in their 70s are more than capable of testifying in a court of law,

and there is certainly no reason to presume a witness is unavailable for that reason alone.

Wey says nothing concrete about the state of the witness's health, the reasons for that

infirmity (such as whether the infirmity was caused or worsened by the passage of time prior

to charging), whether the witness will be unavailable in March 2017, or how that witness

would be helpful to him.

Wey's speculative assertions are hardly the sort of evidence that he can use to carry

his "heavy burden."  This case thus differs entirely from *United States* v. *Santiago*, and cases

like it, on which Wey relies.  Santiago demonstrated actual prejudice because he was able to

show that he had

> irretrievably lost the testimony of the only person, other than [the victim] and
> Santiago himself, who was present when the shooting took place . . . who has
> given several statements that at the very least undermine the Government's
> theory of the case and could well result in Santiago's acquittal on the charge of
> reckless assault.

987 F. Supp. 2d 465, 485 (S.D.N.Y. 2013).  Wey's vague assertions about two potential

witnesses simply do not rise to that level.

Rather, *Scala* is on point.  Scala argued that the Government's delay in bringing an

indictment had violated his right to due process because he (Scala) had lost the ability to

present exculpatory evidence.  388 F. Supp. 2d at 398-99.  However, though Scala claimed

that two since-deceased individuals would have exculpated him entirely on two charges, his

only support for that claim was "assertions in [his] memorandum of law as to the beliefs of

two unnamed individuals of the attitudes of [the deceased individuals] toward Scala."  *Id.* at

399. The court denied Scala's motion, emphasizing that

> [p]roof of actual prejudice must be definite and specific.  Counsel's unsworn
> assertions as to vague generalities that allegedly lead unnamed persons to
> speculate that [the deceased individuals], if alive, would give testimony
> helpful to Scala do not show that Scala's ability to present a defense has been
> substantially and actually prejudiced.

*Id.* at 399-400 (internal footnote omitted); *see also United States v. Gonzalez*, 2000 WL

1721171, at *2 (S.D.N.Y. 2000) (holding that defendant had not established prejudice where

defendant had "offered speculation in place of proof").

Here, as in *Scala*, "there is no evidence before the Court as to what [the deceased 'witnesses'] would have testified, much less specific evidence of how losing that testimony has caused [the defendant] actual prejudice," 388 F. Supp. 2d at 400.

As to the second, "improper purpose" prong of the *Cornielle* test, the defendant must prove "that such delay was a course intentionally pursued by the government for an improper purpose."  *Cornielle*, 171 F.3d at 752; *see also United States* v. *Martinez*, 1995 WL 10849, at *4 (S.D.N.Y. 1995) ("In order to establish improper delay by the Government in filing an indictment, a defendant must show that the delay was the result of an intentional device of the Government to gain tactical advantage over the accused." (internal quotation marks and alterations omitted) (citing *United States* v. *Hoo*, 825 F.2d 667, 671 (2d Cir. 1987))).

To carry his "heavy burden" on this point, *Cornielle*, 171 F.3d at 752, Wey argues that "the Government can proffer no justification for the delay."  (Wey Mem. at 82).  But the burden here is on Wey, not the Government, *e.g.*, *Cornielle*, 171 F.3d at 752, and this assertion is a far cry from a substantial allegation of the requisite "improper purpose," *id.* Wey argues that "the Government's investigation languished and/or was shut down entirely for three or more years," that the passage of time served no "legitimate investigative purpose, since it appears the Government has not uncovered any substantial new evidence since" the January 2012 searches, and that "the Government inexplicably sat on its heels for several years without any valid explanation for doing so," to the detriment of Wey's ability to defend the charges. (Wey Mem. at 82.)  But Wey does not appear to argue "that such delay was a course intentionally pursued by the government for an improper purpose." *Cornielle*, 171 F.3d at 752.  His motion therefore fails.  In any event, Wey's argument is nothing more than speculation about what the Government was or was not doing, and why the Government was or was not doing it.  Wey's argument that the Government acted in bad faith—to the extent

he is making such an argument—is based on no evidence whatsoever, and for good reason: it is not true.

For all of these reasons, the Court should deny Wey's motion to dismiss the Indictment on Due Process Grounds.

## V.   THE COURT SHOULD DENY WEY'S MOTION TO TAKE ERBEK'S RULE 15 DEPOSITION

A Rule 15 deposition is appropriate where the moving party has shown that (1) the prospective witness is unavailable for trial, (2) the witness's testimony is material, and (3) the testimony is necessary to prevent a failure of justice. *United States* v. *Cohen*, 260 F.3d 68, 78 (2d Cir. 2001).  "Unavailability is to be determined according to the practical standard of whether under the circumstances the [party seeking to take the deposition] has made a good-faith effort to produce the person to testify at trial."  *United States* v. *Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984).

Here, Wey has not shown that Erbek is unavailable.  Wey, who did not confer with the Government before filing for this Rule 15 deposition, represents that he attempted to secure Erbek's appearance in the United States to testify at Wey's trial, but that Erbek's counsel has stated that Erbek is unwilling to do so, presumably because Erbek believes he will be arrested once he enters the United States.  (Wey Mem. at 87).  However, the Government is prepared to offer Erbek safe passage to the United States for the limited purpose of testifying at Wey's trial.  Because Erbek can travel to the United States to testify at trial without the specter of being arrested, Erbek, on the current record, cannot be said to be unavailable.  It may be that in light of this safe passage, Erbek is willing to testify at the trial.  Thus, Wey's motion for a Rule 15 deposition should be denied.

## VI.   THE COURT SHOULD DENY WEY'S MOTION TO STRIKE HIS ALIASES

The Indictment references the following two aliases used by Wey: "Benjamin Wei" and "Tianbing Wei."  It is undisputed that Wey previously used these two names to identify

himself.  Because these aliases are relevant, and are neither inflammatory nor prejudicial, they are properly referenced in the Indictment and should not be stricken.

Aliases relevant to the case and not prejudicial in themselves may be set forth in the indictment and proved at trial.  *United States* v. *Dioguardi*, 428 F.2d 1033, 1040 (2d Cir. 1970) (distinguishing a non-prejudicial abbreviation of someone's real name from a "true" alias used to conceal someone's identity, which might provoke suspicion by the jury). Indeed, courts have explained that the inclusion of an alias in an indictment may well serve to obviate jury confusion where witnesses or documents refer to a defendant by his alias. *United States* v. *Rodriguez*, 734 F. Supp. 116, 128-29 (S.D.N.Y. 1990).

The alias "Benjamin Wei" is highly relevant to the crimes charged in the Indictment. As previously noted, in 2002, Wey was permanently barred by Oklahoma from securities dealing in that state.  The allegations in Oklahoma bear some striking similarity to the allegations here—that Wey was failing to disclose personal financial interests in companies the stocks of which he was promoting.  Importantly, after this sanction, and around the time he founded NYGG, Wey changed his name from "Benjamin Wei," which he had been using at the time of the sanction, to "Benjamin Wey," his current legal name.  This alias is relevant because the Government intends to offer proof of Wey's sanction in Oklahoma at trial as both background to the charged conspiracies, and/or as admissible evidence under Rule 404(b) of the Federal Rules of Evidence, to prove intent, knowledge, and/or lack of mistake in committing the charged crimes.

The second alias referenced in the Indictment, "Tianbing Wei," is also properly pled. This name was the defendant's legal name until 2004, and contrary to Wey's bald assertions, there is nothing inflammatory or prejudicial about this name.  *Cf. United States* v. *Persico*, 621 F. Supp. 842, 860-61 (S.D.N.Y. 1985) (denying motions to strike aliases "Frankie the Beast" and "Carmine the Snake").  The alias does not suggest that Wey is "inherently

suspicious" (Wey Mem. at 90); it is merely another means of identifying him.  *See United States* v. *Butler*, 351 F. Supp. 2d 121, 125 (S.D.N.Y. 2004) (Lynch, J.) (noting that references to aliases representing variant spellings of the defendant's name were proper).  Accordingly, the Court should deny Wey's motion to strike references to his aliases in the Indictment.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, the Government respectfully submits that the Court should deny Wey's motions to suppress evidence, dismiss the Indictment, prevent a privilege review, take the Rule 15 deposition of co-defendant Erbek, and strike references to Wey's aliases.

Dated: New York, New York      Respectfully submitted,
   July 8, 2016

                PREET BHARARA
                United States Attorney


          By:  _____/s/_____
                Sarah Eddy McCallum
                Michael Ferrara
                Ian McGinley
                Assistant United States Attorneys
                Tel.: (212) 637-1033/2526/2257