UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

BENJAMIN WEY and
SEREF DOĞAN ERBEK,

Defendants.

Crim. Action No.: 15-CR-00611 (AJN)

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT BENJAMIN WEY'S MOTION TO SUPPRESS**

**HAYNES AND BOONE, LLP**
**30 Rockefeller Plaza**
**New York, New York 10012**
**(212) 659-7300**
*Attorneys for Defendant Benjamin Wey*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ................................................................................................................... 3

I.   THE GOVERNMENT CANNOT DEMONSTRATE GOOD FAITH BECAUSE
     THE WARRANTS ARE DEFECTIVE ON THEIR FACE ................................................. 3

II.  THE GOVERNMENT FAILED TO DEMONSTRATE GOOD FAITH IN THE
     EXECUTION OF THE SEARCH WARRANTS ............................................................... 5

     A.   The Government's Boundless Interpretation of the Search Warrants Precludes
          Application of the Good-Faith Exception .................................................. 6

     B.   The Overseizure of Materials Precludes Application of the Good-Faith
          Exception ........................................................................................... 11

III. THE GOVERNMENT'S HANDLING OF THE ELECTRONIC DATA
     PRECLUDES ANY FINDING OF GOOD FAITH ........................................................... 12

     A.   The Government's Continued Retention and Knowingly Impermissible
          Searching of the Electronic Data in 2015 Is Inconsistent With Good Faith ........... 13

     B.   The Government's Expansion of its Search Beyond the Scope Presented to
          Magistrate Dolinger Constitutes Bad Faith ............................................... 17

     C.   The Government's Fourteen-Month Delay in Beginning its Substantive Review
          of the Seized Electronic Materials Violates *Metter* and Precludes Any Good
          Faith Finding ...................................................................................... 19

CONCLUSION ................................................................................................................ 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Andresen v. Md.*,
427 U.S. 463 (1976)..................................................................12

*People v. Thompson*,
51 Misc. 3d 693 (Sup. Ct., N.Y. Feb. 17, 2016) ...................................17

*Segura v. United States*,
468 U.S. 796 (1984)....................................................................4

*United States v. Buck*,
813 F.2d 588 (2d Cir. 1987)........................................................4, 5

*United States v. Cioffi*,
668 F. Supp. 2d 385 (E.D.N.Y. 2009) ................................................4

*United States v. Debbi*,
244 F. Supp. 2d 235 (S.D.N.Y. 2003)...........................................17, 20

*United States v. Ganias* (*Ganias I*),
755 F.3d 125 (2d Cir. 2014).......................................................16, 18

*United States v. Ganias* (*Ganias II*),
12-CR-240, 2016 WL 3031285 (2d Cir. May 27, 2016) ......................16, 18

*United States v. George*,
975 F.2d 72 (2d Cir. 1992)..........................................................4, 5

*United States v. Kow*,
58 F.3d 423 (9th Cir. 1995) ...........................................................4

*United States v. Leary*,
846 F.2d 592 (10th Cir. 1988) ........................................................4

*United States v. Leon*,
468 U.S. 897 (1984)..................................................................3, 4

*United States v. Metter*,
860 F. Supp. 2d 205 (E.D.N.Y. 2012) ........................................18, 19, 20

*United States v. Rollack*,
90 F. Supp. 2d 263 (S.D.N.Y. 1999).................................................4

*United States v. Romain,*
    15-CR-3404, 2017 U.S. App. LEXIS 1760 (2d Cir. Feb. 1, 2017) ......................................4, 5

*United States v. Rosa,*
    626 F.3d 56 (2d Cir. 2010)...........................................................................................5

*United States v. Vilar,*
    05-CR-621, 2007 U.S. Dist. LEXIS 26993 (S.D.N.Y. Apr. 5, 2007)............................4, 9, 10

*United States v. Zemlyansky,*
    945 F. Supp. 2d 438 (S.D.N.Y. 2013)..........................................................................4, 7, 10

# PRELIMINARY STATEMENT

The Government failed to carry its burden of demonstrating "good faith" sufficient to avoid the exclusionary rule for the unconstitutional general warrants at issue. The Government argues that, despite the warrants' failure to provide any reasonable guidance concerning the nature of the investigation and the scope of the search authority, the agents who conducted the search nevertheless understood from extrinsic sources what should be seized, and acted in "good faith" within that "understood" scope. For several reasons, this argument fails.

As an initial matter, the law does not permit any "good faith" argument to overcome these facially defective warrants. The warrants did not just mistakenly omit a statute or contain a mere typographical error – as a whole they failed to meet even the most basic level of particularity required by the Fourth Amendment. Thus, the good faith exception is inapplicable.

The circumstances of this case illustrate well why that is the law. While reliance on a clear-cut intervening event, such as a new warrant, might demonstrate "good faith" sufficient to excuse a Fourth Amendment violation (*see Ganias II*), demonstrating "good faith" in the circumstances of this case literally makes no sense. What does it mean to act in good faith execution of a formless warrant? How could this Court possibly ascertain, five years after the fact, any objective set of parameters against which to measure the agents' actions or intentions? Effectively, the Government seeks to grant itself the right to define the scope of its search authority *post hoc* and with the benefit of hindsight, designed to justify precisely what it did. The Government is attempting to set up a rigged game they cannot lose.

Yet even within that stilted framework, the Government's position fails, because the witnesses were unable to provide any coherent articulation of what they in "good faith" believed their authority was. They offered a dizzying variety of opinions concerning the intended scope:

from as broad as "everything concerning NYGG's and the Weys' finances" (according to former AUSA David Massey); to some subset of such documents, as limited by the entities and individuals named on Exhibit B to the warrants (according to Agent Matthew Komar); to something in between, to be determined by the discretion of the reviewing agent (Agent Thomas McGuire) or AUSA Massey (who unilaterally expanded the scope to any name "related" or "connected to" the hundreds listed on Exhibit B). And despite asserting that this was a "fairly typical securities fraud case" investigated by a securities fraud squad, the Government, on its own, expanded the scope whenever whim dictated to various money laundering, tax and health care fraud theories, adding over the years not only new theories but entirely different agencies. These warrants were, in effect, Rorschach tests for whatever scope the agents and prosecutors chose to read into them.

Further, what the agents *actually seized* cannot be squared with any of those proffered theories. Infant children's passports, school report cards, X-rays, prescription medications, ancient divorce records and personal correspondence, off-the-shelf software products and photographs of open roads and farm animals abound in the seized materials. And to the extent the witnesses conceded there were limits on their searching authority, the search team repeatedly breached those limits: narcotics and child pornography were supposedly *not* the subject of the search, yet the agents seized photos, DVDs and videos sight unseen, and asserted that if a heroin baggie had "NYGG" was printed on it, they could seize that too.

Any claim of "good faith" is also defeated by the Government's clearly improper retention and use of the electronic evidence. Notwithstanding the Government's present attempt to turn a blind eye, the unvarnished testimony revealed that the FBI fished repeatedly through the

full search database as recently as one week before the 2015 indictment, and then presented

seized evidence, clearly and consciously omitted from the 2012 search scope, to the grand jury.

The Constitution requires a properly and rationally defined search, as presented to and

authorized by a Magistrate Judge, not defined by the unfettered and variable discretion of

Government agents.  The question presently before this Court is not whether the agents were bad

people, but rather, could agents in their shoes have reasonably executed a properly limited and

particularized search, and did they do so?  The answer to both questions is no.

## ARGUMENT

### I.

### THE GOVERNMENT CANNOT DEMONSTRATE GOOD FAITH BECAUSE THE WARRANTS ARE DEFECTIVE ON THEIR FACE

As a threshold matter, the good faith exception is inapplicable because the warrants are

facially deficient.  (*See* Wey Reply Mem. (Doc. 62), pp. 23-24).  A warrant is facially deficient

where it "fail[s] to particularize the place to be searched or the things to be seized."  *United*

*States v. Leon*, 468 U.S. 897, 923 (1984).  The Supreme Court has held "that the executing

officers cannot reasonably presume [a warrant] to be valid" where it is facially deficient.[1]  *Id*.  As

discussed in more detail in Mr. Wey's moving papers, the warrants violate the Constitution

because *all* of the following are true:

- they covered *all* documents related to *the very owner-occupants of both locations*

- they failed to specify any time frame

- they broadly described a virtually limitless universe of materials that could be seized

- they failed to describe at any level of detail the alleged conduct at issue

---

[1]  In this context, the Government's subjective good faith is irrelevant.  Rather, the Court must assess the Government's objective reasonableness.  *Leon*, 468 U.S. at 919.

- they failed to identify *any* crime under investigation, by words or code section

In 1987, the Second Circuit put the Government on notice that it could not reasonably rely on an insufficiently particularized warrant. *United States v. Buck*, 813 F.2d 588, 593 n.2 (2d Cir. 1987). Following *Leon* and *Buck*, in *George* the Second Circuit confirmed that a warrant that allows the seizure of materials "without mentioning a particular crime or criminal activity to which the evidence must relate is void under the Fourth Amendment," and cannot be relied on in good faith. *United States v. George*, 975 F.2d 72, 77-78 (2d Cir. 1992). Courts in this Circuit continue to agree that the good-faith exception is inapplicable to facially deficient search warrants. *See, e.g.*, *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 454, 457 (S.D.N.Y. 2013); *United States v. Cioffi*, 668 F. Supp. 2d 385, 392 (E.D.N.Y. 2009); *United States v. Vilar*, 05-CR-621, 2007 U.S. Dist. LEXIS 26993, at *76-77 (S.D.N.Y. Apr. 5, 2007); *United States v. Rollack*, 90 F. Supp. 2d 263, 274, 277 (S.D.N.Y. 1999); *see also United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995); *United States v. Leary*, 846 F.2d 592, 602-10 (10th Cir. 1988).

The Government cites *United States v. Romain*, 15-CR-3404, 2017 U.S. App. LEXIS 1760 (2d Cir. Feb. 1, 2017) to argue that the good-faith exception applies to these warrants. *Romain* is inapposite. The sole issue in *Romain* was whether the failure to specify the statutes alone precluded the application of the good-faith exception. Here, by contrast, these warrants' failure to list the statutes was but one of a myriad of facial defects.

Also, *Romain* involved the searches of two cellular phones. Here by sharp contrast, these warrants granted law enforcement the power to enter and seize *the entire set of files of a business headquarters* and to rummage through *a family home.* They covered all paper documents and electronics at both locations. The core privacy rights envisioned by the Founders are thus unquestionably implicated. *See Segura v. United States*, 468 U.S. 796, 810 (1984). Further, in

*Romain,* the same agent reviewed the phones and prepared the warrant application, whereas here, the search was actually executed by fifteen to twenty other agents who did *not* read or receive the application paperwork, much less prepare it. Agent Komar and AUSA Massey prepared the warrant and supporting materials, *not* the searching agents.[2] (*See also* Tr. 47:1- 68:20) (Massey not present; search left to agents' discretion); (GX 6, 13) (Komar seized only one item, and could not recall any specific guidance sought from him by searching agents). *Romain* thus has no impact on the instant case. As *Buck* and its progeny have made clear, the Government cannot rely on facially defective warrants.

## II.

### THE GOVERNMENT FAILED TO DEMONSTRATE GOOD FAITH IN THE EXECUTION OF THE SEARCH WARRANTS

The Government has failed to meet its burden to demonstrate the objective reasonableness of its search in any event. *See George*, 975 F.2d at 77. The Government's good faith argument primarily hinges on the fiction that, even if the search warrants are unparticularized and overbroad, the searches are saved by the Government's good-faith execution of the warrants, because somehow the agents actually understood the parameters of their searching authority, and acted reasonably within those parameters. In this respect, the Government contends the reasonable scope was defined further for the agents by (i) the contents of the 97-page Komar Affidavit; (ii) the pre-search oral briefing; (iii) the Ops Plan; and (iv) Agent Komar's availability at the searches. But the Government failed to elicit testimony that

---

[2] In *United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010), the other case on which the Government relies, the Second Circuit again highlighted the fact that – *unlike here* – the officer who swore the affidavit and who executed the search was one and the same. *Id*. at 65. Also in *Rosa* (and unlike here), there was no evidence that that search team seized any items "unrelated to the crimes for which probable cause had been shown." *Id*. Finally, the decision in *Rosa* was largely driven by the Court's acknowledgement of the emergency, overnight circumstances in which that application arose and was presented. The Government has no such excuse here; it had weeks and months to make a considered search application. (Tr. 30:23-31:22)

any of these things limited the discretion of the searching agents *in any discernible way*.  Rather, what the Government's own witnesses revealed was their complete inability to articulate any coherent or consistent explanation of what these warrants covered (or did not cover).  For all practical purposes, the searching agents viewed these warrants as general warrants that allowed them to seize *any piece of evidence they found to be of interest*.

## A.    The Government's Boundless Interpretation of the Search Warrants Precludes Application of the Good-Faith Exception

Far from establishing that the agents operated under any "good faith" belief that there were any actual limits to the warrants' scope, the testimony showed that the Government essentially viewed its authority as *unlimited*.  The Government posits that the searching agents understood the subject of the search was securities fraud based on Massey's oral description of a "fairly routine" "pump and dump" offense, which was encapsulated by the "Ops Plan" and buttressed by the fact that the agents were primarily members of a securities fraud squad.  The testimony supports none of this, however, because (a) it provided zero support for the notion that any of that extrinsic information actually narrowed, rather than expanded, the scope of the warrants, and (b) the actual behavior of the searching agents belies any notion that they believed there were any limits to their discretion.

The Government failed to prove that the briefing that preceded the search of the NYGG Office (the "Ops briefing") conveyed any limits.  (Tr. 190:13-16)  The meeting lasted approximately 45 minutes and in part covered logistics, and no one suggested Massey read the content of the Komar Affidavit aloud at the meeting.  Massey could not recall telling the agents that there were any records they could *not* take, because he only "remember[ed] that meeting vaguely" and did not "have a recollection of what I actually said."  (Tr. 51:6-11, 69:1-8)  Komar testified that the oral briefing was a "big picture overview" where they "discussed some logistics

for the search."[3]  (Tr. 239:4-17)  Indeed, given that the face of the warrant merely listed names and types of documents, the agents more likely viewed the briefing as *expanding* the universe of documents that might be relevant to their inquiry.  In any event, the Ops briefing does not trump the defective warrants, as this Court has previously explained.  *Zemlyansky*, 945 F. Supp. 2d at 473, 475 (Fourth Amendment "animating purpose" violated where warrant was executed "on the basis of a general sense of the investigation" and "a short briefing session," not on any affidavit "presented to a neutral, detached magistrate").

Nor does the testimony support the Government's position that the Komar Affidavit (or any other non-appended materials, including the Ops Plan[4]) provided the search team with any limits on the authorized seizure.  Massey testified that he could not recall any agent other than Komar actually reviewing that affidavit.  (Tr. 71:13-17)  Komar testified (opaquely) that he made the affidavit "available" to other agents, and that he e-mailed the affidavit to "at least one agent" (Tr. 125:1-22, 185:7-20), but the Government could not locate any such e-mail.  (Tr. 228:14-230:4)  The Government therefore failed to show that any other member of the search team reviewed the Affidavit prior to the search.[5]

More to the point, neither the agents nor Massey testified that they felt at all constrained to limit their searching to evidence of securities fraud or pump and dump crimes generally, much

---

[3]  Neither AUSA Massey nor Agent Komar testified that they instructed the search team that they were to seize all business records of NYGG.  While the Government suggests that NYGG was "permeated by fraud" (Gov't Mem., p. 3), the Komar Affidavit says nothing to that effect, the agents testified that they were executing a *limited* warrant, and the Government's overall behavior was inconsistent any such notion.  (Tr. 37:20-39:5)

[4]  The Government offered no testimony that any of the searching agents actually read the Ops Plan.  In any event, the Ops Plan offers nothing more than a high-level description of offenses, the search nonetheless exceeded the scope of the offenses described in the Ops Plan.

[5]  Notably, the warrants and the Komar Affidavit were formulated weeks, if not months, prior to the searches and there was no exigency that required a sudden search.  (Tr. 30:23-31:11)  Komar acknowledged that the Government could have delayed and allowed the other agents time to review it, but chose not to.  (Tr. 186:19-25)

less the narrower theory espoused in the Ops Plan.[6]  Quite the opposite, both Massey and the agents expressly asserted the warrants covered effectively every flavor of paper-related crime – including tax fraud, money laundering and healthcare related fraud, to name a few.  Massey and McGuire took no pause before adding the IRS's own legal theories to the evidence review process in 2013.  (Tr. 353-58).  And Massey wrote that spreadsheets reflecting "family medical issues" were "within the scope of the warrant" because "we believe" Mr. Wey had committed a separate crime – never once mentioned in the Komar Affidavit – of taking unauthorized tax deductions for medical expenses.  (Tr. 78:9–79:24, and DX 4)

Further, the witnesses failed to demonstrate how their supposed "good faith" understanding that the search scope was limited to "securities fraud" guided their authority to seize evidence of such a crime, as distinguished from any other potential offense involving money or paper.  Government witnesses agreed that the warrants covered *essentially any document they might find*.  (Tr. 45:18-21)  Indeed the witnesses' *post hoc* justifications for the sundry items actually seized perfectly illustrates the falsity of the Government's premise. Massey argued that a piece of paper referencing a *de minimis* expenditure of money for allergy eye medication for the Weys' nephew might fall within the search case theory (Tr. 56:17–57:7) despite conceding that a "prescription to a child or a parent" found in the apartment would not be "within the scope" of the warrant (Tr. 47:17-48:1; 52:20-23); that press clippings concerning Mrs. Wey's collegiate tennis team were covered by the warrants because they might show how Ben and Michaela first met (Tr. 59:25-60:7; GX 23, excerpt attached hereto as Exhibit A-111-20), and that a bag of heroin, "if it said New York Global Group it would be within the scope of

---

[6]    The Government also argues that the agents' membership in a securities fraud unit demonstrates a "lack of confusion" of the search objectives even though "not made explicit."  (Gov't Mem., p. 14)  The name of the searching agents' squad cannot serve to obviate the Fourth Amendment's particularity requirement, and the Government cites no authority blessing squad identity as relevant to a good faith analysis, nor as a proxy for warrant particularity.

the warrant" (Tr. 50:5-16) despite the fact that the witnesses repeatedly asserted the warrants did *not* cover narcotics offenses.  (Tr. 12:13-15, 40:11-15, 48:6-7)  Even Agent Komar, who said the search authority was at least cabined by the Exhibit B list (Tr. 153, 197-98), conceded he might have searched the electronic evidence for terms not included in that list.  (Tr. 201)

Agent McGuire similarly testified that the search warrants authorized the seizure of all of Mr. Wey's personal financial records, no matter how tenuously connected to any "pump and dump" activities described in the 97-page Komar Affidavit.  (Tr. 304:11-14) (positing that Mr. Wey's 1998 divorce papers from a prior marriage were covered because they "talk about financial arrangements"); Tr. 271:15-272:2 (asserting a letter from *1992* was covered because it made reference to a $10,000 payment to Mr. Wey)).

In sum, these witnesses' testimony revealed that they believed these warrants gave them unlimited authority to seize virtually any item they found that was of interest to them on any subject at all.  *See Vilar*, 2007 U.S. Dist. LEXIS 26993, at *75-77 (rejecting good faith exception where witnesses testified that warrant authorized seizure of "any corporate record . . . regardless of date or subject matter").  The search warrants themselves provided no boundaries, and nothing – no Ops Plan language, no instruction at the Ops briefing, no (unspecified) guidance they supposedly received on site – provided them with any "good faith" belief that any boundaries existed.  Even if they were so advised, they did not act consistent with any such limitations.

The Government further failed to sustain its burden of proof because they called all the wrong witnesses.  At least 15 agents participated in the searches.  (Tr. 185:18-24)  The Evidence Recovery Logs show that: Agent Taylor[7] recovered 6 items (*i.e.,* boxes, folders or other

---

[7]    Agent Taylor is credited by the evidence log as having seized a suitcase (GX 13), and Agent Komar testified he was told by another agent that the suitcase contained a "trash bag" supposedly found during the search of the Wey Apartment.  (*See, e.g.*, Tr. 142:25-143:2)  While many unanswered questions remain concerning that narrative, at a minimum, Komar's testimony established both (a) he did not personally find the suitcase or

groupings of materials); Agent Lauria, 23 items; Agent Polinitza, 4 items; Agent Garwood,1

item; and Agent O'Hara, 2 items.  (GX 6, 13)  (By comparison, Agent McGuire recovered 1 item

and Agent Komar, 2 items.  *Id.*)  Yet, the Government elicited no testimony from these other

agents.  Nor did the testifying witnesses describe any basis for knowing what those other agents

were thinking at the time – no conversations, no emails, no questions posed to Agent Komar on

the scene – that could provide this Court with a basis for concluding that *the search team* acted in

good faith.  That Komar made himself "available" to answer questions, much like the

"availability" of the Komar Affidavit, is purely illusory.  At best, Agent Komar could muster two

items he asked about: a piece of "letterhead" (what this "letterhead" contained, if anything,

Agent Komar could not say), and duplicates of a glossy brochure that had already been seized.[8]

(Tr. 128:11-19; 130:7-131:3)  This testimony provides no cover here.  *See Vilar*, 2007 U.S. Dist.

LEXIS 26993, at *75 (failure to seize duplicates not evidence of good faith).  The Government

simply did not prove that any of these other agents – those who seized the vast bulk of the

evidence – acted in good faith.  *See Zemlyansky*, 945 F. Supp. 2d at 476.[9]

---

observe it *in situ*, and (b) no photograph – among the dozens taken at the scene – depicts the suitcase in the location it was supposedly found, much less shows its contents.  (Tr. 160:9-11, 157:7-159:6; DX 11)  More importantly, the suitcase contained a plethora of irrelevant and highly personal private documents involving, *inter alia*, medications, yet the Government seized and has retained those documents to this day.  (*See* GX 22)

[8]  The fact that the Government left behind some items they did not find of interest does not demonstrate that their discretion was in any way meaningfully guided.  *See Vilar*, 2007 U.S. Dist. LEXIS 26993, at *75-77 (good faith exception inapplicable even where Government left behind "30%-40% of the materials" in the area searched).

[9]  The Government largely failed to address the issue of whether it intentionally misled the Magistrate.  *Franks*, Yet, when AUSA Massey was asked whether he had reviewed any of the information that would have explained, to any *objective* observer, a significant rise in the share price for DEER (*e.g.*, analyst reports, Chinese stock indices, and financings), he responded that he "probably" did.  (Tr. 101:4-13)  Accordingly, the Government intentionally suppressed information that would have significantly undermined its case for probable cause.

**B.     The Overseizure of Materials Precludes Application of the Good-Faith Exception**

The Government also failed to show that the items seized comport with any good faith understanding of the agents' limited searching authority.  To the contrary, and beyond the sheer volume,[10] the contents of the search materials show the agents operated without guidance.

The Government posits that, at the very least, the search team understood it should not seize items not be relevant a "fraud" investigation.  The witnesses attested that *at least* the following would be outside any reasonable interpretation of these warrants: (i) child pornography; (ii) resumes; (iii) prescriptions for Michaela Wey's birth control; and (iv) X-rays.  However, despite this testimony, the Government *actually seized* resumes of persons whose names did not appear on Exhibit B to the warrant (GX 23, 26, excerpts annexed hereto as Exhibit B),[11] several prescriptions and medication related documentation including Mrs. Wey's birth control, the Wey children's amoxicillin, and health examination and intake forms for the Wey children (GX 22, excerpts annexed hereto as Exhibit C, X-rays of Mrs. Wey's pelvis (GX 23), and a plethora of media, including discs, photographs (both hard prints and all digital photo storage items like SD cards), and VHS,[12] and photo negatives wholly unrelated to the investigation.  (GX 23, examples include photographs of a dirt road, a horse, and farmland, among other things, attached hereto as Exhibit A-006-031)[13]  Thus, even assuming a limiting

---

[10]   20 electronic storage devices were seized from the NYGG Office (Tr. 134:5-6); 17 boxes and 27 electronic devices from the Wey Apartment.  (Tr. 259:2-13; DX 14)  As Agent Komar averred, the comparatively small volume of hard copy documents seized from the Office was commensurate with the predominance of data existing there in electronic form.  (Tr. 133:20-135:15)

[11]   This is despite the fact that Agent McGuire testified that this was such an obvious exclusion that it did not even require consultation with the search team leader.  (Tr. 298:6-299:1)

[12]   The notion that child pornography was off limits thus appears to have had zero practical effect on what the agents chose to seize, since they took every form of photographic data, sight unseen.

[13]   The Government's justification for the overseizure is that the agents "would have been [at the Apartment] for three to four days, probably" if they looked at each document.  (Tr. 146:5-17)  This testimony is simply not credible. The photos of the Wey Apartment show that with the exception of the room marked "D," *the Apartment contained essentially no documents*.  Area D contained a closet with approximately 15 banker's boxes.  Fifteen

parameter as permissive as "we know certain things we should not take" can suffice to satisfy the Fourth Amendment, here, the agents could not even abide by their own flimsy restrictions.

Further, the search materials are littered with other items that are clearly outside the scope of the warrants. (GX 23, 26, examples include Mr. Wey's health insurance card, photographs of Ms. Wey's college tennis team, receipts for the purchase of bottled water, Mr. Wey's living will, a wall-size map of China, among many other items, annexed hereto as Exhibit A; and GX 23, a box of off-the-shelf office software described at GX 13, item # 26.[14])

The Supreme Court has recognized that "there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers" which require the Government to "take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy." *Andresen v. Md.*, 427 U.S. 463, 482 n.11 (1976). Here, the Government took no care in minimizing intrusions into the Wey's most personal papers, instead using these general warrants to seize all panoply of personal, irrelevant materials. Under such circumstances, good faith simply cannot be established.

### III.

### THE GOVERNMENT'S HANDLING OF THE ELECTRONIC DATA PRECLUDES ANY FINDING OF GOOD FAITH

The Government's handling of the seized electronic data also violated Mr. Wey's Fourth Amendment rights in several ways. Despite the fact that five years have passed since the searches were conducted, the Government (1) has inexplicably retained *everything*, even items the Government itself concluded, years ago, are unresponsive to the warrants, (2) searched through and marked as responsive items that were not, and for which it never established

---

agents were involved in the search, and the search lasted for more than four hours (GX 12) – meaning each agent had over 4 hours to search a single banker's box.

[14]  It bears noting that none of the items attached hereto from GX 23 were found in the garbage. They are all from elsewhere.

probable cause, (3) continued to search through the full set of data (including concededly non-responsive data) nearly *four years after* the warrants' expiration, despite *actually knowing* such searches were improper, and (4) unreasonably delayed for fourteen months before beginning a substantive review of the electronic materials.

**A.**   **The Government's Continued Retention and Knowingly Impermissible Searching of the Electronic Data in 2015 Is Inconsistent With Good Faith**

Nearly four years after the warrants were issued, and two years after Agent McGuire completed his designation of responsive versus non-responsive materials within the electronic data, the FBI ran new searches through the full set again – including through data they previously determined to be outside the scope of the warrants[15] – despite that those agents knew it was improper to do so.  (Tr., 368:9-14; 369:1-13; 369:21-24; *see also* DX 2).  Then, days thereafter, the Government took the results of that very search and presented those tainted fruits to the grand jury, which promptly returned an indictment based on that evidence.  Going back to the well in this manner was a clear violation of the law in this Circuit and of Mr. Wey's rights, and no "good faith" argument can cleanse that knowing violation.

More specifically, in late August and early September 2015, Agent Elizabeth Miller was enlisted by Agent McGuire to run searches across *the entire electronic database* and locate documents responsive to a list of search terms, as well as identify documents within the entire electronic data set that were "similar" to certain documents she was presented by McGuire.  (Tr., 368:9-14; 369:1-13; 369:21-370:8; 370:22-371:3; 372:1-7; 374:2-16)  While Agent Miller could not recall the full list of search terms she received from McGuire, she did recall "Dogan Erbek" (a name not on Exhibit B) was among them.  (*Id.*, 369:25-370:8)  After identifying documents responsive to those various searches, Miller removed some potentially privileged items before

---

[15]   The Government took no steps to purge the non-responsive electronic data from the FBI's review platform following the conclusion of McGuire's substantive review in 2013.  (Tr., 334:20-335:3)

delivering the balance of the search set.  The 2015 search took Miller approximately two weeks to complete, and resulted in the identification of approximately fifty documents.  (*Id.*, 372:11-13; 375:2-10; DX 21)  The purpose of this exercise, as McGuire made clear, was "in preparation for the indictment."  (Tr. 349:14-23; *see also* 337:7-338:18).

Miller's testimony concerning the 2015 searches flatly contradicted that of McGuire, who attempted to paint a much more innocuous picture: McGuire testified that he gave Miller precise instructions to re-locate a handful of specific items he had previously marked in 2013 as responsive, allegedly telling her to find "that exact same document," "find this specific document."  (*Id.*, 336:2-339:19)  Miller testified, un-coached and candidly to the contrary, that McGuire instructed her to run search terms, and to find not only the "couple" of documents McGuire showed her, but also any documents that were "similar" to those documents.  McGuire also gave Miller a list of search terms which she was instructed to (and did) run across the *entire* database in search of additional documents for the Government.  (*Id.*, 368:9-14; 369:1-13; 369:21-370:8; 370:22-371:3; 372:1-7; 374:2-16)  After completing her review and entering her results into the CART system, the non-privileged items Miller identified were made available to McGuire.  (*Id.*, 372:6-373:15)  Given that McGuire understood clearly in 2015 that the FBI was *no longer permitted* to search the entire database (*id.*, 338:14-15 ("We decided that in 2015 we could not continue to do searches . . .")), his attempt to sanitize these events is not surprising.

Moreover, as Miller's testimony makes clear, despite being tasked with a substantive review of the electronic data set, she did not clearly understand the scope of search warrants:

> THE COURT:     Were you given any guidance as to the scope of the search warrant in this case or just here are search materials, find those documents, here are some documents, see if you can find similar documents?

THE WITNESS:  I was just given a very brief summary of the case, so I just had some knowledge of what I could – what I should be looking for.  *But I was not given a full scope of what the search warrant entailed.*

(*Id.*, 375:1-8) (emphasis added)

An access data report generated by the FBI (the "FTK report") on September 2, 2015 reflects that bookmarks were created that relate to, among other things, the term "Dogan Erbek," from a database containing *at least three million documents.*[16]  (DX 2; Tr. 383:8-25; 387:14-25; 388:9-14: 389:10-390:5; 390:24-391:10)  The FTK report reflects that Miller is the creator of the bookmarks (DX 21 at p. 8), although FBI CART Agent Brian Booth testified that he was unable to discern which documents in the FBI's system were bookmarked by Miller in 2015, as opposed to by McGuire in 2013.  (Tr. 394:12-24)  Just six days after this FTK report was run, the Government presented this case to the grand jury for indictment using the documents identified by Miller.  (*Id.*, 337:3-339:8; Doc. 2)

The Government disingenuously attempts to dismiss the significance of Miller's 2015 searches, suggesting she was merely employed as a taint agent to identify documents previously marked responsive by McGuire, and claiming that, in any event, "*prior to the use* or review of any of the items Miller had located, the computer problem was corrected and her work was not used."  (Gov't Mem. at 20) (emphasis added)  This flatly misrepresents the record.  McGuire actually said that the alleged software issue was not fixed until "two months later[,]" long after the case was presented to the grand jury.  (Tr., 337:3-339:8)  It cannot be disputed that Miller's work began in late August (*see* DX 20), was completed within a couple of weeks (Tr. 372:11-14), was captured in an FTK report run on September 2, 2015 (*see* Ex. 21) and that her work was for purposes of presenting the very evidence she pulled to the Grand Jury (Tr. 337:15-19).  The

---

[16]  By contrast, McGuire attested that in his 2013 review, he identified approximately 105,000 responsive items in the electronic search data.  (Declaration of Thomas McGuire dated July 8, 2016 (Doc. 55), ¶ 8); Tr. 334:14-16)

Grand Jury indicted Mr. Wey and Mr. Erbek on September 8, 2015, well before the computer problem was resolved (according to McGuire). Taken together, this record quite clearly indicates that Miller's results were presented to the Grand Jury.[17]

While ascertaining the full scope of the taint from the Government's actions may require further inquiry, what cannot be disputed is that Agent Miller conducted a *completely new review* of the *entire set* of electronic search materials in 2015, without even having access to the warrants (let alone the Komar Affidavit, the Ops Plan, Massey's briefing or any other guidance); Miller pulled between 50 and 150 documents from the electronic database (though the Government has not provided any definitive number);[18] and Miller's results were integrated with, and have now become perhaps permanently indistinguishable from McGuire's 2013 search results. The foul identified by the Second Circuit in *United States v. Ganias (Ganias I)*, 755 F.3d 125 (2d Cir. 2014) has thus been fully realized: the Government seized a full set of Mr. Wey's materials in 2012, kept it for four years, repeatedly returned to the well to run searches – including searches not authorized on the face of the original warrants – and used those fruits to indict Mr. Wey. And since the Government never sought a new warrant in 2015 to run those expanded searches, nothing in *Ganias II*'s good faith analysis saves this search.

Here, the Government's more than four-year retention of the documents seized from NYGG and the Wey Apartment – while purging nothing, even after requests for their return, and even after this motion was filed – precludes any finding of good faith, and constitutes a blatant violation of Mr. Wey's Fourth Amendment rights. *See, e.g.*, *United States v. Ganias* (*Ganias II*), 12-CR-240, 2016 WL 3031285, at *25 (2d Cir. May 27, 2016) (Chin, J. dissenting) ("Once

---

[17] To the extent there is any doubt remaining as to this issue, it is within the Government's power to clear up any confusion by producing the Grand Jury minutes.

[18] The FTK report itself suggests a file count of 127. (*See* DX 21 at 8) McGuire's contemporaneous email suggests Miller located "about 150 documents." (DX 20)

responsive files are segregated or extracted, the retention of non-responsive documents is no longer reasonable . . . At that point, the Government's overseizure of files and continued retention of non-responsive documents becomes the equivalent of an unlawful general warrant."); *United States v. Debbi*, 244 F. Supp. 2d 235, 238 (S.D.N.Y. 2003) (Fourth Amendment violation where the Government "felt free to invade Debbi's home, seize his records without meaningful limitation and restraint, pick over them for months thereafter without determining which were actually evidence of the alleged crimes, and even now refrain from returning what it was never entitled to seize."); *People v. Thompson*, 51 Misc. 3d 693, 716 (Sup. Ct., N.Y. Feb. 17, 2016) ("the notion that the People are entitled to retain 100,000 of the Defendant's emails and continue to search them for responsive material for a period which has now extended for more than four years is plainly unreasonable.").

As the *Thompson* court explained:

> The best analogy here is to a warrant authorizing the search of voluminous paper and files and records.  When a warrant is issued which authorizes a search of paper records, the government is entitled to search the files and seize responsive material.  They are not permitted to search the files, seize responsive material and then retain files they have never identified as relevant for multiple years because, at some later time, they might want to search the files again.  A search warrant which authorizes a search of voluminous digital records is no different . . . It is not a license for the government to retain tens of thousands of a defendant's non-relevant personal communications to review and study at their leisure for years on end.

51 Misc. 3d at 716.  Here, the Government did just that.

## B.     The Government's Expansion of its Search Beyond the Scope Presented to Magistrate Dolinger Constitutes Bad Faith

While the Government's conduct in 2015 is the most shocking violation, its conduct violated the law much earlier as well.  In reviewing the electronic materials in 2013, McGuire used a search term list provided to him by Massey containing more than one-hundred *additional* names and entities beyond those contained on Exhibit B.  (Tr., 90:11-25; GX 19)  Indeed, at least

some of the added names were known to the Government prior to its application for the search warrants, but for which the warrants failed to demonstrate probable cause.  (*See* GX 9, 10, 19; Reply Declaration of David Siegal dated August 12, 2016 (Doc. 61), Ex. 47).  That is, these are names for which the Government *actually understood it lacked probable cause.*  Nevertheless, 15 months later and with no new warrant application, the Government added those names to its expanded searches.

For example, the May 2013 search list contained the names "Dogan Erbek," "Otakar Ungerman," and "Tereza Ungerman (Ungermanova)."  (GX 16)  Massey and Komar discussed these individuals and their potential relevance to the investigation on January 12, 2012 – thirteen days before the searches.  (DX 7, 8)  However, they did not include these names – for which they concededly did *not* have probable cause to search – on Exhibit B, nor mention them in the supporting affidavit.  (GX 2, 3, 9, 10; Tr. 94:7-9))  Instead, in May 2013, the Government simply searched for materials relating to these individuals anyway, without obtaining new permission from any judge.

The Government failed to articulate any cognizable theory under which these additional names were added: while Massey testified that additional names on the list were included because they were "directly related" or "sufficiently closely connected" to the Exhibit B names, he was unable to explain what he meant by "related" or "connected" other than to say some of the terms provided "further details" on names that were already on the list.  (Tr., 98:11-23; 112:7-113:114:10; *see also* DX 10)  What he meant was, whatever Massey *felt* was related was deemed to be related.  If this does not epitomize unfettered discretion granted (and taken) by a boundless warrant, nothing does.  *See, e.g.*, *United States v. Metter,* 860 F. Supp. 2d 205, 216 (E.D.N.Y. 2012); *Ganias I*, 755 F.3d at 138-139; *Ganias II*, 2016 WL 3031285, at *25.  That

Massey is engaging in this thought process *15 months after the FBI left the Weys' apartment,* with the benefit of all additional investigation conducted during that time, further accentuates the violation. The Government could never have engaged in this re-imagining of its search instructions had the locations contained merely hard copy materials, because they would never be allowed to reenter the property in May 2013 without a new warrant. But because electronic images were seized, the Government's ability to abuse the process became possible.[19]

**C.**   **The Government's Fourteen-Month Delay in Beginning its Substantive Review of the Seized Electronic Materials Violates *Metter* and Precludes Any Good Faith Finding**

The unwarranted delay in beginning to review the seized materials also demonstrates the Government's lack of good faith. Despite the fact that the Government knew the seizure would involve the imaging of multiple electronic devices, and its anticipation that a taint team review would be necessary before any substantive review could begin, the electronic data was not even loaded to a search platform for months, and the privilege review dragged on for more than a year after the warrants were executed. (Tr., 89:8-90:10; 147:14-149:9; 195:5-7; *see also* DX 6) Substantive review of the electronic materials did not begin until the spring of 2013, more than fourteen months after the seizure, and was not completed until September 2013.[20]

The Government was well aware of precedent in this Circuit holding that they must "complete [their off-site] review . . . within a 'reasonable' period of time." *Metter,* 860 F. Supp. at 211-12. (Tr., 309:23-310:9) In *Metter*, which was decided in May 2012, the Court found that

---

[19]   McGuire's testimony that the added search terms were merely used as a method for locating items "responsive to the warrants" is also circular in the context of a warrant for which there are no parameters. McGuire never testified that, to be "responsive" in his mind, a document had to contain a name on Exhibit B. Nor did he say that when he ran, *e.g.,* "Dogan Erbek" or "Mary Chantal," that he then checked to see if *another* name that *was* on Exhibit B was in each of the items "hit" by those additional search terms. McGuire just said he checked to see that the results were "responsive" – whatever that meant, to someone with a general sense of the investigation and the benefit of additional proffers and case theories 15 months after the searches.

[20]   The Government erroneously states that Agent McGuire's substantive review of the electronic materials was complete in "June or July 2013." (Gov't Mem. at 19)

the Government's 15-month delay in reviewing electronic data seized during a search required suppression of all evidence seized during the search.  860 F. Supp. 2d at 216.  McGuire, who was tasked with the substantive review of the electronic data in May 2013, was the case agent in *Metter*, where he similarly failed to conduct a timely review.  *Id.* at 208.

The *Metter* ruling undeniably put the Government on notice that it could not indiscriminately maintain unresponsive search materials.  Despite Massey and McGuire's awareness of this decision (Tr., 86:18-25; 309:23-310:9), the Government failed to assemble a taint team until months after the warrants were executed, even though it knew one would be required (Tr., 194:22-195:7); failed to begin a substantive review of the electronic data until more than fourteen months after the search (*id.*, 307:14-22; 308:6-18; 309:5-7); and assigned *only one agent* to substantively review over three million documents.  (*Id.*, 308:6-16).

Moreover, McGuire testified that he completed his solo substantive review in *just ten days of work*.  (Tr. 285:1-5, 286:11-14)  The Government cannot claim that ten days of work by one man justifies a more than 19-month delay in completing the review of the electronic materials.  This delay is a clear violation of Mr. Wey's Fourth Amendment rights.  *See, e.g., Metter*, 860 F. Supp. 2d at 216 (15-month delay unconstitutional, warranting suppression); *Debbi*, 244 F. Supp. at 238 (same, eight months delay).  While the Government glibly ascribes the delay to a "lack of resources," nothing in the record suggests that the Department of Justice – an agency with more than 100,000 employees, over 13,000 special agents, and over 100 offices – could not assign a few additional people to actually spend a week or less looking through the seized materials in a 17-month span.  These facts simply do not support any finding of "good faith."

**CONCLUSION**

Based on the foregoing, Mr. Wey respectfully requests an Order granting his motion to suppress and suppressing the fruits of both searches.

Dated:  February 14, 2017

                              HAYNES and BOONE, LLP
                              *Attorneys for Defendant Benjamin Wey*

                    By:  s/ David Siegal
                         David Siegal
                         Sarah Jacobson
                         Joseph Lawlor
                         30 Rockefeller Plaza
                         26th Floor
                         New York, New York 10112
                         Telephone: (212) 659-4995
                         david.siegal@haynesboone.com

                         Barry F. McNeil
                         2323 Victory Avenue, Suite 700
                         Dallas, Texas 75219-7672
                         Telephone: (214)-651-5580
                         barry.mcneil@haynesboone.com

# EXHIBIT A
# Excerpts From GX 23
# Filed Under Seal

# EXHIBIT B
# Excerpts From GX 23 and 26
# Filed Under Seal

# EXHIBIT C
# Excerpts From GX 22
# Filed Under Seal